## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUNRISE WIND LLC,

        *Plaintiff*,

        v.

DOUGLAS J. BURGUM, in his official
capacity as Secretary of the U.S. Department
of the Interior;
1849 C Street, NW
Washington, DC 20240

UNITED STATES DEPARTMENT OF THE
INTERIOR;
1849 C Street, NW
Washington, DC 20240

MATTHEW GIACONA, in his official
capacity as Acting Director of the Bureau of
Ocean Energy Management;
1849 C Street, NW
Washington, DC 20240

BUREAU OF OCEAN ENERGY
MANAGEMENT;
1849 C Street, NW
Washington, DC 20240

KENNETH STEVENS, in his official capacity
as Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental
Enforcement; and
1849 C Street, NW
Washington, DC 20240

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,
1849 C Street, NW
Washington, DC 20240

        *Defendants*.

Civil Action No.: 1:26-cv-00028

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Sunrise Wind LLC ("Sunrise Wind") brings this Complaint for Declaratory and Injunctive Relief against Defendants Douglas J. Burgum, in his official capacity as Secretary of the Interior; the United States Department of the Interior ("Interior"); Matthew Giacona, in his official capacity as the Acting Director of the Bureau of Ocean Energy Management ("BOEM"); BOEM; Kenneth Stevens, in his official capacity as the Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement ("BSEE"); and BSEE.

## PRELIMINARY STATEMENT

1. This is an action for emergency injunctive relief and to vacate and set aside the unlawful December 22, 2025 BOEM "Director's Order" (hereinafter the "Stop Work Order"), Ex. A,[1] requiring that Sunrise Wind suspend for the next 90 days (at least) construction on the U.S. Outer Continental Shelf that was approved almost two years ago and is well underway. The Project has spent billions of dollars in reliance on these valid approvals. The Stop Work Order is invalid and must be set aside because it was issued without statutory authority, in violation of agency regulations and procedures and the Fifth Amendment's Due Process Clause, and is arbitrary and capricious.

2. The Sunrise Wind Farm and Sunrise Wind Export Cable (the "Project") is an offshore wind project located on the Outer Continental Shelf that is currently slated to deliver substantial additional energy necessary to support reliability and expected economic growth in New York State.

3. Over the course of many years, Sunrise Wind and federal regulators, including

---

[1] The Stop Work Order is also available on BOEM's website at
https://www.boem.gov/renewable-energy/state-activities/boem-sunrise-wind-suspension-letter.

Defendants, have undertaken an extensive environmental, national defense, and safety review covering every conceivable aspect of the Project's development and construction. This review, spanning three Presidential administrations, culminated almost two years ago in a consensus decision of approximately 15 federal and state agencies that the Project is both safe and consistent with federal and state law.

4.     The federal government conducted a multi-year process to review and delineate the lease area obtained by Sunrise Wind, including, but not limited to, consultation with the Department of War ("DOW").[2]  After Sunrise Wind obtained its lease through auction by the United States,[3] it worked to conduct and secure more than 20 required federal, state, and local environmental consultations, permits, and approvals as a part of the extensive review required to secure a final decision on the Project.[4]  The review also included numerous opportunities for stakeholders and members of the public to provide comments, input, and consultations.

5.     In reliance on these permits and approvals and continued coordination with relevant federal agencies, offshore construction of this multi-billion dollar Project has been underway since July 2024.  Sunrise Wind has installed 44 out of 84 monopile foundations in the ocean floor for the Project's wind turbine generators.  The offshore converter station jacket and topside have been installed, the near-shore portion of the export cable (16 miles starting from shore) has been

---

[2] Because the majority of the documents involved in the Project's consultations and approvals predate the renaming of the "Department of Defense" to the "Department of War" this complaint uses "Department of War" or "DOW," except where a quoted document or other material refers to the "Department of Defense" or "DOD."

[3] Where an assignor completed a stage of the process pertaining to Sunrise Wind's current lease, the assignor is referred to as Sunrise Wind for avoidance of confusion.

[4] *See, e.g.*, BOEM, Sunrise Wind Farm and Sunrise Wind Export Cable Project Final Environmental Impact Statement, Appendix A: Required Environmental Permits and Consultations, at Table A-1 (July 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Appendix%20A_Required%20Environmental%20Permits%20and%20Consultations_0.pdf (listing required permits and consultations).

installed, and the onshore work—including an 18-mile cable route to connect to the grid—is 90% complete. Overall, the Project is nearly 45% complete and has cost billions of dollars in reliance on the validly issued permits.

6.    Throughout 2025, Sunrise Wind participated in regular meetings with BOEM and BSEE, approximately bi-weekly, to discuss construction updates, plans, reports, mitigation agreements and other matters relating to the Project.[5] The most recent of these bi-weekly meetings occurred on December 23, 2025. During these meetings, neither BOEM nor BSEE raised any national security concerns related to the Project.

7.    Similarly, throughout 2025, Ørsted's Marine Affairs team met weekly with the U.S. Coast Guard ("USCG") for general check-ins regarding all of Ørsted's U.S. projects, including the Sunrise Wind Project and Revolution Wind Project. Representatives from BOEM, BSEE, and NOAA were frequently in attendance at USCG's invitation. The most recent of these weekly meetings was held on January 5, 2026. During these meetings, neither USCG nor any other agency attending raised any national security concerns related to the Project.

8.    The Project is projected to deliver enough domestic energy to power more than 600,000 homes in New York State. In its Q3 2025 short-term assessment of reliability the New York grid operator, New York Independent System Operator ("NYISO"), found that reliability in Long Island is projected to be deficient without the planned completion of future projects, including Sunrise Wind in 2027, noting in part, "[o]nce Sunrise Wind is delivering power as planned, the margins improve in summer 2028…"[6] The Project will support more than 3,500

---

[5] The only exception to this being the period of time of the U.S. Federal Government Shutdown from October 1, 2025 to November 12, 2025.

[6] New York Independent System Operator, Short-Term Assessment of Reliability: 2025 Quarter 3, at 9 (October, 13, 2025), https://www.nyiso.com/documents/20142/39103148/2025-Q3-STAR-Report-Final.pdf.

indirect jobs across construction, manufacturing, shipbuilding, and operations. The Project has already generated more than 1 million union labor hours across more than 1,000 local union workers.

9.    On January 20, 2025, the President issued a Presidential Memorandum that withdrew the Outer Continental Shelf from offshore wind leasing, purported to halt all new permits for offshore wind development, and required agencies to review whether existing permits and leases should be terminated, among other things.[7]

10.    On July 29, 2025, Secretary Burgum followed by issuing a Secretarial Order implementing the Presidential Memorandum and requiring the Interior Assistant Secretary of Land and Minerals Management within 45 days (*i.e.*, by September 12, 2025) to provide a report with recommendations on the effects of taxpayer-funded subsidies on the wind industry, and impacts that the development of offshore wind projects may have on military readiness, among other things.[8] There is no public indication that this deadline was met. Federal agency defendants' implementation of the Presidential Memorandum's pause on new wind energy authorizations was recently declared unlawful and set aside by the United States District Court for the District of Massachusetts. *State of New York v. Trump,* No. 25-cv-11221 (D. Mass.), Dkts. 234, 240.

11.    While halting new offshore wind energy development in the Presidential Memorandum, the President declared a "national energy emergency" in a separate executive order.[9] That "national energy emergency" order identified the "integrity and expansion of our

---

[7] Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 29, 2025) ("Presidential Memorandum").

[8] Secretarial Order 3437, "Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision-Making."

[9] Exec. Order No. 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025).

Nation's energy infrastructure—from coast to coast—[as] an immediate and pressing priority for the protection of the United States' national and economic security," but it excluded any mention of wind energy from its terms, which otherwise encompassed "oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources." *Id.* In addition, the Executive Order, "Removing Barriers to American Leadership in Artificial Intelligence" directs certain actions to "retain global leadership in artificial intelligence," which requires substantial additional power.[10]

12.    On August 22, 2025, BOEM's Acting Director issued an unlawful Stop Work Order, referring to the Presidential Memorandum, to the Revolution Wind Farm and Revolution Wind Export Cable ("Revolution Wind Project") (the "First Revolution Wind Stop Work Order"). The First Revolution Wind Stop Work Order halted offshore construction, pending BOEM's review of purported national security "concerns" and interference with reasonable uses of the Outer Continental Shelf. But DOW previously cleared the Project to proceed. The First Revolution Wind Stop Work Order did not accuse Revolution Wind of violating any law or condition of the Revolution Wind Project's approval.

13.    On September 4, 2025, Revolution Wind filed a Complaint in the U.S. District Court for the District of Columbia against the same Defendants in this case, seeking declaratory and injunctive relief against the First Revolution Wind Stop Work Order.[11] The following day, on September 5, 2025, Revolution Wind filed a Motion for Preliminary Injunction and Stay Pending Review.[12] On September 22, 2025, the U.S. District Court for the District of Columbia granted a

---

[10] Exec. Order No. 14179, Removing Barriers to American Leadership in Artificial Intelligence, 90 Fed. Reg. 8741 (Jan. 31, 2025).

[11] *See Revolution Wind, LLC v. Burgum, et. al.,* No. 1:25-cv-02999-RCL (D.D.C. Sept. 4, 2025), Dkt. 1. (Complaint for Declaratory and Injunctive Relief).

[12] *Id.*, (D.D.C. Sept. 5, 2025), Dkt. 9 (Motion for Preliminary Injunction and Stay Pending Review).

preliminary injunction against enforcement and stay pending review of the First Revolution Wind Stop Work Order after determining that Revolution Wind had demonstrated a likelihood of success on the merits of its underlying claims.[13]   Nonetheless, on December 22, 2025, BOEM's Acting Director issued a second baseless and unlawful Stop Work Order against Revolution Wind, again on purported national security concerns.

14.   Both the First Revolution Wind Stop Work Order and the Second Revolution Stop Work Orders are substantially similar to the Stop Work Order at issue in this case against Sunrise Wind.[14]

15.   On December 22, 2025, with no advance notice, BOEM issued the Stop Work Order to Sunrise Wind ordering it to "suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."   The Stop Work Order states that BOEM may further extend the 90-day suspension period.

16.   The Stop Work Order was issued without notice or a hearing and it offers no reasoning other than a conclusory assertion of "impacts to national security from offshore wind projects"—a topic that was comprehensively addressed during the Project's approval process.

17.   The Stop Work Order violates the Administrative Procedure Act ("APA"), the Outer Continental Shelf Lands Act ("OCSLA"), and the Fifth Amendment.

18.   The Stop Work Order is arbitrary and capricious: It is wholly conclusory, internally inconsistent, and overbroad.   It also ignores Sunrise Wind's obvious and substantial actions and billions of dollars of investment made in reliance on Defendants' approvals of the Project.

---

[13] *Id.*, (D.D.C. Sept. 22, 2025), Dkt. 36 (Order Granting Preliminary Injunction).

[14] BOEM issued substantially similar orders on December 22, 2025 to four other offshore wind projects, including Revolution Wind.  Revolution Wind has now supplemented its complaint to challenge the December 22, 2025 BOEM order and has moved for a preliminary injunction.  *Id.*, Dkts. 47 and 48.  The Court has set a hearing for January 12, 2026 in that case.

19.    BOEM issued the Stop Work Order—and thus directly and immediately impaired Sunrise Wind's property interests in its lease—without notice and a hearing, in violation of the U.S. Constitution and 5 U.S.C. § 558.

20.    BOEM lacked statutory authority for the Stop Work Order.

21.    If allowed to remain in force, the Stop Work Order is estimated to cost Sunrise Wind over $1 million per day.  And compounding impacts of delay risk Project cancellation, which would cause Sunrise Wind to suffer enterprise-level harm, including losses of more than $8 billion.

22.    Sunrise Wind will suffer imminent and irreparable harm if the Stop Work Order remains in force and Sunrise Wind is unable to proceed with Project construction on the Outer Continental Shelf.

23.    Sunrise Wind has carefully sequenced its construction schedule and has contracted specialized vessels necessary for Project construction.  These specialized vessels are in limited supply globally and are tightly scheduled, with little or no availability to work beyond the contracted reservation dates.

