# EXHIBIT C

# LATHAM&WATKINS LLP

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200  Fax: +1.202.637.2201
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Silicon Valley |
| Houston | Singapore |
| London | Tel Aviv |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

January 5, 2026

**VIA FEDEX AND ELECTRONIC MAIL**

Douglas J. Burgum
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Matthew Giacona
Acting Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, DC 20240

Kenneth Stevens
Principal Deputy Director
Bureau of Safety and Environmental
Enforcement 1849 C Street, NW
Washington, DC 20240

Pamela Bondi, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Office of Governor Kathy Hochul
New York State Capitol Bldg.
Albany, NY 12224.

Re: <u>Outer Continental Shelf Lands Act ("OCSLA") Notice of Intent to Sue for Violations of OCSLA Relating to Sunrise Wind LLC</u>

Dear Secretary Burgum, Attorney General Bondi, Acting Director Giacona, Principal Deputy Director Stevens, and Governor Hochul:

On behalf of Sunrise Wind LLC ("Sunrise Wind"), this letter hereby provides a notice of Sunrise Wind's intent to sue the United States Department of the Interior ("Interior"); Doug Burgum, in the official capacity as Secretary of the Interior; Matthew Giacona, in the official capacity as the Acting Director of the Bureau of Ocean Energy Management ("BOEM"); BOEM; Kenneth Stevens, in the official capacity as the Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement ("BSEE"); and BSEE (collectively, the "Federal Actors"), challenging the Stop Work Order issued by BOEM to Sunrise Wind on December 22, 2025 for violations of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356c; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and the United States Constitution.  This letter constitutes a notice of violation and intent to file suit ("Notice Letter") pursuant to Section 23(a) of OCSLA,

LATHAM&WATKINS LLP

43 U.S.C. § 1349(a), to the extent necessary and in order to protect Sunrise Wind's significant interests, unless the Stop Work Order is immediately withdrawn.[1]  Section 1349(a)(3) allows an action to be brought in court immediately after notification of the alleged violation in any case in which the alleged violation "would immediately affect a legal interest of the plaintiff."  As explained in Section III below, to the extent this Notice is required prior to filing suit, that exception applies here, as Federal Actors' conduct is in effect and the Stop Work Order has immediately and adversely affected Sunrise Wind's legal interests.

I.      FACTUAL BACKGROUND

   A.      The Project and Its Extensive Review and Approval Process

The Sunrise Wind Farm and Sunrise Wind Export Cable (collectively, the "Project") constitute an approximately 924-megawatt ("MW") commercial-scale wind energy facility under construction in federal waters on the U.S. Outer Continental Shelf ("OCS"), approximately 30 miles off the Coast of Montauk, New York.  The Project is planned to include up to 84 wind turbine generators ("WTGs") and to deliver enough electricity to provide energy security to nearly 600,000 homes in the State of New York using domestic resources.

The Project is nearly 45% complete.  Among other things, at the time the Stop Work Order was issued, the offshore converter station jacket and topside had been installed, the near-shore portion of the export cable (16 miles from shore) had been installed, and the onshore work—including an 18-mile cable route to connect to the grid—is 90% complete.  Forty-four of 84 of the Project's monopile foundations for the WTGs had been installed on the ocean floor, and the remaining monopile foundations must be installed in 2026 to remain on schedule.

Over the course of many years, the Project has undergone an exhaustive federal and state review process to study and approve its potential environmental, public safety, and national security impacts.  This review process has led to the issuance of more than 20 local, state and federal permits and approvals for the Project.

To date, Sunrise Wind has incurred substantial financial obligations developing, permitting, engineering, procuring, fabricating, preparing for, and commencing construction of the Project.  Sunrise Wind has spent or committed more than $7 billion to date for the development and construction of the Project, and will further incur more than $1 billion in breakaway costs if the Project is cancelled.

---

[1] Some courts have held that OCSLA's citizen-suit provision is inapplicable to lessees, such as Sunrise Wind.  *See, e.g.*, *Murphy Exploration & Production Co. v. U.S. Dep't of the Interior*, 167 F. Supp. 2d 1 (D.D.C. 2000), rev'd on other grounds, *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473 (D.C. Cir. 2001).  Either way, Sunrise Wind is entitled to relief under the APA and the Due Process Clause of the Fifth Amendment.

### B. The Stop Work Order

On December 22, 2025, Acting Director Giacona of BOEM issued a "Director's Order" (the "Stop Work Order") to Sunrise Wind, ordering it to "suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" pursuant to 30 C.F.R. § 585.417(b). The Stop Work Order cited no violations of law by Sunrise Wind or violations of the terms of Sunrise Wind's lease.

