## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUNRISE WIND LLC,

       *Plaintiff*,

    v.

DOUGLAS J. BURGUM, in his official capacity
as Secretary of the U.S. Department of the
Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean
Energy Management;

BUREAU OF OCEAN ENERGY
MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the
Delegated Authorities of the Director of the
Bureau of Safety and Environmental
Enforcement; and

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT,

       *Defendants*.

Case No.: 1:26-cv-00028-RCL

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND STAY PENDING REVIEW

Pursuant to Section 705 of the Administrative Procedure Act, Federal Rule of Civil

Procedure 65(a), and Local Civil Rule 65.1(c), Plaintiff Sunrise Wind LLC ("Sunrise Wind")

hereby moves this Court for a stay pending review and a preliminary injunction of the Department

of the Interior Bureau of Ocean Energy Management's ("BOEM") December 22, 2025 Director's Order "suspend[ing] all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" (the "Stop Work Order"). *See* Compl., Ex. A, Dkt. 1.

The Sunrise Wind Project is a commercial-scale offshore wind energy facility that will bring approximately 924 megawatts ("MW") of domestic energy to the State of New York pursuant to the contract it executed with the New York State Energy Research and Development Authority.  Over the past several years, Sunrise Wind has received over 20 approvals from the relevant federal, state, and local agencies—including from Interior and BOEM.  In reliance on those approvals, Sunrise Wind began offshore construction on the Project in July 2024 and has spent or committed over $7 billion to date to plan, permit, develop, design, manufacture, and construct this Project.  At the time Sunrise Wind received the Stop Work Order, the Project was nearly 45% complete.

This is not the first time that Secretary Burgum and this Administration have sought to shut down an offshore wind project.  On August 22, 2025, BOEM issued an unlawful stop work order, which halted offshore construction of the Revolution Wind Farm and Revolution Wind Export Cable due to purported "concerns related to the protection of national security interests."  That Order was swiftly enjoined by this Court, as the "height of arbitrary and capricious action."  Tr. of Prelim. Inj. Hrg. 41:18-19, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 22, 2025), Dkt. 39.  And just four days before the Stop Work Order was issued, the U.S. District Court for the District of Massachusetts entered a judgment declaring unlawful and setting aside the pause in the issuance of all wind energy authorizations that Defendants had adopted pursuant to President Trump's executive memorandum titled "Temporary Withdrawal of All Areas

on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects," 90 Fed. Reg. 8363 (Jan. 20, 2025). Judgment, *New York v. Trump*, No. 1:25-cv-11221-PBS (D. Mass. Dec. 18, 2025), Dkt. 240. These actions, including the Stop Work Order at issue here, are part of a pattern of unlawful conduct targeting the offshore wind industry.

The Stop Work Order is patently unlawful. It violates the Administrative Procedure Act, the Outer Continental Shelf Lands Act, and the U.S. Constitution. Sunrise Wind is therefore likely to prevail on the merits of its challenge to the Stop Work Order. As a result of Defendants' unlawful action, Sunrise Wind now faces enterprise-level threats. Defendants' unlawful action is already irreparably harming Sunrise Wind, harm that will continue to compound in the absence of a preliminary injunction by **the week of February 1, 2026, and no later than February 6, 2026**. The balance of the equities and the public interest strongly favor a stay of the Stop Work Order, so that construction can progress to completion and the Project can send much-needed power to the grid. Sunrise Wind will help New York State achieve its clean energy goals by delivering approximately 924 MW of reliable energy—enough for nearly 600,000 homes—generating substantial economic benefits through infrastructure and other investments, and supporting more than 3,500 direct and indirect jobs in construction, steel manufacturing, operations and shipbuilding. In its Q3 2025 short-term assessment of reliability the New York grid operator, New York Independent System Operator, found that reliability in Long Island is projected to be deficient without the planned completion of future projects, including Sunrise Wind in 2027,

noting in part, "[o]nce Sunrise Wind is delivering power as planned, the margins improve in summer 2028."[1] .

The Stop Work Order should therefore be stayed by this Court to preserve the *status quo* pending judicial review, *see* 5 U.S.C. § 705, and Defendants should be preliminarily enjoined under Federal Rule of Civil Procedure 65(a) from enforcing the Stop Work Order.

Sunrise Wind reached out to BOEM promptly after the Stop Work Order was issued, asking to meet as soon as possible. On December 30, 2025, Sunrise Wind met with BOEM to seek access to the classified information for Sunrise Wind representatives with security clearances and to resolve this issue. Sunrise Wind had notified BOEM in advance that it was bringing individuals with proper clearance, but no efforts were made in advance by BOEM to facilitate a classified briefing, despite repeated inquiries. Moreover, while BOEM promised in the meeting to facilitate a classified briefing, no timeline for resolution was presented by BOEM and the Government has taken no real steps to facilitate access for those with security clearance or provide unclassified summaries to those without security clearances. Rather, notwithstanding the proffer in the BOEM Order to "meet and confer" on potential mitigation measures, the Government has taken the extraordinary position that it will not share classified information with Sunrise Wind until after resolution of this litigation.

Pursuant to Local Civil Rule 7(m), counsel for Sunrise Wind contacted counsel for Defendants to meet and confer regarding this Motion on January 8, 2026. Counsel for Defendants represented that Defendants intend to respond to the motion no sooner than the seven days allotted under local rules, but the parties are continuing to confer and will propose an exact date to the

---

[1] New York Independent System Operator, Short-Term Assessment of Reliability: 2025 Quarter 3, at 9 (October, 13, 2025), https://www.nyiso.com/documents/20142/39103148/2025-Q3-STAR-Report-Final.pdf.

court. On January 5, 2026, Sunrise Wind also served Federal Defendants and other relevant individuals with a notice of intent to sue pursuant to 43 U.S.C. § 1349.

The grounds for this motion are fully set forth in Sunrise Wind's accompanying Statement of Points and Authorities, and Declarations of Ryan Chaytors, Edward LeBlanc, and Bryan Stockton and the Exhibits thereto. A proposed order is also attached. For the reasons set forth in Sunrise Wind's supporting documents, the Court should enter an Order granting the preliminary injunction and stay of the Stop Work Order. Additionally, Sunrise Wind respectfully requests a hearing pursuant to Local Civil Rule 65.1(d) during the week of **February 1, 2026, and no later than February 6, 2026**, given that Sunrise Wind is already experiencing irreparable harm, which will only compound in the absence of immediate relief. Finally, the Court should direct Defendants to: (1) request that the Department of War process pending requests for representatives for Plaintiff who have appropriate security clearances to review the classified information that Defendants refer to in the Stop Work Order; (2) request that the Department of War provide unclassified summaries of the key decisional documents to the Plaintiff; and (3) provide the Court with an update on the Department of War's response to those requests within forty-eight (48) hours of an order of the Court.

Dated: January 9, 2026                          Respectfully submitted,

By _/s/ Janice M. Schneider_
        Janice M. Schneider (D.C. Bar No. 472037)
        Stacey L. VanBelleghem (D.C. Bar No. 988144)
        Roman Martinez (D.C. Bar No. 1001100)
        Devin. M. O'Connor (D.C. Bar No. 1015632)
        Rachael L. Westmoreland (D.C. Bar No. 90034032)
        LATHAM & WATKINS LLP
        555 11th Street NW, Suite 1000
        Washington, D.C. 20004
        Tel:  (202) 637-2200
        Fax:  (202) 637-2201
        Email: janice.schneider@lw.com
                stacey.vanbelleghem@lw.com
                roman.martinez@lw.com
                devin.o'connor@lw.com
                rachael.westmoreland@lw.com

        _Counsel for Plaintiff Sunrise Wind LLC_

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I caused the foregoing Motion for Stay and Preliminary Injunction, including all documents associated therewith, to be filed electronically through the Court's CM/ECF system, which will serve a Notice of Electronic Filing upon all counsel of record. Additionally, with prior consent, I electronically served a copy of these documents on Kristofor R. Swanson, counsel for Defendants, via email.

/s/ *Janice M. Schneider*
Janice M. Schneider

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUNRISE WIND LLC,

       *Plaintiff*,

    v.

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior;

UNITED STATES DEPARTMENT OF THE
INTERIOR;

MATTHEW GIACONA, in his official capacity as
Acting Director of the Bureau of Ocean Energy
Management;

BUREAU OF OCEAN ENERGY MANAGEMENT;

KENNETH STEVENS, in his official capacity as
Principal Deputy Director Exercising the Delegated
Authorities of the Director of the Bureau of Safety
and Environmental Enforcement; and

BUREAU OF SAFETY AND ENVIRONMENTAL
ENFORCEMENT,

       *Defendants*.

Case No.: 1:26-cv-00028-RCL

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................4

    A.    The Project ........................................................................................4

    B.    OCSLA .............................................................................................5

    C.    Multi-Year Review And Approval Process .....................................6

        1.    BOEM's National Security Review ......................................7

        2.    DOW, U.S. Coast Guard, And Federal Aviation Administration Review And Consultation .......................................................8

        3.    BOEM's COP Approval and Conditions ..............................9

    D.    The Presidential Memorandum And First Revolution Stop Work Order .............10

    E.    Federal Agencies' Lack of Stated National-Security-Related Concerns ...............12

    F.    The Stop Work Order ......................................................................13

JUSTICIABILITY ..............................................................................................15

ARGUMENT ......................................................................................................17

I.    SUNRISE WIND IS LIKELY TO SUCCEED ON THE MERITS ................................17

    A.    The Stop Work Order Is Arbitrary And Capricious.............................18

        1.    The Stop Work Order Lacks A Reasonable Explanation ..........................18

        2.    BOEM Violated The Change-In-Position Doctrine By Ignoring Substantial Reliance Interests ................................25

        3.    The Stop Work Order Is Arbitrary And Capricious Because It Is Overbroad .............................27

    B.    The Stop Work Order Deprives Sunrise Wind Of A Significant Property Interest Without Due Process.............................28

        1.    BOEM Deprived Sunrise Wind Of Its Protected Property Interest ...........29

        2.    BOEM Denied Sunrise Wind Required Pre-Deprivation Process.............29

C.    The Stop Work Order Was Issued Without The Procedures Required By The APA ......................................................................................32

D.    The Stop Work Order Was Issued Without Statutory Authority .........................33

II.    SUNRISE WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF ...........................................................................................................36

A.    Sunrise Wind Faces Substantial Irreparable Harm From Construction Delays Due To The Order......................................................................37

B.    The Stop Work Order Poses Existential Threats to Sunrise Wind's Business ..........................................................................................40

C.    Sunrise Wind Faces Substantial Irreparable Reputational Harm..........................41

III.    EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF....................41

A.    Neither the Public Nor Defendants Will Suffer Harm From Preliminary Injunctive Relief...............................................................................42

B.    The Public Interest Strongly Favors An Injunction ................................................42

CONCLUSION...................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Am. Library Ass'n v. FCC*,
406 F.3d 689 (D.C. Cir. 2005) ................................................................................33

*\*Amoco Prod. Co. v. Fry*,
118 F.3d 812 (D.C. Cir. 1997) ................................................................................29

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ..............................................................................25

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ...........41

*Bennett v. Spear*,
520 U.S. 154 (1997) ...............................................................................................16

*Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*,
367 U.S. 886 (1961) ...............................................................................................30

*Cent. United Life, Inc. v. Burwell*,
128 F. Supp. 3d 321 (D.D.C. 2015) .........................................................................43

*City & Cnty. of San Francisco v. EPA*,
604 U.S. 334 (2025) ...............................................................................................35

*Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, &
Maintain a 24-inch Gas Transmission Pipeline Across Prop. in Greene Cnty.*,
No. 3:07CV00028, 2007 WL 2220530 (W.D. Va. July 31, 2007) ..........................38

*Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less, In
Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*,
310 F. Supp. 3d 685 (N.D.W. Va. 2018) ................................................................44

*Connecticut v. Doehr*,
501 U.S. 1 (1991) ..............................................................................................29, 30

*Connecticut v. DOI*,
363 F. Supp. 3d 45 (D.D.C. 2019) .........................................................................20

*CSL Plasma Inc. v. CBP*,
628 F. Supp. 3d 243 (D.D.C. 2022) .........................................................................27

*Darby v. Cisneros*,
509 U.S. 137 (1993) ...............................................................................................17

iii

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
  784 F.3d 1 (D.C. Cir. 2015) .................................................................28

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................................20, 23

*\*Dep't of Homeland Sec. v. Regents*,
  591 U.S. 1 (2020) .................................................................26, 27

*Dickson v. Sec'y of Def.*,
  68 F.3d 1396 (D.C. Cir. 1995) .................................................................19

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) .................................................................45

*E. Tenn. Nat. Gas Co. v. Sage*,
  361 F.3d 808 (4th Cir. 2004) .................................................................38

*Env't Democracy Project v. Green Sage Mgmt., LLC*,
  No. 22-CV-03970, 2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) .........................................45

*Env't Health Trust v. FCC*,
  9 F.4th 893 (D.C. Cir. 2021) .................................................................18

*Esparraguera v. Dep't of the Army*,
  101 F.4th 28 (D.C. Cir. 2024) .................................................................31

*Fares v. Smith*,
  901 F.3d 315 (D.C. Cir. 2018) .................................................................23, 24

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .................................................................18

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................36

*\*FDA v. Wages & White Lion Invs., LLC*,
  145 S. Ct. 898 (2025) .................................................................25, 26

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
  636 F.2d 755 (D.C. Cir. 1980) .................................................................45

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .................................................................42

*Healthy Gulf v. DOI*,
  152 F.4th 180 (D.C. Cir. 2025) .................................................................35

*Hoyl v. Babbitt*,
129 F.3d 1377 (10th Cir. 1997) ...................................................................................29

*\*In re NTE Conn., LLC*,
26 F.4th 980 (D.C. Cir. 2022) .....................................................................................40

*Int'l Org. of Masters, Mates, & Pilots v. NLRB*,
61 F.4th 169 (D.C. Cir. 2023) .....................................................................................27

*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) ....................................................................................30

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 257 (D.D.C. 2018) .............................................................................19

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...................................................................................42, 43

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................................16

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ....................................................................................................29

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) .................................................................................................18, 27

*Nat. Res. Def. Council v. Kempthorne*,
525 F. Supp. 2d 115 (D.D.C. 2007) .............................................................................44

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ......................................................................................16

*\*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001) ...............................................................................29, 32

*Nat'l Lifeline Ass'n v. FCC*,
No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) ......................................40

*New York v. Trump*,
No. 25-cv-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025)..............................10, 11

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................................................17

*PayPal, Inc. v. CFPB*,
728 F. Supp. 3d 31 (D.D.C. 2024) ..............................................................................23

*Pennsylvania v. DeVos,*
 480 F. Supp. 3d 47 (D.D.C. 2020) ............................................................................. 17

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
 613 F.3d 220 (D.C. Cir. 2010) ................................................................................. 31

*Propert v. District of Columbia,*
 948 F.2d 1327 (D.C. Cir. 1991) ............................................................................... 29

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
 758 F.3d 296 (D.C. Cir. 2014) ................................................................................. 31

*S. Educ. Found. v. U.S. Dep't of Educ.,*
 No. CV- 25-1079, 2025 WL 1453047 (D.D.C. May 21, 2025) ............................... 40

*Shell Offshore Inc. v. Greenpeace, Inc.,*
 No. 3:12-cv-00042, 2012 U.S. Dist. LEXIS 74387 (D. Alaska May 29, 2012) ..... 29

*Sierra Club v. EPA,*
 292 F.3d 895 (D.C. Cir. 2002) ................................................................................. 16

*Sierra Club v. EPA,*
 793 F. Supp. 3d 158 (D.D.C. 2025) ......................................................................... 24

*Sierra Club v. U.S. Army Corps of Eng'rs,*
 990 F. Supp. 2d 9 (D.D.C. 2013) ............................................................................. 43

*Smoking Everywhere, Inc. v. FDA,*
 680 F. Supp. 2d 62 (D.D.C. 2010) ........................................................................... 42

*Tri Cnty. Indus., Inc. v. District of Columbia,*
 104 F.3d 455 (D.C. Cir. 1997) ................................................................................. 30

*United States v. Swank,*
 451 U.S. 571 (1981) ................................................................................................. 29

*Wash. Teachers' Union, Loc. No. 6 v. Am. Fed'n of Teachers,*
 751 F. Supp. 2d 38 (D.D.C. 2010) ........................................................................... 42

*\*Winter v. Nat. Res. Def. Council,*
 555 U.S. 7 (2008) ............................................................................................. 17, 40

*World Shipping Council v. Fed. Maritime Comm'n,*
 152 F.4th 215 (D.C. Cir. 2025) .......................................................................... 18, 19

*Xiaomi Corp. v. Dep't of Def.,*
 No. CV 21-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) .................................... 19

*XP Vehicles, Inc. v. DOE,*
   118 F. Supp. 3d 38 (D.D.C. 2015) ........................................................................20

*Zevallos v. Obama,*
   793 F.3d 106 (D.C. Cir. 2015) ....................................................................23, 32

## STATUTES

5 U.S.C.
   § 558 ....................................................................................................2, 32, 33
   § 558(c) ..........................................................................................................33
   § 704 ...............................................................................................................16
   § 705 ...............................................................................................................17
   § 706(2) ...........................................................................................................18
   § 706(2)(A) ......................................................................................................33
   § 706(2)(C) ......................................................................................................33
   § 706(2)(D) ......................................................................................................32

43 U.S.C.
   § 1334 ........................................................................................................35, 36
   § 1334(a)(1)(B) ..........................................................................................35, 36
   § 1337 ....................................................................................................34, 35, 36
   § 1337(p) ........................................................................................................35
   § 1337(p)(1)(B) ..............................................................................................34
   § 1337(p)(1)(C) ................................................................................................5
   § 1337(p)(4) ................................................................................................6, 26
   § 1337(p)(4)(F) ..........................................................................................26, 34
   § 1337(p)(5) ....................................................................................................34
   § 1341 ........................................................................................................35, 36
   § 1341(c) ......................................................................................................6, 34
   § 1341(d) ..........................................................................................................34
   § 1349 ...............................................................................................................16
   § 1349(a)(3) ....................................................................................................17

## RULES

Fed. R. Civ. P. 65(c) ............................................................................................45

## REGULATIONS

30 C.F.R.
   § 585.118 ..........................................................................................................17
   § 585.415(b) ......................................................................................................34
   § 585.417 ............................................................................................................6
   § 585.417(b) ................................................................................................34, 36
   § 585.600 ..........................................................................................................33

## CONSTITUTIONAL PROVISIONS

U.S. Const., amendment V...............................................................................................2, 28

## OTHER AUTHORITIES

90 Fed. Reg. 8363 (Jan. 29, 2025) ..............................................................................10, 11

90 Fed. Reg. 8433 (Jan. 29, 2025) ...................................................................................28

Pub. L. 83-212..................................................................................................................35

Pub. L. 109-58, § 388, 119 Stat. 744-47 .........................................................................35

Pub. L. No. 109-58, 119 Stat. 594, 746 .............................................................................5

## INTRODUCTION

This suit challenges the Department of the Interior's unlawful attempt to suspend the activities of the Sunrise Wind Farm and Sunrise Wind Export Cable (the "Project"), an offshore wind project that will deliver much needed, reliable power to customers in the State of New York. Interior authorized those activities, issuing Plaintiff Sunrise Wind LLC ("Sunrise Wind") the relevant approvals in 2024 following years of review.  Sunrise Wind has spent or committed over $7 billion to develop the Project, which is now nearly 45% complete.

As this Court knows, Defendants first attempted to stop a separate offshore wind project— the Revolution Wind Farm and Revolution Wind Export Cable ("Revolution Wind Project")— with a Director's Order on August 22, 2025 ("First Revolution Stop Work Order").  Compl., *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 4, 2025), Dkt. 1.  That Order required Revolution Wind to "halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf" based on purported "concerns" with national security interests, among other things.  *Id.*  This Court swiftly enjoined the First Stop Work Order, finding it to be "the height of arbitrary and capricious" government action, noting that, without injunctive relief, "the entire enterprise could collapse."  Tr. of Prelim. Inj. Hrg. 41:18-19, 43:9-10, *Revolution Wind*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 26, 2025), Dkt. 39.  In a substantially similar action, on December 22, 2025, Defendant Matthew Giacona issued a "Director's Order" to Sunrise Wind ("Stop Work Order" or "Order") ordering it to "suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security." Compl., Ex. A.

The Stop Work Order, like the First Revolution Stop Work Order, was issued without notice or hearing and offers no reasoning other than a conclusory assertion of "impacts to national security from offshore wind projects."  *Id.* at 1.  But national-security considerations were

comprehensively addressed through more than 10 years of review and approval by the responsible federal regulators, including Defendants.  In 2024, this review culminated in a Record of Decision that the Project is consistent with law, including with national security requirements.[2]

The Stop Work Order violates the Administrative Procedure Act ("APA"), the Outer Continental Shelf Lands Act ("OCSLA"), and the Fifth Amendment.  If allowed to remain in force, the Order is estimated to cost Sunrise Wind more than $1.25 million per day.  And compounding costs of delay and deferring commercial operation risk Project cancellation, which would cause Sunrise Wind to suffer losses of more than $8 billion.  This Court should ultimately reject the Order.  For now, the Court should stay the Order and preliminarily enjoin its enforcement.  Sunrise Wind respectfully asks the Court to grant this relief by the week of **February 1, 2026, and no later than February 6, 2026**, to halt the ongoing irreparable harm caused by the Order.  All of the relevant factors support preliminary injunctive relief.

*First*, Sunrise Wind has a strong likelihood of success on the merits.  The Stop Work Order is arbitrary and capricious:  It is conclusory; it is internally inconsistent; and it is overbroad.  The Order ignores that the Government has stated plainly that the Project does not interfere with national security.  It also ignores Sunrise Wind's substantial actions and billions of dollars of investment made in reliance on Defendants' approvals of the Project.  And BOEM lacks statutory authority to order a suspension of activities under these circumstances.  Finally, BOEM issued the Stop Work Order—and thus immediately impaired Sunrise Wind's property interests in its lease— without notice and a hearing, in violation of the U.S. Constitution and 5 U.S.C. § 558.

---

[2] The Project's Record of Decision, jointly issued by BOEM, NOAA Fisheries, and the National Park Service, (Mar. 25, 2024) is available at https://www.boem.gov/renewable-energy/state-activities/record-decisionsunrise-windocs-0487.

*Second*, Sunrise Wind will suffer imminent and irreparable harm if the Stop Work Order remains in force and Sunrise Wind is unable to proceed with construction on the outer continental shelf ("OCS") and timely achieve and maintain commercial operation.  The Order was issued mid-construction, with the Project nearly 45% complete.  Sunrise Wind has carefully sequenced its construction schedule and has contracted specialized vessels necessary for construction.  These specialized vessels are in limited supply globally and are tightly scheduled.  If the Stop Work Order is not lifted by the week of **February 1, 2026, and no later than February 6, 2026**, there is a very high risk Sunrise Wind will not complete installation of the mid- and far-shore portion of its offshore export cable before the latest vessel availability date for the specialized vessel required to complete that critical work.  If that happens, the Project's first power and commercial operations dates will be delayed.  Such delay would in turn delay revenue generation, compromise the Project's financial viability, and create a substantial risk of its cancellation.

