# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SUNRISE WIND LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; <br><br> MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management; <br><br> BUREAU OF OCEAN ENERGY MANAGEMENT; <br><br> KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and <br><br> BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, <br><br> *Defendants*. | Case No.: 1:26-cv-00028-RCL |

**DECLARATION OF RYAN CHAYTORS IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

Pursuant to 28 U.S.C. § 1746(2), I, Ryan Chaytors, declare as follows:

1.      I am employed by Orsted North America Inc. ("Ørsted") as the Senior Director

Permitting, Marine Affairs and Commercial Management including for the commercial-scale

Sunrise Wind Farm and Sunrise Wind Export Cable (together, the "Project"). The Project is owned by Sunrise Wind LLC ("Sunrise Wind"), which is a subsidiary of Ørsted.

2.      I have been employed at Ørsted since March 2018. Collectively, I have worked on the Project for nearly seven years, and I have 25 years of professional experience in the renewable energy field. I obtained my Bachelor of Arts in Environmental Studies from Dartmouth College in 1999.

3.      As Senior Director for the Project, I am and have been involved in and aware of local, state, and federal permitting; negotiation and management of commercial and real estate agreements (including approximately 70 contracts for construction, and more than 200 contracts throughout the lifespan of the Project with more than 150 suppliers); stakeholder and market affairs management; cable and interconnection facility siting; project layout and design; site investigation activities; and construction activities.

4.      I reviewed the December 22, 2025 Director's Order issued by the Acting Director of the Bureau of Ocean Energy Management ("BOEM") to Sunrise Wind "to suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" (the "Stop Work Order"). A true and correct copy of the Stop Work Order is attached to Sunrise Wind's Complaint as Exhibit A, Dkt. 1-1, and is also available on BOEM's website for the Sunrise Wind Project.[1] I also reviewed the December 22, 2025 press release posted on the Department of the Interior's website titled, "The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases."[2]

---

[1] The Stop Work Order is available at: https://www.boem.gov/renewable-energy/state-activities/boem-sunrise-wind-suspension-letter (last accessed Jan. 7, 2026).
[2] Press Release, U.S. Department of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025),

5.      As part of my role at Ørsted, I also have worked on the nearby Revolution Wind Project,[3] and I am aware that BOEM also issued an order to Revolution Wind on December 22, 2025,[4] that was substantively identical to Sunrise Wind's Stop Work Order.  Additionally, I am familiar with BOEM's previous stop work order for the Revolution Wind Project on August 22, 2025, which I understand was enjoined by this Court on September 22, 2025.  And I am aware that on December 22, 2025, three other offshore wind projects (in addition to Sunrise Wind and Revolution Wind) received similar stop work orders from BOEM.[5]

6.      I am personally familiar with the Project's permitting and development history and the impacts that could result from the Stop Work Order if not enjoined.  I execute this Declaration in support of Sunrise Wind's Motion for Preliminary Injunction and Stay Pending Review in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.  I am over 18 years of age and competent to testify about the matters set forth herein.

### A.      Overview of the Sunrise Wind Project

7.      The Project involves the construction and operation of an approximately 924-megawatt ("MW") commercial-scale offshore wind energy facility with up to 84 wind turbine generators, inter-array cables between the wind turbine generators, an offshore converter station, an offshore transmission export cable to bring power to shore, an onshore transmission cable, an onshore converter station, and an onshore interconnection cable to connect to the existing

---

https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases (last accessed Jan. 7, 2026).

[3] The Revolution Wind Project is owned by Revolution Wind, LLC, which is a joint venture indirectly owned in equal part by Ørsted and an investment joint venture partner.

[4] *See* https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Revolution%20Wind%20Suspension%20Letter.pdf?VersionId=8ZW3HfSIRj3Jxi.4iIV5.tMmJVD_uWd0.

[5] *See* Press Release, *supra* note 2.

3

Holbrook Substation. The Project's wind turbine generators will be located in federal waters on the U.S. Outer Continental Shelf ("OCS"), within the area covered by BOEM Renewable Energy Lease No. OCS-A 0487, in the Atlantic Ocean approximately 19 miles south of Martha's Vineyard, Massachusetts; 30 miles east of Montauk, New York; and 17 miles from Block Island, Rhode Island.[6] When fully constructed, the Sunrise Wind Project will deliver electricity to the Holbrook Substation in the Town of Brookhaven, New York, which connects to the transmission system managed by the New York Independent System Operator.[7] A map depicting the proposed Project area and facilities is provided below.[8]



**Figure 1-1.2 Proposed Project Area and Facilities**

---

[6] *See* BOEM, Record of Decision for Sunrise Wind Project Construction and Operations Plan at 12 ("ROD") (Mar. 25, 2024), https://www.boem.gov/renewable-energy/state-activities/record-decisionsunrise-windocs-0487.

[7] *Id.*

[8] *Id.* at 8.