24.    If the Stop Work Order is not enjoined, there is a high risk Sunrise Wind will not complete installation of the mid- and far-shore portions of the Project's offshore export cable before the latest vessel availability date in the contract for the specialized vessel required to complete this critical work.  That could lead to significant delay of achieving first power and commercial operation, significantly undermining the Project's financial viability, ultimately leading to cancellation of the Project, causing Sunrise Wind to substantially lose its investments and expected future profits.

25.    As of the Stop Work Order, Sunrise Wind had already spent or committed more than $7 billion on the Project, and also will incur over $1 billion in breakaway costs if the Project is

cancelled.  Sunrise Wind may lose all of this investment if the unlawful Stop Work Order remains in effect.  Sunrise Wind spent these sums and incurred these financial obligations in reasonable reliance on Defendants' approval and authorization of the Project and with the expectation of due process under the law.  Sunrise Wind would also forgo billions of dollars in revenues over the life of the Project under the Offshore Renewable Energy Certificate Purchase Agreement (the "OREC Agreement") it executed with the New York State Energy Research and Development Authority ("NYSERDA").

26.    Sunrise Wind requests an order from the Court declaring that the Stop Work Order violates OCSLA, the APA, and the U.S. Constitution, and vacating and setting aside the unlawful Stop Work Order.  The Court should further grant a stay of the Stop Work Order and preliminary and permanent injunctive relief preventing Defendants from enforcing the Stop Work Order to interfere with Sunrise Wind's ability to conduct lawful activities to construct and operate the Project.

## PARTIES

27.    Plaintiff Sunrise Wind is an offshore wind energy company engaged in the construction of an approximately 924-megawatt ("MW") offshore wind farm located on the Outer Continental Shelf, in federal waters in the Atlantic Ocean approximately 30 miles east of Long Island, New York.  Sunrise Wind is a limited liability company organized under the laws of Delaware with its principal place of business in New York at 437 Madison Avenue, Suite 1903, New York, NY 10022, within New York County.  Defendants' unlawful actions are injuring Sunrise Wind by directly preventing Sunrise Wind from developing its lease, causing financial and contractual burdens, creating delay in Sunrise Wind's development of the Project on its leasehold, and depending on the length of delay, potentially jeopardizing the Project entirely.  *See*

*Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (noting that when the plaintiff is "an object of the action . . . at issue," there "should be little question" that the action "caused him injury"). Enjoining enforcement of the Stop Work Order and vacating the unlawful agency action will redress these injuries because Sunrise Wind will be able to complete its approved, lawful construction of the Project.

28.    Defendant Department of the Interior is a department of the United States that oversees BOEM and BSEE.  Its headquarters and principal place of business are located at 1849 C Street NW, Washington, DC 20240.  Its governmental activities occur nationwide.

29.    Defendant Douglas J. Burgum is the Secretary of the Interior.  He is sued in his official capacity.  In this capacity, Secretary Burgum is responsible for activities at Interior, including the actions and decisions complained of herein.

30.    Defendant Matthew Giacona is the Acting Director of BOEM and Defendant Kenneth Stevens is the Principal Deputy Director of BSEE.  Both are sued in their official capacities. Defendant BOEM and Defendant BSEE are agencies within the Department of the Interior, subject to control by Interior leadership.  BOEM's headquarters are located at 1849 C Street NW, Washington, DC 20240.  BSEE's headquarters are also located at 1849 C Street NW, Washington, DC 20240.  BOEM and BSEE are the agencies charged with managing offshore resources in federal waters on the Outer Continental Shelf, including offshore wind.  43 U.S.C. § 1337; 30 C.F.R. part 585 (BOEM); 30 C.F.R. part 285 (BSEE).  BOEM approved the Project's Construction and Operations Plan and issued the Stop Work Order.  BSEE did not issue any cessation order prior to BOEM issuing the Stop Work Order.  The governmental activities of both BOEM and BSEE occur nationwide.

**JURISDICTION, VENUE, EXHAUSTION, AND FINAL AGENCY ACTION**

31.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law pursuant to the APA, 5 U.S.C. §§ 701-706, OCSLA, 43 U.S.C. §§ 1331-1356c, and the United States Constitution.

32.    Sunrise Wind's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1361.

33.    Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703 because federal Defendants are sued in their official capacities and reside in the District of Columbia, and because "a substantial part of the events or omissions giving rise to the claim[s]" brought herein "occurred" in the District of Columbia.  28 U.S.C. § 1391(e).

34.    The Stop Work Order is final agency action subject to judicial review under 5 U.S.C. § 704.  The Stop Work Order was immediately effective, marks the consummation of Defendants' decision-making, and results in immediate, irreparable legal consequences to Sunrise Wind.

35.    There is no mandatory statutory or regulatory requirement for exhaustion of administrative remedies.  Thus, administrative exhaustion is not a prerequisite to suit.[15]

---

[15] To the extent necessary, Sunrise Wind submitted a citizen-suit notice to Federal Defendants on January 5, 2026, that complies with the statutory requirements in 43 U.S.C. § 1349(a).  Ex. C. Some courts have held that OCSLA's citizen-suit provision is inapplicable to lessees, such as Sunrise Wind.  *See, e.g.*, *Murphy Exploration & Production Co. v. U.S. Dep't of the Interior*, 167 F. Supp. 2d 1 (D.D.C. 2000), rev'd on other grounds, *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473 (D.C. Cir. 2001).  To the extent notice is required under Section 1349, Section 1349(a)(3) allows an action to be brought in court immediately after notification of the alleged violation in any case in which the alleged violation "would immediately affect a legal interest of the plaintiff."  43 U.S.C. § 1349(a)(3).  That exception applies here, as Sunrise Wind has a "legal interest" in the subject of the Stop Work Order that has been immediately and adversely affected by Interior's violation.  Either way, Sunrise Wind is entitled to relief under the APA and the Due Process Clause of the Fifth Amendment.

# BACKGROUND

## A.    The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356c

36.    OCSLA governs the leasing of the Outer Continental Shelf for energy and mineral development.  OCSLA describes the Outer Continental Shelf as a "vital national resource reserve" that "should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).

37.    To effectuate this "expeditious and orderly development," Congress amended OCSLA in 2005 to expand its reach to include advances in renewable energy, authorizing the Secretary of the Interior to grant leases to "produce or support production, transportation, storage, or transmission of energy from sources other than oil and gas," including offshore wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.  OCSLA now directs and authorizes the Secretary of the Interior to issue calls for nominations of areas to be leased for offshore wind energy and to conduct wind lease sales on the Outer Continental Shelf.  43 U.S.C. § 1356c.

38.    By providing for domestic offshore wind development, Congress sought to "enhance the energy security of the United States," to "decrease dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1 (2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept. No. 109-90, at 1 (2005).

39.    Since OCSLA's amendment in 2005, the United States has issued at least 39 commercial leases for wind development projects on the Outer Continental Shelf and has approved 11 wind projects totaling over 19 gigawatts, enough to provide electricity to millions of homes.

40.    Offshore wind leasing and development under OCSLA is subject to numerous, extensive environmental reviews and stringent safety, national security, and environmental standards.

41.    BOEM is generally responsible for the development of offshore renewable energy in federal waters.  BOEM's renewable energy program occurs in four phases: planning and

analysis, lease issuance, site assessment, and construction and operations.  BOEM conducts reviews throughout this process.

42.    During phase one, BOEM determines where it will offer leases.  BOEM first enters into task forces with States to take stakeholder input, and to plan and assess areas for potential offshore wind development.  30 C.F.R. § 585.102(e).  It then publishes a Request for Interest in the Federal Register to gauge commercial interest in wind energy development at a generalized offshore location.  30 C.F.R. § 585.116.  Taking feedback from the Request for Interest and the State task forces, BOEM selects a Wind Energy Area that appears most suitable for commercial wind energy activities, while presenting the fewest apparent environmental and user conflicts.  The next step is publication of a "Call" in the Federal Register to identify locations where there is interest in seeking commercial leases for developing wind projects and to identify site conditions and resources and avoid conflicts with other uses of the Outer Continental Shelf.  BOEM finally prepares an environmental assessment of the Call Area under the National Environmental Policy Act ("NEPA") to evaluate lease issuance.  30 C.F.R. §§ 585.210-212.  This process includes consultation with multiple federal agencies, including consultation with the DOW on potential national security issues.

43.    During phase two, BOEM makes a Proposed Sale Notice available, 30 C.F.R. §§ 585.210(b)(3), 585.213, and may, as it did here, hold a competitive lease sale.  30 C.F.R. §§ 585.220-226.

44.    During phase three, after lease issuance, a lessee may submit and have BOEM approve a Site Assessment Plan including "detailed information and analysis to assist BOEM in complying with NEPA," 30 C.F.R. § 585.611(a), and a demonstration of how the lessee's activities to assess a lease site will maintain safety and environmental protection, including "proposed

measures for avoiding, minimizing, reducing, eliminating, and monitoring environmental impacts," 30 C.F.R. § 585.610(a)(8), as well as the results of numerous geological, biological, archaeological, meteorological, and oceanographic studies and models. 30 C.F.R. § 585.610(b).

45.     During phase four, lessees must submit for BOEM's approval a Construction and Operations Plan describing, among other things: how the construction, operation, and decommissioning of the project will proceed; the results of navigational and safety risk assessments for the project's interactions with military vessels, commercial vessels, and fisheries; a detailed description of the project's safety management system; the results of geological, geotechnical, biological, archaeological, socioeconomic and oceanographic studies; detailed information on environmental hazards, water quality, biological resources (including marine mammals), threatened and endangered species, sensitive habitats, other ocean users (including fishing) and how the project will prevent, minimize, and, if necessary, ameliorate impacts to any of these; and other requirements. 30 C.F.R. §§ 585.620-628.  Among other things, the COP must demonstrate that the project is planned and proposed activities will be conducted in a manner that does not unreasonably interfere with other uses of the OCS, including those involved with national security or defense. 30 C.F.R. §§ 585.621(d).

46.     BOEM then conducts a thorough review of a project's Construction and Operations Plan, including developing an environmental impact statement ("EIS"), coordinating with other agencies (including the DOW) and interested stakeholders, as well as complying with numerous other federal laws. 30 C.F.R. § 585.628; 43 C.F.R. Part 46 (2023).[16]

---

[16] The Department of the Interior has recently revised its NEPA regulations. *See* Dep't of Interior, National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 29,498 (July 3, 2025).

47.    In practice, completing the necessary reviews requires years of careful preparation, investment, field surveys, analyses, documentation, and response to public comments before final approvals may be issued.  The Project expended over a hundred million dollars in this process.

48.    BSEE collaborates with BOEM to ensure that offshore wind projects will be constructed and operated safely, consistent with BSEE's role in developing safety and environmental regulations for the offshore wind industry.

49.    BSEE thus conducts additional review and compliance monitoring for offshore wind developments.  For example, BSEE requires lessees to submit, among other things: facility design reports and fabrication and installation reports prior to installing any facilities described in the Construction and Operations Plan, 30 C.F.R. § 285.700(a); and an Oil Spill Response Plan for review and approval, *id.* § 585.627.  BSEE also requires lessees to have a Safety Management System that will guide all activities described in the approved Construction and Operations Plan. *Id.* § 285.810.

50.    43 U.S.C. § 1337(p)(4) provides that "[t]he Secretary shall ensure that any activity under this subsection," generally covering the required procedures for granting offshore leases, "is carried out in a manner that provides for:"— "safety," "protection of the environment," "public notice and comment" on proposed leases, "protection of national security interests," and "prevention of interference with reasonable uses" of the Outer Continental Shelf, among other things.

51.    OCSLA's provision that authorizes leasing of the Outer Continental Shelf for offshore wind also provides that the "Secretary shall provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under this subsection," 43 U.S.C. § 1337(p)(5), and requires the Secretary to promulgate regulations implementing that

directive in consultation with certain Cabinet secretaries, including the Secretary of Defense. *Id.* at § 1337 (p)(8). Those regulations are found at 30 C.F.R. parts 285 (BSEE) and 585 (BOEM).