BOEM issued substantially similar Director's Orders that same day to four other offshore wind projects, including Revolution Wind, LLC ("Revolution Wind"). This was the second time Revolution Wind received a stop work order from BOEM. BOEM previously issued an August 22, 2025 "Director's Order" (the "First Revolution Stop Work Order") to Revolution Wind, directing it to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025. 90 Fed. Reg. 8363 (January 29, 2025)." Revolution Wind subsequently filed suit in the U.S. District Court for the District of Columbia, and the Honorable Royce C. Lamberth preliminarily enjoined the First Revolution Stop Work Order on September 22, 2025. *See Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL (D.D.C. Sept. 22, 2025), Dkt. 36 (Order Granting Preliminary Injunction). That case remains pending, and Revolution Wind has now supplemented its complaint to challenge BOEM's December 22, 2025 order and has moved for a preliminary injunction. Dkts. 47 and 48.

## II. BOEM AND OTHER FEDERAL ACTORS HAVE VIOLATED OCSLA, THE APA, AND THE U.S. CONSTIUTION

The Stop Work Order violates OCSLA, the APA, and the U.S. Constitution because it is arbitrary and capricious and contrary to law, as well as being issued without observance of procedure as required by law.

### A. The Stop Work Order Is Arbitrary and Capricious

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). Interior's Stop Work Order, issued without sufficiently explaining or justifying the basis for its issuance and without notice or an opportunity to be heard is arbitrary and capricious and impermissible under the APA, which requires an agency to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Not only did Interior not provide a sufficient explanation for issuing the Stop Work Order, Interior provided *no explanation* for its decision beyond a conclusory assertion of "impacts to national security from offshore wind projects." That alone falls short of the required "satisfactory explanation," because, even when national security is at issue, an agency must provide factual information supporting the reasoning for its decision. The Stop Work Order also contains unexplained internal inconsistencies in its reasoning, such as why there is a purportedly immediate and irreparable harm to national security but the Acting Director was aware of the relevant national security information for a month before notifying the Project of any issue and taking action.

**LATHAM&WATKINS**LLP

      The Stop Work Order also violates the "change-in-position doctrine." The change-in-position doctrine provides that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages and White Lion Investments, LLC*, 604 U.S. 542, 568 (2025). Federal Actors have already spent years reviewing and considering all aspects of the Project, including national security, and documented it in the approvals for the Project. Federal Actors have violated the change-in-position doctrine by making this about-face without taking Sunrise Wind's substantial reliance interests into account. "When an agency changes course," as Interior did here, it must consider whether its prior actions "engendered serious reliance interests" and take those interests into account. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

      Sunrise Wind has spent or committed more than $7 billion to date to plan, permit, develop, and construct this project. If the Project is cancelled, Sunrise Wind will incur an additional more than $1 billion in breakaway costs, for a total of over $8 billion. In reliance on Federal Actors' approvals, Sunrise Wind entered into contracts for union labor, the manufacture and transport of project components and for the leasing of vessels necessary to construct the Project. The Stop Work Order halting construction of the Project threatens Sunrise Wind's ability to complete a critical phase of installation of the Project's mid- and far-shore portions of the offshore export cable before losing a specialized vessel necessary for that work. That could lead to significant delay of achieving first power and commercial operation, significantly undermining the Project's financial viability, ultimately leading to cancellation of the Project, causing Sunrise Wind to substantially lose its investments and expected future profits. Interior did not consider, or even acknowledge, the many harms to Sunrise Wind, or Sunrise Wind's substantial and legitimate reliance interests in issuing its Stop Work Order. This alone is sufficient to render the Order arbitrary and capricious.

      An agency's action is also arbitrary and capricious when it fails to "address" alternative "way[s] of achieving [its] objectives" and give "adequate reasons" for abandoning those alternatives. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 48. Here, the Stop Work Order fails to explain why a narrower approach would not suffice. Depriving the Project of the ability to continue to work on elements of the Project unrelated to any purported national security concerns is arbitrary and capricious. This failure is particularly acute given that the Project was on schedule to achieve first power as soon as October 2026, meaning that Sunrise Wind was expected to begin generating power (and delivering it to the grid) from a subset of the Project's wind turbine generators. Delaying that addition of power to the grid in the face of the President's and Secretary Burgum's own characterizations of an "energy emergency" is antithetical to an energy emergency and overly broad, especially given that the Project would soon provide power.

      **B.**    **The Stop Work Order Violates the Fifth Amendment**

      Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right." 5 U.S.C. § 706(2)(A), (C). BOEM's Stop Work Order is contrary to law because it deprives Sunrise Wind of its property without due process of law, as required by the Fifth Amendment. U.S. Const., amend. V.