Sunrise Wind has already spent or committed over $7 billion to date on Project development in reliance on Defendants' approvals.  If the Project is cancelled, Sunrise Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total loss of more than $8 billion.  Additionally, Sunrise Wind would forgo billions of dollars in revenues under the Offshore Renewable Energy Certificate Purchase Agreement (the "OREC Agreement") it executed with the New York State Energy Research and Development Authority ("NYSERDA") over the life of the Project.

*Third*, the balance of the equities and the public interest favor immediate relief.  The public has a significant interest in the reliable energy the Project will provide to the State of New York, the Project's significant reliability, economic, and job benefits, and the health benefits associated with the Project.  By contrast, neither the public nor the Defendants will suffer harm if this Court

preserves the status quo by preliminarily enjoining enforcement of the Stop Work Order. Although the BOEM Order stated that Defendants rely on national security grounds found in classified information as rationale for its issuance, Defendants have shown no interest in taking any timely action on it. Instead, Defendants sat on the information for a month prior to issuing the Stop Work Order without notice and have now refused to share that information with qualified individuals with security clearances, raising serious questions about Defendants' true intentions.

## BACKGROUND

### A. The Project

The Project involves the construction and operation of an approximately 924-megawatt ("MW") commercial-scale offshore wind energy facility in federal waters on the OCS offshore Massachusetts, New York, and Rhode Island. Decl. of Ryan Chaytors in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review ¶ 7 ("Chaytors Decl."), attached as Exhibit A. BOEM's decision to approve the Project's Construction and Operations Plan ("COP") followed years of environmental, national security, and safety reviews by Federal and State agencies. *Id.* ¶ 12.

Once operational, the Project will connect to the transmission system managed by the New York Independent System Operator ("NYISO") and bring approximately 924 MW of offshore wind capacity to the State of New York pursuant to the OREC Agreement with NYSERDA. *Id.* ¶¶ 7-8. If the Project is cancelled, Sunrise Wind would forgo billions of dollars of revenue under the OREC Agreement over the life of the Project. *Id.* ¶ 43.

The Project has been under construction for more than two years and is now nearly 45% complete. *Id.* ¶¶ 9, 15. Offshore work has included site-preparation activities on the OCS (including boulder clearance and pre-lay grapnel runs along the export cable corridor and rock pad installation at the offshore convertor station location), horizontal directional drill work at the export cable landfall site in New York State waters, offshore site-preparation including boulder

relocation at foundation locations and along inter-array cable corridors, and installing scour protection at the monopile foundation locations. *Id.* ¶ 17. When the Stop Work Order issued, 44 out of 84 of the monopile foundations had been installed. *Id.* ¶ 19. Sunrise Wind has also installed the Offshore Converter Station jacket and topside and the nearshore portion of the offshore export cable. *Id.* ¶ 17.

The Stop Work Order imperils Sunrise Wind's ability to complete the mid- and far-shore offshore export cable installation scope of work, which is expected to start the week of February 1, 2026, and take approximately four to six months. *Id.* ¶ 22. That installation must be complete by July 2026, when a crucial construction vessel must depart, to avoid cascading delays because there are later construction phases which cannot begin until the export cable is installed. *Id.* Prior to the Stop Work Order, Sunrise Wind was projected to achieve first power in October 2026 and commercial operations in 2027, both important milestones in revenue generation for the Project's financial viability. *Id.* ¶¶ 23, 37, 38, 47.

To date, Sunrise Wind has spent or committed over $7 billion developing, permitting, engineering, procuring, fabricating, preparing for, and constructing the Project in reliance on BOEM's COP Approval. *Id.* ¶¶ 9, 28, 43. The Project will generate enough reliable energy to power nearly 600,000 homes and, prior to the Stop Work Order, Sunrise Wind had been forecasted to start delivering power to the grid as early as October 2026. *Id.* ¶¶ 23, 51. The Project will also help meet New York State's energy and emissions reduction goals. *Id.* ¶ 59.

## B. OCSLA

OCSLA governs energy development on the OCS. In 2005, Congress amended the statute to add Section 1337, which authorizes Interior to grant OCS leases for alternate energy sources, including offshore wind. 43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746. The Secretary is required to "ensure that any activity under [§ 1337(p)] is carried out in a manner that

provides for" twelve enumerated goals, including "protection of national security interests of the United States[.]" 43 U.S.C. § 1337(p)(4). OCSLA and its implementing regulations also address Interior's limited authority to issue lease suspensions. In particular, 43 U.S.C. § 1341(c) requires that all leases contain a provision "whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States . . . to suspend operations under any lease[.]" OCSLA also allows the Secretary of the Interior to issue regulations allowing "for the suspension or temporary prohibition of any operation or activity" pursuant to a lease or permit in limited circumstances, including "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or to the marine, coastal, or human environment . . . ." *Id.* § 1334(a)(1). BOEM's implementing regulations provide that BOEM may order a "suspension" of a lease in only two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease[,]" or (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417. Under OCSLA's regulations, if BOEM orders a lease suspension, BOEM's "written order [must] explain the reasons for its issuance and describe the effect of the suspension order on [the] lease . . . and any associated activities." *Id.* § 585.418(c). Sunrise Wind's Lease also provides that, in the event of a suspension under § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally be given before requiring a suspension[.]" Compl., Ex. B at Addendum C, Sec. 3.2.2. Such "[s]uspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours[.]" *Id.* at Addendum C, Sec. 3.2.3.

## C. Multi-Year Review And Approval Process

Over the course of more than a decade, Sunrise Wind has undertaken an extensive multi-

year environmental, national security, and safety review to comply with numerous federal laws. These processes have resulted in thousands of pages of information and analysis supporting the agencies', including Defendants', approvals of the Project.   Chaytors Decl. ¶¶ 10-13.

### 1.  BOEM's National Security Review

Beginning approximately 16 years ago, BOEM conducted an environmental assessment of potential wind energy areas offshore Massachusetts and Rhode Island, including consultation with the Department of War ("DOW")[3] on potential national security issues.   Chaytors Decl. ¶ 10. Relevant meeting materials from December 10, 2010; May 2, 2011; and March 1, 2012, reflect participation by Department of the Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport. *Id.*  BOEM issued a final environmental assessment in May 2013, concluding leasing and site assessment activities in the proposed lease sale area would result in no significant effects.  *Id.*

After Sunrise Wind submitted its COP to BOEM in September 2020 and in August 2021, BOEM kicked off a more than two-year process preparing an Environmental Impact Statement for the COP.  *Id.* ¶ 12.   The process involved Sunrise Wind and a multitude of federal agencies, including as relevant here, the Bureau of Safety and Environmental Enforcement ("BSEE"), DOW, Navy, North American Aerospace Defense Command ("NORAD"), U.S. Air Force, U.S. Coast Guard, and Federal Aviation Administration ("FAA").  *Id.* ¶ 14; Decl. of Edward LeBlanc in Supp. of Pl.'s Mot. for a Preliminary Inj. and Stay Pending Review ¶ 27 ("LeBlanc Decl."), attached as Exhibit B.

---

[3] Because the majority of the documents involved in the Project's consultations and approvals predate the renaming of the "Department of Defense" to the "Department of War" this brief uses "Department of War" or "DOW," except where a quoted document or other material refers to the "Department of Defense" or "DOD."

2. **DOW, U.S. Coast Guard, And Federal Aviation Administration Review And Consultation**

The DOW, U.S. Coast Guard, and Federal Aviation Administration ("FAA") extensively reviewed the Project.  At each stage of the regulatory process, BOEM consulted with the DOW to assess national security.  LeBlanc Decl. ¶ 27.  The Project itself also repeatedly communicated with agencies regarding national security, navigation safety, and aviation, including the U.S. Coast Guard, U.S. Naval Undersea Warfare Center, U.S. Air Force, North American Aerospace Defense Command ("NORAD"), U.S. Army, U.S. Army Corps of Engineers, and FAA.  *Id*.  After consulting with the DOD Clearinghouse, the DOW division responsible for reviewing energy infrastructure for potential impacts to military missions, in January 2025 Sunrise Wind entered into a mitigation agreement with DOW and the U.S. Air Force to address national security risks and to mitigate potential adverse effects on military operations and readiness, including to protect military radar systems (the "DOD Agreement").  *Id.* ¶¶ 28-31.  The agreement requires, for example, that Sunrise Wind provide funding for upgrading radar system capabilities and to "immediately curtail wind turbine operations" upon request from NORAD for national security or defense purposes.  LeBlanc Decl., Ex. 3 at 6.  The parties "agree[d] that the terms [set forth] will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."  LeBlanc Decl., Ex. 3 at 2.

BOEM coordinated with the FAA during review of "the proposed facilities, project design, project activities, and fabrication and installation details in the COP."  Record of Decision, Appendix B, at 1.  Sunrise Wind coordinated "with the DOD and FAA for air surveillance radar systems," FEIS at 3-523, and agreed that "[t]he [wind turbine generators] would be lit and marked in accordance with Federal Aviation Administration (FAA) . . . requirements for aviation . . .

obstruction lighting," FEIS at 2-39.[4]   COP Condition of Approval 5.1.1 requires that the Project use "an FAA-approved vendor for the Aircraft Detection Lighting System (ADLS)," which activates the FAA hazard lighting.[5]   Further, the wind turbine generators "would be constructed under the listed FAA flight level ceiling designated within the Project area, therefore, would not affect commercial or military flight operations."  Record of Decision, Appendix B, at 24.  Finally, numerous other COP conditions of approval incorporate FAA requirements and recommendations. *See* Conditions of COP Approval, 3.1.1.3, 5.1.1, 5.2.3, and 7.10; Record of Decision at 111, 115, 120, 188.

3.   **BOEM's COP Approval and Conditions**

BOEM requested that the DOD Clearinghouse coordinate within the DOW to review the Sunrise Wind COP.  LeBlanc Decl. ¶ 25.  And BOEM coordinated with the DOW "to develop measures necessary to safeguard against potential liabilities and impacts on DoD activities," imposing several conditions on Sunrise Wind's COP approval to address national security considerations, including a mitigation agreement (i.e., the DOD Agreement).  LeBlanc Decl. ¶¶ 26, 28, 30-32.  The Record of Decision documents BOEM's determination that the COP, with modifications and Conditions of Approval, complies with each of OCSLA's § 1337(p)(4) factors, including with respect to national security.  Record of Decision, Appendix B at 18-20, 27.

---

[4]  BOEM, Sunrise Wind FEIS (Dec. 2023),  https://www.boem.gov/renewable-energy/state-activities/sunrise-wind-final-environmental-impact-statement-feis-commercial.

[5]  BOEM, Conditions of COP Approval Lease Number OCS-A 0487 (Jun. 21, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/5774_App%20A_Sunrise%20Wind_Conditions%20of%20COP%20Approval_OCS-A%200487_FINAL.pdf.

### D. The Presidential Memorandum And First Revolution Stop Work Order

The Administration has now taken numerous actions targeted at offshore wind energy projects, many of which have been vacated or enjoined.  On January 20, 2025, the President issued a Memorandum entitled "Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects" (the "Presidential Memorandum"), which, among other things, paused new wind energy authorizations pending a "comprehensive review of the ecological, economic, and environmental necessity of terminating or amending any existing wind energy leases."  90 Fed. Reg. 8363 (Jan. 29, 2025).  Several States challenged the permitting pause in the United States District Court for the District of Massachusetts.  *New York v. Trump*, No. 25-cv-11221 (D. Mass.). On December 8, 2025, the court issued a memorandum opinion vacating the federal agency defendants' implementation of the pause on new wind energy authorizations in its entirety.  *New York v. Trump*, No. 25-cv-11221, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).  The court found, among other things, that federal agency defendants "concede[d] that the sole factor they considered in deciding to stop issuing permits was the President's direction to do so."  *Id.* at *14.[6]

---

[6] Numerous other federal actions designed to harm wind and solar projects were recently challenged in *Renew Northeast v. U.S. Dep't of the Interior*, 1:25-cv-13961 (D. Mass filed Dec. 23, 2025).  The Government is also seeking to remand the BOEM approved COPs for numerous offshore wind projects. *Mayor and City Council of Ocean City, Maryland v. U.S. Dep't of the Interior*, 1:24-cv-03111-SAG, Dkt. 81 (D. Md. filed Sept. 12, 2025); *Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, 1:25-cv-02211-JMC, Dkt. 13 (D.D.C. Sept. 26, 2025); *Ack for Whales, Inc. v. U.S. Dep't of Com.*, 2:25-cv-1678-JW, Dkt. 18 (D.D.C. filed Dec. 2, 2025).  And most recently it issued virtually identical stop work orders against the five offshore wind projects in active construction: Sunrise Wind, Revolution Wind, Vineyard Wind, Empire Wind, and Coastal Virginia Offshore Wind.  *See* LeBlanc Decl. ¶ 8.