8.     Sunrise Wind has executed an Offshore Renewable Energy Certificate Purchase and Sale Agreement (the "OREC Agreement") with the New York State Energy Research and Development Authority ("NYSERDA") corresponding to the entire generating capacity of the Project.

9.     Overall, the Project is nearly 45% complete.  To date, Sunrise Wind has already spent or committed over $7 billion to plan, permit, develop, design, manufacture, and construct this Project.

**B.     The Project's Multi-Year Development Process**

10.     BOEM's environmental, national security, and safety review for the Project and its lease area began approximately 16 years ago with a review and environmental assessment of potential wind energy areas offshore Massachusetts and Rhode Island that included, among many others, participants from the Department of War.[9]  For example, meeting materials from December 10, 2010,[10] May 2, 2011,[11] and March 1, 2012,[12] show the participation of the Department of the Navy, including the Office of the Chief of Naval Operations, N43-Navy Fleet Readiness Division, and the Naval Undersea Warfare Center - Division Newport.  BOEM issued

---

[9] *Id.* at 2.
[10] BOEM, Attendees at Massachusetts/Rhode Island Joint Task Force Meeting (Dec. 10, 2010), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/TaskForceMeetingAttendees.pdf.
[11] BOEM, Attendees at Massachusetts/Rhode Island Joint Task Force Meeting (May 2, 2011), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/BOEMREJointRI-MA_TFMAttendees5-2-11.pdf.
[12] BOEM Rhode Island Renewable Energy Task Force Webinar (Mar. 1, 2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/BOEM%20RI%20Task%20Force%20March%201%20Presentation.pdf.

a final environmental assessment in May 2013, concluding leasing and site assessment activities in the proposed lease sale area would not have significant effects.[13]

11.    In July 2013, BOEM held a competitive lease sale for commercial leasing for wind power on the OCS offshore Rhode Island and Massachusetts after conducting a thorough environmental review and issuing an environmental assessment.[14]  Deepwater Wind New England, LLC (an entity subsequently acquired by an Ørsted affiliate) won lease OCS-A-0487 and later assigned a 100% interest in that lease to Sunrise Wind LLC.[15]  In January 2015, RES America Developments, Inc. won lease OCS-A 0500 in a separate competitive lease sale and subsequently assigned its 100% interest in that lease to an Ørsted affiliate; that Ørsted affiliate subsequently assigned 100% of its interest in a portion of lease OCS-A 500, which BOEM designated as lease OCS-A 0530, to Sunrise Wind.[16]  In March 2021, BOEM completed the consolidation of lease OCS-A 0530 into lease OCS-A-0487 through an amendment to lease OCS-A 0487.[17]

12.    Sunrise Wind and its affiliates conducted extensive surveys of the Project area pursuant to the leases and BOEM-approved Site Assessment Plans.  Sunrise Wind submitted its initial Construction and Operations Plan ("COP") to BOEM in September 2020.  The final version of the COP is thousands of pages long, including appendices.[18]  In August 2021, BOEM issued a

---

[13] BOEM, Revised Environmental Assessment: Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Rhode Island and Massachusetts at Section 1.5 (May 2013),
https://www.boem.gov/sites/default/files/documents/renewable-energy/BOEM%20RI_MA_Revised%20EA_22May2013.pdf.
[14] ROD, *supra* note 6, at 4.
[15] *Id.* at 5.
[16] *Id.*
[17] *Id.* at 5; *see also* BOEM, *Sunrise Wind*, https://www.boem.gov/renewable-energy/state-activities/sunrise-wind ("Leasing History" tab) (last accessed Jan. 7, 2026).
[18] *See* BOEM, *Sunrise Wind Construction and Operation Plan*, https://www.boem.gov/renewable-energy/state-activities/sunrise-wind-construction-and-operation-plan (last accessed Jan. 7, 2026).

Notice of Intent to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA").[19] That began an additional more than two-and-a-half year period of environmental review by the federal government involving Sunrise Wind; a multitude of federal agencies; state cooperating agencies in New York, Massachusetts, and Rhode Island; and an extensive array of other stakeholders, including American Indian tribes.[20] The Project's Draft EIS ("DEIS") was published in December 2022, and after accepting and responding to public comments, BOEM published the Final EIS ("FEIS") in December 2023.[21] In March 2024, BOEM issued a Record of Decision ("ROD") documenting the Department of the Interior's decision to approve the COP, with some modifications.[22] BOEM issued its letter documenting COP approval for the Project in June 2024.[23]

13. Overall, Sunrise Wind and its affiliates worked to obtain the BOEM lease at issue and subsequently worked to develop the Project for more than 10 years, including BOEM's March 2024 decision to approve the Sunrise Wind Project COP, along with over 20 other local, state, and federal permits and approvals issued for the Project. In practice, completing the necessary reviews requires years of careful preparation, investment, field surveys, analyses,