52. OCSLA's statutory text and implementing regulations provide very narrow authority and specific procedures for: (1) directing the cessation of activities on leased areas if violations occur; (2) suspending operations under any lease during a state of war or national emergency for national security reasons; and (3) suspending offshore wind leases. Neither the statute nor the regulations grant Interior, BOEM, or BSEE general authority to order cessation of activities or suspend leases based on pure policy considerations, including the alleged national security concerns articulated here.

53. One national security provision states that "[a]ll leases issued under this subchapter, and leases, the maintenance and operation of which are authorized under this subchapter, shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States after August 7, 1953, to suspend operations under any lease; and all such leases shall contain or be construed to contain provisions for the payment of just compensation to the lessee whose operations are thus suspended." 43 U.S.C. § 1341(c).

54. Another OCSLA provision states that "[t]he United States reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense; and so long as such designation remains in effect, no exploration or operations may be conducted on any part of the surface of such area except with the concurrence of the Secretary of Defense; and if operations or production under any lease theretofore issued on lands

16

within any such restricted area shall be suspended, any payment of rentals, minimum royalty, and royalty prescribed by such lease likewise shall be suspended during such period of suspension of operation and production, and the term of such lease shall be extended by adding thereto any such suspension period, and the United States shall be liable to the lessee for such compensation as is required to be paid under the Constitution of the United States." 43 U.S.C. § 1341(d). The Secretary of War has not designated the Sunrise Wind lease area as a restricted National Defense Area under OCSLA.

55.     Sunrise Wind's lease provides that BOEM may "suspend . . . operations in accordance with the national security and defense provisions of [43 U.S.C. § 1341] and applicable regulations, provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d)." Ex. B at Section 3(c). Addendum C to the Lease also includes a section on "National Security and Military Operations" that details procedures in the event of an "evacuation or suspension of activities" and for "electromagnetic emissions." *Id.* at Addendum C § 3.2-3.3. The lease further provides that, in the event of a suspension under § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations", that "[a]dvance notice will normally be given before requiring a suspension" and that the "appropriate command headquarters, military agency, or higher authority will provide information to allow the Lessee to assess the degree of risk to, and provide sufficient protection for, the Lessee's personnel and property." *Id*. at Addendum C, Sec. 3.2.2. Such "suspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours." *Id*. at Addendum C, Sec. 3.2.3.

56.     43 U.S.C. § 1334(a)(1)(B) gives BOEM authority to order "suspension or temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is

a threat of serious, irreparable, or immediate harm or damage to life . . . , to property, to any mineral deposits . . . , or the marine, coastal, or human environment."  BOEM must then provide "for the extension of any permit or lease affected by [such] suspension or prohibition . . . by a period equivalent to the period of such suspension or prohibition."  43 U.S.C. § 1334(a)(1)(B).

57.    Sunrise Wind's lease provides that "[a]ny cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities." Ex. B at Section 8.  No such finding by BOEM has been presented here and no advance warning was provided.

58.    30 C.F.R. § 585.102(a) states that BOEM "will ensure that any activities authorized in this part are carried out in a manner that provides for and reaches a rational balance among the following goals to the extent they conflict or are otherwise in tension, none of which inherently outweighs or supplants any other . . . ."  This analysis is required as part of BOEM's review process before a project is approved.

59.    30 C.F.R. § 585.105(h) purports to require lessees to "[c]onduct all activities authorized by the lease . . . in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]" of OCSLA.

60.    30 C.F.R. § 585.106, in turn, lays out the procedure that BOEM must follow if there is a suspected violation of 30 C.F.R. § 585.105(h).

61.    Specifically, BOEM may issue "a notice of noncompliance" that tells the lessee "how [it] failed to comply with this part, any order of the Director and/or the provisions of [its] lease,

grant or other approval, and will specify what [it] must do to correct the noncompliance and the time limits within which [it] must act." 30 C.F.R. § 585.106(b)-(c).

62.    BOEM's regulations provide that "[f]ailure of a lessee, operator, or grant holder to take the actions specified in a notice of noncompliance . . . within the time limit specified provides the basis for issuance of a cessation order by BSEE, as provided in 30 CFR 285.401 and/or cancellation of the lease or grant by the Secretary as provided in § 585.422." 30 C.F.R. § 585.106(d).

63.    In addition to BOEM's procedures for issuing a notice of noncompliance, under the regulations, BSEE regulations also provide that BSEE may issue a "cessation order" requiring the cessation of activities on a lease when a lessee "fail[s] to comply with an applicable law; regulation; order; or provision of a lease, grant, plan, or BSEE or BOEM approval." 30 C.F.R. § 285.401(a).  BSEE must allow lessees "a period of time to correct any noncompliance before issuing an order to cease activities." *Id.* § 285.401(a).  The only exception to that requirement is when BSEE "determines that any incident of noncompliance poses an imminent threat of serious or irreparable damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance." *Id.* § 285.400(e).  In all cases, "[a] cessation order will set forth what measures [the lessee is] required to take, including reports [it is] required to prepare and submit to BSEE, to receive approval to resume activities" on a lease. *Id.* § 285.401(b).

64.    BOEM regulations provide it may order "suspension" of a lease only to comply with judicial decrees, 30 C.F.R. § 585.417(a), or "[w]hen the suspension is necessary for reasons of national security or defense," *id.* § 585.417(b).  "A suspension is an interruption of the period of [a] lease" that extends the expiration date of the relevant period of the lease for the length in time

the suspension is in effect. *Id.* § 585.415(b). During a "suspension," "[a]ctivities may not be conducted on [the] lease . . . except as expressly authorized under the terms of the lease . . . suspension." *Id.* § 585.415(a), (c). In other words, a lease suspension "suspends" the term (i.e., length) of the lease. BOEM's regulations require that, in the event BOEM orders a suspension, BOEM's "written order will explain the reasons for its issuance and describe the effect of the suspension order on [the] lease or grant and any associated activities." *Id.* § 585.418(c).

65.    BSEE's regulations also provide that it may order a suspension of a lease to comply with judicial decrees or "when continued activities pose an imminent threat of serious or irreparable harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance." *Id.* § 285.417(a). If BSEE orders a suspension, the lessee may be required to "conduct a site-specific study that evaluates the cause of the harm, the potential damage, and the available mitigation measures." *Id.* § 285.417(b). OCSLA regulations require that, in the event BSEE orders a suspension, BSEE's "written order will explain the reasons for its issuance and describe the effect of the suspension order on [the] lease or grant and any associated activities." *Id.* § 285.418(c).

66.    The Stop Work Order cites 30 C.F.R. § 585.417(b). It "suspend[s] all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security," does not explain why suspension is "necessary" for reasons of national security, and does not otherwise state that the lease has been extended.

**B.    Multi-Year Federal Consultation and Approval Process Concluding that Sunrise Wind's Project Is Safe, Environmentally Sound, and Consistent with Federal Law**

67.    Over the course of more than a decade, Sunrise Wind has undertaken an extensive environmental and safety review, costing the company over a hundred million dollars in planning,

20

studies, surveys, and permitting.  A multitude of federal agencies reviewed and consulted on Sunrise Wind's project proposal throughout the many years of its approval process.  These reviews have resulted in thousands of pages of data and have uniformly concluded that the Project is environmentally sound, safe and consistent with federal law.

### 1.    BOEM's Review

68.    BOEM's reviews for the Project can be traced back to well before 2013, when BOEM conducted a competitive lease auction for offshore wind projects in areas offshore Rhode Island and Massachusetts.  The first BOEM-Massachusetts Intergovernmental Renewable Energy Task Force meeting occurred in November 2009 and the first BOEM-Joint Rhode Island and Massachusetts Renewable Task Force Meeting occurred in December 2010.  *See* https://www.boem.gov/renewable-energy/state-activities/renewable-energy-task-force-meetings. After task force deliberations and public comments received in response to a Request for Interest published in December 2010 and a Call for Information and Nominations published in February 2012, BOEM announced identification of the Rhode Island and Massachusetts Wind Energy Area on May 30, 2012.  *See* https://www.boem.gov/newsroom/press-releases/boem-identifies-wind-energy-area-offshore-rhode-island-and-massachusetts.    This pre-auction process included the DOW.[17]

69.    This lease auction was predicated on BOEM's environmental review and environmental assessment, including consultation with DOW.  Relevant meeting materials from December 10, 2010; May 2, 2011; and March 1, 2012, reflect early and ongoing participation by

---

[17] Meeting notes from the March 1, 2012 meeting note early input from the Naval Undersea Warfare Center - Division Newport.  *See* https://www.boem.gov/sites/default/files/uploadedFiles /BOEM/RenewableEnergy_Program/State_Activities/BOEM%20RI%20Task%20Force%20Mar ch%201%20Presentation.pdf.

Department of the Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division and the Naval Undersea Warfare Center – Division Newport.

70.    After an initial draft and public comment period in 2012, BOEM issued a 417-page environmental assessment in May 2013, which concluded that leasing and site assessment activities in the proposed lease sale area would result in no significant environmental effects.[18]

71.    BOEM conducted another lease sale offshore Massachusetts in 2015 after undertaking a separate environmental review beginning in 2012.  The final review for the second lease sale similarly concluded, after public comment, that lease issuances and site assessment activities would have "no significant impact" on the environment.[19]

72.    Sunrise Wind holds Lease OCS-A-0487.  The lease area was originally acquired in 2013.  BOEM approved the assignment of Lease Area OCS-A 0487 (formerly Deepwater Wind New England LLC) and a portion of Lease Area OCS-A 0500 (Bay State Wind LLC) to Sunrise Wind LLC, and approved the consolidation of the two lease areas via revised Lease OCS-A 0487, which was issued on March 15, 2021.[20]  In 2016, Sunrise Wind developed and submitted to BOEM a Site Assessment Plan.[21]  The Site Assessment Plan demonstrated that Sunrise Wind would conduct site assessment activities in a manner that was "safe," that would "not unreasonably

---

[18] BOEM, Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Rhode Island and Massachusetts: Revised Environmental Assessment, at 1 (May 2013), https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEM%20RI_MA_Revised%20EA_22May2013.pdf.

[19] *See* BOEM, Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf (OCS) Offshore Massachusetts, 79 Fed. Reg. 34,781, 34,781 (June 18, 2014), https://www.govinfo.gov/content/pkg/FR-2014-06-18/pdf/2014-14004.pdf.

[20] See BOEM, Sunrise Wind Farm Project Construction and Operations Plan (Dec. 23. 2023), at 89, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SRW01_COP_2023.pdf.

[21] Bay State Wind Offshore Wind Farm, Site Assessment Plan, https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/Bay-State-MA-Wind-Offshore-Wind-Farm-Project.pdf.

interfere with other uses of the [Outer Continental Shelf]," and that it would "not cause undue harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance."  30 C.F.R. § 585.606.  BOEM reviewed the Site Assessment Plan, completed its own "technical and environmental reviews," *id.* § 585.613, and approved Sunrise Wind's Site Assessment Plan in June 2017.[22]

73.    After its Site Assessment Plan was approved, Sunrise Wind undertook field surveys to understand and characterize the environment and the Project site and its potential suitability for wind energy development, including meteorological, bathymetric, geological, geotechnical, geophysical, biological, archaeological, hazard, and oceanographic surveys.

74.    Based on these extensive environmental surveys, Sunrise Wind submitted a detailed Construction and Operations Plan to BOEM in September 2020, describing the planned facilities and construction and operation activities for the Project, which it updated throughout the development process.

75.    As with the Site Assessment Plan, Sunrise Wind demonstrated in the Construction and Operations Plan that it would conduct its activities in an environmentally sound manner.  *See* 30 C.F.R. § 585.621.  The final version of the Construction and Operations Plan is thousands of pages long, including appendices, and includes the many environmental and ecological studies Sunrise Wind conducted in preparation for development.[23]

---

[22] BOEM Letter to Bay State Wind LLC (June 29, 2017), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/SIGNED_-BSW-SAP-Approval-OCS-A-0500-%281%29.pdf.