Leases convey property interests at common law, and "[a] leasehold interest is a property interest for purposes of the Fifth Amendment." *Turntable Fishery & Moorage Corp. v. U.S.*, 52 Fed. Cl. 256, 261 (Fed. Cl. 2002). Lessees pursuing energy development on lands leased by the Department of the Interior have "property rights in the . . . leases." *E.g.*, *Hoyl v. Babbitt*, 129 F.3d 1377, 1386 (10th Cir. 1997).

The Due Process Clause requires "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (citations omitted) (emphasis in original). Even "temporary or partial impairments to property rights . . . merit due process protection." *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).

The Stop Work Order impairs Sunrise Wind's ability to take advantage of its property interest in its leasehold by requiring Sunrise Wind to "suspend all ongoing activities related to the [Project]." Sunrise Wind was not afforded any notice or hearing before impairment of its property interest nor provided sufficient information regarding the purported basis for the Order, so that Sunrise Wind could address the facts that BOEM considered. Indeed, despite numerous meetings between BOEM and Sunrise Wind over the past year, including a number more recently in November and December, there was no mention of this concern. Accordingly, Sunrise Wind was deprived of property without due process required by law.

### C.     The Stop Work Order Was Issued Without the Procedures Required by the APA

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). APA Section 558 makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts. *Id.* § 558(c). The APA defines a license as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8). An OCSLA lease and Construction and Operations Plan approval is a "form of permission" to use the OCS for energy development. Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise." *Id.* None of those exceptions has been demonstrated to apply here, and BOEM failed to comply with the procedures of 5 U.S.C § 558.

### D.     The Stop Work Order Is Contrary to Law

Under the APA, the Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). BOEM "literally has no power to act unless and until Congress confers power upon it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C.

LATHAM&WATKINS LLP

Cir. 2005) (internal quotation omitted).  But Congress has not conferred the broad authority BOEM claims.

In the Stop Work Order, BOEM invoked 30 C.F.R. § 585.417(b), which provides that "BOEM may order a suspension . . . when the suspension is necessary for reasons of national security or defense."  Interior cites 43 U.S.C. § 1337 as its authority for 30 C.F.R. § 585.417(b). *See id.* § 585.100.  Section 1337(p) gives the Secretary authority to grant leases on the OCS promoting "energy from sources other than oil and gas," including wind energy.  43 U.S.C. § 1337(p)(1)(C).  It directs the Secretary of the Interior to "ensure that any activity under this subsection [subsection (p)] is carried out in a manner that provides for . . . protection of national security interests of the United States," *id.* § 1337(p)(4)(F), and to "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5).

Two other OCSLA provisions are relevant to national security suspensions.  *First,* the "national security clause" in 43 U.S.C. § 1341(c) requires BOEM to include a provision in every lease that confers authority on the Secretary to "suspend operations" "upon a recommendation of the Secretary of Defense [War], during a state of war or national emergency declared by the Congress or the President of the United States."  And § 1341(d), titled "national defense areas; suspension of operations; extension of leases," permits the "Secretary of Defense [War], with the approval of the President," to designate "areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense," and to suspend operations on any leases in that area.  *Second*, 43 U.S.C. § 1334(a)(1)(B) authorizes BOEM to order "suspension or temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is a threat of serious, irreparable, or immediate harm or damage to life…, to property, to any mineral deposits . . . , or to the marine, coastal, or human environment."

Section 1337 must be read alongside—and is limited by—§§ 1341 and 1334.  *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 350 (2025).  OCSLA was originally enacted in 1953, Pub. L. 83-212, to provide for offshore oil and gas leasing.  *Healthy Gulf v. DOI*, 152 F.4th 180, 187 (D.C. Cir. 2025).  When § 1337(p) was enacted to add renewable energy uses of the OCS, Pub. L. 109-58, § 388, 119 Stat. 744-47, Congress gave no indication that it intended to give the Secretary of the Interior more authority to suspend leases and activities for renewable energy uses than for oil and gas.  Thus, Section 1337 is properly interpreted as authorizing suspensions only in the circumstances contemplated by either Section 1341 or Section 1334.

Section 1341 does not apply because the Secretary of War has not recommended suspension during a declaration of war or national emergency nor withdrawn areas of the OCS for national defense.  Section 1334(a)(1)(B) is also inapplicable.  BOEM had to make a finding of "*particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities."  Amendment and Restatement of Renewable Energy Lease OCS-A 0486, at Sec. 8.  And the harm must be "serious, irreparable, or immediate."  43 U.S.C. § 1334(a)(1)(B).  BOEM's conclusory assertions in the Stop Work Order cannot suffice to show that there is (1) "serious, irreparable, or immediate harm" that can (2) "only be feasibly averted by suspension of on-lease activities."