On July 29, 2025, Secretary Burgum issued Secretarial Order 3437 to implement the Presidential Memorandum.[7]  He instructed the Assistant Secretary for Land and Minerals Management to provide him a report by September 12, 2025, with recommendations for (among other things) addressing the effects of offshore wind projects on military readiness.  *Id.* at 6.

On August 22, 2025, BOEM issued the First Revolution Stop Work Order, which affected another separate offshore wind project.[8]  Le Blanc Decl. ¶ 6 n. 7.  That Order directed Revolution Wind "to halt all ongoing activities related to the Revolution Wind Project on the outer continental shelf (OCS) to allow time for [BOEM] to address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025." *Id.*

Revolution Wind brought suit in this Court challenging the First Revolution Stop Work Order.  *See* Compl., *Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL (D.D.C. Sept. 4, 2025), Dkt. 1.  This Court preliminary enjoined the First Stop Work Order.  Order Granting Prelim. Inj., *Revolution Wind*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 22, 2025), Dkt. 36.  It found that the First Stop Work Order was "the height of arbitrary and capricious action" because it "represent[ed] a clear change in position on the part of [BOEM], which previously certified that the project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process for the project" and "there are strong reliance interests at stake."  Tr. 41:18-19, 41:1-5, 43:6-7, *Revolution Wind*, No. 1:25-cv-02999-RCL, (D.D.C. Sept. 26, 2025), Dkt. 39.  The Court also concluded that without injunctive relief, Revolution Wind's "entire enterprise could collapse." *Id.* at 43:9-10.  The Federal Defendants did not appeal the Court's decision.

---

[7] Secretarial Order 3437, https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign.

[8] BOEM, Revolution Wind Director's Order (Aug. 22, 2025), https://www.boem.gov/renewable-energy/directorsorder-20250822pdf.

### E. Federal Agencies' Lack of Stated National-Security-Related Concerns

Since Sunrise Wind entered into the DOD Agreement in January 2025, other than during the government shutdown, Sunrise Wind has continued to participate in regular biweekly meetings with BOEM and BSEE to discuss construction updates, plans, reports, mitigation agreements and other issues related to the Project. Chaytors Decl. ¶ 26. The most recent biweekly meeting was with BOEM and BSEE on January 6, 2026. *Id.* During these meetings, neither BOEM nor BSEE raised any national security concerns. *Id.*

Sunrise Wind also met weekly with BSEE throughout 2025 and into 2026 to discuss the certification and verification process. Chaytors Decl. ¶ 26. The most recent of these meetings was held with BSEE on January 6, 2026. *Id.* BSEE never raised any national security concerns at these meetings. *Id.* Ørsted's Marine Affairs team has also continued to have regular weekly meetings, even during the government shutdown, with the U.S. Coast Guard to discuss Project construction progress and activities. LeBlanc Decl. ¶ 36; Chaytors Decl. ¶ 27. Representatives from BOEM and BSEE frequently attended these meetings. *Id.* The most recent meeting was on January 5, 2026. LeBlanc Decl. ¶ 36; Chaytors Decl. ¶ 27. No agency attending raised any national security concerns during any of these meetings. *Id.* Additionally, the same Project representatives participate in the U.S. Navy-sponsored Thames River Users Group, where unclassified information relative to the U.S. Navy submarine base at Groton is routinely discussed. In none of these forums has any national defense concern ever been raised by any of the participants, including the DOW or the U.S. Coast Guard. LeBlanc Decl. ¶ 36; Chaytors Decl. ¶ 27.

Between execution of the DOD Agreement in January 2025 and issuance of the Stop Work Order on December 22, 2025, Sunrise Wind never received any communication from any military agency suggesting the existence of any national security concerns with the Project, notably

including in the period after BOEM says it received an additional assessment from DOW.  LeBlanc Decl. ¶¶ 30, 35-36.

### F.  The Stop Work Order

On December 22, 2025, with no advance notice to Sunrise Wind, Defendant Giacona issued the Stop Work Order, directing Sunrise Wind to "suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security."  Stop Work Order at 1, Compl., Ex. A.  Like the First Revolution Stop Work Order, the Sunrise Wind Stop Work Order is approximately 1 page and does not acknowledge the Project's 2025 mitigation agreement with DOW.  *Id.*  It states that "[b]ased on BOEM's initial review of" "new classified information," (which BOEM had received from DOW in November 2025), "including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects[,]" "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities."  *Id.*

The Order also notes that BOEM "will determine whether the national security threats relating to this project can be mitigated" and "will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled."  *Id.*  It "invite[s] [Sunrise Wind] to meet and confer" about these issues.  *Id.*  It also notes that BOEM could "further extend the 90-day suspension" pending discussions with the DOW.  *Id.*

Interior's public statements provide different and additional information that appears to conflict with the Order.  In a subsequent press release about the Stop Work Order—and about nearly identical orders issued against four other offshore wind projects—Interior gave additional reasoning that was not in the Order itself:

As for the national security risks inherent to large-scale offshore wind projects, unclassified reports from the U.S. Government have long found that the movement of massive turbine blades

and the highly reflective towers create radar interference called "clutter."  The clutter caused by offshore wind projects obscures legitimate moving targets and generates false targets in the vicinity of the wind projects.

The Department of Energy in a 2024 report stated that a radar's threshold for false alarm detection can be increased to reduce some clutter, but an increased detection threshold could cause the radar to "miss actual targets."[9]

In another offshore wind project's litigation challenging its nearly identical stop work order, Defendant Giacona stated that he reviewed the allegedly new "classified material" from the DOW on November 26, 2025—nearly a month before issuing the Stop Work Order (which nevertheless claims that the Project has "the potential to cause . . . immediate . . . harm").  Decl. of Matthew Giacona ¶¶ 9-11, *Va. Elec. & Power Co. v. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. filed Dec. 27, 2025), Dkt. No. 19-1; Compl., Ex. A.  Giacona also stated that, after his initial review, he again reviewed that classified information with "senior Department [of the Interior] leadership in early December 2025."  *Id.* ¶ 11.  To the extent an exigent issue was presented in this information, Defendants did not promptly address it.  This is particularly true now that Defendants refuse to provide access to classified information for Sunrise Wind representatives who hold national security clearances and will only "consider" sharing the classified information after "resolution of the litigation."  Decl. of Bryan Stockton in Supp. of Pl.'s Mot. for Preliminary Inj. and Stay Pending Review ¶ 20 & Ex. 4 ("Stockton Decl."), attached as Exhibit C.[10]

---

[9] Press Release, U.S. Dep't of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

[10] In a January 8, 2026 declaration made in Revolution Wind, LLC's lawsuit challenging the Second Stop Work Order, the Department of the Interior's Deputy Assistant Secretary, Land and

In any event, in Secretary Burgum's press appearances announcing the five orders, he spoke extensively on other rationales for them that are unrelated to national security. On December 22, 2025, he gave an interview on Fox News in which he criticized offshore wind projects as "unreliable" and "unaffordable." LeBlanc Decl. ¶ 21. The next day, in another Fox News interview, he stated that offshore wind "is really expensive", that you could "get 1 gigawatt of power for one fifth of the price" from natural gas, that wind energy is "not reliable, it only works when the wind is blowing," and that "the people that love the whales are opposed to [offshore wind] because of the whale grounding." *Id.* ¶ 23. Secretary Burgum also posted on X that "[o]ffshore wind is a GIANT rip off for every American consumer," that "[i]t's TWICE as expensive to heat a home in New England, the birthplace of the American Revolution, than in Europe during a Russian Invasion!", and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!" *Id.* ¶ 24.

Sunrise Wind has fully complied with the Stop Work Order.

## JUSTICIABILITY

Sunrise Wind has Article III standing to challenge the Stop Work Order. Article III requires a plaintiff to sufficiently plead: (1) injury-in-fact; (2) a "causal connection between the injury and the conduct complained of;" and (3) a likelihood that the alleged injury "will be redressed by a favorable decision." *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The Stop Work Order injures Sunrise Wind by preventing construction and completion of the

---

Minerals Management, Jacob Tyner, provided a different reason for denying access, stating that, "[g]iven the foreign control over the Revolution Wind Project, BOEM is coordinating with DoW on whether access to the classified material with a secret designation by Developers is possible." *Revolution Wind, LLC v. Burgum, et. al.,* No. 1:25-cv-02999-RCL (D.D.C. Jan 5, 2026), Dkt. 60-1. The declaration failed to acknowledge that representatives of Revolution Wind, LLC (and Sunrise Wind) had already been told by the Department of the Interior that no classified information would be shared while litigation was pending. Stockton Decl. ¶¶ 20, 22 & Ex. 4.

Project, inflicting financial harm, and, depending on the length of delay, potentially jeopardizing the Project and the Sunrise Wind enterprise entirely. *See Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Sunrise Wind's injury is caused by the Stop Work Order and is redressable: If this Court provides preliminary injunctive relief against the Stop Work Order and vacates the unlawful agency action, Sunrise Wind will be able to continue its previously-approved, lawful construction of the Project.

BOEM's Stop Work Order is a final agency action subject to judicial review under 5 U.S.C. § 704. The Stop Work Order is in effect and "marks the consummation" of BOEM's decision-making to suspend Project activities on the OCS. *See Bennett v. Spear*, 520 U.S. 154, 156 (1997). This is true even if Defendants characterize the Stop Work Order as an "interim" decision because the decision to issue the Stop Work Order itself "is not itself subject to further consideration" by BOEM. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The Stop Work Order is also an action by which Sunrise Wind's "rights or obligations have been determined" and from which "legal consequences" have already flowed. *See Bennett*, 520 U.S. at 178. The Stop Work Order has already resulted in immediate, irreparable harm to Sunrise Wind. *See infra* at Section II. The Stop Work Order further "suspend[s] all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days[.]" *See* Compl., Ex. A.

Neither OCSLA nor the APA mandate administrative exhaustion as a prerequisite to this action. *See* 43 U.S.C. § 1349; 5 U.S.C. § 704. The relevant BOEM regulations also do not require exhaustion and do not make the decision inoperative pending appeal to the Interior Board of Land Appeals. *See* 30 C.F.R. § 585.118; *Darby v. Cisneros*, 509 U.S. 137, 154 (1993).

Further, this action is subject to immediate review pursuant to OCSLA's citizen-suit provision, which provides that "[a]n action may be brought . . . immediately after notification of

the alleged violation [of OCSLA] in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). Sunrise Wind notified Defendants of their violations before bringing this action. Sunrise Wind has a "legal interest" in the subject of the Stop Work Order that is immediately and adversely affected.