---

[19] Notice of Intent To Prepare an Environmental Impact Statement for the Proposed Sunrise Wind Farm Project on the Northeast Atlantic Outer Continental Shelf, 86 Fed. Reg. 48,763 (Aug. 31, 2021), https://www.govinfo.gov/content/pkg/FR-2021-08-31/pdf/2021-18741.pdf.
[20] ROD, *supra* note 6, Appendix B, Section 3.3.
[21] The DEIS and FEIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/sunrise-wind (last accessed Jan. 7, 2026). In March 2024, prior to issuing the ROD, BOEM published an errata to the FEIS.
[22] ROD, *supra* note 6.
[23] BOEM, COP Approval Letter (June 21, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/5774_COP%20Approval%20Letter_Sunrise%20Wind%20OCS-A%200487_FINAL%20signed.pdf.

documentation, and response to public comments before final approvals may be issued. This planning and permitting process alone cost Sunrise Wind over $100 million.

**C.    Current Construction Status**

14.    The Project involves both onshore and offshore construction activities. Before the Stop Work Order was issued, the Project had made significant progress, and both onshore and offshore construction activities were ongoing.

15.    The Project began onshore construction in July 2023. Onshore activities for the Project include building a High Voltage Direct Current converter station at the Union Avenue site; connecting that to the Holbrook Substation; and connecting the export cable that runs from the offshore wind farm to the onshore converter station, which requires building over 18 miles of onshore duct bank work and associated laydown yards. The Holbrook Substation expansion is substantially complete and energized and is currently undergoing commissioning and testing. Cable installation is ongoing. Onshore construction is over 90% complete.

16.    Offshore work for the Project is also well underway. The Project began offshore construction in July 2024, beginning with three-dimensional boulder surveys. The Project's offshore installation schedule is extremely complex and has been carefully designed to accommodate many factors, including time-of-year restrictions to protect marine mammals, Atlantic cod, Atlantic sturgeon, winter flounder, horseshoe crabs, nesting shorebirds, and seasonal tourism as approved permit conditions; precise sequencing of installation scopes; grid availability; and availability of specialized vessels. In particular, the many separate time-of-year restrictions—which vary by species and affect different construction activities—make it even more difficult to alter the construction schedule and can have a disproportionate delay impact on the Project (*e.g.*, not just a day for day delay). This is because, when certain construction activities are allowed only during a specified time-of-year window, if that work cannot be completed within that window, it

would need to wait for the next available window (which could be months or up to a year later). Moreover, there is no guarantee that the necessary vessels, which are often scheduled years in advance, will be available within the next permissible construction window.

17.    To date, offshore work has included site-preparation activities on the OCS (including boulder clearance and pre-lay grapnel runs along the export cable corridor and rock pad installation at the offshore convertor station location), horizontal directional drill work at the export cable landfall site in New York State waters, offshore site-preparation including boulder relocation at foundation locations and along inter-array cable corridors, installing scour protection at the monopile foundation locations, and monopile foundation installation (as described below). Sunrise Wind has also installed the nearshore portion of the offshore export cable (16 miles starting from the horizontal directional drill exit pit) and the Project's single offshore converter station jacket and topside.

18.    Monopile foundation installations require over a dozen vessels, including two main installation vessels, which Sunrise Wind contracted for the 2025 and 2026 piling seasons. Foundation installation is also subject to time-of-year restrictions for marine mammal and Atlantic cod protection; monopile foundations can only be installed between May 1 and October 31, with very limited exceptions as specified in permit conditions. Thus, even minor delays can push installations into the following year. And if Sunrise Wind is not able to install the remaining foundations in 2026, it will push the foundation installation into at least 2027 if not 2028 or later depending on vessel availability, which would be unsustainable for the Project.

19.    The first monopile foundation was installed in June 2025. To date, during the Project's first offshore installation season in 2025, 44 of the 84 monopile foundations and 43 of the 84 sets of advanced foundation components were installed. During the 2026 offshore

installation season, Sunrise Wind planned to complete the remaining monopile foundations, the remaining portions of the export cable, all of the array cables, and over half of the wind turbine generators.   To remain on schedule, Sunrise Wind must install all 40 remaining monopile foundations in 2026.



**Monopile**

20.    The wind turbine generators themselves cannot be installed until the monopile foundations are installed.  Therefore, if the monopile foundations are delayed, there are cascading effects for wind turbine generator installation.  All of the monopile foundations have already been manufactured, and over 90% of the wind turbine generator components have already been manufactured, but no wind turbine generators have been installed yet.  Prior to the Stop Work Order, wind turbine generator installation at the Project was scheduled to begin in late February 2026.

21.    Once the wind turbine generators are installed, they must be connected with array cables to each other and to the offshore converter station.  The array cables that connect the wind turbine generators to each other cannot be fully installed until the monopile foundations are installed.  The first array cables are scheduled to be installed in mid-2026, based on a pre-Stop Work Order assumption that by that point a sufficient number of monopile foundations would have been installed so as to make array cable installation commercially feasible.  There are also time-of-year restrictions under the Project's permit approvals that limit when cable-laying and burial activities may be conducted.