[23] *See* BOEM, Sunrise Wind Construction & Operations Plan (Mar. 2023), https://www.boem.gov/renewable-energy/state-activities/sunrise-wind-construction-and-operation-plan.

76.     As part of the Project's Construction and Operations Plan, Sunrise Wind submitted Appendix Y1 to BOEM, which included a Radar and Navigational Aid Screening Study covering airspace, radar, and other national security-related potential impacts of the project using DOW's Preliminary Screening Tool.  In addition to this study, the Project's Record of Decision[24] found that BOEM "coordinated with DOD to develop measures necessary to safeguard against potential liabilities and impacts on DOD activities," and that "[t]o protect the security interests of the United States," BOEM included various measures as conditions of approval of the Record of Decision for the Project.  Record of Decision, Appendix B, at 19-20.

77.     Appendix X of the Project's Construction and Operations Plan includes a Navigation Safety Risk Assessment ("NSRA") for the Project.[25]  This risk assessment is used by the USCG to assist with evaluating the potential impacts of the Project on the marine transportation system, including navigation safety, traditional uses of the waterways, and USCG missions. NSRA at 1. The Navigation Safety Risk Assessment did not identify any major areas of concern regarding the Project's impact on marine navigation, *id.*, and the Project voluntarily utilizes a uniform one nautical mile[26] by one nautical mile grid in a North/South/East/West orientation providing three lines of orientation as recommended by the USCG for the wind turbines to facilitate safe passage through the lease area, based on consultation with the local mariner community.  *Id.* at 90, 140, C-1.

---

[24] The Project's Record of Decision, jointly issued by BOEM, NOAA Fisheries, and the National Park Service, is available at https://www.boem.gov/renewable-energy/state-activities/record-decisionsunrise-windocs-0487.

[25] Sunrise Wind Farm Navigational Safety Risk Assessment (last revised Aug. 19, 2022), https://www.boem.gov/renewable-energy/state-activities/appendix-x-navigation-safety-risk-assessment.

[26] A nautical mile is the equivalent of 1.15 miles on land.

78.    BOEM issued a Notice of Intent to prepare an EIS under NEPA, 42 U.S.C. §§ 4321-4347, in 2021.  That began a more than two-and-a-half-year period of environmental review by the federal government involving Sunrise Wind, twelve federal agencies, four state cooperating agencies, as well as meetings and consultations with an extensive array of other stakeholders, including American Indian tribes, the fishing industry, local communities, and historic preservation organizations.

79.    After publishing the Draft EIS in 2022, BOEM held three public meetings to solicit additional input.  BOEM published the Final EIS on December 11, 2023.[27]  The Final EIS describes the extensive consultations and public involvement BOEM undertook in the process of its NEPA review, as well as many of the more than 20 federal, state, and local consultations and approvals issued for the Project.

80.    On March 29, 2024, BOEM published the notice of a Record of Decision documenting the Department of the Interior's decision to approve the Construction and Operations Plan with some modifications.[28]

81.    With respect to § 8(p)(4) of OCSLA, 43 U.S.C. § 1337(p)(4), which requires the Secretary of the Interior to consider twelve enumerated factors before authorizing energy development activity on the Outer Continental Shelf, BOEM determined that the Project "will comply with the Bureau's regulations and that the proposed activities will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other

---

[27] The Draft EIS and Final EIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/sunrise-wind.

[28] Notice of Availability of a Joint Record of Decision for the Proposed Sunrise Wind Farm Offshore New York, Massachusetts, and Rhode Island, 89 Fed. Reg. 22,117 (Mar. 29, 2024), https://www.federalregister.gov/documents/2024/03/29/2024-06752/notice-of-availability-of-a-joint-record-of-decision-for-the-proposed-sunrise-wind-farm-offshore-new.

factors listed in subsection 8(p)(4) of OCSLA." Record of Decision, Appendix B, at 1. In its assessment, BOEM evaluated each of the twelve (p)(4) factors in light of the Project's detailed Construction and Operations Plan, including the protection of the national security interests of the United States, and concluded that approval of the Construction and Operations Plan with the modifications and conditions of approval it set forth "would be in accordance with the regulations at 30 CFR part 585 and would ensure that all the activities on the OCS are carried out in a manner that provides for the factors in subsection 8(p)(4) of OCSLA." Record of Decision, Appendix B, at 30.

82.    Subsequently, on June 21, 2024, BOEM sent Sunrise Wind a Construction and Operations Plan approval letter.[29] Interior concluded that its decision was "consistent with the duties required under subsection 8(p)(4) of OCSLA, which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals." Record of Decision, at 62.

83.    That same day, BOEM sent Sunrise Wind the Conditions of Approval, which contain extensive mitigation requirements, including related to navigational and aviation safety and national security.[30]

### 2. Department of War Review

84.    As BOEM described in the Record of Decision, "[a]t each stage of the regulatory process involving Lease OCS-A 0487, BOEM . . . consulted with the Department of Defense

---

[29] BOEM, Sunrise Wind COP Approval Letter (Jun. 21, 2024), https://www.boem.gov/renewable-energy/state-activities/5774cop-approval-lettersunrise-wind-ocs-0487final-signed.

[30] BOEM, Conditions of COP Approval Lease Number OCS-A 0487 (Jun. 21, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/5774_App%20A_Sunrise%20Wind_Conditions%20of%20COP%20Approval_OCS-A%200487_FINAL.pdf.

(DoD) for the purposes of assessing national security considerations in its decision-making processes." Record of Decision, Appendix B, at 18. This consultation began in 2011 when BOEM worked with multiple agencies, including the DOW, to identify potential areas to develop commercial offshore wind. Record of Decision, Appendix B, at 18-19. The Naval Undersea Warfare Center, for example, participated in a March 1, 2012 preliminary meeting.[31] BOEM also consulted with the DOW on the environmental assessment for the Call Area, which "discusses military activities and aviation within the [Wind Energy Area]," and, following BOEM's proposal to issue leases in the entire Wind Energy Area, "the DoD concluded that site-specific stipulations, designed in consultation with the DoD, could mitigate the impact" on DOW testing training and operations in the Wind Energy Area. Record of Decision, Appendix B, at 19. BOEM further determined that, "when addressed through coordination with the DOD, impacts would be negligible and avoidable." *Id*.

85.    While reviewing the Project's COP, BOEM also coordinated with the DOW to "develop measures necessary to safeguard against potential liabilities and impacts on DOD activities." Record of Decision, Appendix B, at 19. Specifically, BOEM requested that the DOW's Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse") coordinate within the DOW to review the COP. *Id*. Following its review of the COP, the DOD Clearinghouse "identified potential impacts on Department of Navy (DON), United States Army (Army), and the North American Aerospace Defense Command (NORAD) operations", but confirmed that these impacts could be rendered "negligible and avoidable" when addressed through coordination with the DOW. *Id*. BOEM and the DOD Clearinghouse therefore

---

[31] BOEM, Rhode Island Renewable Energy Task Force Webinar Slide Deck, at 12-15 (Mar. 1, 2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/BOEM%20RI%20Task%20Force%20March%201%20Presentation.pdf.

"coordinated to address these concerns and to avoid or mitigate them," ultimately requiring the lessee to enter into a mitigation agreement with DOW. *Id.* Representative mitigation measures requested by the Clearinghouse include:

> (1) advance notice to NORAD prior to the completion of commissioning of the last wind turbine generator;
>
> (2) an $80,000 contribution for Radar Adverse-impact Management (RAM) execution; and
>
> (3) temporary curtailment of wind turbine operations for national-security purposes as set forth in the mitigation agreement. *Id.*

BOEM incorporated these measures into the Conditions of COP Approval "[t]o protect the security interests of the United States." *Id*. at 20.

86. Consistent with its COP Conditions of Approval, in 2025, Sunrise Wind entered into an agreement with what was then called the DOD, acting through the DOD Clearinghouse, and the Department of the Air Force "to mitigate any potential adverse impacts on military operations and readiness and to minimize risks to national security while allowing the Sunrise Wind Project (Project), within the BOEM lease area OCS-A 0487, to proceed with development."[32] As the DOD Agreement explained, "[a]s the Project was originally filed, its spinning turbine blades would conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth, Massachusetts Airport Surveillance Radar 8 (ASR-8)" but the "Parties have focused on de-conflicting these activities and agree that the terms [set forth] will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."[33]

---

[32] Agreement Between DOD, Department of the Air Force, and Sunrise Wind ("DOD Agreement") (Jan. 17, 2025) at § 1.A.

[33] *Id*. at § 1.B.

For example, upon request by DOD or NORAD, Sunrise Wind has agreed to immediately curtail wind turbine operations for a national security or defense purpose as defined in the agreement.[34]

87.    The Project's COP Conditions of Approval include various national security mitigation provisions relating to air surveillance radar, distributed fiber-optic sensing technology, and electromagnetic submissions as Conditions 4.2 through 4.4.

### 3.    Federal Aviation Administration and Other Airspace-Related Review

88.    The Record of Decision indicates that BOEM coordinated with the FAA during review of "the proposed facilities, project design, project activities, and fabrication and installation details in the COP."  Record of Decision, Appendix B, at 1.  With respect to onshore facilities, the COP explains that "Sunrise Wind has evaluated the Part 77.9 criteria . . . and, as required, has submitted or will submit notice to the FAA to determine if the proposed structures and construction activities will impact air navigation."[35]  With respect to offshore facilities, "the [Project] is more than 13.8 mi (12 nm; 22 km) from shore and, therefore, is not subject to FAA review, but is subject to review by BOEM, DoD, and the Department of Homeland Security."[36]  Nevertheless, the FAA supported BOEM's environmental review as a "participating agency."[37]  The FEIS indicates that Sunrise Wind "would coordinate with the DOD and FAA for air surveillance radar systems,"[38] and that "[t]he [wind turbine generators] would be lit and marked in accordance with Federal Aviation Administration (FAA). . . requirements for aviation . . . obstruction lighting."[39]  COP Condition of Approval 5.1.1 requires that the Project use "an FAA-approved vendor for the Aircraft Detection

---

[34] *Id.* at § 4.C.

[35] COP Section 1.4.2.7, at 70.

[36] COP Section 1.4.2.8, at 70.

[37] *Id.* at 4.

[38] FEIS, at 3-523.

[39] FEIS, 2-39.

Lighting System (ADLS), which activates the FAA hazard lighting. Further, the BOEM ROD states that the wind turbine generators "would be constructed under the listed FAA flight level ceiling designated within the Project area, therefore, would not affect commercial or military flight operations." Record of Decision, Appendix B, at 24. Further, numerous COP conditions of approval incorporate FAA requirements and recommendations.[40] Finally, Sunrise Wind submitted COP Appendix Y1 to BOEM, which included a Radar and Navigational Aid Screening Study covering airspace, radar, and other national security-related potential impacts of the project using DOW's Preliminary Screening Tool. According to the COP, Appendix Y1 includes an analysis "for the maximum wind turbine tip height to identify potential impacts on civilian aviation or military activities, and to screen for radar sites used by air traffic control, national defense (air defense and homeland security), and weather operations." COP, p. 4-615.

### C. State Approvals and Concurrences

89.    In addition to all of the federal environmental review described above, Sunrise Wind submitted consistency certifications to the Rhode Island Coastal Resources Management Council ("RI CRMC"), the Massachusetts Office of Coastal Zone Management, and the New York State Coastal Management Program for review for consistency, to the maximum extent practicable, with each State's approved coastal management program pursuant to the Coastal Zone Management Act, 16 U.S.C. § 1451. In 2023, all three states concurred that the project was consistent and complies with their federally approved coastal management plans.[41]

90.    The Sunrise Wind Project has also received all of its necessary state siting approvals for the required transmission infrastructure under state jurisdiction, along with many other state and

---

[40] *See* Conditions of COP Approval, conditions 3.1.1.3, 5.1.1, 5.2.3, and 7.10; ROD, at 111, 115, 120, 188.

[41] BOEM ROD, Appendix B, at 11.

local permits and approvals.