LATHAM&WATKINS LLP

      BOEM's suspension authority in 30 C.F.R. § 585.417(b) must be understood as limited to particular situations contemplated by Congress in other parts of OCSLA. Because BOEM's Stop Work Order went further, it improperly exceeded its statutory authority.

### III. THE STOP WORK ORDER IMMEDIATELY AFFECTS A LEGAL INTEREST OF SUNRISE WIND

      OCSLA's citizen-suit provision provides that "[a]n action may be brought . . . immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). The Stop Work Order is in effect and immediately and adversely affects the legal interests of Sunrise Wind. Sunrise Wind intends to bring suit challenging the Stop Work Order imminently to protect its interests, unless the Stop Work Order is rescinded.

      The Stop Work Order immediately impacts Sunrise Wind's ability to conduct activities on its leasehold. As a result of the Stop Work Order, Sunrise Wind is currently facing a sudden, unplanned work stoppage that is expected to generate cascading delays, substantially increase costs, and ultimately threaten Project viability. Sunrise Wind has carefully sequenced its construction schedule and has contracted (and reserved for a limited time) specialized vessels necessary for the Project's construction. The Stop Work Order prevents Sunrise Wind from meeting this schedule, delaying the overall Project timeline, increasing costs, causing workers not to be able to do their jobs, and undermining grid reliability, which can inhibit economic growth and public safety.

      Delays are costly, regardless of whether the Project is ultimately cancelled. The Stop Work Order could prevent the Project from achieving its commercial operations as previously scheduled. Delay of this nature could ultimately lead to the Project's cancellation, causing Sunrise Wind to substantially lose its investments and expected future profits. If the Project is cancelled, Sunrise Wind anticipates that it may lose its entire greater than $8 billion of investment including over $1 billion in breakaway costs. Additionally, Sunrise Wind would forgo substantial revenues under the Project's offtake agreement.

      The longer the Stop Work Order remains in place, the more likely it is that the Stop Work Order will lead to the Project's termination. Overall, the delay caused by BOEM's Stop Work Order is already costing Sunrise Wind millions of dollars per week. Federal Actors' Stop Work Order interferes with Sunrise Wind's ability to carry out construction activities in the short term, and all operations in the longer term.

### IV. CONCLUSION

      This Notice Letter sufficiently states Sunrise Wind's grounds for filing suit challenging the Stop Work Order, to the extent notice is required under 43 U.S.C. § 1349. In addition to the violations set forth above, this Notice Letter covers all violations of OCSLA, the APA, and the U.S Constitution by the Federal Actors that is evidenced by information that becomes available to Sunrise Wind after the date hereof.

**LATHAM&WATKINS**LLP

      In addition to injunctive relief under OCSLA and the APA, Sunrise Wind may seek all such other relief as is permitted by law. Section 23(a)(5) of OCSLA, 43 U.S.C. § 1349(a)(5), also permits prevailing parties to recover costs and fees of litigation.

      Sunrise Wind has retained me to represent it in this matter. Please direct all communications to:

| | |
|---|---|
| Janice M. Schneider | janice.schneider@lw.com |
| Stacey L. VanBelleghem | stacey.vanbelleghem@lw.com |
| Latham & Watkins LLP | |
| 555 Eleventh Street NW, Suite 1000 | |
| Washington, D.C. 20004 | |
| (202) 637-2306 | |

      Sincerely,

Janice M. Schneider
LATHAM & WATKINS LLP

January 5, 2026
Page 9

LATHAM&WATKINS LLP

  Pursuant to 28 U.S.C. § 1746(2) and 43 U.S.C. § 1349, I declare under penalty of perjury that the factual information in the foregoing is true and correct.

Executed on January 5, 2026.

Boston, MA

_____
Ryan Chaytors, Authorized Person
Sunrise Wind LLC

LATHAM&WATKINS LLP

## Service List

| | |
|---|---|
| Doug Burgum<br>Secretary of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 | United States Department of the Interior<br>1849 C Street, NW<br>Washington, DC 20240 |
| Matthew Giacona<br>Acting Director<br>Bureau of Ocean Energy Management<br>1849 C Street NW<br>Washington, DC 20240 | Bureau of Ocean Energy Management<br>1849 C Street NW<br>Washington, DC 20240 |
| Kenneth Stevens<br>Principal Deputy Director<br>Bureau of Safety and Environmental Enforcement<br>1849 C Street, NW<br>Washington, DC 20240 | Bureau of Safety and Environmental Enforcement<br>1849 C Street, NW<br>Washington, DC 20240 |
| Pamela Bondi<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington DC 20530 | Office of Governor Kathy Hochul<br>New York State Capitol Bldg.<br>Albany, NY 12224 |
| Letitia James<br>Managing Attorney's Office<br>Empire State Plaza<br>Justice Building, 2nd Floor<br>Albany, NY 12224 | |