## ARGUMENT

Sunrise Wind is entitled to a stay of the Stop Work Order, and a preliminary injunction against enforcement of the Stop Work Order to preserve the status quo pending this Court's adjudication of this case on the merits. 5 U.S.C. § 705. Issuance of a stay under the APA is governed by the same four-factor test that generally governs preliminary injunctions: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 426 (2009)); *see also Nken*, 556 U.S. at 426; *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). All the preliminary injunction factors weigh strongly in favor of immediate relief here. This Court should maintain the status quo by staying the Stop Work Order and enjoining Defendants from enforcing the Order pending full adjudication on the merits.

## I.    SUNRISE WIND IS LIKELY TO SUCCEED ON THE MERITS

Sunrise Wind is likely to succeed on the merits of its claims that the Stop Work Order violates the APA, OCSLA, and the U.S. Constitution for many of the same reasons that this Court articulated when it enjoined the First Revolution Stop Work Order. The APA requires this Court to "hold unlawful and set aside" BOEM's Stop Work Order because it is "arbitrary" and "capricious," "contrary to constitutional right," and "contrary to law." 5 U.S.C. § 706(2).

17

**A.  The Stop Work Order Is Arbitrary And Capricious**

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The Stop Work Order fails these requirements on multiple grounds.

**1.  The Stop Work Order Lacks A Reasonable Explanation**

The Stop Work Order is arbitrary and capricious because it lacks a reasonable explanation for the suspension.  "To satisfy arbitrary-and-capricious review, an agency must at least reasonably explain its decision[.]"  *World Shipping Council v. Fed. Maritime Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025).  "[C]onclusory statements . . . do not substitute for the reasoned explanation that the APA requires."  *Env't Health Trust v. FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021).  And it is "arbitrary and capricious for the agency's decision making to be internally inconsistent."  *World Shipping Council*, 152 F.4th at 221.

The Order is unacceptably conclusory.  In justifying the suspension, the Order says only that DOW "provided senior leadership . . . with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."  Compl., Ex. A.  BOEM did not acknowledge the DOD Agreement or point to a single design or technical specification of Sunrise Wind that raised national security concerns.  *See id.*  Indeed, BOEM issued a substantively identical order to four other offshore wind projects, without reference to any specific project characteristics.  *See supra* at Background § F. While national security is undeniably important, "APA review . . . involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had

18

good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). BOEM was still required to complete the "critical step" of connecting facts to its conclusion. *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *5 (D.D.C. Mar. 12, 2021) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)). BOEM failed to do so.

BOEM's single reference to "classified information" in the Order does nothing to change this analysis (with no explanation for why suspension is "necessary"), particularly given indications that BOEM's purported national security rationale could be pretextual.

*First*, Secretary Burgum has made countless statements in subsequent public interviews and announcements maligning offshore wind energy unrelated to national security. LeBlanc Decl. ¶¶ 13-15, 20-24. In announcing the Stop Work Order on X, Secretary Burgum called the projects "expensive, unreliable, [and] heavily subsidized," and stated "ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED." *Id.* ¶ 14. Secretary Burgum's posts on X the following day similarly alleged that offshore wind is a "GIANT rip off for every American consumer," and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!" *Id.* ¶ 21.

These biased claims indicate that BOEM's Stop Work Order are likely motivated by political pressure to oppose the offshore wind industry rather than considerations "made relevant by Congress" in OCSLA, such as the national security rationale upon which Stop Work Order is purportedly based. *See Connecticut v. DOI*, 363 F. Supp. 3d 45, 63 (D.D.C. 2019); *see also XP Vehicles, Inc. v. DOE*, 118 F. Supp. 3d 38, 75-76 (D.D.C. 2015). Defendants' multi-year environmental, national security, and safety review process spanning three presidential administrations concluded that the Project should be permitted to proceed under all statutory and

regulatory review requirements. Yet, consistent with the Administration's aggressive anti-wind objectives, including its First Revolution Wind Stop Work Order that this Court enjoined, BOEM came up with a new purported rationale to shut down the Project.

*Second*, the absence of any indication of concerns from the DOW and military contacts during the Project's regular communications further indicates the conclusory nature of the Order. Since DOD Agreement was executed in January 2025, Sunrise Wind has not received any communication from the DOW, Air Force, Coast Guard, Navy, or any other military agency regarding national security concerns. LeBlanc Decl. ¶¶ 35-38. The Project met weekly with the Coast Guard, and BSEE and BOEM routinely attended those meetings. *Id.* ¶ 35. And no national security concerns have been raised in the Navy-sponsored Thames River (New London/Groton, CT) Users Group, where unclassified information relative to the Navy submarine base at Groton is routinely discussed. *Id.* Therefore, nothing in Sunrise Wind's experience or on the face of the Order itself suggests that the DOW deems Stop Work Order necessary or justified. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (finding agency action arbitrary and capricious when court was presented "explanation for agency action that is incongruent with what the record reveals about the agency's priorities"). The only information that Sunrise Wind has received related to Defendants' classified national security concerns is through the press and review of declarations (one heavily redacted) filed by federal personnel in various other pieces of litigation. LeBlanc Decl. ¶ 35.

*Third*, the Stop Work Order repeats arguments Interior already made with respect to the First Revolution Wind Stop Work Order that this court enjoined. Indeed, Secretary Burgum made comments about radar interference to justify the First Revolution Wind Stop Work Order that are substantially identical to what he has now said about the Sunrise Wind Stop Work Order (and the

orders to four other offshore wind projects, including Revolution Wind).  *See* Pl.'s Reply 11 n.6,

*Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL (D.D.C. Sept. 4, 2025), Dkt. 30;

LeBlanc Decl. ¶¶ 21-22.  Thus, Defendants repeated what appears to be that same failed rationale

to shut down Revolution Wind, this time alleging Sunrise Wind's national security concerns are

grounded in "classified" information and to date preventing representatives of Sunrise Wind with

appropriate security clearances (and those whose clearances could be reactivated) from evaluating

the sole stated basis for the Order.  Like the First Revolution Wind Stop Work Order, the Sunrise

Stop Work Order also halts work while the Defendants "invite" a discussion with the Project on

mitigating national security concerns, Compl., Ex A, which could have occurred more than a

month ago when these purported concerns were allegedly identified in November 2025.  That

BOEM's concerns are now classified as "secret" "does not mean that those concerns rise to such

a level that work must cease immediately."  *See* Tr. 40:13-25, *Revolution Wind, LLC v. Burgum,*

No. 1:25-cv-02999-RCL (D.D.C. Sept. 26, 2025), Dkt. 39 (recognizing that even when "national

security" was cited, the agency failed to "actually point to any factual findings" suggesting that

"those concerns rise to such a level that work must cease immediately").    Given that the

Government has taken no real steps to facilitate access for those Sunrise Wind representatives with

security clearance or provide unclassified summaries to those without security clearances, and that

it has now taken the position that it will not share classified information with Sunrise Wind until

after resolution of this litigation—even for purposes of discussing mitigation for the purported

"new" threat—until after the litigation is resolved, Stockton Decl. 5, underscores the lack of

immediacy or existence of a true threat level on the part of BOEM.

Indeed, while the Stop Work Order stated that it was "[b]ased on BOEM's initial review

of [the] classified information," Compl., Ex. A, two weeks later, Defendants conceded (in litigation

pending before this Court in relation to Revolution Wind's identical order), that BOEM's decision was actually only "based in part" on classified information, implicitly acknowledging an unclassified basis that is a post-hoc rationalization.[11]  While BOEM's notice did not identify this other, unclassified information, the press release by Interior accompanying the Stop Work Order discussed "unclassified reports from the U.S. Government," including a 2024 report that the release characterizes as having found radar interference from turbine blades.  LeBlanc Decl. ¶ 16. This suggests that the unclassified information is not only a post-hac rationalization, but also information that is nearly two years old.  (Notably, that report, which predated Sunrise Wind's DOD Agreement, acknowledged that "'[w]ind farm operational agreements" such as the DOD Agreement have "been employed as a means of mitigating impacts to radar systems.'"  LeBlanc Decl. ¶ 19)  Secretary Burgum has similarly made repeated unclassified statements on national news about "radar interference" and "drones," LeBlanc Decl. ¶¶ 20-23 , just as he did in relation to the First Revolution Wind Stop Work Order.  *See* Pl.'s Reply 11 n.6, *Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL (D.D.C. Sept. 26, 2025) Dkt. 30; *see* LeBlanc Decl. ¶ 22. Specifically, Secretary Burgum apparently provided at least a partial unclassified summary of DOW's assessment, saying that it "zeroes in" on changed "adversarial threats," and discussing use of drones in foreign conflicts.  LeBlanc Decl. ¶ 20.  These statements similarly fail to provide Sunrise Wind a reasonable basis to understand the Stop Work Order because they are not referenced on the face of the decision document itself.  And they are a concession by Defendants that additional unclassified information could have been provided in the Stop Work Order so that Sunrise Wind, as well as the public, can evaluate the nature of BOEM's decision.  To date, BOEM

---

[11] *Revolution Wind, LLC v. Burgum, et. al.,* No. 1:25-cv-02999-RCL (D.D.C. Jan 5, 2026), Dkt. 56 (Notice of Intent to Share Classified Information For *Ex Parte* and *In Camera* Review).

has not only failed to engage with Sunrise Wind's requests for qualified representatives with the requisite security clearance to have access to the classified information, but has also failed to provide unclassified summaries of the information upon which it relied, so that Sunrise Wind may adequately defend itself.  *See Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018) (discussing unclassified summaries); *Zevallos v. Obama*, 793 F.3d 106, 117 (D.C. Cir. 2015) (same).  The Stop Work Order does not explain the factual basis for BOEM's concerns and therefore violates the APA.  *PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 39 (D.D.C. 2024) (failure to explain "*why*" facts supported an agency's "conclusory explanation" rendered it arbitrary and capricious).

BOEM's failure to articulate a satisfactory explanation leaves its decision without a justification "that can be scrutinized by courts and the interested public."  *Dep't of Com.*, 588 U.S. at 785.  At a minimum, the Court should take action to ensure that both Sunrise Wind and the Court can adequately probe the national security assertion.  The Court should require Defendants to share with representatives for Sunrise Wind that have appropriate security clearances access to the same information (including through reactivating recent government security clearances for Sunrise Wind's counsel), while also requiring that the Defendants provide unclassified summaries of the key decisional documents for those without clearances as part of its preliminary injunction order.  *See Fares*, 901 F.3d at 324.

The inconsistencies in BOEM's Stop Work Order also undercut any reasonable explanation that might otherwise satisfy BOEM's obligations under the APA.  *First*, BOEM purports to base the Order on national security information with "the potential to cause serious, immediate, and irreparable harm" from a DOW review completed in November 2025, and that BOEM Acting

Director Giacona has since disclosed he reviewed on November 26, 2025.[12]  However, Director Giacona did not issue the Order until December 22, 2025, approximately a month later.  Compl., Ex A.  At a minimum, this delay as well as the continued delay by the Defendants of providing Sunrise Wind sufficient information to address any "new" alleged threat is inconsistent with the purported "immediate" and "irreparable" harm necessitating the broad cessation of activities under the Order.  Compl., Ex. A; *cf. Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) ("[I]ntentional delay is in tension with the high bar they must clear to establish irreparable harm.").  And in combination with this Administration's repeated attempts to halt offshore wind development, the delayed timing of the Order until days after judgment setting aside the Presidential Memorandum, *see supra* Background § D, and the unrelated justifications presented at length by the Secretary in the press, the circumstances are suspect and indicate pretext.