22.    Offshore export cable installation, installing the cables that move energy from the offshore converter station to onshore operations, is a critical phase of offshore construction, as described further below.  Like monopile foundation installation, this work is subject to substantial time-of-year restrictions under the Project's approvals for the protection of Atlantic cod, Atlantic sturgeon, winter flounder, horseshoe crabs, nesting shorebirds, and seasonal tourism.  Following the recent installation of the nearshore section of the export cable, the scope of work for the mid- and far-shore sections of the export cable was scheduled to start the week of February 1, 2026, and is anticipated to take four to six months.  This work must be complete by July 2026, when a crucial construction vessel must depart, to avoid cascading delays because there are later construction phases that cannot begin until the export cable is installed.  Examples of activities that cannot begin until the offshore export cable is complete include offshore jointing and termination at the offshore converter station, offshore converter station pull in, full cable test and handover, High Voltage Direct Current converter station system energization and testing, and delivering power from offshore to onshore to the electric grid.

23.    Prior to the Stop Work Order, Sunrise Wind had been forecasted to achieve first power in October 2026, meaning that Sunrise Wind was expected to begin generating power by operating a subset of the Project's wind turbine generators and sending power from those turbines to the grid in coordination with the New York State Independent System Operator (even before the Project is fully commissioned).

24.    Consistent with the terms of the Stop Work Order, all work on the OCS related to the Project has been halted except for activities that are necessary to prevent impacts to health, safety, and the environment.

25.    Even after the Stop Work Order, Sunrise Wind has kept the public aware of construction activities, including through a website[24] and "Mariners Briefing" listserv, as well as Local Notice to Mariners issued regularly.

**D.    Continued Coordination with Federal Agencies Following COP Approval**

26.    Throughout 2025 and into 2026, Sunrise Wind continued to participate in regular meetings with BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE"), approximately bi-weekly, to discuss construction updates, plans, reports, mitigation agreements, and other matters relating to the Project, with the exception of the period of time that the U.S. Federal Government shutdown from October 1, 2025, to November 12, 2025.  The bi-weekly meeting scheduled for October 14, 2025, did occur, however, only BSEE attended.  The most recent of these bi-weekly meetings was held with BOEM and BSEE on January 6, 2026.  During these meetings neither BOEM nor BSEE raised any national security concerns.  The Sunrise Wind certification team also met weekly with BSEE throughout 2025 and into 2026 to discuss the

---

[24] Ørsted, Construction Updates, https://sunrisewindny.com/construction-updates (last accessed Jan. 7, 2026).

certification and verification process.  The most recent of those meetings was held with BSEE on January 6, 2026.  BSEE never raised any national security concerns at these meetings.

27.    Throughout 2025 and into 2026, Ørsted's Marine Affairs team also met weekly with the United States Coast Guard ("USCG") for general check-ins, even during the U.S. Federal Government shutdown period (October 1 – November 12), regarding all of Ørsted's U.S. projects, including the Sunrise Wind Project.  Representatives from BOEM, BSEE, and the National Oceanic and Atmospheric Administration were frequently in attendance at USCG's invitation. The most recent of these weekly meetings were held on January 5, 2026.  During these meetings, neither USCG nor any other agency attending raised any national security concerns.

### E.    Threats to Project Feasibility if the Stop Work Order Is Not Stayed or Enjoined

28.    Sunrise Wind has spent or committed over $7 billion to date to plan, permit, develop, design, manufacture, and construct this Project.

29.    Sunrise Wind has entered into contracts for the manufacture, transport, and installation of project components during specific times of the year, and has taken other steps in reliance on BOEM's approval and other federal agency approvals for the Project's construction at issue here.

30.    Sunrise Wind is injured by the Stop Work Order due to its inability to construct the Project, which is directly caused by the Stop Work Order.  Sunrise Wind has no business other than the Project, and if Sunrise Wind is prevented from completing construction and timely achieving and maintaining commercial operation of the Project, Sunrise Wind will not be able to fulfill its sole and exclusive corporate function of developing, constructing, and operating the Project.  The Stop Work Order directly prevents Sunrise Wind from constructing and finalizing the Project, causing financial and contractual burdens, creating delay in Sunrise Wind's

development of the Project, and if the delay is long enough, potentially jeopardizing the Project entirely.  There are at least two categories of ways the Stop Work Order is causing imminent, irreparable harm that threatens the viability of Sunrise Wind's business.

        **1.**        **The Stop Work Order Will Result in the Loss of Vessels Needed for Construction and Creates Cost Delays that Threaten Project Cancellation if It Is Not Enjoined**

31.      Sunrise Wind has sequenced its construction schedules to ensure efficient usage of scarce resources for the Project.  Construction of large-scale offshore wind projects requires the use of over a hundred vessels, including specialized transport and installation vessels in limited supply and in high demand.  For certain offshore construction tasks there are only a handful of vessels globally with the necessary capabilities, so these vessels are normally contracted years in advance and scheduled without downtime between projects.  These vessels work on projects around the world, and sailing between continents can itself take weeks, making scheduling even more difficult.  So if a project's construction schedule is delayed to the point that a specialized vessel needs to be rescheduled or replaced, it would not be uncommon to have to wait a year—or even multiple years—to find another open window when such a vessel is available in the right place and at the right time.