### D.    Construction of the Project Is Well Underway

91.    Sunrise Wind began the onshore construction process in July 2023, and the Project is now nearly 45% complete.

92.    Onshore activities for the Project include building a High Voltage Direct Current converter station at the Union Avenue site; connecting that to the Holbrook Substation; and connecting the export cable that runs from the offshore site to the onshore converter station, which requires building over 18 miles of onshore duct bank work and associated laydown yards.  The Holbrook Substation expansion is currently undergoing commissioning and testing, and cable installation is ongoing.  Onshore construction is over 90% complete.

93.    The offshore construction is supported by multiple port facilities in Connecticut and Rhode Island that prepare components for installation on the Outer Continental Shelf.  The Stop Work Order will result in the idling of operations at those facilities.

94.    With respect to offshore construction activities, the Project was making significant progress and construction was ongoing at the time of the Stop Work Order.  Offshore work has included site-preparation activities on the Outer Continental Shelf (including boulder clearance along the export cable corridor and rock pad installation at the offshore convertor station location), horizontal directional drill work at the export cable landfall site in New York State waters, offshore site-preparation including boulder relocation at foundation locations and along inter-array cable corridors, installing scour protection at the monopile foundation locations, and monopile foundation installation.  Sunrise Wind has also installed the nearshore portion of the offshore export cable (16 miles starting from shore).  The offshore converter station jacket and topside have been installed on the Outer Continental Shelf.  Monopile foundation installation for the Project's 84 wind turbine generators began in June 2025, having observed mandatory periods during which

no foundation installation could occur because of species-protective time-of-year restrictions.

95.    When the Stop Work Order was issued, 44 of 84 of the Project's monopile foundations had been installed.  To remain on schedule, Sunrise Wind must install all 40 remaining monopile foundations in 2026.

96.    The wind turbine generators themselves cannot be installed until the foundations are installed.  Over 90% of the wind turbine generator components have already been completed, but no wind turbine generators have been installed yet.  Prior to the Stop Work Order, wind turbine generator installation at the Project was scheduled to begin in late February 2026.

97.    Prior to the Stop Work Order, the mid- and far-shore portions of the offshore export cable scope was scheduled to begin in February 2026 with completion by July 25, 2026, when the specialized vessel is scheduled to depart for another project.  The array cables are scheduled for installation in mid-2026, based on a pre-Stop Work Order assumption that, by that point, a sufficient number of wind turbine generator foundations would have been installed so as to make array cable installation commercially feasible.

98.    Work on the Outer Continental Shelf associated with Sunrise Wind has been halted consistent with and in the manner provided by the Stop Work Order.

### E.    The Administration's Statements Against Offshore Wind Leading to the Stop Work Order

#### 1.    Anti-Wind Statements

99.    Although the President has made numerous statements over many years critical of the offshore wind industry, the President noted that, while the Administration generally does not "allow wind mills," there is an exception for "legal situation[s] where somebody committed to it a long time ago."[42]

---

[42] *See* ROLL CALL, *Remarks: Donald Trump Leads a Cabinet Meeting at the White House – August*

100.    In addition to the First Revolution Wind Stop Work Order, the Administration previously issued a similar stop work order to Empire Wind, a large wind energy project offshore of New York, in April 2025—although it should be noted that offshore construction activities for that project had just begun at the time.  The Administration later rescinded the order and claimed in a statement to the press that the rescission was a "deal" made with New York Governor Kathy Hochul regarding a new natural gas pipeline in New York.[43]

101.    Nevertheless, the President's public statements criticizing offshore wind date back at least to 2012, long before his first campaign for President.[44]

102.    The President has apparent hostility towards offshore wind, including based on statements made on the campaign trail.[45]  And even on the day of his inauguration, the President made statements against the offshore wind industry.[46]  These examples are just a few of the adverse comments made about wind energy by the President and the Secretary of the Interior.

## 2.    The Presidential Memorandum and Other Executive Memoranda

103.    On January 20, 2025, the President issued a Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review

---

*26, 2025*, at 6:48 (Aug. 26, 2025),  https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-white-house-august-26-2025/.

[43] *See* Mike Soraghan, *White House Claims Hochul 'Caved' on Gas Pipelines to Save Empire Wind*, POLITICO PRO (May 27, 2025), https://subscriber.politicopro.com/article/eenews/2025/05/27/white-house-claims-hochul-caved-on-gas-pipelines-to-save-empire-wind-00369211.

[44]  "Donald J. Trump (@realDonaldTrump), X (Apr. 23, 2012, 2:30 PM), https://x.com/realdonaldtrump/status/194493341302394880.

[45] WORKBOAT, *Trump Promises to Block Offshore Wind 'On Day One' If Elected* (May 13, 2024), https://www.workboat.com/wind/trump-promises-to-block-offshore-wind-on-day-one-if-elected.

[46] *See* ROLL CALL, *Speech: Donald Trump Hosts a Post-Inaugural Rally at Capital One Arena - January 20, 2025*, at 14:11 (Jan. 20, 2025),  https://rollcall.com/factbase/trump/transcript/donald-trump-speech-inauguration-executive-orders-capitol-one-arena-january-20-2025/#:~:text=We%27re%20not%20going,want%20windmills%20either.

of the Federal Government's Leasing and Permitting Practices for Wind Projects."  Presidential Memorandum, *supra*.

104.    The Presidential Memorandum withdraws the entirety of the unleased areas of the Outer Continental Shelf, which include over 1.4 billion acres, from all further wind energy leasing under OCSLA "until [the] [Presidential Memorandum] is revoked," Presidential Memorandum § 1, despite OCSLA's declaration that the Outer Continental Shelf "should be made available for expeditious and orderly development."  43 U.S.C. § 1332(3).

105.    The Presidential Memorandum also directs that the heads of all relevant agencies "shall not issue new or renewed approvals, rights of way, permits, leases, or loans for onshore or offshore wind projects pending the completion of a comprehensive assessment and review of Federal wind leasing and permitting practices."  That directive applied regardless of the merits or stage of development of any particular wind energy project.  Presidential Memorandum § 2(a).[47]

106.    The Presidential Memorandum halts future offshore wind leasing on the Outer Continental Shelf and states that "[n]othing in his withdrawal affects rights under existing leases in the withdrawn areas."  *Id.* § 1.  With respect to existing leases, the Presidential Memorandum directs the Secretary of the Interior to "conduct a comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases."  *Id.*

107.    The Presidential Memorandum treats offshore oil, gas, and mineral production preferentially by specifically carving out offshore "leasing related to any other purposes such as,

---

[47] On December 8, 2025, the U.S. District Court for the District of Massachusetts issued a memorandum opinion vacating the federal agency defendant' implementation of the Presidential Memorandum's pause on new wind energy authorizations as unlawful.  *New York v. Trump*, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).

but not limited to, oil, gas, minerals, and environmental conservation," from the President's withdrawal under OCSLA.

108.    This preferential treatment is highlighted by other executive actions.  For example, in an Executive Order entitled "Unleashing American Energy," the President declared: "It is the policy of the United States . . . to encourage energy exploration and production on Federal lands and waters, *including on the Outer Continental Shelf,* in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future," but the order only applies to "oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources."  Exec. Order No. 14154 at § 3(a), 90 Fed. Reg. 8353 (Jan. 29, 2025) (emphasis added).

109.    On July 7, 2025, President Trump issued Executive Order 14315 to further disadvantage offshore wind based on his personal bias against it.  Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 10, 2025).  Executive Order 14315 directed the Secretary of the Interior to identify and eliminate sources of supposed "preferential treatment" for wind and solar power and, without evidence asserted that wind and solar projects "compromise[] our electric grid", "denigrate[] the beauty of our Nation's natural landscape," and "threaten[] national security."  *Id.* §§ 1, 4. And on July 29, 2025 Secretary Burgum issued a Secretarial Order requiring the Interior Assistant Secretary of Land and Minerals Management within 45 days (e.g., by September 12, 2025) to provide a report with recommendations on the effects of taxpayer-funded subsidies on the wind industry, and impacts that the development of offshore wind projects may have on military readiness, among other things.[48]  There is no public indication that this deadline has been met.

---

[48] Secretarial Order 3437, "Ending Preferential Treatment for Unreliable, Foreign Controlled Energy Sources in Department Decision-Making."

### 3.    The Department of the Interior's First Revolution Wind Stop Work Order

110.    The First Revolution Wind Stop Work Order vaguely stated: "BOEM is seeking to address concerns related to the protection of national security interests of the United States and prevention of interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, as described in" 43 U.S.C. § 1337(p)(4), a subsection of OCSLA, and its implementing regulations at 30 C.F.R. § 585.102(a).  The First Revolution Wind Stop Work Order did not assert that the Revolution Wind Project violated the law or failed to comply with its permits and approvals.

111.    Although BOEM purported to have issued the First Revolution Wind Stop Work Order to address national security concerns and prevent interference with reasonable uses of the Outer Continental Shelf, shortly after its issuance, Interior told the press that the Stop Work Order was "in line with President Donald Trump's energy goals. . . ."  It made no reference in that statement to the First Revolution Wind Stop Work Order's stated national security and interference "concerns," but rather claimed that "experimental and expensive wind projects [] are proven failures," and that "Interior is putting an immediate stop to these costly failures."[49]  Secretary Burgum then endorsed this framing less than 45 minutes after it was first published.[50]

112.    In multiple public interviews about the First Revolution Wind Stop Work Order, Secretary Burgum made only vague references to any purported national security concerns as a justification for halting the Revolution Wind Project.  He instead referred to a list of issues including tax credits, purported marine wildlife impacts, and others, and asserted that the

---

[49] Audrey Streb, *Trump Admin Kills Massive Offshore Wind Project*, DAILY CALLER (Aug. 22, 2025, 4:00 PM), https://dailycaller.com/2025/08/22/exclusive-trump-admin-kills-massive-offshore-wind-project.

[50] Secretary Doug Burgum (@SecretaryBurgum), X (Aug. 22, 2025, 4:36 PM), https://x.com/RapidResponse47/status/1958991682034352576.

Revolution Wind Project's energy would be the most expensive electricity on the market. In an interview, Secretary Burgum said that "the offshore wind industry was really built around incredible, enormous tax subsidies" and that the First Revolution Wind Stop Work Order was part of the Administration's "whole of government look at these tax subsidies."[51]  When pressed in another interview about the purported national security justification for the First Revolution Wind Stop Work Order, Secretary Burgum made only loose references to "radar" and "undersea drones," and attempted to justify the Stop Work Order mostly on the basis of other issues, including "people that are concerned about saving the whales" and electricity prices.[52]

113.    Lee Zeldin, Administrator of the EPA, similarly acknowledged that the First Revolution Wind Stop Work Order was not based on national security concerns, stating two days after its issuance that "[t]he President is not a fan of wind, the economic impacts, the environmental impacts to fisheries," and again making no reference to national security.[53]

114.    In the same week that the First Revolution Wind Stop Work Order was issued, the President continued to indicate that the Administration would take action against wind power regardless of its many benefits or past approvals—and with no reference to national security concerns.[54]

---

[51] *See* Varney & Co., *Trump Pauses $6.2B Offshore Wind Boondoggle, Touts 'Clean Coal' Project*, at 0:15 – 2:10, FOX BUSINESS (Aug. 27, 2025), https://www.foxbusiness.com/video/6377521139112.

[52] *See* The Source with Kaitlan Collins, *After DC Police Takeover, Trump Digs in on Crime*, at 24:40 – 27:36, CNN PODCASTS (Aug. 27, 2025), https://www.cnn.com/audio/podcasts/the-source-with-kaitlan-collins.

[53] Fox News, *Lee Zeldin Backs Trump's Push for US Energy Dominance: 'Wind Isn't the Answer'* at 0:30 (Aug. 25, 2025), https://www.foxnews.com/video/6377296984112.

[54] *See* Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Aug. 20, 2025, 9:51 AM), https://truthsocial.com/@realDonaldTrump/posts/115061417084982814; *id.* (Aug. 19, 2025, 7:28 AM), https://truthsocial.com/@realDonaldTrump/posts/115055190585472069.