*Second*, the Stop Work Order states that the harm posed by the Project "can only be feasibly averted by suspension of on-lease activities" but then "invites" Sunrise Wind to "meet and confer" about potential mitigation measures.  Compl., Ex A.  BOEM offers no explanation for why it took the drastic step of suspending activities without notice, despite existing mitigation measures in place that could have alleviated the need for suspension, or why 90 days is required for resolution.  The DOD Agreement addresses adverse impacts on radar, including a provision by which Sunrise Wind agrees to "immediately curtail wind turbine operations for a National Security or Defense Purpose," as defined in the agreement.  LeBlanc Decl. ¶ 33.  And the Project's COP Conditions of Approval require "all [wind turbine generator] rotors (blade assemblies) [be equipped] with control

---

[12] A different declaration submitted by Deputy Under Secretary of War for Acquisition and Sustainment, Dale R. Marks, in *Revolution Wind, LLC v. Burgum*, states that DOW provided the classified material to BOEM on November 13, 2025—nearly two weeks earlier.  No. 1:25-cv-02999-RCL (D.D.C. Jan 5, 2026), Dkt. 60-2.

mechanisms constantly operable from the Lessee's control center," enabling the Project to immediately initiate the curtailment of any wind turbine generator upon emergency order from the DOW or the Coast Guard. *Id.* ¶ 31 n.50. Sunrise Wind's Lease further provides that "[e]very effort will be made . . . to provide as much advance notice as possible of the need to suspend operations" and "[a]dvance notice will normally be given before requiring a suspension." Compl., Ex B, at Addendum C, Sec. 3.2.2. But Sunrise Wind had no notice before the Stop Work Order, despite frequent communications with BOEM and BSEE, and ongoing coordination with the military. *See* Chaytors Decl. ¶¶ 26-27; LeBlanc Decl. ¶¶ 35-38.

The inconsistency between no advance notice, ignoring existing mitigation, and then shutting down the Project effective immediately is unexplained. "Because [BOEM's] decision is internally inconsistent, it is arbitrary and capricious." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

### 2. BOEM Violated The Change-In-Position Doctrine By Ignoring Substantial Reliance Interests

The Stop Work Order is also arbitrary and capricious because it violates the "change-in-position doctrine." *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025). That doctrine makes clear that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* BOEM has failed to consider that Sunrise Wind developed substantial reliance interests based on Defendants' Project approvals.

In 2024, after years of exhaustive review, BOEM approved the Project, concluding its decision was consistent with 43 U.S.C. § 1337(p)(4) of OCSLA, "which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals," including national security. Record of Decision at 62; *see also* 43 U.S.C. § 1337(p)(4)(F).

BOEM's approval detailed its consideration of national security, explaining that "[a]t each stage of the regulatory process . . . BOEM has consulted with the DOD for the purposes of assessing national security considerations in its decision-making processes."  Record of Decision at B-18-19.  When determining the lease area, "DOD concluded that site-specific stipulations . . . could mitigate" any impacts and BOEM concluded that national security impacts would "be negligible and avoidable."  *Id.* at B-19.  And while "reviewing the COP," BOEM requested that the DOD Clearinghouse "coordinate within the DOD a review" of the COP, and "BOEM and the DOD Clearinghouse coordinated to address these concerns and to avoid or mitigate them."  *Id.*  BOEM then included those mitigation measures as conditions of approval.  *See id.* at Appendix A, Conditions 4.2-4.4.

BOEM's Stop Work Order represents a complete reversal of the BOEM's prior conclusions regarding national security.  But the Order fails to acknowledge that Defendants' prior approval of the Project and conclusion that there were no national security threats "engendered serious reliance interests."  *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30 (2020).  This Court reached the same conclusion in its oral decision enjoining the First Revolution Stop Work Order.  *See* Tr. 43, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 26, 2025), Dkt. 39 (court acknowledging reliance interests).

As the Supreme Court has explained, the APA requires an agency reversing a prior policy or agency action "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Regents*, 591 U.S. at 33.  BOEM did not even attempt to meet this standard.  Nothing in the Stop Work Order "address[ed] why [BOEM's] policy shift outweighs" Sunrise Wind's reliance interests or provided "good reasons for concluding those interests were insufficient to hold off the policy shift."  *CSL*

*Plasma Inc. v. CBP*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022). BOEM's passing reference to the Project's "construction status" says nothing about BOEM's consideration of reliance interests with respect to the Stop Work Order. Compl., Ex. A.

The reliance interests at stake here are immense. Sunrise Wind has spent or committed over $7 billion to date to plan, permit, develop, and construct this Project. If the Project is cancelled, Sunrise Wind anticipates that it would also incur more than $1 billion in breakaway costs, for a total of loss of more than $8 billion. Chaytors Decl. ¶ 43.

BOEM's unreasoned change in position itself is a sufficient basis for deeming the Stop Work Order arbitrary and capricious. *See Int'l Org. of Masters, Mates, & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating decision for "no regard for the parties' reliance interests").

### 3. The Stop Work Order Is Arbitrary And Capricious Because It Is Overbroad

The Stop Work Order is also arbitrary and capricious because it suspends *all* activities (other than to prevent health, safety, and environmental impacts) for a *minimum* of 90 days, without any explanation as to why a narrower suspension would not suffice. Agencies are required to "address" alternative "way[s] of achieving [their] objections" and give "adequate reasons" for abandoning those alternatives. *State Farm*, 463 U.S. at 48. BOEM failed to do so here.

Although the Stop Work Order itself leaves Sunrise Wind guessing as to what the purported national security concerns are, Secretary Burgum's interviews, *supra* Background § F, and the Interior press release, suggest that the concerns are related to "radar." LeBlanc Decl. ¶¶ 16, 20-23. It is unclear exactly how these concerns relate to the Project, but, in any event, concerns relating to radar interference do not justify (particularly given that the DOD Agreement is in place) an arbitrary total suspension of activities, including time-sensitive work related to undersea cables. Chaytors Decl. ¶¶ 21-22, 36. And, given that the lease suggests national security suspensions will

generally be limited to 72 hours, *see infra* Section I.D, BOEM offers no explanation why it chose a 90-day suspension, with indefinite renewals.  Compl., Ex. A.

Depriving the Project of the ability to continue to work on elements of the Project unrelated to any purported national security concerns is arbitrary and capricious.  This failure is particularly acute given that the Project was on schedule to achieve first power as early as October 2026, meaning that Sunrise Wind was expected to begin generating power, and delivering it to the grid, from a subset of the Project's wind turbine generators.  Chaytors Decl. ¶ 23.  Depriving the grid of needed power in the face of the President's and Secretary Burgum's own characterizations of an "energy emergency" in the United States is antithetical and overly broad.  *See, e.g.*, Executive Order 14156, Declaring a National Energy Emergency, 90 Fed. Reg. 8433 (Jan. 29, 2025).  Because BOEM "too cavalierly sidestepped its responsibility to address reasonable alternatives, its action was not rational and must, therefore, be set aside."  *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 784 F.3d 1, 18 (D.C. Cir. 2015).

## B.    The Stop Work Order Deprives Sunrise Wind Of A Significant Property Interest Without Due Process

The Stop Work Order is unconstitutional because it violates Sunrise Wind's Fifth Amendment due process rights.  The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const., amend. V.  "In assessing constitutional due process claims, [courts] ask two questions:  Did the Government deprive the party of a protected property interest?  If so, what process was due?"  *Amoco Prod. Co. v. Fry*, 118 F.3d 812, 819 (D.C. Cir. 1997); *see Nat'l Council of Resistance of Iran v. Dep't of State* ("*NCRI*"), 251 F.3d 192, 205 (D.C. Cir. 2001).  Sunrise Wind has a protected property interest in its lease, and BOEM's lack of notice and opportunity for hearing violated Sunrise Wind's due process rights.

1.  **BOEM Deprived Sunrise Wind Of Its Protected Property Interest**

Sunrise Wind has a protected property interest in its lease.  *See United States v. Swank*, 451 U.S. 571, 579 n.15 (1981); *Hoyl v. Babbitt*, 129 F.3d 1377 (10th Cir. 1997); *Shell Offshore Inc. v. Greenpeace, Inc.*, No. 3:12-cv-00042, 2012 U.S. Dist. LEXIS 74387, at *44 (D. Alaska May 29, 2012) (oil company had a property interest in OCS lease).  The Stop Work Order suspends Sunrise Wind's rights to develop its lease and to construct the Project on schedule, depriving Sunrise Wind of its Property Interest.  *See* Chaytors Decl. ¶¶ 28-48.

No rationale is provided as to why the Stop Work Order is for 90 days, and BOEM states that it "may further extend the 90-day suspension period" without limitation.  Compl., Ex. A.  Even "temporary or partial impairments to property rights . . . merit due process protection."  *Amoco Prod. Co.*, 118 F.3d at 819 (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)) (companies had protected property interest in temporarily-withheld funds).

2.  **BOEM Denied Sunrise Wind Required Pre-Deprivation Process**

The due process clause requires the government to provide notice and some form of hearing before deprivation of a property interest.  *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991).  The type of notice and hearing requires a balancing of:  (1) the "private interest" affected, (2) "the risk of erroneous deprivation" of that interest and the value of additional procedural safeguards; and (3) "the government's interest," including the burden and cost of additional procedures.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see NCRI*, 251 F.3d at 205-08.  All three factors demonstrate that Sunrise Wind was entitled to notice of the Stop Work Order and to sufficient information regarding the purported basis for the Order to provide Sunrise Wind an opportunity to contest the facts that BOEM considered.

*First*, Sunrise Wind's private interest, a significant property right in its lease and billions of dollars of private investments to develop the lease, supports pre-deprivation process.  *Cafeteria*

*& Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961). The Stop Work Order threatens the viability of the Sunrise Wind Project, and, in turn, Sunrise Wind's private property interests. Chaytors Decl. ¶¶ 28-48. The Supreme Court has found significant interests on far less. *See, e.g.*, *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991) (holding that attachment had significant effect on private property interests). Indeed, courts have found "the entitlement to continue construction without unfair interference—is substantial." *Tri Cnty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 461 (D.C. Cir. 1997).

*Second*, there is a high risk of erroneous deprivation without pre-deprivation process. This is not a situation where "the [agency]'s examination process included numerous safeguards against an arbitrary seizure," including "many opportunities" for the company "to express its views." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1100 (D.C. Cir. 1996). There were no safeguards, formal or informal. BOEM did not raise these issues with Sunrise Wind before issuing the Stop Work Order, despite many opportunities to do so. Chaytors Decl. ¶¶ 26-27; LeBlanc Decl. ¶¶ 35-38. Had BOEM taken these steps, Sunrise Wind could have explained its position, addressed any potential issues, and avoided the Order. Ørsted has extensive experience worldwide working cooperatively with military and national security governmental agencies (such as the North Atlantic Treaty Organization), to identify measures to meet the specific needs of those agencies, including, but not limited to, mitigating radar interference and potential threats from adversarial actors associated with offshore facilities, including offshore wind facilities. LeBlanc Decl. ¶8. Ørsted has first-hand experience of mitigation and enhancement measures, including installation of both land-based and offshore wind facility structure-based sensors (including radar) that mitigate radar interference and can enhance defense capabilities, this includes the installation of offshore surveillance equipment to detect and track incoming threats, and the installation of

subsea surveillance equipment in the form of active and passive sonars, distributed acoustic sensing (DAS) and other means to enhance underwater detection capability, and encryption and other systems that can be used to protect cables and secure signals. *Id.* ¶ 9.

An affected entity must have the information it needs "to tailor its submission to the [government's] concerns [and] rebut the factual premises underlying the [agency] action." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014). That is true even if "the information at the 'heart' of the [government]'s decision is classified." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-29 (D.C. Cir. 2010). It was possible for BOEM to provide unclassified evidence to Sunrise Wind a month ago. *See supra* at Background § F. BOEM also could have provided classified materials to Project representatives with security clearance.