32.      Critically, Sunrise Wind's contracts for project construction vessels include a latest vessel availability date, *i.e.*, the date after which the vessel must leave the Project for its next contractual engagement—regardless of whether its work on the Sunrise Wind Project is complete. As a result, if there are schedule delays that prevent completion of work that requires a specialized vessel during the contracted time period, Sunrise Wind will be required to pay for that vessel nonetheless (despite the vessel being idle), and then pay for another vessel to return and complete the unfinished work—if a replacement vessel can be found.  This would come with a significant

cost and schedule uncertainty (because, as mentioned above, specialized vessels are in limited supply and often are contracted many years in advance).

33.    As an example, Sunrise Wind has contracted with a vessel called the Connector to install the mid- and far-shore sections of the Project's export cable, which will bring the electricity generated by the wind turbines to shore.  The Connector is currently scheduled to begin its scope of work for the Project the week of February 1, 2026.  After working on another project, the Connector is anticipated to depart Europe mid-January 2026 and take approximately two weeks to cross the Atlantic Ocean.  Even after the Connector transits the Atlantic, there are critical steps that must be taken to load and mobilize the vessel before it could start installation work for the Project on the OCS.  For instance, Sunrise Wind will not begin loading the export cable onto the Connector vessel while in port before the Project's authorization to install the export cable on the OCS is restored because, as a technical matter, once the cable is loaded on this vessel it cannot be offloaded back at the port in a way that guarantees no risk or damage to the cable.

34.    **Exhibit 1** is a true and correct copy of an illustration depicting the export cable installation route and showing where installation has not yet been completed by the Connector for the mid-shore and far-shore export cable segments.

35.    The installation process for the Project's mid- and far-shore export cable sections is anticipated to take approximately four to six months.  Sunrise Wind's contract with the Connector has a latest vessel availability date of July 25, 2026, and the Connector is scheduled to depart for another project immediately thereafter.  This leaves a very tight window for the Project to complete the export cable installation with the Connector, especially if the work faces typical complications and delays, including routine mechanical issues, potential cable damage, unforeseen technical challenges, and inclement weather (*e.g.*, wind, waves, fog).  I understand that the

Connector will not have another four-to-six month window of availability until at least the third quarter of 2027.  I also understand that there are no alternate vessels that would be able to begin to perform this work until at least late 2026.  As a result, Sunrise Wind needs relief from the Stop Work Order by the week of February 1, 2026, and no later than February 6, 2026.

36.     Even if a suitable alternate vessel to the Connector could be located, Sunrise Wind would still have to complete compliance with BSEE's certification process.  Sunrise Wind submitted its Facility Design Report / Fabrication and Installation Report ("FDR/FIR") for the Offshore Export Cable to BSEE on May 16, 2025.  Under the regulations, BSEE has 60 business days (approximately three months) to review a FDR/FIR once deemed submitted.  The 60-business-day review process for the Project began on May 27, 2025, and concluded with BSEE issuing a "non-objection" on August 21, 2025.  That FDR/FIR included Sunrise Wind's usage of the Connector vessel and included the Connector-specific engineering design documentation certified by the Certified Verification Agent (based on detailed engineering carried out by the export cable installation contractor regarding the specific vessel types and tools planned to be used during cable installation), as required.  Therefore, even if another vessel could replace the Connector, Sunrise Wind would need to submit a project modification report to BSEE to change its existing FDR/FIR to account for such a substantial change to the cable installation vessel and tools.  Before doing that, Sunrise Wind would need to engage an agent to conduct approximately three-to-six months of re-engineering and third-party certification for the new vessel and its tools.

37.     Overall, if the Stop Work Order prevents the Connector from commencing the mid- and far-shore export cable's scope of work by the week of February 1, 2026 (*e.g.*, no later than February 6), there is a high risk that the export cable installation will not be completed before the latest vessel availability date in Sunrise Wind's contract for the Connector.  If that happens, the

Project's first power and commercial operations dates will be delayed, both of which are important milestones in revenue generation for the Project's financial viability. Such delay would in turn delay revenue generation, and, depending on the length of the delay, threaten the Project's financial viability and force its cancellation.

38.    Sunrise Wind is scheduled to install all 40 remaining monopile foundations in 2026. Sunrise Wind has contracted over a dozen vessels for foundation installation in 2026. If the Stop Work Order pushes any monopile foundation installation out of the 2026 installation window, the entire Project's schedule will be delayed past the planned 2027 commercial operation date. Sunrise Wind will then have to try to recontract vessels (if they are available). Sunrise Wind will also have to pay for storage costs in the interim, as 100% of the Project's monopile foundations have been manufactured. Vessel availability in 2027 is highly uncertain, and significant schedule delay due to vessel unavailability in future years (*e.g.*, not until 2028 or later) could result in Project cancellation.