115.    This Court issued a preliminary injunction against the First Revolution Wind Stop Work Order on September 22, 2025. *Revolution Wind, LLC v. Burgum, et. al.,* No. 1:25-cv-02999-RCL (D.D.C. Sept. 22, 2025), Dkt. 36 (Order Granting Preliminary Injunction).  It found that the First Revolution Wind Stop Work Order was "the height of arbitrary and capricious action" because it "represent[ed] a clear change in position on the part of [BOEM], which previously certified that the project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process for the project" and "there are strong reliance interests at stake." *Id.* at Dkt. 39 (Tr. of Prelim. Inj. Hrg. 41:18-19, 41:1-5, 43:6-7 (Sept. 22, 2025) ("Tr.")). The Court also concluded that, without injunctive relief, Revolution Wind's "entire enterprise could collapse." *Id.* at 43:9-10.

### F.    The Department of the Interior's Stop Work Order

116.    Since Sunrise Wind entered into its DOD Agreement with the DOW and the Department of the Air Force on January 17, 2025 and prior to the issuance of the Stop Work Order close to a year later, no federal agency or representative ever communicated or suggested to Sunrise Wind that there were any national security-related concerns with the Project.  The DOW has not provided any notice to Sunrise Wind under the terms of its lease.

117.    Throughout 2025, other than during the government shutdown, Sunrise Wind has participated in regular, approximately biweekly meetings with BOEM and BSEE to discuss construction updates, plans, reports, mitigation agreements, and other issues related to the Project. The most recent such biweekly meeting was on December 23, 2025, the day after the Stop Work Order was issued.  Neither BOEM nor BSEE raised any national security concerns during any of these meetings.  The Sunrise Wind certification team also met weekly with BSEE throughout 2025 to discuss the certification and verification process.  The last meeting with BSEE prior to the Stop

Work Order was on December 16, 2025—less than a week before the Stop Work Order was issued. BSEE never raised any national security concerns at these meetings.

118.    Ørsted's Marine Affairs team continued to have weekly meetings, even during the government shutdown, with the Coast Guard to discuss Project construction progress and activities.   Representatives from BOEM, BSEE, and the National Oceanic and Atmospheric Administration frequently attended these meetings.   The most recent meeting was on January 5, 2026.   No agency in attendance raised any national security concerns during any of these meetings.

119.    No federal military agency provided Sunrise Wind with any communication regarding the existence of any national security concerns with the Project supporting the Stop Work Order nor did they initiate any mechanisms in the DOD Agreement.   For example, the same Project representatives participate in the U.S. Navy-sponsored Thames River (New London/Groton, CT) Users Group, where unclassified information relative to the U.S. Navy submarine base at Groton is routinely discussed.   In none of these forums have national defense issues ever been raised by any of the participants, including the DOW or the U.S. Coast Guard.

120.    Since the execution of the DOD Agreement in January 2025 and prior to issuance of the Stop Work Order, Sunrise Wind had not received any communication from any agency regarding any national security concerns related to the DOD Agreement to minimize national security risks and mitigate potential impacts on military operations and readiness, including to maintain the effectiveness of military radar systems.

121.    On December 22, 2025, Defendant Matthew Giacona issued the Stop Work Order. The Stop Work Order is a letter to Sunrise Wind directing Sunrise Wind to "suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."   Ex. A at 1.

122.    Like the First Revolution Wind Stop Work Order, the Stop Work Order is approximately one page and does not acknowledge the Project's DOD Agreement. *Id.* It states that "[b]ased on BOEM's initial review of" "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects," that it received from the DOW in November 2025, "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities." *Id.* The Stop Work Order also states that BOEM "will determine whether the national security threats relating to this project can be mitigated" and "will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled." *Id.* It "invite[d] [Sunrise Wind] to meet and confer" about these issues. *Id.* It also notes that BOEM could "further extend the 90-day suspension" pending discussions with the DOW. *Id.*

123.    As with the First Revolution Wind Stop Work Order, this Stop Work Order does not assert that the Project has violated the law or failed to comply with its permits and approvals.

124.    Sunrise Wind met with the Acting Director of BOEM in the Interior Department at 1849 C Street in Washington, D.C. on December 30, 2025, to discuss the Stop Work Order. Prior to the meeting, Sunrise Wind informed BOEM that it was bringing representatives to the meeting with Top Secret security clearances in order to have access to the classified secret information that was the basis for the Stop Work Order. The Interior Department at 1849 C Street in Washington, D.C. has a Sensitive Compartmentalized Information Facility ("SCIF") on-site. BOEM did not facilitate or accommodate the request or otherwise allow Sunrise Wind representatives with security clearances access to the classified information. At the meeting, the Interior Department's representative agreed to arrange access to and request a briefing regarding the classified information that is the basis for the Stop Work Order. No subsequent briefing or access to the

classified material that is the basis for the Stop Work Order has been provided by BOEM, the Interior Department or the DOW, despite repeated requests.  Similarly, although Sunrise Wind requested an unclassified summary and/or unclassified redacted version of the classified material, no unclassified material has been provided in response to this request.

125.    While BOEM purports to have issued the Stop Work Order to address national security concerns, Interior's public statements once again provide different and additional information than what Sunrise Wind received in the Stop Work Order.

126.    In a subsequent press release about the Stop Work Order—and nearly identical orders issued against four other offshore wind projects—Interior belatedly gave additional reasoning that was not in the Order itself:  "As for the national security risks inherent to large-scale offshore wind projects, unclassified reports from the U.S. Government have long found that the movement of massive turbine blades and the highly reflective towers create radar interference called 'clutter.'  The clutter caused by offshore wind projects obscures legitimate moving targets and generates false targets in the vicinity of the wind projects.  The Department of Energy in a 2024 report stated that a radar's threshold for false alarm detection can be increased to reduce some clutter, but an increased detection threshold could cause the radar to "miss actual targets."[55]  The 2024 Department of Energy report is not new information; this information was reflected in the DOD Agreement and was not cited in the Stop Work Order.

127.    In another offshore wind project's litigation challenging its nearly identical stop work order, Defendant Giacona stated that he reviewed the supposedly new "classified material" from the DOW on November 26, 2025—nearly a month before issuing the Stop Work Order.

---

[55] Interior, Press Release, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

Decl. of Matthew Giacona ¶¶ 9-11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 19-1.  Giacona also stated that, after his initial review, he again reviewed that classified information with "senior Department [of the Interior] leadership in early December 2025."  *Id.* ¶ 11.  To the extent an exigent issue was presented in this information that "necessitated" suspension of construction, the Government was not timely to address it.

128.    Secretary Burgum gave other rationales for these stop work orders.    On December 22, 2025, he gave an interview on Fox News in which he criticized offshore wind projects as "unreliable" and "unaffordable."[56]  The next day, in another Fox News interview, he stated that "this is the most expensive form of energy we're producing"—you could "get 1 gigawatt of power for . . . 1/5 of the price" from fossil-fuel sources—that wind energy is "not reliable, it only works when the wind is blowing," and that "people who love the whales are opposed to [offshore wind] because of the whale grounding."[57]  He added that, "if people are worried about an electricity crisis, it was self-made by the same people that support offshore wind," stating that "the grid operator . . . has shut down over 20 gigawatts of baseload in the last 5 years," and that "we have a solution right there . . . , which is natural gas from Pennsylvania, which would generate power five-to-ten times more than all these five wind projects together."[58]  Secretary Burgum also posted on X that "[o]ffshore wind is a GIANT rip off for every American consumer,"[59] that "[i]t's TWICE as expensive to heat a home in New England, the birthplace of the American Revolution,

---

[56] Fox News, *Doug Burgum explains national security concerns that led to pausing offshore wind projects* at 02:00-02:02 (Dec. 22, 2025), https://www.foxnews.com/video/6386850294112.

[57] YouTube, *Trump admin halts all offshore wind farm construction* at 02:15-02:33, 05:12-05:22 (Dec. 23, 2025), https://www.youtube.com/watch?v=zaGVeJSdy30.

[58] *Id.* at 02:10-48.

[59] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM), https://x.com/SecretaryBurgum/status/2003542182930842066.

than in Europe during a Russian Invasion!,"[60] and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!"[61]

129.    The statements of the Secretary and Department of the Interior demonstrate that the Stop Work Order—like the First and Second Revolution Wind Stop Work Orders—was apparently issued in bad faith.  The Stop Work Order appears to be a pretextual policy change in position that is both unreasonable and contrary to the administrative record.  In order to fully comply with the Stop Work Order, Sunrise Wind has suspended Project activity on the Outer Continental Shelf, consistent with and in the manner provided by the Stop Work Order, at substantial cost to the Project, risking collapse of the Sunrise Wind enterprise.

### G.    Sunrise Wind's Financial Obligations and Commercial Commitments

130.    The Stop Work Order immediately harms Sunrise Wind, including by threatening its significant financial investments in the Project as well as its significant investment of time, money, and other resources in the lease auction processes and administrative processes supporting the approvals.

131.    To date, Sunrise Wind has already spent or committed more than $7 billion to plan, permit, develop, design, manufacture, and construct this Project in reliance on over 20 different approvals and authorizations issued by Defendants and various state and local agencies.  Sunrise Wind has also entered many contracts with a variety of commercial suppliers to develop the Project.  These include contracts for the manufacture and transport of Project components and for the leasing of specialized vessels to transport and install the components.

---

[60] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM), https://x.com/SecretaryBurgum/status/2003542188484104627.

[61] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, 2:04 PM), https://x.com/SecretaryBurgum/status/2003542190170210637.

132.    If the Project is cancelled because Sunrise Wind is not permitted to resume construction shortly, Sunrise Wind anticipates that over $1 billion in breakaway costs will also be lost.

133.    In the immediate term, the Stop Work Order is causing estimated losses of over $1 million dollars per day to the Project.

134.    The Stop Work Order halting construction could further harm Sunrise Wind by significantly delaying the Project's first power and commercial operation, significantly undermining the Project's financial viability, ultimately leading to cancellation of the Project, and causing Sunrise Wind to substantially lose its investments and expected future profits.

135.    Sunrise Wind has carefully sequenced its construction schedules to ensure efficient use of scarce resources, including the specialized vessels necessary for Project construction.  These specialized vessels are in limited supply and are tightly scheduled, with limited availability to work beyond the contracted reservation dates.   Sunrise Wind's contracts for vessels for project construction typically include latest vessel availability date provisions, under which, if Project work is not complete by the specified final vessel availability date, the contracted vessels are able to depart to begin work on other projects.  As a result, unless operations are allowed to resume expeditiously, the vessels may depart for other scheduled commitments without completing work on the Project.  If the work cannot be completed as scheduled, the Project could be delayed by an unknown period of time required to secure an alternative specialized vessel and will be at risk of cancellation.

136.    If the Stop Work Order remains in place, Sunrise Wind risks being default under the OREC Agreement, in which case its counterparty would have a termination right.  Revenues under the OREC Agreement are critical to the Project's viability.  Putting aside forgone revenues,

termination of the OREC Agreement would cause Sunrise Wind to forfeit the $89.6 million in existing securities held by NYSERDA under the OREC Agreement. (If Project construction and commercial operation is delayed beyond 2027, Sunrise Wind will be required to commit millions of Dollars in additional guaranties that will similarly be at risk.)

**H.    The Stop Work Order's Threat to Energy, Environmental, and Public Health Benefits**

137.    The Stop Work Order also poses an immediate threat to significant energy, environmental, and public health benefits that the Project would otherwise generate.

138.    Once operational, the Project will have an electrical generating capacity of 924 megawatts, providing much needed reliable energy as electricity demand continues to grow, including demand related to data centers and artificial intelligence. Available information shows that similar offshore wind generation delivers reliable energy at a capacity on par with that State's baseload power sources.

139.    Once completed, the Project will provide enough domestic energy to power more than 600,000 homes in New York State.