*Third*, the only way BOEM can justify offering *no pre-deprivation process at all* is by showing that there are "exigent circumstances." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (citation omitted). BOEM has not shown that this is an "exigent" circumstance that justifies skipping pre-deprivation process. There is of course a strong government interest in national security, but the government has not identified any exigent circumstance sufficient to justify BOEM's failure to give Sunrise Wind notice and a fair opportunity to address BOEM's purported basis for the Stop Work Order and in fact that BOEM had this purported information for nearly six weeks before the Order was issued. Neither the government's privilege in classified information affecting national security, *NCRI*, 251 F.3d at 207, nor BOEM's assertion that it has preliminarily determined that offshore wind projects may implicate national security demonstrate that BOEM giving Sunrise Wind pre-deprivation process would interfere with the government's interest in national security. In other words, there is no indication that BOEM needed to withhold

from Sunrise Wind the nature or even existence of its concerns until after the decision was made. There is no evidence presented, for example, that it would harm national security interests to alert Sunrise Wind in advance to the idea that the government was considering suspending lease activities.  *Compare Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) (government needed to "block[] the assets of international narcotics traffickers" without giving advance notice to avoid "a substantial risk of asset flight").

Moreover, BOEM has had the information from DOW's review since November 13, 2025 and BOEM's Acting Director states he did not review it until November 26, 2025.  *See supra* at Background § F; *supra* n.12.  Yet BOEM waited until December 22, 2025 to issue the Stop Work Order.  This delay cuts against any government interest in issuing the Stop Work Order before giving Sunrise Wind notice and an opportunity to be heard.

### C.    The Stop Work Order Was Issued Without The Procedures Required By The APA

BOEM also violated the APA because it acted without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  APA Section 558 makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id.* § 558(c).  The APA defines a license as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  *Id.* § 551(8).  An OCSLA lease is a "form of permission" to use the OCS for energy development.  Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise."  *Id.*  Neither applies here.

The Stop Work Order suspended all ongoing Sunrise Wind activities on the OCS without any notice or opportunity to demonstrate compliance.  Compl., Ex. A.  As a result, Sunrise Wind

is unable to exercise its rights under the approved COP, including to conduct "activities pertaining to construction of facilities for commercial operations on [its] commercial lease." 30 C.F.R. § 585.600; *see also id.* §§ 585.620-585.628. But unspecified "national security implications," like evolution of technology that requires further study are insufficient justification to deny Sunrise Wind notice and an opportunity to demonstrate compliance before BOEM acted. 5 U.S.C. § 558(c). For the same reasons that BOEM has no interest in denying pre-deprivation process for constitutional due process purposes, § 558 is not satisfied here. There is nothing in the Stop Work Order that shows that this is an emergency circumstance that justifies the skipping pre-deprivation process required by the APA. *See supra* Background § F.

### D.    The Stop Work Order Was Issued Without Statutory Authority

The Court "shall . . . hold unlawful and set aside" final agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). BOEM "literally has no power . . . to act unless and until Congress confers power upon it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005) (internal quotation omitted). But Congress has not conferred the broad authority BOEM claims. Instead, OCSLA only authorizes BOEM to order a national security-based suspension under circumstances that have not been presented here.

In the Stop Work Order, BOEM invoked 30 C.F.R. § 585.417(b), which provides that "BOEM may order a suspension . . . when the suspension is necessary for reasons of national security or defense," although BOEM does not explain why suspension is "necessary" for reasons of national security. "A suspension is an interruption of the period of [a] lease" which extends the expiration date of the relevant period of the lease for the length in time the suspension is in effect. 30 C.F.R. § 585.415(b). BOEM also does not state that the lease has been extended. Interior cites 43 U.S.C. § 1337 as its authority for 30 C.F.R. § 585.417(b). *See id.* § 585.100. As relevant here,

§ 1337(p) gives the Secretary authority to grant leases on the OCS promoting "energy from sources other than oil and gas," including wind energy.  43 U.S.C. § 1337(p)(1)(B).  It directs the Secretary of the Interior to "ensure that any activity under this subsection [subsection (p)] is carried out in a manner that provides for . . . protection of national security interests of the United States," *id.* § 1337(p)(4)(F), and to "provide for the duration, issuances, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5).

Two other OCSLA provisions provide specific guidance on when BOEM may suspend activities and operations on the lease for reasons implicating national security.  *First*, the "national security clause" in 43 U.S.C. § 1341(c) requires BOEM to include a provision in every lease that confers authority on the Secretary to "suspend operations" "upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President of the United States."  Relatedly, § 1341(d), titled "national defense areas; suspension of operations; extension of leases," permits the "Secretary of Defense, with approval of the President," to designate "areas restricted from exploration and operation that part of the outer Continental Shelf needed for national defense," and to suspend operations on any leases in that area.  *Second*, 43 U.S.C. § 1334(a)(1)(B) authorizes BOEM to order "suspension or temporary prohibition of any operation or activity . . . pursuant to any lease or permit" "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . , or the marine, coastal, or human environment."  The Stop Work Order did not argue these circumstances are present.

Section 1337 must be read alongside—and is limited by—§§ 1341 and 1334(a)(1)(B).  *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 350 (2025).  OCSLA was originally enacted in 1953, Pub. L. 83-212, to provide for offshore oil and gas leasing.  *Healthy Gulf v. DOI*, 152 F.4th

180, 187 (D.C. Cir. 2025). When § 1337(p) was enacted to add renewable energy uses of the OCS, Pub. L. 109-58, § 388, 119 Stat. 744-47, Congress gave no indication that it intended to give the Secretary of the Interior more authority to suspend leases and activities for renewable energy uses than for oil and gas. Thus, Section 1337 is properly interpreted as authorizing suspensions only in the circumstances contemplated by either Section 1341 or Section 1334(a)(1)(B).

The agency appears to agree because it has structured Sunrise Wind's lease to follow Sections 1341 and 1334. Sunrise Wind's lease permits BOEM to "suspend . . . operations in accordance with the national security and defense provisions of [43 U.S.C. § 1341]." Compl., Ex. B at Sec. 3(c). The lease further provides that, in the event of a suspension under § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations" and that "[a]dvance notice will normally be given before requiring a suspension." *Id.* at Addendum C, Sec. 3.2.2. Such "suspensions . . . for national security reasons" will "not generally exceed seventy-two (72) hours." *Id.* at Addendum C, Sec. 3.2.3. Sunrise Wind's lease recognizes that "any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage"—i.e., pursuant to § 1334(a)(1)(B)—"requires a finding by the Lessor *of particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities." *Id.* at Sec. 8 (emphasis added). No other provisions of the lease contemplate that BOEM may issue the kind of order here.

Thus, read in context, § 1337's suspension authority reaches only as broadly as the authorities in §§ 1341 and 1334(a)(1)(B). Neither provision provides BOEM with authority here. Section 1341 does not apply because the Secretary of War has not recommended suspension during a declaration of war or national emergency, nor withdrawn areas of the OCS for national

defense.  *See* Compl., Ex. A.  And BOEM made no effort to comply with its promise to provide notice before a national security suspension in the lease.  *See* Compl, Ex. B at Addendum C.

Section 1334(a)(1)(B) is also inapplicable.  Under the lease provision mirroring the language of Section 1334, BOEM had to make a finding of "*particularized harm* that it determines can only be feasibly averted by suspension of on-lease activities."  *Id.* at Sec. 8.  And the harm must be "serious, irreparable, or immediate."  43 U.S.C. § 1334(a)(1)(B).  The Stop Work Order only discussed alleged harm stemming from "offshore wind projects" as a whole, not Sunrise Wind's specific project.  *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Particularized" harm is "personal and individual," not "general.").  And BOEM's conclusory assertions in the Stop Work Order cannot suffice to show that there is (1) "serious, irreparable, and immediate harm" that can (2) "only be feasibly averted by suspension of on-lease activities." Compl., Ex. A.

BOEM's suspension authority in 30 C.F.R. § 585.417(b) must be understood as limited to particularly situations contemplated by Congress in other parts of OCSLA.  Because BOEM's Stop Work Order went further, it improperly exceeded its statutory authority.

## II.    SUNRISE WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

Sunrise Wind is suffering immediate, irreparable harm from the Stop Work Order.  Sunrise Wind conservatively estimates that the Order is currently causing the Project losses of at least $1.25 million per day.  Chaytors Decl. ¶ 40.  These daily costs will also increase the longer work is stopped and are expected to jump significantly by $650,000 in February if the Project's export cable installation cannot commence, and by another approximately $850,000 if the wind turbine generator installation spread cannot commence.  *Id.*  Crucially, if Sunrise Wind does not obtain relief from the Stop Work Order by the week of **February 1, 2026**, **and no later than February**

**6, 2026**, it will result in significant Project delays that would in turn delay first power and commercial operations dates, and, therefore, revenue generation.  Depending on the length of the delay, this would threaten the Project's financial viability and force its cancellation, posing an existential risk to Sunrise Wind.  *Id.* ¶¶ 37, 60.

A.    **Sunrise Wind Faces Substantial Irreparable Harm From Construction Delays Due To The Order**

Sunrise Wind has sequenced its construction schedules to ensure efficient usage of scarce resources for the Project, including the limited amount vessels globally with the necessary capabilities to construct the Project.  *Id.* ¶ 31.  Offshore wind projects rely on highly specialized vessels that work on projects around the world, and if a project's construction schedule is delayed to the point that a specialized vessel needs to be rescheduled or replaced, it would not be uncommon to have to wait a year—or even multiple years—to find another open window when such a vessel is available in the right place and at the right time.  *Id.*  Compounding this scarcity is the fact that Sunrise Wind's contracts for project construction vessels include a latest vessel availability date, *i.e.*, the date after which the vessel must leave the Sunrise Wind Project for its next contractual engagement—regardless of whether its work on the Sunrise Wind Project is complete.  *Id.* ¶ 32.  Sunrise Wind has contracted (and reserved for a limited time) specialized vessels necessary for the Project's construction that limited supply globally and this delay threatens Sunrise Wind's ability to timely meet the Project's first power and commercial operations dates, which are in turn crucial to support the Project's financial viability.  *Id.* ¶¶ 32-37, 47.  Courts have found irreparable harm from agency action, like the Stop Work Order, that threatens timely completion of the project to avoid missing contractual deadlines.  *Columbia Gas Transmission Corp. v. An Easement to Construct, Operate, & Maintain a 24-inch Gas Transmission Pipeline Across Prop. in Greene Cnty.*, No. 3:07CV00028, 2007 WL 2220530, at *4 (W.D. Va. July 31,

2007); *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (granting preliminary injunction to avoid missing contractual deadlines); *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 26, 2025) Dkt. 39 (finding that Revolution Wind was "likely to suffer irreparable harm in the absence of an injunction" following BOEM's First Revolution Wind Stop Work Order).

Specifically, if the Stop Work Order is not enjoined by the week of **February 1, 2026**, **and no later than February 6, 2026**, there is a high risk that the Project's export cable installation will not be completed before the latest vessel availability date for the vessel needed to complete this work. Chaytors Decl. ¶ 37. Sunrise Wind has contracted with a highly-specialized vessel, the "Connector" to commence the mid-and far shore portion scope of work for the Project's export cable the week of February 1, 2026. *Id.* ¶¶ 33-34. This work is expected to take approximately four to six months, and the Connector's latest vessel availability date is July 25, 2026 (after which the vessel will not be available until 2027), leaving a very tight window to complete the export cable installation, especially if the work faces typical complications and delays including due to inclement weather and routine mechanical issues. *Id.* ¶ 35. No appropriate alternate vessels are expected to be available to begin to perform this work until at least late 2026. *Id.* And even if a suitable alternate vessel to the Connector could be located, Sunrise Wind would likely be unable to satisfy BSEE's certification process in time for export cable installation to begin in sufficient time to meet the Project's first power and commercial operations dates. Chaytors Decl. ¶ 36. Thus, if the Connector cannot begin the mid- and far-shore export cable installation scope of work by the week of February 1, 2026, there is a high risk that the Project's first power and commercial operations dates will be delayed, which would in turn delay revenue generation, and, depending on the length of the delay, threaten the Project's financial viability and force its cancellation. *Id.*

¶¶ 31-37.