39.    As another example, the Project's wind turbine generation installation work is scheduled to begin in late February 2026. The longer the Stop Work Order remains in place, the more likely it is that, even if the Stop Work Order is lifted, there will be compounding delays to the Project that threaten its viability. There are 84 wind turbine generators to install at the Project, so even small increases in installation time per generator can add up to major delays.

### 2.    The Stop Work Order Increases Costs that Could Derail the Project

40.    Sunrise Wind is conservatively[25] estimated to be incurring at least an additional $1.25 million in costs per day, or approximately $8.8 million per week, on installation and

---

[25] This estimate contains zero contingency for unforeseen and unknown costs (such as additional demobilization, maintenance and remobilization costs for vessels that have been unexpectedly stood down). The project's daily burn rate could increase substantially if Project becomes liable for additional vessels' day rates.

manufacturing contracts without any certainty that construction work will be allowed to resume. These daily costs will increase the longer work is stopped and are expected to jump by $650,000 in February if the export cable installation cannot commence (including cable storage costs and vessel daily standby rates), and by another approximately $850,000 if the wind turbine generator installation spread cannot commence. Beginning in April, the daily costs will increase by up to approximately $1.3 million if the foundation installation scope of work cannot commence. Because vessel contracts are nonrefundable, day rates can be accrued up to the full vessel contract prices (approximately $1 billion covering monopile foundation installation, array and export cable installation, construction support vessels and helicopters, and wind turbine generator installation), regardless of vessel use or if additional contracts will be required to complete the required work once construction resumes. In other words, Sunrise Wind will incur these increasing daily costs as a matter of course due to its existing contracts—even if work under those contracts cannot be performed. And then, Sunrise Wind expects to incur even greater daily costs due to needing to contract for alternate, scarce vessels (most likely on worse commercial terms) to replace previously-contracted-for vessels that have reached their latest vessel availability dates.

41.     **Exhibit 2** is a true and correct copy of the summary materials outlining costs associated with an idle workforce and vessels, costs of day for day Commercial Operations Date (COD) delay, and other costs as a result of the Sunrise Wind Stop Work Order that I reviewed before executing this Declaration.

42.     In addition to costs related to installation and manufacturing contracts, every day of construction delay equates to a day of delay in the Project operations generating power and receiving revenues. A 90-day delay could cost Sunrise Wind over $100 million in lost revenue during the first year after full operation.

43.     Sunrise Wind has already spent or committed approximately 7 billion to date to plan, permit, develop, design, manufacture, and construct this Project.  If the Project is cancelled, Sunrise Wind anticipates that it would also incur over $1 billion in breakaway costs, for a total of over $8 billion in Project costs.  Additionally, Sunrise Wind would forgo billions of dollars of revenue under its OREC Agreement over the life of the Project.

44.     The Stop Work Order has also led to delays and idling with respect to onshore activities that support offshore construction on the OCS.  Construction of the offshore components of the Project requires a significant amount of support from onshore facilities and workers.  The Project's wind turbine generator marshalling facilities (where Project components are received, prepared for installation, and loaded onto barge and tug vessels to be transported for installation) are located at New London State Pier in Connecticut, which also serves as the marshalling facility for Revolution Wind.  This is a facility in which hundreds of millions of dollars have been invested in order to create the only active offshore wind marshalling terminal in the northeast United States with unobstructed access to the ocean.[26]  Here, predominantly union workers were preparing wind turbine generators for offshore installation.  Work at the New London State Pier is currently idle due to the Stop Work Order for the Sunrise Wind Project and the similar stop work order for the Revolution Wind Project.  There is now insufficient space at the facility to accept new materials for Sunrise Wind, creating additional logistical challenges for equipment and materials that weigh hundreds of tons and disrupting the Sunrise Wind Project's supply chain.

45.     If the Stop Work Order remains in place, Sunrise Wind risks being in default under the OREC Agreement, in which case its counterparty could seek to terminate.  The OREC

---

[26] Connecticut Port Authority, *State Pier Infrastructure Improvements Project*, https://statepiernewlondon.com/ (last accessed Jan. 7, 2026).

Agreement requires that Sunrise Wind have authority to construct and operate the Project, and that the sales contemplated by the OREC Agreement not violate any order of a Federal agency. If the counterparty takes the position that Sunrise Wind is out of compliance with these requirements because of the Stop Work Order, those non-compliances could turn into Events of Default if the Stop Work Order remains in place—with an immediate unilateral right for the counterparty to terminate the OREC Agreement. Revenues under the OREC Agreement are critical to the Project's viability.