140.    In its Q3 2025 short-term assessment of reliability NYISO found that reliability in Long Island is projected to be deficient without the planned completion of future projects, including Sunrise Wind in 2027, noting in part, "[o]nce Sunrise Wind is delivering power as planned, the margins improve in summer 2028…"

141.    The Project will also help meet New York State energy and environmental policy goals. The New York State Climate Leadership and Community Protection Act established multiple ambitious greenhouse gas reduction mandates to combat climate change, including a requirement for the State to procure 9 GW of offshore wind energy by 2035, which the State of New York has recognized is a critical element of the State's overarching objectives of obtaining

70% of its electricity from renewable sources by 2030 and 100% of its electricity from zero-emission sources by 2040, and of achieving a reduction in economy-wide greenhouse gas emissions of 40% by 2030 and 85% by 2050 from 1990 levels.  The Project will satisfy more than 10% of the Climate Leadership and Community Protection Act's offshore wind energy requirement and will contribute toward satisfying the Act's renewable energy and greenhouse gas emission reduction requirements.

142.    Over the lifetime of the Project, Sunrise Wind anticipates it will pay hundreds of millions of dollars in royalties, rents, and operating fees.  The vast majority of this sum will be forgone by the federal government if the Project cannot move forward due to the Stop Work Order.

143.    Sunrise Wind anticipates paying hundreds of millions of dollars in state tax revenue over the lifetime of the Project.  That public revenue would be lost if the Project is cancelled.

144.    Sunrise Wind estimates that the Project will support more than 3,500 direct and indirect jobs in construction, steel manufacturing, shipbuilding, and operations.  On April 22, 2022, Ørsted, the North America's Building Trades Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement," a first-of-its-kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's offshore wind projects, including the Project.[62]

145.    The Project has already generated more than one million union labor hours across more than 1,000 local union workers, resulting in over $97 million in prevailing wages and benefits.  By the third anniversary of the Project's Commercial Operation Date, the Project estimates spending over $800 million in total New York economic benefits, including the purchase

---

[62] Ørsted, *North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor* (May 5, 2022, 12:45 PM) https://us.orsted.com/news-archive/2022/05/national-offshore-wind-agreement.

of U.S.-manufactured iron and steel, labor payments, community benefit commitments, the establishment of a National Offshore Wind Training Center, and funding to New York Universities for research, development, and workforce training. If the Project is delayed or cancelled, the existing and future jobs the Project will otherwise create will be lost.

146. Ørsted and Sunrise Wind are also investing significantly in port infrastructure, shipbuilding, and domestic manufacturing. Across its offshore wind portfolio, Ørsted has invested $695 million in U.S. vessels, spanning direct vessel construction, project development, and service contracts.

### CLAIM I: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

### The Stop Work Order Is Arbitrary and Capricious In Violation of 5 U.S.C. § 706

147. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

148. Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

149. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). The Stop Work Order fails these requirements on multiple grounds.

150. The Stop Work Order is arbitrary and capricious because it lacks a reasonable explanation for the suspension.

151. The Stop Work Order is unacceptably conclusory. In justifying the suspension, the Order says only that the DOW "provided senior leadership with new classified information,

including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." Ex. A. BOEM did not point to a single design or technical specification of Sunrise Wind that raised national security concerns. *See id.* Indeed, BOEM issued a substantively identical order to four other offshore wind projects, without reference to any specific project characteristics.

152.    While national security is undeniably important, "APA review . . . involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). BOEM was still required to complete the "critical step" of connecting facts to the conclusion, which BOEM failed to do.

153.    BOEM's sole reference to "classified information" does nothing to change this analysis (with no explanation for why suspension is "necessary"), particularly given indications that BOEM's purported national security rationale could be pretextual.

154.    *First*, Secretary Burgum has made countless statements in subsequent public interviews and announcements maligning offshore wind energy unrelated to national security. These statements suggest that BOEM's Stop Work Order could be based on political pressure, which is a consideration "not made relevant by Congress" in OCSLA, and is inconsistent with the purported "national security" rationale of the Stop Work Order.

155.    *Second*, the absence of any indication of concerns from the DOW and military contacts with which the Project regularly communicates further underscores the arbitrary nature of the Order. Since the DOD Agreement was executed in January 2025, Sunrise Wind has not received any communication from the DOW, U.S. Air Force, U.S. Coast Guard, Navy, or any other military agency regarding national security concerns, despite numerous meetings.

156.    *Third*, the Stop Work Order repeats arguments Interior already made with respect to the First Revolution Wind Stop Work Order that this Court enjoined.  Secretary Burgum made comments with respect to the First Revolution Wind Stop Work Order mentioning radar interference and drones.  *See supra* ¶ 112.  Defendants appear to be applying that same rationale to shut down the Sunrise Wind Project, with a sole reference to "classified" information that Sunrise Wind representatives with security clearances have not been able to evaluate to determine the alleged basis for the Order.  The Stop Work Order also immediately halts work while the Government "invites" a discussion with the Project on mitigating national security concerns, Ex. A, which of course could have initially occurred over a month ago when these purported concerns were allegedly identified.

157.    Despite the Order's reference to "classified information," the press release by Interior accompanying the Stop Work Order discussed "unclassified reports from the U.S. Government," including a 2024 report that the release characterizes as having found radar interference from turbine blades (a report that had been in existence prior to the November 2024 DOD agreement having been executed).  Press Release, *supra* n.55.  Secretary Burgum has similarly made repeated unclassified statements on national news about "radar interference" and "drones," just as he did in relation to the First Revolution Wind Stop Work Order.  *See, e.g.*, Fox News, *Doug Burgum explains national security concerns that led to pausing offshore wind projects* at 00:10-00:25 (Dec. 22, 2025), https://www.foxnews.com/video/6386850294112.  The Stop Work Order (like the First Revolution Wind Stop Work Order) does not explain the factual basis for BOEM's concerns and therefore violates the APA.  BOEM's failure to articulate a satisfactory explanation leaves its decision without a justification "that can be scrutinized by courts and the interested public."  *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

158.    The inconsistencies in BOEM's Stop Work Order also undercut any reasonable explanation that might otherwise satisfy BOEM's obligations under the APA.

159.    *First*, BOEM purports to base the Order on national security information with "the potential to cause serious, immediate, and irreparable harm" from a DOW review completed in November 2025, and that BOEM Director Giacona has since disclosed he reviewed on November 26, 2025.  Ex. A.  However, Director Giacona did not issue the Order until December 22, 2025, approximately a month later.  *Id.*  Furthermore, Secretary Burgum's discussion of the DOW review in an interview on December 22, 2025, referred to considerations, such as radar interference, that the Secretary had already used to try to justify the First Revolution Wind Stop Work Order in August 2025.  At a minimum, this delay is inconsistent with the purported "immediate" and irreparable harm requiring the "necessary" broad cessation of activities under the Order.

160.    *Second*, the Stop Work Order states that the harm posed by the Project "can only be feasibly averted by suspension of on-lease activities" but then "invites" Sunrise Wind to "meet and confer" about potential mitigation measures.  Ex. A.  BOEM offers no explanation for why it was necessary to take the drastic step of broadly suspending activities with no notice given existing mitigation measures in place that could have alleviated the need for suspension, or why 90 days or more may be required for resolution.  The DOD Agreement addresses adverse impacts on radar, including a curtailment provision by which Sunrise Wind agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose, as defined in the agreement. Sunrise Wind's Lease further provides that "[e]very effort will be made . . . to provide as much advance notice as possible of the need to suspend operations" and "[a]dvance notice will normally be given before requiring a suspension."  Ex. B at Addendum C, Sec. 3.2.2.  None of these mechanisms to protect national security and the Project's reliance interests were initiated and

Sunrise Wind had absolutely no notice before BOEM's Stop Work Order, despite regular and frequent communications with BOEM and BSEE, and ongoing coordination with the military.

161.    The inconsistency between no advance warning, ignoring existing mitigation, and then shutting down the Project effective immediately (nearly a month after reviewing the purported basis) is unexplained.  Because BOEM's decision is internally inconsistent, it is arbitrary and capricious.

162.    The Stop Work Order is also arbitrary and capricious because it violates the "change-in-position doctrine."  *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).  That doctrine makes clear that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests."  *Id.*  Defendants "made no attempt to explain [their] about-face," and "that failure of explanation alone renders" the Stop Work Order arbitrary and capricious. *Sinclair Wyo. Refining Co. LLC v. EPA*, 114 F.4th 693, 713 (D.C. Cir. 2024).

163.    In 2024, after many years of exhaustive review, BOEM approved the Project, explaining that its decision was consistent with 43 U.S.C. § 1337(p)(4) of OCSLA, "which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals, "including national security.  Record of Decision, at 62; *see also* 43 U.S.C. § 1337(p)(4)(F) (enumerating "protection of national security interests of the United States" as a factor).

164.    BOEM's decision to approve the Project's Construction and Operations Plan was based upon and supported by an extensive record before the Agency.

165.    BOEM's Stop Work Order fails to acknowledge that Defendants' prior approval of the Project and conclusion that there were no national security threats engendered serious reliance

interests.

166.    The APA requires an agency reversing a prior policy or agency action "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).  BOEM did not even attempt to meet this standard.  Nothing in the Stop Work Order "address[ed] why [BOEM's] policy shift outweighs" Sunrise Wind's reliance interests or provided "good reasons for concluding those interests were insufficient to hold off the policy shift."  *CSL Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022).

167.    The reliance interests at stake here are immense.  Sunrise Wind has already spent or committed more than $7 billion to date to plan, permit, develop, and construct this Project.  If the Project is cancelled, Sunrise Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of over $8 billion in Project costs.

168.    BOEM's unreasoned change in position itself is a sufficient basis for deeming the Stop Work Order arbitrary and capricious.

169.    The Stop Work Order is also arbitrary and capricious because it suspends *all* activities for 90 days or more, without any explanation as to why a suspension was "necessary" or why a narrower suspension would not suffice.  Agencies are required to "address" alternative "way[s] of achieving [their] objections" and give "adequate reasons" for abandoning those alternatives.  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 48.  BOEM failed to do so here.

170.    Although the Stop Work Order itself leaves Sunrise Wind unclear as to what the purported national security concerns are, Secretary Burgum's interviews, *supra* nn.56-58, and the Interior press release, suggest that the concerns are related to radar interference, Press Release,

*supra* n.55.  It is unclear whether these concerns relate to the Project, given the consultation with the DOW on radar interference and the fact that this issue is addressed in the DOD Agreement.  In any event, no basis has been presented as to why concerns relating to radar interference justify an arbitrary total suspension of activities, including critical work related to installation of the mid- and far-shore portions of Sunrise Wind's offshore export cable.  And, given that the lease states national security suspensions will generally be limited to 72 hours, BOEM offers no explanation why it chose a 90-day suspension, with indefinite renewals.  Ex. B.

171.    Depriving the Project of the ability to continue to work on elements of the Project unrelated to any purported national security concerns is arbitrary and capricious.  Because BOEM "too cavalierly sidestepped its responsibility to address reasonable alternatives, its action was not rational and must, therefore, be set aside."  *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015).

172.  The Stop Work Order is arbitrary and capricious and should be vacated and set aside under the APA and OCSLA.

### CLAIM II: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT

### The Stop Work Order Was Issued Without Observance of Procedure as Required by Law In Violation of 5 U.S.C. § 706

173.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.

174.  Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(D).

175. Section 558 of the APA makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id.* § 558(c).

176. Under the APA, a license is defined as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8).  An OCSLA lease and Construction and Operations Plan approval are a "form of permission" to use the Outer Continental Shelf for energy development.

177. Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise." *Id.*  Neither exception had been demonstrated to apply here.

178. BOEM failed to follow these procedures.  The Stop Work Order suspended all ongoing Sunrise Wind activities on the Outer Continental Shelf without any notice or opportunity to demonstrate compliance.  As a result, Sunrise Wind is unable to exercise its rights under the approved COP, including to conduct "activities pertaining to construction of facilities for commercial operations on [its] commercial lease." 30 C.F.R. § 585.600; *see also id.* §§ 585.620-585.628.

179. Furthermore, references to unspecified "national security implications" and evolution of technology that require further study and dialogue with affected parties are insufficient to deny Sunrise Wind notice and an opportunity to demonstrate compliance before BOEM acted.  5 U.S.C. § 558(c).  There is nothing in the Stop Work Order that shows this is an emergency circumstance that justifies skipping pre-deprivation process.