Sunrise Wind is also scheduled to install all 40 remaining monopile foundations in 2026 and has contracted over a dozen vessels to complete this work.  *Id.* ¶ 38.  If the Stop Work Order pushes any monopile foundation installation out of the 2026 installation window, the entire Project's schedule will be delayed past the planned 2027 commercial operation date.  *Id.* ¶ 38. Vessel availability in 2027 is highly uncertain, and significant schedule delay due to vessel unavailability in future years (*e.g.*, not until 2028 or later) could result in project cancellation.  *Id.* In addition, the Project's wind turbine generation installation work is scheduled to begin in late February 2026, and the longer the Stop Work Order remains in place, the more likely it is that, even if the Stop Work Order is lifted, there will be compounding delays to the Project that threaten its viability.  *Id.* ¶ 39.  Given that there are 84 wind turbine generators to install at the Project, even small increases in installation time per generator can add up to major delays.  *Id.*

For these reasons, absent an injunction, the Stop Work Order will prevent timely completion of the Project,[13] creating a high risk that the Project's first power and commercial operations dates will be delayed, which would in turn delay revenue generation, and, depending on the length of the delay, threaten the Project's financial viability and force its cancellation.  *Id.* ¶ 37.  This harm is "likely in the absence of an injunction," *Winter*, 555 U.S. at 22 (emphasis removed), and is irreparable.  *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (internal quotations and citation omitted).

_____

[13] The Stop Work Order presents significant other risks of irreparable harm that are unrelated to construction delays, not least that Defendants have stated that one of the aims of the Stop Work Order is for BOEM to decide "whether the project must be cancelled."  Compl., Ex. A, Dkt. 1; *see also Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL (D.D.C. Jan 5, 2026), Dkt. 60-1 (Tyner declaration stating that purpose was to determine whether mitigation was "possible and feasible or whether cancellation is the preferred option").

**B.     The Stop Work Order Poses Existential Threats to Sunrise Wind's Business**

"[F]inancial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the movant's business.'"  *S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV- 25-1079, 2025 WL 1453047, at *14 (D.D.C. May 21, 2025) (citation omitted) (cleaned up); *see also Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (finding irreparable harm absent injunctive relief where implementation of [an agency's] Order [would] result in substantial, unrecoverable losses in revenue that [might] indeed threaten the future existence of [petitioners'] businesses.").  With respect to the First Revolution Wind Stop Work Order, this Court already found that "if Revolution Wind cannot meet benchmarked deadlines, the entire enterprise could collapse".  *See* Tr. 43:8-15, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Sept. 26, 2025), Dkt. 39.  The same holds true for Sunrise Wind.

The delay caused by BOEM's Stop Work Order is currently costing the Project estimated losses of at least $1.25 million per day or more, which will increase the longer work is stopped and are expected to jump significantly in February if the mid- and far-shore export cable installation scope of work cannot commence.  Chaytors Decl. ¶ 40.  Beginning in April, the daily costs will increase by up to approximately $1.3 million if the foundation installation scope of work cannot commence.  *Id.*  Compounding those financial losses is the fact that, every day of construction delay equates to a day of delay in the Project generating power and receiving revenues.  *Id.* ¶ 42.  A 90-day delay could cost Sunrise Wind over $100 million in lost revenue during the first year after full operation.  *Id.*  If the Project is ultimately cancelled due to follow-on delays from the Stop Work Order, Sunrise Wind would forgo billions of dollars of revenue under its OREC Agreement over the life of the Project.  *Id.* ¶ 43.

In addition, if the Stop Work Order remains in place, Sunrise Wind risks being in default under the OREC Agreement, in which case its counterparty could seek to terminate.  *Id.* ¶ 45.

Revenues under the OREC Agreement are critical to the Project's viability. *Id.* Termination of the OREC Agreement would also require Sunrise Wind to forfeit the $89.6 million in existing securities held by NYSERDA under the OREC Agreement. *Id.* ¶ 46. Even if Sunrise Wind was able to complete the Project after a delay and the Project ultimately operated as intended, its revenue would be negatively impacted due to the time-value-of-money impact if revenue anticipated in 2026 does not arrive until months or later years, and also because the prices Sunrise Wind is paid under the OREC Agreement are fixed for 25 years and not indexed to inflation. *Id.* ¶ 47. For all these reasons, the Stop Work Order poses an existential risk to the Project, and thus to Sunrise Wind.

## C. Sunrise Wind Faces Substantial Irreparable Reputational Harm

The Stop Work Order will harm Sunrise Wind's reputation which constitutes irreparable harm; thus, this "[i]njury to reputation can . . . support the issuance of an injunction." *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019). If it remains in place, the Stop Work Order could result in in default under the OREC Agreement, whose termination would pose a grave threat to the Project's viability (not to mention forfeiture of $89.6 million in financial assurance). Chaytors Decl. ¶ 46. Where the government's action "jeopardize[s]" the plaintiff's "binding contracts," the plaintiff not only loses economic value but also "good will." *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C. 2010). Reputational damage is an irreparable injury. *Wash. Teachers' Union, Loc. No. 6 v. Am. Fed'n of Teachers*, 751 F. Supp. 2d 38, 56 (D.D.C. 2010).

## III. EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF

The balance of the equities and the public interest favor immediate relief because, as Defendants have acknowledged, the public has an interest in agencies following the law and the

Project provides benefits to the public. Conversely, neither the public nor Defendants will suffer harm if this Court preserves the status quo by enjoining the unlawful Stop Work Order.

### A. Neither the Public Nor Defendants Will Suffer Harm From Preliminary Injunctive Relief

Neither the public nor Defendants will suffer harm if this Court preserves the status quo by granting Sunrise Wind relief. After all, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). That is particularly true here, where Defendants have not articulated any specific harm from allowing Project construction to proceed and have not provided an evidentiary basis. *See supra* Section I.A.1. Moreover, no narrower alternatives were raised, to the extent that Defendants were able to identify any specific threat of harm from construction of Sunrise Wind. *See supra* Section I.A.3.

### B. The Public Interest Strongly Favors An Injunction

There is, however, "a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted); *see also Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). This is especially so where the public also has a specific interest in the certainty and reliability of Defendants' permitting and approvals process. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013). Allowing Defendants to halt this Project based on a general conclusory statement of "impacts to national security from offshore wind projects" more than two years after onshore construction began, and with a significant percentage of offshore construction complete, undermines the public's strong interest in the reliability of federal agency processes and approvals.

42

Moreover, denying an injunction here would: (1) deprive the public of significant economic benefits from the Project; (2) result in the loss to New Yorkers of 924 MW of clean energy generation and the associated environmental benefits; and (3) harm public health.

Denying an injunction would have significant negative effects on jobs. The Project supports more than 3,500 direct and indirect jobs in construction, steel manufacturing, operations, and shipbuilding. Chaytors Decl. ¶ 56. As of January 2026, the Project has generated more than 1 million union labor hours across more than 1,000 local union workers. *Id.* Over the Project's lifetime, Sunrise Wind estimates spending over $800 million in wages and benefits for New York-based operations alone, but, if the Project is delayed or cancelled, the existing and future jobs the Project will otherwise create may be lost. *Id.* Since the Stop Work Order, work at onshore port facilities have been idled. *Id.* ¶ 44. The public interest favors maintaining those economic opportunities. *Sierra Club*, 990 F. Supp. 2d at 42 (strong public interest in jobs and economic growth from project).

The public will also benefit from the rents and operating fees Sunrise Wind will pay during construction and operations. Over the lifetime of the Project, Sunrise Wind anticipates it will pay $100 million in royalties, rents, and operating fees. Chaytors Decl. ¶ 54. It is in the public's interest to collect these revenues. *See Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007) (project that would "generate millions of dollars in revenue" is in the public interest); *Columbia Gas Transmission, LLC v. 84.53 Acres of Land, More or Less, In Calhoun, Marshall, Ritchie, Tyler, & Wetzel Cntys.*, 310 F. Supp. 3d 685, 696 (N.D.W. Va. 2018).

Through the OREC Agreement, Sunrise Wind has also committed to providing more than $800 million in economic benefits to New York State in the Project's first three years alone through direct and supply chain investments; the purchase of U.S.-manufactured iron and steel; labor

payments; community benefit commitments; the establishment of a National Offshore Wind Training Center; and funding to New York universities for research, development, and workforce training. Chaytors Decl. ¶ 52. Sunrise Wind estimates there will be an additional $1.1 billion in New York economic benefits over the remaining 22 years of the 25-year contract, including approximately $600 million in additional wages and benefits. *Id.*

Sunrise Wind and its parent companies have made substantial U.S. investments in port infrastructure, domestic manufacturing, workforce training, economic development, and union construction labor, including supply-chain upgrades at the Port of Coeymans, New York, New London State Pier, Connecticut, and a cable manufacturing facility in South Carolina. *Id.* ¶ 53. Sunrise Wind's parent companies have also invested $695 million in a new American offshore wind vessel fleet—catalyzing 14 new U.S.-made vessels and repurposing 10 former oil and gas vessels. *Id.* These benefits may be lost if the project is canceled or delayed. *Id.*

The Project will help New York State meet its energy and emissions reduction goals by delivering 924 MW of clean energy, enough to power nearly 600,000 homes, and eliminating up to approximately 2.45 million metric tons of carbon dioxide equivalents emissions annually (which is equivalent to taking approximately 530,000 gasoline-power cars off the road each year) and over 85 million tons of carbon emissions over the Project's lifetime. *Id.* ¶ 59. NYSERDA also found that the Project would have hundreds of millions of dollars in additional health impact benefits, in the form of avoided hospitalizations and premature death associated with asthma and respiratory and cardiovascular diseases. *Id.* ¶ 58. The public has a clear interest in those health benefits. *See Env't Democracy Project v. Green Sage Mgmt., LLC*, No. 22-CV-03970, 2022 WL 4596616, at

*4 (N.D. Cal. Aug. 23, 2022) (granting preliminary injunction that "implicate[d] the public's interest in protecting the environment and public health").[14]

Furthermore, delaying the Project will deprive electricity customers in New York of much needed grid reliability.  In its Q3 2025 short-term assessment of reliability NYISO, found that reliability in Long Island is projected to be deficient without the planned completion of future projects, including Sunrise Wind in 2027, noting in part, "[o]nce Sunrise Wind is delivering power as planned, the margins improve in summer 2028."  *See supra* n.1.

## CONCLUSION

For the foregoing reasons, this Court should grant Sunrise Wind's motion for a stay of the Stop Work Order and a preliminary injunction that bars Defendants from enforcing the Stop Work Order.

Dated:  January 9, 2026

Respectfully submitted,

By /s/ Janice M. Schneider
Janice M. Schneider (D.C. Bar No. 472037)
Stacey L. VanBelleghem (D.C. Bar No. 988144)
Roman Martinez (D.C. Bar No. 1001100)
Devin. M. O'Connor (D.C. Bar No. 1015632)
Rachael L. Westmoreland (D.C. Bar No. 90034032)
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, D.C. 20004
Tel:  (202) 637-2200
Fax:  (202) 637-2201
Email: janice.schneider@lw.com
        stacey.vanbelleghem@lw.com
        roman.martinez@lw.com

---

[14] Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" as to whether to order a plaintiff to provide a security to pay the costs and damages of a party found to have been wrongly enjoined.  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  A court can "dispense with any security requirement whatsoever where the restraint will do the defendant no material damage."  *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (internal quotation marks and citation omitted).  Defendants will not suffer any material damages from the Court restoring the status quo and allowing Sunrise Wind to proceed under its existing federal approvals.  The Court should not order a bond.

devin.o'connor@lw.com
rachael.westmoreland@lw.com

*Counsel for Plaintiff Sunrise Wind LLC*