46.     Putting aside forgone revenues, termination of the OREC Agreement would cause Sunrise Wind to forfeit the $89.6 million in existing securities held by NYSERDA under the OREC Agreement. (If Project construction and commercial operation are delayed beyond 2027, Sunrise Wind will be required to commit millions of dollars in additional guaranties that will similarly be at risk.)

47.     Even if Sunrise Wind were able to complete the Project after a delay and the Project ultimately operates as intended, its revenue would be negatively impacted in at least two ways. First, there is a time-value-of-money impact if revenue anticipated in 2026 does not arrive until months or years later. Second, the prices Sunrise Wind is paid under the OREC Agreement are fixed for 25 years and not indexed to inflation, so the effective value of the revenue earned over the Project's life decreases the later the Project begins selling power under the OREC Agreement.

48.     For all the reasons discussed above, the Stop Work Order poses an existential risk to the Project, and thus to Sunrise Wind.

**F.     Possible Alternatives Would Not Cure Sunrise Wind's Irreparable Harms**

49.     Sunrise Wind has been and is continuing to explore possible alternatives to mitigate the irreparable harm that BOEM's Stop Work Order is causing and will continue to cause imminently.

50.     It is doubtful whether any offshore components of the Project could be decommissioned and repurposed for other projects.  The Project's offshore converter station is bespoke and is not reuseable for another project, largely because Sunrise Wind is the first offshore wind project in the United States to use High Voltage Direct Current transmission technology and because most global markets use a different frequency for transmission.  Over 90% of the Project's wind turbine generators' components have been built and all were designed (i) with smaller dimensions and therefore lower capacity than newly designed projects are likely to use, and (ii) specifically for the U.S. market at 60 Hz, so they cannot be used in most other global markets in their current form.  The Project's monopile foundations will not be able to be reused because each foundation is designed specifically for its location in the Sunrise Wind layout and installed foundations are not structurally capable of being removed and then installed again.  In addition, future projects built with larger wind turbine generators will require correspondingly larger monopile foundations.  Accordingly, if Sunrise Wind was forced to decommission the monopile foundations, they would ultimately be scrapped.  Converting the wind turbine generators would also be cost-prohibitive because of the costs of converting the frequency, as well as the significant storage costs that Sunrise Wind would incur while waiting for the wind turbine generators to be repurposed.  The cables are not project-specific, but their value is low and would not come close to offsetting the more than $8 billion loss Sunrise Wind would face if the Project is not completed.

### G.     The Project Will Provide Significant Benefits

51.     Once operational, the Project will have a generating capacity of approximately 924 MW of clean energy, enough to power nearly 600,000 homes.  In its Q3 2025 short-term assessment of reliability the New York grid operator, New York Independent System Operator, found that reliability in Long Island is projected to be deficient without the planned completion of

future projects, including Sunrise Wind in 2027, noting in part, "[o]nce Sunrise Wind is delivering power as planned, the margins improve in summer 2028."[27]

52.     Sunrise Wind is committed to providing over $800 million in economic benefits to New York State under the OREC Agreement by the end of the Project's first three years of operations alone, including direct and supply chain investments; the purchase of U.S.-manufactured iron and steel; labor payments; community benefit commitments; the establishment of a National Offshore Wind Training Center; and funding to New York universities for research, development, and workforce training.  Sunrise Wind has further estimated up to an additional $1.1 billion in New York economic benefits over the remaining 22 years of the 25-year contract, including approximately $600 million in additional wages and benefits.

53.     Sunrise Wind and its parent companies have and are investing substantially in port infrastructure and domestic manufacturing.  These contractual commitments include supply-chain improvements such as the purchase of advanced foundation components fabricated at a new facility at the Port of Coeymans, New York; investment in the New London State Pier in Connecticut for wind turbine generator marshalling; investment in the Nexans cable manufacturing facility in South Carolina; additional investments in workforce training and economic-development initiatives; and expenditures for unionized construction labor.  Sunrise Wind's parent company has also invested $695 million in U.S. vessels for its American fleet, including the first-ever American-built, owned, and crewed offshore wind service operations vessel, which was built

---

[27] N.Y. Indep. Sys. Operator, Short-Term Assessment of Reliability: 2025 Quarter 3, at 9 (Oct.13, 2025), https://www.nyiso.com/documents/20142/39103148/2025-Q3-STAR-Report-Final.pdf.

in shipyards in Louisiana, Mississippi, and Florida.[28]  In addition to catalyzing 14 new American-made vessels, Sunrise Wind's parent company has repurposed 10 oil and gas vessels for use in offshore wind projects.[29]  If the Project is cancelled or delayed, these benefits may be lost.

54.    Sunrise Wind anticipates paying over $100 million in royalties, rents, and operating fees to the U.S. government over the life of the Project.  The vast majority of this sum will be foregone by the federal government if the Project cannot move forward due to the Stop Work Order.