180. Therefore, BOEM issued the Stop Work Order without the procedure required by law in violation of the APA.

**CLAIM III: VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT AND THE ADMINISTRATIVE PROCEDURE ACT**

**The Stop Work Order Was Issued In Excess of Statutory Authority In Violation of 5 U.S.C. § 706**

181. The foregoing paragraphs are incorporated by reference as if set forth in full herein.

182.  Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

183.  BOEM "literally has no power to act unless and until Congress confers power upon it."  *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (internal quotation omitted).  Here, Congress has not conferred the broad authority BOEM claims.

184.  The Stop Work Order invoked 30 C.F.R. § 585.417(b), which provides that "BOEM may order a suspension . . . when the suspension is necessary for reasons of national security or defense."  "A suspension is an interruption of the period of [a] lease" which extends the expiration date of the relevant period of the lease for the length in time the suspension is in effect.  30 C.F.R. § 585.415(b).

185.  Interior cites 43 U.S.C. § 1337 as its authority for 30 C.F.R. § 585.417(b).  Section 1337(p) gives the Secretary authority to grant leases on the Outer Continental Shelf promoting "energy from sources other than oil and gas," including wind energy.  43 U.S.C. § 1337(p)(1)(B).  It directs the Secretary of the Interior to "ensure that any activity under this subsection [subsection (p)] is carried out in a manner that provides for . . . protection of national security interests of the United States," *id.* § 1337(p)(4)(F), and to "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5).

186.  Two other OCSLA provisions provide specific guidance on authority to suspend activities and operations on a lease for reasons implicating national security.

187.  *First*, the "national security clause" in 43 U.S.C. § 1341(c) requires BOEM to include a provision in every lease that confers authority on the Secretary to "suspend operations" "upon a recommendation of the Secretary of Defense, during a state of war or national emergency

declared by the Congress or the President of the United States."  Relatedly, Section 1341(d), titled

"national defense areas; suspension of operations; extension of leases," permits the "Secretary of

Defense, with approval of the President" to designate "areas restricted from exploration and

operation that part of the outer Continental Shelf needed for national defense," and to suspend

operations on any leases in that area.

188.    *Second*, 43 U.S.C. § 1334(a)(1)(B) authorizes BOEM to order "suspension or

temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is

a threat of serious, irreparable, or immediate harm or damage to life (including fish and other

aquatic life), to property, to any mineral deposits . . . , or the marine, coastal, or human

environment."

189.    Section 1337 must be read alongside—and is limited by—Sections 1341 and

1334(a)(1)(B).  *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 350 (2025).  Section 1337 is

properly interpreted as authorizing suspensions only in the circumstances contemplated by either

Section 1341 or Section 1334(a)(1)(B).

190.    BOEM appears to agree because it structured Sunrise Wind's lease to follow

Sections 1341 and 1334(a)(1)(B).

191.    Sunrise Wind's lease permits BOEM to "suspend . . . operations in accordance with

the national security and defense provisions of [42 U.S.C. § 1341]."  Ex. B at Section 3(c).  The

lease further provides that, in the event of a suspension under Section 1341, "[e]very effort will be

made by the appropriate military agency to provide as much advance notice as possible of the need

to suspend operations" and that "[a]dvance notice will normally be given before requiring a

suspension."  *Id.* at Addendum C, Sec. 3.2.2.  Such "suspensions . . . for national security reasons"

will "not generally exceed seventy-two (72) hours."  *Id.* at Addendum C, Sec. 3.2.3.  Sunrise

Wind's lease also recognizes that "any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage or immediate harm or damage"—i.e., pursuant to § 1334(a)(1)(B)—"requires a finding by the Lessor *of particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities." *Id.* at Sec. 8 (emphasis added). No other provisions of Sunrise Wind's lease contemplate that BOEM may issue the kind of order here.

192. Read in context, Section 1337's suspension authority reaches only as broadly as the authorities in Sections 1341 and 1334(a)(1)(B). Neither provision provides BOEM with authority here.

193. Section 1341 does not apply because the Secretary of War has not recommended suspension during a declaration of war or national emergency nor withdrawn areas of the Outer Continental Shelf for national defense. *See* Ex. A. And BOEM made no effort to comply with its promise to provide notice before a national security suspension in the lease. *See* Ex. B at Addendum C.

194. Section 1334(a)(1)(B) is also inapplicable. This provision requires a showing of harm that must also be "serious, irreparable, or immediate." 43 U.S.C. § 1334(a)(1)(B). The Stop Work Order only discussed alleged harm stemming from "offshore wind projects" as a whole, not Sunrise Wind's specific project. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Particularized" harm is "personal and individual," not "general."). BOEM's conclusory assertions in the Stop Work Order cannot suffice to show there is (1) "serious, irreparable, and immediate harm" that can (2) "only be feasibly averted by suspension of on-lease activities." Ex. B, at Sec. 8. Moreover, under the lease, BOEM had to (but failed to) make a finding of "*particularized harm* that it determines can only be feasibly averted by suspension of on-lease

activities." *Id.*  The Stop Work Order does not mention Sections 1341 or 1334.

195.     BOEM's suspension authority in 30 C.F.R. § 585.417(b) must be understood as limited to particular situations contemplated by Congress in other parts of OCSLA.  Because BOEM's Stop Work Order went further, it improperly exceeded its statutory authority in violation of the APA.

### CLAIM IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AND FIFTH AMENDMENT

### The Stop Work Order Violates The Procedural Due Process Guarantees of the Fifth Amendment to the U.S. Constitution

196.  The foregoing paragraphs are incorporated by reference as if set forth in full herein.

197.  Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity"  5 U.S.C. § 706(2)(B).

198.  The Stop Work Order is contrary to law because it deprives Sunrise Wind of its property without due process required by law.  U.S. Const., amend. V.

199.  The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  *Id.*

200.  "In assessing constitutional due process claims, [courts] ask two questions:  Did the Government deprive the party of a protected property interest?  If so, what process was due?"  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997); *see Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI*"), 251 F.3d 192, 205 (D.C. Cir. 2001).

201.  The Stop Work Order deprived Sunrise Wind of a significant property interest without due process.  Sunrise Wind has a protected property interest in its lease.  The Stop Work Order suspends Sunrise Wind's rights to develop its lease and to construct the Project on schedule, depriving Sunrise Wind of its property interest.

202.     Although the Stop Work Order is limited to 90 days, BOEM states that it "may

further extend the 90-day suspension period" without limitation.  Ex. A.  And even "temporary or partial impairments to property rights . . . merit due process protection."  *Amoco Prod. Co.*, 118 F.3d at 819 (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

203.     BOEM failed to provide Sunrise Wind the required pre-deprivation process.  The due process clause requires the government to provide notice and some form of hearing before deprivation of a property interest.  The type of notice and hearing requires a balancing of:  (1) the "private interest" affected, (2) "the risk of erroneous deprivation" of that interest and the value of additional procedural safeguards; and (3) "the government's interest," including the burden and cost of additional procedures.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see NCRI*, 251 F.3d at 205-08.  All three factors demonstrate that Sunrise Wind was entitled to notice of the Stop Work Order and to sufficient information regarding the purported basis for the Order to provide Sunrise Wind an opportunity to contest the facts that BOEM considered.

204.     *First*, Sunrise Wind's private interest, a significant property right in its lease and billions of dollars of private investments to develop the lease, supports pre-deprivation process.  "[T]he entitlement to continue construction without unfair interference—is substantial."  *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997).  Here, the Stop Work Order threatens the viability of the Sunrise Wind Project, and, in turn, Sunrise Wind's private property interests and investments.

205.     *Second*, there is a high risk of erroneous deprivation without pre-deprivation process.  This is not a situation where "the [agency]'s examination process included numerous safeguards against an arbitrary seizure," including "many opportunities" for the company "to express its views."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1100 (D.C. Cir. 1996).  There were no formal or informal safeguards.  BOEM did not raise these issues with Sunrise Wind

before issuing the Stop Work Order, despite many opportunities to do so.  Had BOEM taken these steps, Sunrise Wind could have explained its position, addressed any issues, and avoided the Order.  Moreover, an affected entity must have the information it needs "to tailor its submission to the [government's] concerns [and] rebut the factual premises underlying the [agency] action." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014).  That is true even if "the information at the 'heart' of the [government]'s decision is classified." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-29 (D.C. Cir. 2010).  It was possible for BOEM to provide unclassified evidence to Sunrise Wind a month ago.  *See* Ex. A.  BOEM also could have provided classified materials to Project representatives with security clearance.  BOEM made no attempt to coordinate with Sunrise Wind regarding the classified materials before the Stop Work Order.

206.    *Third*, BOEM has not shown that this is an "exigent" or "extraordinary" circumstance that justifies skipping pre-deprivation process with notice and a fair opportunity to defend itself against the government's allegations.  Neither the government's privilege in classified information affecting national security, *NCRI*, 251 F.3d at 207, nor BOEM's assertion that it has preliminarily determined that offshore wind projects may implicate national security, Ex. A, demonstrate that BOEM giving Sunrise Wind pre-deprivation process would interfere with the government's interest in national security.  There is no indication that BOEM needed to keep Sunrise Wind in the dark about its concerns until after the Stop Work Order was issued.  There is no evidence, for example, that it would harm national security interests to alert Sunrise Wind in advance to the idea that the government was considering suspending lease activities.

207.    The timing of BOEM's decision makes clear that it could have provided pre-deprivation process here.  BOEM has had the information from the DOW's review since

November 26, 2025. *See* Decl. of Matthew Giacona ¶ 11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 27, 2025), Dkt. 19-1; Ex. A. Yet BOEM waited until December 22, 2025—the week of a federal holiday—to issue the Stop Work Order. This delay cuts against any government interest in suspending the lease before giving Sunrise Wind notice and an opportunity to be heard.

208.    Sunrise Wind was not afforded any notice or hearing before impairment of its protected property interest in its lease. Accordingly, Sunrise Wind was deprived of property without due process required by law.

**PRAYER FOR RELIEF**

WHEREFORE, Sunrise Wind respectfully requests that this Court enter judgment in its favor and grant the following relief:

a.    A declaration pursuant to 28 U.S.C. § 2201 stating that:

    i.  the Stop Work Order is contrary to law;

    ii.  the Stop Work Order violates OCSLA;

    iii.  the Stop Work Order was issued without procedure required by law;

    iv.  the Stop Work Order is arbitrary and capricious; and

    v.  the Stop Work Order is contrary to constitutional right and violates the procedural due process guarantees of the Fifth Amendment.

b.    A stay of the Stop Work Order.

c.    An order vacating and setting aside the Stop Work Order.

d.    Temporary, preliminary, and permanent injunctive relief preventing enforcement of the Stop Work Order to interfere with Sunrise Wind's ability to conduct lawful activities to construct the Project; and preventing Defendants from unreasonably withholding any required approvals, concurrences, or Project-related agreements.

e.     An order temporarily, preliminarily, and permanently enjoining Defendants, and their

officers, agents, employees, assigns, and all persons acting in concert or participating with

them, from relying on the Stop Work Order.

f.     An order awarding Sunrise Wind its costs and attorneys' fees and expenses as allowed

by law, including under 43 U.S.C § 1349(a)(5).

g.     Such other and further relief as the Court deems just and proper.


Dated:  January 6, 2026                         Respectfully submitted,


                                                By /s/  Janice M. Schneider
                                                    Janice M. Schneider (D.C. Bar No. 472037)
                                                    Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                                    Roman Martinez (D.C. Bar No. 1001100)
                                                    Devin. M. O'Connor (D.C. Bar No. 1015632)
                                                    Rachael L. Westmoreland (DC Bar No.
                                                    90034032)
                                                    LATHAM & WATKINS LLP
                                                    555 11th Street NW, Suite 1000
                                                    Washington, D.C. 20004
                                                    Tel:  (202) 637-2200
                                                    Fax:  (202) 637-2201
                                                    Email: janice.schneider@lw.com
                                                           stacey.vanbelleghem@lw.com
                                                           roman.martinez@lw.com
                                                           devin.o'connor@lw.com
                                                           rachael.westmoreland@lw.com


                                                    *Counsel for Plaintiff*
                                                    *Sunrise Wind LLC*