55.    Sunrise Wind anticipates paying over $200 million to the community of Brookhaven, New York, and Suffolk County, New York, over the Project's lifetime.  This includes $164 million still owed under Host Community and payment-in-lieu of taxes agreements with the Town of Brookhaven, New York, and the Brookhaven Industrial Development Authority, respectively.  The vast majority of these payments will only be paid if the Project reaches commercial operations.  This public revenue and other anticipated tax payments would be lost if the Project is cancelled.

56.    On April 22, Ørsted, the North America's Building Trade Unions, and the United Brotherhood of Carpenters entered into a "National Offshore Wind Agreement," a first-of-its-kind U.S. project labor agreement that creates expansive job opportunities for workers in the building trade unions on offshore construction associated with Ørsted's offshore wind projects, including

---

[28] Ørsted, *Ørsted and Shipbuilder Edison Chouest Christen First-Ever American-Built, Offshore Wind Service Operations Vessel* (May 11, 2024), https://us.orsted.com/news-archive/2024/05/orsted-and-shipbuilder-edison-chouest-christen-american-built-offshore-wind-service-operations-vessel (last accessed Jan. 7, 2026); Ørsted, *America's new fleet: Ørsted is investing nearly $700 million into U.S. vessels to secure our energy future* 1, https://cdn.orsted.com/-/media/www/docs/corp/us/factsheets/orsted_vesselfactsheet.pdf?rev=b14a7bbdddcd4daf88d7726e957cd73a&hash=536C7E36976CC9869635A2B8EFCB23AB.

[29] *See Americas's new fleet*, *supra* note 30, at 1.

the Project. The Project has already generated more than 1 million union labor hours across more than 1,000 local union workers, resulting in over $97 million in prevailing wages and benefits. In total, Sunrise Wind estimates that the Project will support more than 3,500 direct and indirect U.S. jobs in shipbuilding, construction, operations, steel manufacturing, and related activities. Over the Project's lifetime, Sunrise Wind estimates spending over $800 million in wages and benefits for New York-based operations alone. If the Project is delayed or cancelled, the existing and future jobs that the Project will otherwise create may be lost.

57.     If Sunrise Wind cannot complete the Project due to the Stop Work Order, these community commitments will never materialize.

58.     NYSERDA found that the Project would have hundreds of millions of dollars in additional health impact benefits, in the form of avoided hospitalizations and premature death associated with asthma and respiratory and cardiovascular diseases.[30] If the Project is delayed, New York will be deprived of the Project's 924 MW of energy generation and the associated environmental and public health benefits corresponding to the delay period. If the Project is cancelled, New York will not receive that energy and its benefits at all.

59.     The Project will help New York State meet its energy and emissions reduction policy goals. The New York State Climate Leadership and Community Protection Act ("CLCPA") established multiple greenhouse gas ("GHG") reduction mandates to address climate change,[31] including a requirement for development of 9,000 MW of offshore wind energy by 2035.[32] This

---

[30] *See* Launching New York's Offshore Wind Industry: Phase 1 Report at S-4 (rev. Oct. 2019), https://www.nyserda.ny.gov/-/media/Project/Nyserda/Files/Programs/Offshore-Wind/osw-phase-1-procurement-report.pdf (finding that the Sunrise Wind Project, together with another offshore wind project, would "provide approximately $700 million of avoided health impact costs").
[31] N.Y. Envtl. Conserv. Law § 75-0107.
[32] N.Y. Pub. Serv. Law § 66-p(5).

requirement is a critical element of the State's overarching requirements of (1) obtaining 70% of its electricity from renewable sources by 2030 and 100% of its electricity from zero-emission sources by 2040; and (2) achieving a reduction in economy-wide GHG emissions of 40% by 2030 and 85% by 2050 from 1990 levels.[33]  The Project will satisfy more than 10% of the CLCPA's offshore wind energy requirement and will contribute toward satisfying the CLCPA's renewable energy and GHG emission reduction requirements.  The Project is anticipated to eliminate up to approximately 2.45 million metric tons of carbon dioxide equivalent emissions annually (which is equivalent to taking approximately 530,000 gasoline-power cars off the road each year) and over 85 million tons of carbon emissions over the Project's lifetime (estimated for this calculation as 35 years).

### H.    Relief Is Needed On or Before February 6, 2026

60.    For these reasons, relief from this Court is required by the week of February 1, 2026, and no later than February 6, 2026, to avoid significant Sunrise Wind Project delays, potential Project cancellation, and significant additional costs that threaten the Project's viability and thus Sunrise Wind's very existence.  Granting preliminary injunctive relief against the Stop Work Order and vacating the unlawful agency action will redress the injuries described above because Sunrise Wind would be able to complete previously-approved, lawful construction of and operation of the Project.

---

[33] New York State Climate Action Council, Scoping Plan Executive Summary 3-4, 15 (Dec. 2022), https://climate.ny.gov/-/media/Project/Climate/Files/Chapter1ExecutiveSummary.pdf.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on January 9, 2026, at Winchester, MA.

Ryan Chaytors

# EXHIBIT 1

# SRW Export installation overview



# EXHIBIT 2

## FILED UNDER SEAL