# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF COLUMBIA**

| |
|---|
| SUNRISE WIND LLC, |
| |
| *Plaintiff*, |
| |
| v. |
| |
| DOUG BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior; |
| |
| UNITED STATES DEPARTMENT OF THE INTERIOR; |
| |
| MATTHEW GIACONA, in his official capacity as Acting Director of the Bureau of Ocean Energy Management; |
| |
| BUREAU OF OCEAN ENERGY MANAGEMENT; |
| |
| KENNETH STEVENS, in his official capacity as Principal Deputy Director Exercising the Delegated Authorities of the Director of the Bureau of Safety and Environmental Enforcement; and |
| |
| BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, |
| |
| *Defendants*. |

Case No.: 1:26-cv-00028-RCL

**DECLARATION OF EDWARD LEBLANC IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

Pursuant to 28 U.S.C. § 1746(2), I, Edward LeBlanc, declare as follows:

1.      I am employed by Orsted North America Inc. ("Ørsted") as the Head of Marine

Affairs, in which role I direct and oversee a range of activities, such as de-conflicting offshore

wind project construction and operations with other uses of the seas, compliance with navigational

1

safety requirements, and coordination with the U.S. Coast Guard, Department of the Navy ("U.S. Navy"), the Department of the Air Force ("U.S. Air Force"), the Department of War ("DOW")[1], and the Federal Aviation Administration ("FAA"), including for the commercial-scale Sunrise Wind Farm and Sunrise Wind Export Cable (together, the "Project").

2.      I have been employed at Ørsted since August of 2019 as a manager of Marine Affairs, and have held the position of Head of Marine Affairs since November of 2021.  Prior to joining Ørsted, I served for more than 40 years in military and civilian positions with the U.S. Coast Guard. I served on multiple sea tours patrolling the Northeastern U.S. fishing grounds.  I also served in a special assignment with the U.S. Navy as the Anti-Submarine Warfare Officer aboard the USS Connole (home-quartered in Newport, Rhode Island), where I actively hunted Russian submarines in the North Atlantic and Mediterranean Sea.  In this role, I was also responsible for the ship's nuclear weapons administration program.  I also served as head of the U.S. Coast Guard search and rescue mission for New England.  I retired from the U.S. Coast Guard with the rank of Commander after 28 years of active military service.  I then served in a civilian position as Chief of the Waterways Management Division, Coast Guard Sector Southeastern New England, from 2003 until my retirement in 2019.  In that role, among other responsibilities, I led the U.S. Coast Guard's review of offshore wind farm proposals off the coast of southeastern New England, including the proposed Cape Wind offshore wind farm and the now-operational Block Island Wind Farm. Beginning in 2010, I participated in the Department of the Interior's ("DOI") Bureau of Ocean Energy Management's ("BOEM") Joint Rhode Island/Massachusetts Renewable

---

[1] Because the majority of the documents involved in the Project's consultations and approvals predate the renaming of the "Department of Defense" to the "Department of War" this declaration uses "Department of War" or "DOW", except where a quoted document or other material refers to the "Department of Defense" or "DOD."

Energy Task Force. Collectively, I have more than 20 years of experience working on offshore wind deconfliction and navigational safety matters, including more than 6 years working on the Sunrise Wind Project.

3.      I obtained my Bachelor of Science in General Studies from George Washington University's Columbian College of Arts & Sciences and a Master's Degree in Quality Management from the National Graduate School of Quality Management.

4.      As Ørsted's Head of Marine Affairs, I am and have been directly involved in, have directed and overseen, and am and have been aware of numerous aspects of the Project, including: Project layout; coordination with the U.S. Navy, U.S. Air Force, and DOW regarding Project design, construction, and operations; permitting and regulatory requirements from the U.S. Coast Guard and the FAA; compliance with navigational safety requirements; communication with the maritime community including through weekly notices of Project construction activities; and mitigation of Project impacts on commercial and recreational fishing.

5.      I have reviewed the December 22, 2025, Director's Order issued by the Acting Director of BOEM to Sunrise Wind LLC ("Sunrise Wind") "to suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security" (the "Stop Work Order").[2]  A true and correct copy of the Stop Work Order is attached to Sunrise Wind's Complaint as Exhibit A and on BOEM's website for the Sunrise Wind Project.[3]

---

[2] The Stop Work Order also states that "while BOEM and DoW endeavor to reach a determination on feasible mitigation measures within 90 days following the date of this letter, BOEM may further extend the 90-day suspension period based on the status of those discussions."

[3] The Stop Work Order is also available here: https://www.boem.gov/renewable-energy/state-activities/boem-sunrise-wind-suspension-letter.

6.      I have also worked on the Revolution Wind Project as part of my role at Ørsted.[4]  I have reviewed the stop work order that BOEM issued to Revolution Wind on December 22, 2025[5], which is substantively identical to Sunrise Wind's Stop Work Order, and I submitted a declaration in support of Revolution Wind's Motion for a Preliminary Injunction and Stay Pending Review of that order.[6]  I have also reviewed the stop work order that BOEM previously issued for the Revolution Wind Project on August 22, 2025[7], and I submitted a declaration in support of Revolution Wind's Motion for Preliminary Injunction and Stay Pending Review of that order.[8]  I attended the hearing in which this Court granted that motion on September 22, 2025.  In addition, I am aware that three other offshore wind projects under construction (in addition to Sunrise Wind and Revolution Wind) received similar stop work orders from BOEM on December 22, 2025.[9]

7.      I execute this Declaration in support of Sunrise Wind's Motion for Preliminary Injunction and Stay Pending Review regarding the Stop Work Order in this case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would

---

[4] The Revolution Wind Project is owned by Revolution Wind, LLC, which is a joint venture indirectly owned in equal part by Ørsted and an investment joint venture partner.

[5] BOEM, Revolution Wind Director's Order (Dec. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Revolution%20Wind%20Suspension%20Letter.pdf?VersionId=8ZW3HfSIRj3Jxi.4iIV5.tMmJVD_uWd0.

[6] *Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL (D.D.C. Jan. 2, 2026), Dkt. 50-3 (Second Declaration of Edward LeBlanc).

[7] BOEM, Revolution Wind Director's Order (Aug. 22, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/Director%26%23039%3BsOrder-20250822.pdf?VersionId=Y674sNo8zi7jLu3VWRvq2hFb_8KtMldc.

[8] *Revolution Wind, LLC v. Burgum,* No. 1:25-cv-02999-RCL, (D.D.C. Sept. 18, 2025), Dkt. 31-14 (Rebuttal Declaration of Edward LeBlanc).

[9] U.S. Department of the Interior, "The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases" (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases ("Dec. 22, 2025 DOI Press Release").

testify truthfully thereto.  I am over 18 years of age and competent to testify about the matters set forth herein.

Ørsted's Worldwide Experience Working with Military and National Security Agencies

8.      Ørsted has extensive experience worldwide working with military and national security governmental agencies (such as the North Atlantic Treaty Organization), including, but not limited to, mitigating radar interference and potential threats from adversarial actors associated with offshore facilities, including offshore wind facilities.  This experience includes offshore the United Kingdom where thousands of offshore wind facility turbines are located, including more than 1,000 installed by Ørsted alone, Northern Europe the Baltics, Asia and the United States.

9.      Ørsted works cooperatively with specific military and national security governmental agencies to identify measures to meet the specific needs of those agencies.  There are a multitude of readily available tried-and-tested solutions that can be employed to mitigate interference with military defense and national security capabilities and that can even enhance those capabilities.  Ørsted has first-hand experience of mitigation and enhancement measures, including installation of both land-based and offshore wind facility structure-based sensors (including radar) that mitigate radar interference and can enhance defense capabilities. This includes the installation of offshore surveillance equipment to detect and track incoming threats, and the installation of subsea surveillance equipment in the form of active and passive sonars, distributed acoustic sensing (DAS) and other means to enhance underwater detection capability, and encryption and other systems that can be used to protect cables and secure signals.

10.      Ørsted generally works with military and national security governmental agencies to identify and deploy mitigation or enhancement measures during the offshore wind facility's design phase.  However, Ørsted also has experience installing and deploying measures at

operational offshore wind facilities and those under construction.  Ørsted, in partnership with international defense contractors Terma and SAAB, installed and successfully tested supplementary infill radar on Ørsted's Hornsea One offshore wind facility—which was already in operation, and was the largest offshore wind facility in the world at the time.

11.    The Department of the Interior has thus far not granted Ørsted's requests for access to the information on which BOEM relied in issuing the Order.  In my decades of experience, I have never seen an instance in which the federal government perceived a threat involving critical energy infrastructure or national security concerns and failed to engage with the company about those concerns.

<u>Allegations in the Stop Work Order and Related Press Statements Regarding National Security</u>

12.    The Stop Work Order states that, in November 2025, "the Department of War (DoW) completed an additional assessment regarding the national security implications of offshore wind projects, and provided senior leadership at the Department of the Interior with new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."[10]  According to the Stop Work Order, "[t]hese impacts are heightened by the projects' sensitive location on the East Coast and the potential to cause serious, immediate, and irreparable harm to our great nation."[11]  The Stop Work Order states that, "[b]ased on BOEM's initial review of this classified information, the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities" and that BOEM, in coordination with the DOW, "will determine whether the national security threats relating to this project can be mitigated."[12]  The Stop Work Order invites Sunrise

---

[10] Stop Work Order at 1.
[11] *Id.*
[12] *Id.*

Wind "to meet and confer about that possibility."[13]  The Stop Work Order also states that the BOEM and DOW will "endeavor to reach a determination on feasible mitigation measures within 90 days" following the date of the letter.[14]  This time period can be extended by BOEM.  Finally, the Stop Work Order provides that "[g]iven the construction status of this project, BOEM will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled."[15]  I understand that four other offshore wind projects that are currently under construction all received substantially similar stop work orders on December 22, 2025 (the "Orders"): Revolution Wind, Vineyard Wind 1, Coastal Virginia Offshore Wind Commercial Project, and Empire Wind 1.

13.    On December 22, 2025, DOI issued several statements to the press regarding the Orders.  These included a posting on X by the Secretary of the Interior, Douglas Burgum, and several television and newspaper interviews.

14.    In announcing the new Orders against the five offshore wind projects, at 8:25 AM (ET) on December 22, 2025, Secretary Burgum issued a post on X that states:  🚨 Due to national security concerns identified by @DeptofWar, @Interior is PAUSING leases for 5 expensive, unreliable, heavily subsidized offshore wind farms!  ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED. @POTUS is bringing common sense back to energy policy & putting security FIRST!"[16]

15.    At 3:23 PM (ET) on December 22, 2025, the Secretary posted a lengthy thread on X that began with the claim: "Offshore wind is one of the most expensive, unreliable, subsidy-

---

[13] *Id*.
[14] *Id.*
[15] *Id.*
[16] The post is available at https://x.com/SecretaryBurgum/status/2003094666040787213 (last accessed Jan. 8, 2026).

dependent schemes ever pushed upon American taxpayers. Here's why @POTUS is prioritizing energy projects like clean, beautiful coal & U.S. natural gas that actually WORK 📝 ".[17]  Secretary Burgum summarized: "America deserves energy that is affordable, reliable and secure—not this."[18]

16.    The press release issued by DOI on December 22, 2025, titled, "The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases," [19] refers in passing to unspecified "national security risks identified by the Department of War in recently completed classified reports", but the only specific discussion of national security concerns from offshore wind  comes from "unclassified reports from the U.S. Government", which the press release characterizes as having "long found that the movement of massive turbine blades and the highly reflective towers create radar interference called 'clutter.'"[20]  It references a U.S. Department of Energy ("DOE") 2024 report, which the press release describes as stating "that a radar's threshold for false alarm detection can be increased to reduce some clutter, but an increased detection threshold could cause the radar to 'miss actual targets.'"[21]  I understand this statement to be referring to a DOE February 2024 report ("2024 DOE Report") to Congress describing the efforts of the Federal Interagency Wind Turbine Radar Interference Mitigation working group, which was established by a consortium of Federal agencies, including the DOW, DOE, FAA, and

---

[17] The post is available at https://x.com/SecretaryBurgum/status/2003199842152251802 (last accessed Jan. 8, 2026).
[18] *Id.*
[19] Dec. 22, 2025 DOI Press Release.
[20] *Id.*
[21] *Id.*

National Oceanic and Atmospheric Administration ("NOAA").[22]  I have reviewed the 2024 DOE Report.  A true and correct copy of the 2024 DOE Report is attached hereto as Exhibit 1.

17.    This federal interagency working group was created in 2014 pursuant to a Memorandum of Understanding, which was updated in 2023, between DOW, DOE, FAA, NOAA, and BOEM to "identify and develop the means to mitigate the potential technical and operational effects of wind turbine projects on critical radar missions within the jurisdiction of the Parties, including offshore regions."[23]  I understand that the Federal Interagency Wind Turbine Radar Interference Mitigation working group remains an active inter-agency organization.

18.    The 2024 DOE Report acknowledges that, "[t]he clutter created by wind turbines typically increases the false alarm detection rate of a radar" and that "[t]o suppress this, the radar system will raise the threshold for what is considered a detection and, as a result may miss actual targets."[24]  However, the 2024 DOE Report further explains that "the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts . . ."[25]  The report indicates that the working group is well aware of and "continues to fully address wind turbine radar interference as an impact to critical radar missions, ensure the long-term resilience of radar operations in the presence of

---

[22] DOE, Update on the Efforts of the Wind Turbine Radar Interference Mitigation Working Group (Feb. 2024), available at https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-004484%20-%20Report%20to%20Congress%20as%20of%20December%2014%202023%20%282%29.pdf.
[23] Memorandum of Agreement: Establishment of the Wind Turbine Radar Interference Mitigation Working Group, available at https://www.energy.gov/sites/default/files/2023-08/wind-turbine-radar-interference-mitigation-strategy-memorandum-of-agreement.pdf.
[24] 2024 DOE Report at ii.
[25] 2024 DOE Report at ii.

wind turbines, and remove radar interference as an impediment to future wind energy development."[26]

19.    One of the mitigation strategies identified in the 2024 DOE Report to address this issue is "Wind farm operational agreements," which the report notes have "been employed as a means of mitigating impacts to radar systems, including curtailment agreements".[27]  As described in greater detail below, Sunrise Wind entered into a mitigation agreement after extensive consultation with the DOW and after this report was released.

20.    On December 22, 2025, Secretary of the Interior Doug Burgum gave an interview on Fox Business where he claimed that "one could understand how [these offshore wind projects] would cause issues with casting radar shatters[28] and clutter as they call it".[29]  Secretary Burgum then described recent military conflicts as evidence that "adversarial threats have really changed", which was purportedly a focus of the classified assessment referenced in the Stop Work Order:

> And we know that with the advances that have happened, the wars that are happening between Russia and Ukraine, largely those are aerial drone wars.  We know what was going on between Iran and Israel: that wasn't piloted, that was aerial drone wars that were occurring there, sometimes, you know, Iran launching as many as 500 aircraft missiles or drones at Israel in a single day just this last year, during 2025.  So, the adversarial threats have really changed, and so this new report from the War Department really zeroes in on that . . . .[30]

21.    On December 22, 2025, Secretary Burgum also gave an interview on Fox News citing "recently completed, classified reports from the Department of War focused around radar

---

[26] 2024 DOE Report at 8.
[27] 2024 DOE Report at iii.
[28] In the interview, it is unclear whether Secretary Burgum used the term "shatters" or "shadows".
[29] Portions of the interview are available on Facebook at https://www.facebook.com/purpleroompolitics/videos/on-december-22-2025-interior-secretary-doug-burgum-announced-that-the-trump-admi/777945785302771/ (last accessed on Jan. 8, 2026).
[30] *Id.*

and radar interference" as grounds for halting activities on the leases for five offshore wind Projects, including Sunrise Wind.[31] But, in the same interview, Secretary Burgum quickly moved on to criticizing offshore wind projects as "unreliable, unaffordable, and they were built primarily with foreign sourced companies and foreign sourced equipment."[32] Secretary Burgum praised "President Trump's policies about increasing supply, 'drill, baby drill'", claiming that "the proof is already here that his energy policies can bring affordability and secure, reliable energy to Americans."[33]

22.    Secretary Burgum's statements about radar and drones in the December 22, 2025 Fox Business interview echo statements that Secretary Burgum made to CNN following the BOEM Acting Director's August 22, 2025 Stop Work Order, which halted offshore construction of the Revolution Wind Project:

> In particular there's concerns about radar relative to undersea . . . doesn't have to be a large Russian sub, but undersea drones, the new technology. I mean, the war in Ukraine has shown that swarm attacks by drones, if you're going to launch one into our most populous part of our country, the Pacific Northwest, the way. . . people with . . . bad ulterior motives to the United States would launch a swarm drone attack through a wind farm, the radar gets very distorted around detecting, if you're trying to . . . detect and avoid if you've got drones coming . . . .[34]

23.    On the morning of December 23, 2025, Secretary Burgum gave another interview on Fox News where he claimed that "modern warfare is drone warfare," and expressed concerns about "the radar interference caused by these massive, gargantuan projects."[35] Again he focused

---

[31] This interview is available on the Fox News website at
https://www.foxnews.com/video/6386850294112 (last accessed on Jan. 8, 2026).
[32] *Id.*
[33] *Id.*
[34] This interview is available at https://www.cnn.com/audio/podcasts/the-source-with-kaitlan-collins/episodes/9075c0fa-2cda-11ef-bba8-a758d1b9f5e3 (last accessed on Jan. 8, 2026) and the relevant discussion begins at approximately the 25:15 mark.
[35] This interview is available on the Fox News YouTube channel at:
https://www.youtube.com/watch?v=zaGVeJSdy30 (last accessed Jan. 8, 2026).

mostly on criticizing the cost and reliability of offshore wind, which he suggested was an inferior

source of energy compared to natural gas:

> So, it's not reliable, it only works when the wind is blowing. It's expensive. And, of course, it depends on foreign suppliers almost completely for this industry. And we have a solution right there in New England, which is natural gas from Pennsylvania, which would generate power five-to-ten times more than all these five wind projects together.
> …
>
> So, these things are not only highly subsidized and really expensive---one of these projects, $11 billion to get one gigawatt of power. You could get a gigawatt of power for one-to-two billion, one fifth the price using natural gas. So this is, then the wind energy only works when the wind is blowing, and at times when we've needed the most, along the East Coast during the coldest days and hottest days in the last year, we've had two percent of the entire grid being powered by wind. So, you still need all the rest of the power, you still need all the baseload. And PJM, the grid operator that runs from D.C. to New York, has shut down over 20 gigawatts of baseload in the last 5 years. So, if people are worried about an electricity crisis, it was self-made by the same people that support offshore wind. The people that support offshore wind are the ones that were campaigning as special interests to shut down all the baseload. But move to a different part of the country and you'll find out that electricity prices—like in my home state—are one third that they are the price in New England.[36]

During the interview, Secretary Burgum also made several claims regarding the environmental

impacts of offshore wind development:

> We've got the marine fisheries and the fishermen are opposed to these. The people that love the whales are opposed to them because of the whale groundings.
> …
>
> During the Biden Administration, when these projects were approved, they got permits, yes, but they were… these things flowed through the system without any serious understanding of the impacts on fish, on mammals, on the ocean floor. I mean, think about, each one of these towers is connected to another one by a cable. There are hundreds of miles of undersea cables that need to be [inaudible]. And then, when they dig those into the bottom of the ocean, they're just doing a thing called jet-trenching, which is causing all kinds of disturbances when they're laying these cables in the ground.[37]

I have watched each of these interviews.

---

[36] *Id.*

[37] *Id.*

24.    On December 23, 2025, Secretary Burgum posted another "thread" on X in which he claimed that "Offshore wind is a GIANT rip off for every American consumer."[38]  As part of this thread, Secretary Burgum suggested that, because of offshore wind, "It's TWICE as expensive to heat a home in New England, the birthplace of the American Revolution, than in Europe during a Russian Invasion!"[39]  He claimed also that "better options" for power were being ignored in favor of offshore wind, and that "[o]ffshore wind isn't just a bad deal, it's a scam and YOU are paying for it!"[40]

The Project's Multi-Year Review and 2025 DOD Clearinghouse Mitigation Agreement

25.    I am personally familiar with the Project's development history, its permitting, including compliance with BOEM's Conditions of Construction and Operations Plan Approval, its interactions with the DOW and its agencies, and the ongoing and future impacts of the Stop Work Order on the Project if not enjoined.

26.    As described below, consistent with Congressional direction and requirements, the DOW has established a robust, multi-year process to review proposed energy projects, including but not limited to onshore and offshore wind projects, to ensure that the siting and design are compatible with military missions and operations, including any potential national security concerns known as the DOD Military Aviation and Installation Assurance Siting Clearinghouse ("DOD Clearinghouse").  I discuss the DOD Clearinghouse in more detail below.  With respect to the potential for radar interference, all relevant military branches and the DOD Clearinghouse

---

[38] The post is available at https://x.com/SecretaryBurgum/status/2003542182930842066 (last accessed Jan. 8, 2026.

[39] The post is available at https://x.com/SecretaryBurgum/status/2003542188484104627 (last accessed Jan. 8, 2026).

[40] The post is available at https://x.com/SecretaryBurgum/status/2003542190170210637 (last accessed Jan. 8, 2026).

review proposed projects and develop mitigation agreements, which are executed by DOW and the wind project developer to address those potential concerns.

27.     Among the many federal agencies that reviewed the Project before its approval, the Project was reviewed by the Bureau of Safety and Environmental Enforcement ("BSEE"), DOW, U.S. Coast Guard, and FAA.   BOEM consulted with DOW to assess national security considerations at each stage of the regulatory process involving the Project's lease, as described in BOEM's Record of Decision ("ROD") approving the Project's Construction and Operations Plan ("COP").[41]  Representatives of the Project engaged in numerous communications with agencies regarding national security, aviation and navigation safety, including the U.S. Coast Guard, U.S. Navy, U.S. Naval Undersea Warfare Center, the U.S. Air Force, the North American Aerospace Defense Command ("NORAD"), U.S. Army, U.S. Army Corps of Engineers, NOAA, and the FAA.[42]

28.     As part of the Project's BOEM COP review process, Sunrise Wind's consultant (Westslope Consulting) prepared a preliminary screening analysis—Radar and Navigational Aid Screening Study dated November 12, 2020—early in the Project's review, to support subsequent evaluation and consultation regarding the Project's potential radar impacts.   Sunrise Wind submitted this Radar and Navigational Aid Screening Study to BOEM as part of Appendix Y1 to the COP.[43]  Westslope's Radar and Navigational Aid Screening Study identified that the Project's

---

[41] BOEM Record of Decision ("ROD") (March 25, 2024), Appendix B at 18-20, available at: https://www.boem.gov/renewable-energy/state-activities/record-decisionsunrise-windocs-0487.
[42] *See* ROD, Appendix B at 8, 18-19.
[43] COP Appendix Y1 was first submitted to BOEM on December 18, 2020 and was resubmitted to BOEM on October 28, 2021.  A true and correct copy of COP Appendix Y1 as submitted to BOEM on October 28, 2021 (including Westslope Consulting's Sunrise Offshore Wind Project Radar and Navigational Aid Screening Study) and Sunrise Wind's transmittal correspondence to BOEM is attached as Exhibit 2.

wind turbines would be "within line-of-sight" of certain radar sites, noting that "Westslope expects that the DoD and FAA will have concerns with wind turbines within line-of-sight in the study area at blade-tip heights of 636 feet AGL and 968 feet AGL based on electromagnetic interference to air navigation facilities" and that "[t]he FAA's aeronautical study process and the DoD Siting Clearinghouse process will provide an official decision as to whether impacts are acceptable to operations."[44] Accordingly, BOEM's ROD for the Project explains that, while reviewing the Project's COP, BOEM coordinated with the DOW "to develop measures necessary to safeguard against potential liabilities and impacts on DoD activities" and requested that the DOD Clearinghouse coordinate within the DOW to review the Sunrise Wind COP.[45]

29.    The DOD Clearinghouse was established by the 2011 National Defense Authorization Act to "coordinate Department of Defense review of applications for energy projects or antenna structure projects filed with the Secretary of Transportation" and to evaluate these applications to "assess the likely scope, duration, and level of risk of any adverse impact of such energy project or antenna structure project on military operations and readiness" and "identify any feasible and affordable actions that could be taken by the Department, the developer of such energy project or antenna structure project, or others to mitigate the adverse impact and to minimize risks to national security while allowing the energy project or antenna structure project to proceed with development."[46] With respect to offshore energy development, "[t]he Clearinghouse leads DOD interactions with BOEM for offshore energy compatibility and coordinates at every stage of planning, permitting, and development throughout the Atlantic, Pacific, and Gulf of America," and

---

[44] Ex. 2, Radar and Navigational Aid Screening Study at 7, 29 (PDF pages 28, 50 of COP Appendix Y1).
[45] ROD, Appendix B at 19.
[46] 10 U.S.C. §§ 183a (b), (c).

"[t]he efforts of the Clearinghouse, BOEM, and states create plans that support offshore energy development while safeguarding military missions."[47]

30.    As BOEM explained in the ROD, as a result of the DOD Clearinghouse review, DOW identified potential impacts and "BOEM and the DoD Clearinghouse coordinated to address these concerns and to avoid or mitigate them."[48]  BOEM's ROD provides the specific mitigation measures requested by the DOD Clearinghouse, and explains that "[t]o protect the security interests of the United States, BOEM . . . included these measures  . . . as conditions of approval in Appendix A of the ROD" and in the Project's Conditions of COP Approval.[49]

31.    As directed by BOEM,[50] in January 2025, Sunrise Wind entered into an agreement ("DOD Agreement") with the DOW, acting through the DOD Clearinghouse, and the U.S. Air Force "to mitigate any potential adverse impacts on military operations and readiness and to minimize risks to national security while allowing the Sunrise Offshore Wind Project (Project), within the BOEM lease area OCS-A 0487 to proceed with development."[51]  The DOD Agreement

---

[47] DOD Clearinghouse, Offshore Energy, available at
https://www.dodclearinghouse.osd.mil/Offshore-Energy/.
[48] ROD, Appendix B at 19.
[49] ROD, Appendix B at 20; *see* ROD, Appendix A, at pdf pp. 113-115; Conditions of COP Approval (June 21, 2024), at 31-32, available at https://www.boem.gov/renewable-energy/state-activities/5774app-asunrise-windconditions-cop-approvalocs-0487final.
[50] The BOEM Conditions of COP Approval include Condition 3.1.2, which requires that "all [wind turbine generator] rotors (blade assemblies) [be equipped] with control mechanisms constantly operable from the Lessee's control center,"  and that these controls enable the Project to "immediately initiate the shutdown of any WTG upon emergency order from the Department of Defense (DOD) or the USCG."  Braking and shut down of each requested WTG must be initiated upon receiving the order and operations may only be resumed upon notification from the entity (DOW or USCG) that initiated the shutdown.  The shutdown procedure is included in the Project's Emergency Response Procedure and the capability is tested to ensure it is functioning.  The results of testing are submitted to BSEE.  The Project also coordinates with the Government in advance of "training and exercises to test and refine notification and shutdown procedures."
[51] A true and correct copy of the DOD Agreement is attached as Exhibit 3 to this declaration.

explains that, "[a]s the Project was originally filed, its spinning turbine blades would conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth-Otis Air Force Base (AFB), Massachusetts Airport Surveillance Radar 8 (ASR-8)" but the "Parties have focused on de-conflicting these activities and agree that the terms [set forth] will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness."[52]

32.    The mitigation measures agreed to in the DOD Agreement, which are also reflected in the BOEM Conditions of COP Approval, required Sunrise Wind to contribute funding to the DOW "to offset the cost of measures undertaken by DoD to mitigate adverse impacts of this Project" and notify NORAD prior to the completion of commissioning of the last wind turbine generator.[53]    Specifically, the Radar Adverse impact Management ("RAM") funded by Sunrise Wind's contribution is a "technical process designed to minimize the adverse impact of obstruction interference on a radar system" that "[i]nvolves a visit to the radar site by technicians to adjust applicable radar parameters."[54]

33.    The DOD Agreement also includes a curtailment provision, which states that "[u]pon request by NORAD, [Sunrise Wind] agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose utilizing the communication protocol set out in Attachment C."[55]    The DOD Agreement defines "National Security or Defense Purpose" as "[a]n emergency circumstance where the President of the United States, the Secretary of Defense, or a

_____

[52] DOD Agreement at 2.
[53] DOD Agreement at 4.
[54] DOD Agreement at 3.  The DOD Agreement governs when and how the RAM fee is to be paid.  *See* DOD Agreement at 4-5.  To date, the DOW has not requested Sunrise Wind to expedite payment of this fee.
[55] DOD Agreement at 6.  In this context, curtailing wind turbine operations involves stopping or otherwise slowing the blades from rotating.

combatant commander under 10 U.S.C. Section 164 directs a change to the mission of NORAD in support of emergency circumstances."[56]  The agreement expressly provides that "[a] NORAD air defense event is an emergency circumstance under this definition."[57]  The DOD Agreement explains that "[c]urtailment for a National Security or Defense Purpose will be temporary in nature and extend only so long as is absolutely necessary to meet the discrete, temporary, and stated National Security or Defense Purpose."[58]  The DOD Agreement explains the procedure for initiating a curtailment under this provision: "Any request for Curtailment under this subsection will be communicated by either DoD Party or applicable NORAD Air Defense Sector (ADS) to Project Owner and will include the releasable portions of the President's, the Secretary's, or the combatant commander's mission order."[59]  To date, Sunrise Wind has not received any communication from the DOW, the U.S. Air Force, or the applicable NORAD Air Defense Sector indicating that the measures in the DOD Agreement will be insufficient.

34.    The DOD Agreement also includes a provision explaining that "[t]he DoD Parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project (except as provided in sections 6.B [regarding DOW's communications with the Committee on Foreign Investment in the United States] and 10.H [regarding the Anti-Deficiency Act] of this agreement) provided that Project Owner is in material compliance with the terms of this agreement and that, as of the effective date of this agreement, Project Owner has disclosed to the DoD Parties in writing all material facts

---

[56] DOD Agreement at 3.
[57] *Id.*
[58] *Id.* at 6.
[59] *Id.*

necessary for the DoD Parties to be able to fully assess the Project's potential adverse impacts on military operations and readiness and risks to national security."[60]

<u>No Additional Communications from DOW or Other Agencies Since 2025 DOD Agreement</u>

35.    Aside from the Stop Work Order, since the DOD Agreement was executed in January 2025, Sunrise Wind has not received any communication from DOI, DOW, the U.S. Air Force, or any other military agency with respect to the DOD Agreement or with respect to any national security or compliance concerns, including any communication from DOW or the U.S. Air Force suggesting the need for additional Project mitigation.  The only other information I have seen related to the Defendants' classified national security concerns is through review of declarations filed by federal personnel in various other pieces of litigation that I obtained through my legal counsel and press coverage.

36.    Project representatives (Ørsted U.S. Marine Affairs staff) meet weekly with the U.S. Coast Guard to discuss project progress and anticipated on-water construction and maintenance activities over the upcoming week.  Frequently other Federal agencies join the meeting, including BSEE, BOEM, and NOAA.  The most recent of these weekly meetings was held on January 5, 2026.  The same representatives meet with various U.S. Coast Guard-sponsored Port Safety and Security Committees in southeastern New England, where maritime security issues are discussed.  Additionally, the same representatives participate in the U.S. Navy-sponsored Thames River (New London/Groton, CT) Users Group, where unclassified information relative to the U.S. Navy submarine base at Groton are routinely discussed.  In none of these forums has national defense issues related to radar or offshore wind ever been raised by any of the participants, including the DOW or the U.S. Coast Guard.

---

[60] *Id.* at 6, 7, 10.

37.     Apart from the Stop Work Order, which was issued by DOI, Sunrise Wind has never received a notice or any indication that it has failed to coordinate with DOW, U.S. Navy, or U.S. Air Force regarding its offshore activities, or that these agencies have any concerns with the ongoing coordination.

38.     More broadly, between the execution of the DOD Agreement in January 2025 and the Stop Work Order on December 22, 2025, Sunrise Wind never received any communication from the DOW, U.S. Navy, or the U.S. Air Force describing or suggesting the existence of any national security concerns related to the Project.  Sunrise Wind also did not receive any prior notice before BOEM issued the Stop Work Order.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on January 9, 2026, at Naples, Maine.

_____
Edward LeBlanc

# EXHIBIT 1



# Update on the Efforts of the Wind Turbine Radar Interference Mitigation Working Group

**Report to Congress**
**February 2024**

**United States Department of Energy**
**Washington, DC 20585**

# Message From the Secretary

Pursuant to statutory requirements, this report is being provided to the following Members of Congress:

- **The Honorable Patty Murray**
  Chair, Senate Committee on Appropriations

- **The Honorable Susan Collins**
  Vice Chair, Senate Committee on Appropriations

- **The Honorable Patty Murray**
  Interim Chair, Energy and Water Development Subcommittee
  Senate Committee on Appropriations

- **The Honorable John Kennedy**
  Ranking Member, Energy and Water Development Subcommittee
  Senate Committee on Appropriations

- **The Honorable Kay Granger**
  Chairwoman, House Committee on Appropriations

- **The Honorable Rosa DeLauro**
  Ranking Member, House Committee on Appropriations

- **The Honorable Chuck Fleischmann**
  Chairman, Energy and Water Development Subcommittee
  House Committee on Appropriations

- **The Honorable Marcy Kaptur**
  Ranking Member, Energy and Water Development Subcommittee
  House Committee on Appropriations.

If you have any questions or need additional information, please contact me or Meg Roessing, Deputy Director for External Coordination, Office of Budget, Office of the Chief Financial Officer, at (202) 586-3128.

Sincerely,

Jennifer M. Granholm

# Executive Summary

This report responds to language set forth in the House Committee on Appropriations Report 117-98, which accompanied the Energy and Water Development and Related Agencies Appropriations Bill (2022).

As wind turbines continue to expand in both size and number, they can interfere with radar systems. The clutter created by wind turbines typically increases the false alarm detection rate of a radar. To suppress this, the radar system will raise the threshold for what is considered a detection and, as a result, may miss actual targets.

While there are many types of radar systems, the systems that this report focuses on are broadly categorized into four types: terminal, long-range, high-frequency, and weather. These systems support air traffic control and flight safety, severe weather forecasting and warnings, coastal sea-surface and maritime surveillance, oceanographic measurements, and homeland and national defense missions. To date, no mitigation technology has been able to fully restore the technical performance of impacted radars. However, the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts, and have also enabled significant wind energy deployments throughout the United States which produced more than 9% of the United States' electricity in 2021 [1].

The Report describes the efforts of the Federal interagency Wind Turbine Radar Interference Mitigation (WTRIM) working group, which was established by a consortium of Federal agencies including the U.S. Department of Defense (DOD), U.S. Department of Energy (DOE), Federal Aviation Administration (FAA), and National Oceanic and Atmospheric Administration (NOAA) to address the impacts of wind turbines on civilian and national defense radar system operations.[1] Each agency that voluntarily participates in the WTRIM working group receives its own annual appropriations and direction from Congress.[2]

The Report also provides a broad overview of options to mitigate wind turbine radar interference, as well as the status of some specific mitigation strategies and technologies that have been studied. These include wind farm siting and operations, reduced signal wind turbines (turbine design changes to reduce amount of energy reflected to the radar system), radar

---

[1] The U.S. Department of Homeland Security (DHS) and Bureau of Ocean Energy Management (BOEM) have been observers of the WTRIM working group, with BOEM becoming a full participating member in 2018.

[2] Portions of these agencies' funds have been used to support agency-focused research, development, and demonstration of wind turbine radar interference mitigation activities. DOE's Wind Energy Technologies Office requested input from the federal WTRIM working group on the status of past, current, and planned activities to reduce wind turbine impacts on civilian and defense radar systems.

upgrades, command and control automation upgrades, augmentation radars, and replacement radars.

The report concludes with detailed information on the mitigations options currently being developed and tested, mitigation solutions that are not being considered because of resource constraints, and mitigation options that have been dismissed and explains why they are not considered viable.

Key findings from the report are summarized below:

- Wind turbines that are located within the line-of-sight[1] of civilian and defense radar systems are known to cause interference which impacts radar performance, and in turn can negatively impact the missions that depend on those radars.
- Testing campaigns to date have been successful in characterizing interference issues with each radar type tested and increasing the technical understanding of the interference issues.
- Wind farm siting tools have been developed and are available to assist in analyzing potential wind turbine impacts on federal radar systems.
- The most basic and widely-employed mitigation method is wind farm siting, such as modifying the layout a proposed wind farm to keep the wind turbines out of the line-of-sight of the radar.
- Wind farm operational agreements have also been employed as a means of mitigating impacts to radar systems, including curtailment agreements to reduce the speed of the wind turbine blades for special events.  In less straightforward cases, a mitigation agreement may be negotiated that requires either changes to the operation of the wind facility or that industry funds a mitigation upgrade to the existing radar system.
- Reducing the radar cross section of a wind turbine blade by integrating radar-absorbing material could achieve a limited reduction in interference though not enough to satisfy the cost to manufacturers and the limited ability to enhance radar performance.
- Radar software upgrades for long-range radars have had moderate success at improving the ability of the radars to operate in areas with high wind turbine deployment. However, with the anticipated development of additional wind farms, these software upgrades may not be enough to mitigate the impacts.
- Replacement radar and infill radar solutions are the most viable technology mitigation solutions to enhance degraded radar performance in areas above wind turbines.

Going forward, wind energy will play a leading role in the nation's transition to a clean energy economy.  Continued progress in radar interference mitigation will be important for ensuring

---

[1] Radar line-of-sight refers to the region above the Earth's surface which the energy transmitted by the radar can reach. There are limits to the reach of radar signals which can be caused by the transmitter power of the radar, the curvature of the Earth, and/or terrain obstructions.

access to high wind resource areas by developers.  Interagency collaboration and coordination must continue in order to define solutions that will allow large-scale wind deployment.



# Update on the Efforts of the Wind Turbine Radar Interference Mitigation Working Group

## Table of Contents

I.      Congressional Language ................................................................................................ 1

II.     Wind Energy and Radar Introduction .......................................................................... 1

III.    Wind Turbine Radar Interference Mitigation Working Group Overview ........................... 5

IV.     Mitigation Option Status ............................................................................................. 9

V.      Remaining Work and Resource Gaps for Mitigations Currently Being Developed .......... 13

VI.     Mitigations Not Being Considered Because of Resource Constraints .............................. 25

VII.    Dismissed Mitigations With Reasoning ....................................................................... 27

VIII.   References ................................................................................................................ 30

IX.     Glossary of Terms ..................................................................................................... 33

Appendix A. Wind Turbine Radar Interference Mitigation Working Group ................................ 35

Appendix B. Wind Turbine Radar Interference Mitigation Memorandum of Understanding ..... 36

# I.        Congressional Language

This report responds to language set forth in the House Committee on Appropriations Report 117-98, which accompanied the Energy and Water Development and Related Agencies Appropriations Bill (2022). On page 115, Report 117-98 states:

> *"The Committee is aware of and supports the ongoing work of the Wind Turbine Radar Interference Mitigation working group managed by the Wind Energy Technologies Office. The Department is directed to provide to Committee not later than 180 days after enactment of this Act a report on the efforts of the working group. The report should include the:*
>    o   *status of testing, certification and deployment of mitigation options by radar type and department or agency;*
>    o   *remaining steps and timelines before mitigation options currently being developed or tested could be available for deployment;*
>    o   *identification of resource gaps to achieve deployment of mitigation options currently being tested;*
>    o   *identification of mitigation options that are not currently being considered due to resource constraints but may be promising with additional resources and prioritization; and*
>    o   *mitigation options that have been dismissed along with an explanation of why the option is not considered viable."*

# II.        Wind Energy and Radar Introduction

U.S. wind energy is a competitive and robust source of electricity across the Nation, with more than 136 gigawatts of capacity[3] installed that contributed over 9 percent of total generation in 2021 [1]. This growth of wind energy installations is poised to accelerate due to continued expansion of new economic and environmental benefits, such as lower costs for electricity generation, tens of thousands of well-paying jobs, increased U.S. manufacturing and supply chain opportunities, and significant public-health benefits resulting from improved air and water quality.

Land-based wind energy is a proven, low-cost electricity generation source when deployed at high-quality wind resource locations. Adding to that is an emerging market for offshore wind energy, which will be available in both shallow and eventually deeper waters [2]. Wind energy can also help make the electric grid more reliable and resilient, as well as generate clean fuels to help transition the U.S. economy to zero emissions in the transportation, buildings, industrial, and agricultural sectors.

---

[3] Capacity is defined as the amount of electricity a generator can produce at its maximum output level.

Radar systems are vital tools used across many missions within the Federal Government, such as homeland defense, flight safety, search and rescue, and weather observation and warning systems.

As wind turbines continue to expand in both size and number, they can interfere with radar systems. This represents a significant challenge as over 40 percent of land-based and over 25 percent of offshore wind resource technical potential is in the field of view of critical radar systems (see Figure 1). The radar systems that are impacted support air traffic control and flight safety, severe weather forecasting and warnings, coastal sea-surface and maritime surveillance, oceanographic measurements, and homeland and national defense missions, all of which can directly affect people's daily lives and property.



Figure 1 – This map shows radar line-of-sight (LOS) polygons approximated at 100 meters above ground using a simple viewshed analysis based on publicly available radar station locations. The polygons do not represent the actual line-of-sight that can be observed by the scan of a radar system but give an approximation of the potential areas of CONUS where wind turbine build out may impact a radar system. Short/Long (red shading) range refers to air traffic control and air route surveillance radars respectively and NEXRAD (yellow shading) represents weather radars. The yellow and red shading is for visualization purposes only and these areas do not represent no-go zones for wind development. *Image created by the National Renewable Energy Laboratory.*

Wind turbines that are located within the line-of-sight[4] of civilian and defense radar systems are known to cause interference, potentially impacting their ability to perform their mission. For example, interference with weather radar may impede critical weather forecasts. In general, wind turbines can impact radar performance by:

- Creating clutter[5]

- Reducing detection sensitivity

- Obscuring potential targets

- Scattering target returns, which can inhibit target detection

- Hindering target tracking

- Generating false targets


*Weather Radar*




*Air Surveillance Radar*

Technical impacts:
- Turbines present unique mix of moving and static clutter
- Decrease probability of target detection
- Increase false alarms
- Corrupt track quality

Mission impacts:
- Flight safety (FAA, DOD)
- Border protection, navigation, search and rescue (DHS)
- Homeland defense (DOD)
- Weather observation and warning, ocean observation (NOAA)

Figure 2 - Wind-radar interference basics. [3]

To date, no mitigation technology has been able to fully restore the technical performance of impacted radars. However, the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform

---

[4] Radar line-of-sight refers to the region above the Earth's surface which the energy transmitted by the radar can reach. There are limits to the reach of radar signals which can be caused by the transmitter power of the radar, the curvature of the Earth, and/or terrain obstructions.
[5] Clutter refers to any unwanted return signals to the radar. This can come in the form of man-made structures (i.e., buildings, antennas, etc.), birds, trees, and so on.

their missions without significant impacts and have also enabled significant wind energy deployments throughout the United States.

The clutter created by wind turbines typically increases the false alarm detection rate of a radar. To suppress this, the system will raise the threshold for what is considered a detection and, as a result, the radar may miss actual targets. For national weather radars (Next Generation Weather Radar [NEXRAD] systems) and coastal high-frequency radars, existing technologies can only reduce, but not eliminate, the interference caused by wind turbines of true weather signals. Coastal high-frequency and over-the-horizon radar systems add to the complexity because they are impacted by multiple electromagnetic pathways. With these systems, the radar signals are affected by objects above the ground and at the ground or sea surface.

While there are many types of radar systems, the systems that this report is interested in can be broadly categorized into four types: terminal, long-range, high-frequency, and weather.

Terminal radar systems include surveillance radars known as Airport Surveillance Radars (ASR). These radar systems provide short-range (60 nautical miles) coverage near airports and serve as a tool to manage terminal air traffic [4]. They include the ASR-8, ASR-9, ASR-11, and DASR.

Long-range radar systems, used by the FAA, DOD, and DHS, include surveillance radars known as Air Route Surveillance Radars (ARSR). As the name implies, these radar systems provide long-range (200–250 nautical miles) coverage to detect and track targets over large areas. Targets can include anything in the airspace from commercial aircraft to non-cooperative homeland threats [4]. They include the ARSR-4, and the Common Air Route Surveillance Radar (CARSR).

High-frequency radar systems used by NOAA and the U.S. Coast Guard measure the speed and direction of ocean surface currents. These radar systems have coverage areas up to 100 nautical miles from the shore and are used to aid in marine navigation, hazardous materials spills, search and rescue, and water quality monitoring [5].

Another type of high-frequency radar system is called the Relocatable Over-the-Horizon Radar (ROTHR) used by the Department of Defense. This is a long-range system that utilizes the ionosphere to detect targets up to 1,600 nautical miles away and is primarily used for drug interdiction [6].

Weather radar systems provide near real-time information on storm systems and are used to issue severe weather warnings. These systems include the Weather Surveillance Radar, 1988 Doppler (WSR-88D), also known as NEXRAD. There are 160 NEXRADs in operation in the United States and they can have a coverage of up to 250 nautical miles [7].

# III.  Wind Turbine Radar Interference Mitigation Working Group Overview

Active research in the radar interference space began in 2012 with the Interagency Field Test & Evaluation (IFT&E) campaign, funded by DOE, DOD, DHS, and the FAA, to:

- Characterize the impact of wind turbines on existing program-of-record air surveillance radars.

- Assess near-term technologies proposed by industry that have the potential to mitigate the interference from wind turbines on radar systems; and

- Collect data and increase technical understanding of interference issues to advance development of long-term mitigation strategies [8].

Under this campaign, the Massachusetts Institute of Technology's Lincoln Laboratory (MIT LL) and DOE's Sandia National Laboratories successfully conducted three flight test campaigns in Tyler, Minnesota and Abilene and King Mountain, Texas, to assess eight proposed mitigation technologies for terminal- and long-range radars systems (Figure 3). The eight technologies included infill radar systems,[6] radar upgrades, and replacement radars.



|  | CARSR | ASR-11 | ARSR-4 |
|---|---|---|---|
| Range (nmi) | 200 | 60 | 250 |
| Scan Time (s) | 12.0 | 4.8 | 12.0 |
| Max Elevation (°) | 20 | 30 | 30 |
| Band | L | S | L |

Figure 3 - IFT&E locations and tested program-of-record radar systems [8]

---

[6] Infill radar systems, also called augmentation radars, tend to have a shorter range and higher resolution than traditional radar systems and would be used to fill in the gaps in the surveillance area of the existing radar caused by wind turbines.

The first test in Tyler, Minnesota, was of a long-range Common Air Route Surveillance Radar (CARSR) and included the evaluation of three proposed mitigation technologies: the C Speed Lightwave[7] infill radar, the SRC LSTAR(V)3[8] infill radar, and a Raytheon CARSR processing upgrade.

The second test in Abilene, Texas, characterized the performance of the Airport Surveillance Radar (ASR-11) and evaluated two proposed mitigation technologies, the Terma Scanter 4002[9] infill radar, and a radar upgrade called the Booz Allen Hamilton RF Precision Nulling Device.

The third test in King Mountain, Texas, was at another long-range radar site, the Air Route Surveillance Radar (ARSR-4). The third test also evaluated three proposed mitigation technologies, a Lockheed Martin TPS-77[10] replacement radar, an Aveillant Holographic[11] infill radar, and a Raytheon X-band infill radar.

All the proposed mitigation technologies were impacted by wind turbines; however, many were significantly less affected than the existing program-of-record radars. Figure 4 summarizes the detection performance of the mitigation technologies by category and region. Because of the missions of many of these systems and their proprietary nature, many test results are considered Official Use Only and cannot be shared publicly. The results shown here were shared in a public version of the report [8], but did not include any Official Use Only information.

The data showed that the existing primary surveillance radars are impacted by wind turbines. In addition, while all systems tested were impacted by wind turbines, the replacement radar and most of the infill radars performed better than the existing primary surveillance radars in areas above wind turbines. "The infill radars demonstrated either sufficient, or near sufficient, detection performance, but elevated false alarm rates in general or poor detection performance for aircraft at higher elevation angles." "The radar upgrades tested did not significantly improve the surveillance capability over wind farms, and therefore the technologies tested were not considered an effective mitigation. Nevertheless, data collected during the tests suggest alternative upgrade approaches that may be more successful; meaning this category of mitigation should not be altogether dismissed." [8]

---

[7] https://www.cspeed.com/radar
[8] https://www.srcinc.com/products/radar/lstar-air-surveillance-radar.html
[9] https://www.terma.com/markets/ground/wind-farms/radar-mitigation/
[10] https://www.lockheedmartin.com/en-us/products/ground-based-air-surveillance-radars/tps-77.html
[11] https://www.aveillant.com/applications/windfarm-tolerant-radar/



Figure 4 – These charts illustrate the performance of existing Federally owned radars and probability of detection and false alarm for various aircraft of different sizes using various mitigation technologies from IFT&E Report [8]. This shows the difference in performance of the tested existing radar systems and the mitigation technologies between areas above wind turbines, represented with a circle, and areas free of wind turbines, represented with a diamond. Better-performing technologies will have high probability of detection and low probability of false alarm and will be situated in the upper left corner of each graph. The line shows the difference in performance of the various systems in areas free of wind turbines versus areas above wind turbines.

The IFT&E campaigns were successful in increasing the technical understanding of the interference issues and the potential mitigation technologies, but they were only the beginning to bringing these solutions to market.

Under a memorandum of understanding[12] (MOU) signed in 2014, a consortium of Federal agencies comprising the DOD, DOE, FAA, and National Oceanic and Atmospheric Administration (NOAA) established the WTRIM working group to address the impacts of wind turbines on civilian and national defense radar system operations. The U.S. Department of Homeland Security (DHS) and Bureau of Ocean Energy Management (BOEM) have been observers of the WTRIM working group, with BOEM subsequently becoming a full participating member.

---

[12] https://www.acq.osd.mil/DODsc/library/15-S-1452%20WTRIM%20MOU.pdf

Through collaborative activities and coordinated investments, the WTRIM working group continues to fully address wind turbine radar interference as an impact to critical radar missions, ensure the long-term resilience of radar operations in the presence of wind turbines, and remove radar interference as an impediment to future wind energy development. DOE partners with multiple laboratories (Sandia National Laboratories, Lawrence Berkeley National Laboratory, National Renewable Energy Laboratory, and MIT Lincoln Laboratory) that assist in these efforts.

The MOU established the framework of cooperation for the WTRIM working group to:

- Develop near- (5 years), mid- (10 years), and long-term (20 years) mitigation solution recommendations; and

- Determine funding requirements to implement workable solutions and include a process for each MOU participant to fund execution of specific near-, mid-, and long-term mitigation technologies.

To fulfill these goals, the WTRIM working group coordinates activities across three broad strategic themes [9]:

- Improving the capacity of the government and industry to evaluate the impacts of existing and planned wind energy installations on radar systems and their missions;

- Developing and facilitating the deployment of hardware and software mitigation measures to increase the resilience of existing radar systems to wind turbines; and

- Encouraging the development of next-generation radar systems that are resistant to wind turbine interference.

The WTRIM working group meets regularly to discuss and coordinate proposed research and field-testing activities in accordance with the MOU. In addition, the working group actively communicates with both the wind energy and radar industries to better understand any potential impacts from wind turbine development and solutions to their interference.

The WTRIM working group has recently engaged in the following activities:

- Provided critical resources and technical support, along with other Federal, state, and local partners, for a new series of aircraft test flights to collect data and evaluate potential mitigation technologies for air-defense radars near Brookings, South Dakota, in late August through early September 2021.

- Executed a new DOE-FAA interagency agreement in August 2021 to design and evaluate a prioritized set of radar software mitigation solutions for existing air traffic control and other radar systems under FAA's control [10].

- Led the renewal of a 5-year interagency agreement to continue the WTRIM working group to understand and reduce wind turbine interference with radar operations as an impediment to future wind energy development [11].

Each agency that voluntarily participates in the Wind Turbine Radar Interference Mitigation (WTRIM) working group receives its own annual appropriations and direction from Congress. Portions of these agencies' funds have been used to support agency-focused research, development, and demonstration of wind turbine radar interference mitigation activities. DOE's Wind Energy Technologies Office requested input from the Federal WTRIM working group on the status of past, current, and planned activities to reduce wind turbine impacts on civilian and defense radar systems.

In certain instances, DOD, DOE, FAA, DHS, NOAA, and BOEM have been able to provide resources for coordinated activities that support the missions of multiple agencies. Coordination among the agencies to advance, prioritize, and execute activities in support of the WTRIM working group's goals remains a voluntary effort under an interagency Memorandum of Understanding signed in 2014, which is under review for renewal at the time this report was prepared.

For a list of WTRIM working group agency offices see Appendix A - Wind Turbine Radar Interference Mitigation Working Group.

# IV.    Mitigation Option Status

This section summarizes and directly answers the requests from Congress regarding the status of testing, certification, and deployment of mitigation options by radar type and department or agency. This section and the following sections are organized by the mitigation categories as shown in Figure 5 and include the radar types and agency to which each mitigation can be applied.





Figure 5 - Wind turbine radar interference mitigation technology categories [8]

## Wind Farm Siting and Operations

### Siting

The easiest and most-employed mitigation method is wind farm siting. This approach is when a developer modifies the specifics of the proposed wind farm in such a way that the wind turbines are out of the line-of-sight of the radar, or in less critical areas, as informed by the radar operator. Implementing this mitigation approach can be done by:

- Changing the size of the wind turbine (i.e., reducing the height)
- Removing wind turbines from the project
- Changing the location of wind turbines that fall within the line-of-sight of radar systems [12]
- Increasing the spacing between wind turbines

This mitigation approach applies to all types of radar systems except for coastal high-frequency radar systems. Coastal high-frequency radar systems require significant overlap of systems in the field and result in limited use of siting as a mitigation due to the number of coastal radar systems, which make it nearly impossible to move wind turbines to areas outside the coverage region of the radars [14]. While changing the location of wind turbines may be the easiest option, the growth of wind turbine deployment coupled with the many other facets of wind farm siting is making this option less viable. This is because much of the desired areas with good wind resources have already been developed and there is less room to build outside the coverage area of radar systems.

### Siting and Analysis Tools

Federal agencies have developed tools that improve the existing capabilities that are used to site wind turbines and analyze their expected impacts on government radar systems. A few of the tools developed or improved upon by the WTRIM working group include:

- NOAA's NEXRAD Public Wind Turbine Siting Tool
- NOAA's NEXRAD Internal Wind Turbine Analysis Siting Tool
- The North American Aerospace Defense Command's Radar Obstruction Evaluation Model/Simulator
- DOD's Relocatable Over the Horizon Radar (ROTHR) WTRI Evaluation Mission Compatibility Analysis Tool
- DOD's Mission Compatibility Analysis Tool
- FAA's Windfarm Impact Tool (module within the radar toolbox)

### Operations

Wind farm operational agreements have also been employed as a means of mitigating impacts to radar systems. Specifically, this can include using curtailment agreements so that the wind farm operator reduces the speed of the wind turbine blades during emergencies, such as for

severe weather[13] or for scheduled military operations (e.g., launches or tests). DOD has entered into approximately 65 curtailment agreements but has not yet activated one for any emergency or event [16].

## Reduced Signal Wind Turbines

Reducing the radar cross section of a wind turbine – the amount of energy a wind turbine reflects to the radar system – has been proposed as a mitigation solution for wind turbines that fall within the line-of-sight of radar systems. As a result, DOE has funded research [17] to investigate the feasibility of designing and manufacturing wind turbine blades with a reduced radar cross section that could be deployed within the line-of-sight of radar systems without any adverse impacts. The research found that integrating radar-absorbing material into the wind turbine blade manufacturing process could achieve a reduction in the radar cross section for a wind turbine blade, but that does not necessarily correspond to an equivalent reduction for the entire wind turbine. Significant work remains before altering wind turbines in this way can be considered a valid mitigation option. Additionally, the radar-absorbing material incorporated into the blade would need to be designed for the specific radar frequency or frequencies of interest.

## Radar Upgrades

Radar upgrades can include improving the processing of the return signals from wind turbines to remove said signals from what a radar operator will see on the radar screen. This occurs within the existing radar computational processes and specifically affects detection and false alarm rates. These improvements may include modifying clutter maps,[14] constant false alarm rates,[15] or other filtering or preliminary tracking algorithms.

## Command and Control (C2) and Automation Upgrades

Command and control and automation upgrades include upgrading the process at the automation system (e.g., the Standard Terminal Automation Replacement System, Standard Terminal Automation Replacement System (STARS)[16], or the Air and Marine Operations Surveillance System,[17] and the Battle Control System-Fixed).

Generally, a command-and-control-type mitigation improves the tracking logic and performance of a command-and-control system based on the radar's target detection. One

---

[13] An example of a National Weather Service curtailment agreement can be found online: https://www.windaction.org/posts/43184-nextera-letter-of-intent-wind-turbine-operational-curtailment-during-severe-weather

[14] Clutter maps are created in the radar processor and are a tool used in target tracking algorithms to account for stationary clutter.

[15] Constant false alarm rates are part of the radar system's algorithm used to adjust the detection of targets in the presence of background signal noise.

[16] https://www.faa.gov/air_traffic/technology/tamr/arts/

[17] https://www.dhs.gov/publication/air-and-marine-operations-surveillance-system

example is improving the fusion process between different radars viewing the same air space, thereby potentially allowing nonimpacted radar to surveil the airspace of an impacted radar.

## Augmentation Radars

The use of augmentation radars, also called infill radars, would add radars in or around wind farms to make up for lost coverage of the existing impacted radar. These radars tend to have a shorter range and higher resolution with the intention of tracking targets in areas that would be lost to the existing radar.

The WTRIM working group has tested infill radars at multiple sites across the country including during the IFT&E [8] and at Travis Air Force Base [19]. The project at Travis Air Force Base built upon the previous testing of the infill radar systems and researched the use of these radars to recover lost air space for an Airport Surveillance Radar (ASR-11[18]) or Digital Airport Surveillance Radar (DASR). This project not only attempted to quantify the performance of the infill radar in the airspace above wind turbines, but it also investigated the process and challenges with integrating infill radar data into the command-and-control automation, in this case, STARS. The following two main conclusions came out of this project:

1. Infills show less clutter and result in better performance than the DASR above-wind turbines.
2. Additional improvements for using infill radars to mitigate wind turbine interference might be achieved as integration with the automation platforms evolves.

These projects have demonstrated that infill radars can serve as a viable mitigation solution for impacted radar systems. However, before they can be deployed into the National Airspace System (NAS) and used by the FAA, they must undergo a validation and certification process controlled by the FAA. The FAA is currently working to determine, define, and validate the necessary processes to qualify nonfederal radars (infill radars) for use in the NAS.

## Replacement Radars

These systems replace existing, less-sophisticated radars with more-advanced radars, typically phased-array radars with narrow three-dimensional beams with higher resolution and advanced clutter mitigation capabilities. They could be placed at current radar sites, or at alternative, more desirable locations. For example, a replacement radar, a Lockheed Martin TPS-77[19] long-range radar, was tested during the 2013 IFT&E at King Mountain, Texas. As shown in Figure 4, the replacement radar performed significantly better than the existing radar systems in areas above wind turbines.

---

[18] https://www.faa.gov/air_traffic/technology/asr-11/
[19] https://www.lockheedmartin.com/en-us/products/ground-based-air-surveillance-radars/tps-77.html

**Spectrum Efficient National Surveillance Radar**

The Spectrum Efficient National Surveillance Radar (SENSR) [20] program, consisting of the FAA, DOD, DHS, and NOAA, was initiated to determine the feasibility of reducing the size of the L-Band radio frequency used by government radar systems and using the resulting funding from the sale of that bandwidth to replace the aging legacy radar systems with a single system. As a result, the program hoped to reduce the maintenance footprint and related supply chains as well as address growing issues, such as resolving the barrier to wind deployment driven by wind turbine radar interference concerns.

**Airspace Non-Cooperative Surveillance Radar**

The Airspace Non-Cooperative Surveillance Radar (ANSR) program [21] is a FAA and DOD initiative launched in 2022 to addresses non-cooperative radar systems (ASRs and DASRs) that have surpassed or will soon surpass their service life. This program will focus on component replacement, subsystem replacement, or full-system replacement. The FAA plans to replace non-cooperative radar systems or components starting in 2024.

# V.    Remaining Work and Resource Gaps for Mitigations Currently Being Developed

This section summarizes the status of mitigation options currently being developed and tested as well as the cognizant agencies. To be deployable means the mitigation option is available, either commercially or as government-furnished equipment, and proven to mitigate wind turbine interference for a specific radar system or systems. Options being developed or tested today span several radar types and systems. For consistency and to reduce redundancy, the current mitigation option work projects being funded are addressed in the remainder of this section under the same categories noted in Section IV.

## Wind Farm Siting and Operations

### Siting and Analysis Tools

These projects improve user friendliness, increase database utility, improve effectiveness of modeling capabilities, and extend usefulness for all stakeholders concerned with reducing wind turbine radar interference. Each new enhancement has continued the move toward eliminating wind turbine radar interference as a barrier to renewable energy system deployment.

### U.S. Wind Turbine Database

DOE's Lawrence Berkeley National Laboratory (LBNL), in partnership with the United States Geological Survey and American Clean Power, has developed and maintains the U.S. Wind Turbine Database (USWTDB).[20] The database provides locations and technical specifications for all known existing utility-scale wind turbines in the United States. It covers both land-based and

---

[20] https://eerscmap.usgs.gov/uswtdb/

offshore wind energy projects. WTRIM stakeholders requested a separate database of offshore wind energy development due to the rapid growth expected and the need to incorporate additional sources of information to determine the potential wind turbine radar interference impacts of wind energy operations offshore. LBNL and BOEM recently developed the U.S. Wind Turbine Project Pipeline, which includes a complete data set of proposed, but not yet built, offshore wind turbines.

A sample graphic is shown in Figure 6. The database of offshore wind projects is current as of January 2022, and LBNL is working with BOEM to build a system for regular updates [22].



Figure 6 - Sample graphic from the new U.S. Wind Turbine Project Pipeline database capability

**Enhancement of the ASR-11 Radar Toolbox To Improve Existing Capabilities as a Mitigation**

The FAA is undertaking new ASR-11 Radar Toolbox enhancements that are expected to improve both target and weather processing capabilities of the ASR-11 Radar Toolbox. These capabilities can be customized over wind farms by making specific adjustments to radar maps, such as additions of wind turbine locations. New modeling tools are needed to take advantage of improved and existing ASR-11 capabilities.

As of May 2022, the FAA added a feature to their maps to remove wind turbine clutter (using weather Range-Azimuth Gates) [23]. In parallel, the FAA performed additional tool updates for Build 14 (a project noted later in this section) to minimize costs across the spectrum of the ASR-11's mission requirements. An enhanced Radar Toolbox was released within the FAA in FY22 and it remains under active development.

**Relocatable Over the Horizon Radar Wind Turbine Radar Interference Evaluation Mission Compatibility Analysis Tool**

DOD's ROTHR system provides wide-area air and sea surveillance track information to support U.S. Southern Command's Counter-Illicit Drug Trafficking Mission. The ROTHR Modeling and Simulation Tool is a key component of the Wind Farm Modeling Process, as the analysis it provides spans both land-based and offshore wind energy farms [24]. The tool currently requires a close collaborative process between MIT LL and the U.S. Navy's Forces Surveillance Support Center (FSSC). This project currently comprises several phases of transitioning the tool to FSSC and will end with the Center becoming the main operator of the modeling system as new graphical user interface capabilities are developed and transitioned to the Virginia FSSC team's offices.

MIT LL is jointly performing studies and concurrently developing graphical user interfaces for the ROTHR analysis tool. Expected project completion is the last quarter of FY23.

## Reduced Signal Wind Turbines

WTRIM agencies are not currently funding any projects to develop wind turbines with reduced radar interference, but they remain open to funding promising work in this area in the future.

## Radar Upgrades

### Deployment of Stationary Doppler Target Suppressor Code on ASR-11

This is a follow-on project stemming from an FAA success story regarding the CARSR 270 Upgrade[21] and was initiated after findings were reviewed from the first IFT&E event conducted at the radar site near Tyler, Minnesota. The project comprises the following two core tasks:

1. Evaluate Stationary Doppler Target Suppressor (SDTS) code on ASR-11 hardware. This task involves conducting an engineering analysis regarding the addition of new algorithms such as the FAA-developed SDTS originally designed for and currently deployed in Common Air Route Surveillance Radars to existing ASR-11/DASR digital signal processing.

   The SDTS software has been integrated and is running in the ASR-11 Support Lab.

2. Optimize SDTS for ASR-11 sites. This study uses multiple versions of adaptation settings to explore the effects of those adaptations on the radar picture. The project uses the ASR-11 simulator with SDTS software to process radar return data from sites with wind turbine interference. The resulting report provides recommendations for optimization of the SDTS code at a typical radar site.

Adjustments to SDTS parameters continue to be made and previously collected flight data are being reprocessed. The results are being collected for further analysis. [23].

### Next-Generation Weather Radar Algorithm Study

This project focuses on a software improvement for weather radars. DOD is working with Georgia Tech Research Institute on an algorithm to work in conjunction with ground clutter filter to aid in separating wind turbine interference from weather.

The program is funded and is expected to be completed in early 2023. If the algorithm proves viable, the findings will be presented to a NEXRAD peer review board that will then determine

---

[21] NOTE: This software is installed at all CARSR radar sites, although each individual CARSR system requires configuration and optimization for each wind turbine project that impacts the individual radar [16].

the mitigation value versus the cost and risk of using the algorithm and integrating it into the NEXRAD system's operational software [16].

**Least Squares Wind Turbine Suppression Algorithm**

This is a software improvement project for airport surveillance radars. DOD is working with Space Dynamic Laboratory on a new algorithm to mitigate wind turbines' observed effects on radar systems by a process that removes wind turbine clutter to improve the radars' ability to perform its mission in or above areas with wind turbines.

This is project is currently funded to test, characterize, and optimize the algorithm. If successful, deployment of the algorithm will require the FAA to test, evaluate, and integrate it into airport surveillance radar software; the project is expected to take approximately 3–5 years to complete [16].

**Implementation of Mitigation for Offshore Wind Turbine Interference on Coastal Oceanographic Radar Systems**

Managed by NOAA, there are currently 160 coastal surface high-frequency radars in the U.S. Integrated Ocean Observing System (IOOS) network measuring ocean current velocities and waves in near-real time. Their range extends out beyond 150+ kilometers offshore with a base resolution of 0.2–6 kilometers. A core mission for the high-frequency radars is public safety. Surface current measurements available without these devices is a mere 300 measurements per hour from in situ methods (e.g., moored buoys). However, with high-frequency radars, there are some 100,000+ measurements per hour benefiting weather, ocean currents, and search and rescue efforts.

This work is funded by BOEM using the Coastal Ocean Dynamics Applications Radar (CODAR), a high-frequency-radar system. This project implements a real-time software solution to minimize wind turbine interference.

A new tool to simulate offshore wind turbine interference on coastal high-frequency radars will be developed based on the buildout of offshore wind farms  [26].

**Software Tools to Mitigate Wind Turbine Interference in the U.S. IOOS Network**

This project is funded by the NOAA Integrated Ocean Observing System Ocean Technology Transition program. Partners include the Woods Hole Oceanographic Institution, University of California Santa Barbara, CODAR Ocean Sensors, Ltd., and Rutgers University. The objectives include:

- Documenting the best practices for high-frequency-radar setup that minimize interference

- Setting up robust WTRIM tests and testing standards

- Generating a three-tiered testing data set including fully simulated data, simulated wind turbine interference radar data added to SeaSonde® spectra, and SeaSonde® data collected from sites near wind farms paired with wind turbine rotation rates

- Fully testing the mitigation software developed under BOEM
- Performing a field study of the impacts from wind turbine interference [27].

### Oceanographic High-Frequency-Radar Data Preservation in Wind Turbine Interference Mitigation

Funded by the National Offshore Wind Research and Development Consortium, this project includes the following partners: CODAR Ocean Sensors, Ltd., Old Dominion University, Rutgers University, and East Carolina University. This project is using multiple high-frequency radars to fill in gaps from the wind turbine radar interference and will implement a machine-learning model to identify and separate the wind turbine interference from the sea echo  [28].

## Command and Control and Automation Upgrades

### Determine the Value of New Wind Turbine Radar Interference Mitigation Features for the ASR-11 Build 14 upgrade

This FAA project is designed to determine if there are WTRIM-related benefits of including both Weather (Wx) Edge Tagging and increased Range-Azimuth Gate (RAG) count in ASR-11 Software Build 14 as a mitigation solution. Previous United States Air Force data analysis suggests that disabling the ASR-11 Wx Edge Tag functionality over areas like the Wind Resource Area near Travis Air Force Base, California, could improve the aircraft tracking. In addition, it is known that adding more RAGs to the ASR-11 software can allow for more precise removal of wind turbines from target processing by increasing the resolution of the radar. This project is designed to address the inclusion of Wx Edge Tagging functionality and increased RAG count in ASR-11 Software Build 14 and test these new features at an operational site.

The FAA team finalized development test procedures in May 2022. A Build 14 development test in progress and an operational test is being tentatively scheduled for the first or second quarter of FY23 [23].

## Augmentation Radar

### Infill Radar as a Mitigation (Applicable to NAS Terminal and Long-Range Radar Systems)

The IFT&E program and WTRIM working group have conducted several field tests of infill radars. The results of these field tests led to the Travis Air Force Base Pilot Mitigation Project and a field test, funded in part by DOD, DOE, and the FAA, which was designed to incorporate the raw radar data from two commercial infill systems into an impacted Airport Surveillance Radar through the STARS air traffic control display. The infill systems demonstrated their ability to successfully detect aircraft, track performance, and integrate with the local radar. The project concluded that the results, while not acceptable for immediate acquisition and inclusion

as a mitigation technology into the NAS, did show potential to mitigate wind turbine interference [19]. Field testing of the initial approach was completed in January 2022.

The conclusion of the recent field tests led to an infill radar integration approach whereby the FAA is working in the lab to improve the overall performance between the Airport Surveillance Radar, infill radars, and STARS [19]. As of the writing of this report, the validation process is expected to lead to an approved infill radar certification process in 2023.

**Airport Surveillance Radar/Air Route Surveillance Radar Multi-static Prototyping Effort**

The DOD Siting Clearinghouse funded a feasibility study in 2021 regarding the development of a multi-static receiver augmentation system to reduce the effects of wind-turbine-induced radar interference on CARSR, ARSR-4, and ASR-11/DASR radar systems.

The follow-on to that study, co-funded by DOE, DOD, and BOEM, is a project that is currently being pursued as both a software and hardware improvement system for Airport and Air Route Surveillance Radars. MIT LL has been tasked with developing low-cost receivers to deploy around wind farms to improve sensitivity, increase resolution, reject clutter from wind turbines, and can operate continuously across a range of environmental conditions.

This study is partially funded to begin algorithm development, multi-sensor analysis, and conduct an operational evaluation. If testing is successful, the radar industry will be able to review the prototype software and hardware design. The expectation would be that a manufacturer could produce the system in sufficient quantities for deployment at multiple radar sites and wind farms over time. In addition, the system will require FAA certification for integration with the National Airspace System [16].

# Replacement Radar

## Passive Radar System

DOD and DHS have committed to testing passive radar systems for Airport and Air Route Surveillance radars and have recently studied or field tested several versions. These systems may provide an adequate performance capability to meet some limited DOD and DHS mission requirements. A passive radar could potentially be used in non-air-traffic-control environments (for example, homeland defense/security missions) immediately. Additionally, these systems may also be used to enhance air traffic control situational awareness prior to FAA certification.

Data collected from recent field tests are being analyzed by MIT LL who is expected to develop a final classified report in FY23 [16].

## Multi-Function Phased-Array Radar

Funded by DOE, MIT LL is coordinating with the NOAA National Severe Storms Laboratory to demonstrate the capabilities of next-generation radar systems required to operate in modern wind turbine environments by leveraging the panel-based phased array radar technology that

MIT LL has developed via the NOAA and FAA jointly funded multi-function phased-array radar (MPAR) program.

MIT LL is assessing the suitability of the MPAR 10-panel demonstrator hardware, MPAR Advanced Technology Demonstrator system in Norman, Oklahoma, and other tile-based phased-array panel technology for relevant aircraft, weather, and atmospheric science measurements in wind turbine environments [30].

For Table 1, the following definitions and caveats apply:

- Remaining Steps for Mitigation Deployment: Depending on the TRL of each project, the remaining steps to deploy the mitigation technology may fall outside the current scope of the R&D project.

- Target deployment timeline is defined as:

  - Near term (1–3 years)
  - Mid term (4–9 years)
  - Long term (10 years and beyond).

Resource Gaps for Mitigation Deployment: Depending on the TRL of each project, deployment of the mitigation technology may fall outside the scope of the R&D project. Potential gaps are identified below.

Table 1 - Table of Mitigations Currently Being Developed or Tested and Including Resource Gaps

| Mitigation | Applicable Radar Type | Tool or Radar Owner and/ or User | Current Status[22] | Remaining Steps for Mitigation Deployment | Target Deployment | Resource Gaps for Mitigation Solution Deployment | Agency Mitigation Sponsor(s) |
|---|---|---|---|---|---|---|---|
| **Wind Farm Siting and Wind Turbine Radar Interference Analysis Tools** | | | | | | | |
| U.S. Wind Turbine Database [22] | NA | DOE, USGS, FAA, BOEM | In use Project pipeline updates now include pending land-based and offshore wind energy developments | Updating and validating offshore wind data fields | Near term | No | DOE |

---

[22] As of September 2022

| Mitigation | Applicable Radar Type | Tool or Radar Owner and/ or User | Current Status[22] | Remaining Steps for Mitigation Deployment | Target Deployment | Resource Gaps for Mitigation Solution Deployment | Agency Mitigation Sponsor(s) |
|---|---|---|---|---|---|---|---|
| ASR-11 Radar Toolbox Enhancements [23] | ASR-11 and DASR | FAA, DOD | Additional tool updates for Build 14 are being performed to minimize costs | Implementing adjacent target RAG cell merge; Radar toolbox testing and reporting | Near term | No | FAA |
| Relocatable Over-the-Horizon Radar (ROTHR) Wind Turbine Radar Interference Evaluation Mission Compatibility Analysis Tool [24] | ROTHR | DOD | MIT LL is jointly performing studies with the FSSC team and concurrently developing a user interface for the ROTHR analysis tool | Performing additional studies for the ROTHR analysis tool | Near term | Yes | DOD |
| **Reduced Signal Wind Turbines** | | | | | | | |
| No projects in this category are currently funded. | | | | | | | |
| **Radar Upgrades** | | | | | | | |

| Mitigation | Applicable Radar Type | Tool or Radar Owner and/ or User | Current Status[22] | Remaining Steps for Mitigation Deployment | Target Deployment | Resource Gaps for Mitigation Solution Deployment | Agency Mitigation Sponsor(s) |
|---|---|---|---|---|---|---|---|
| Next Generation Weather Radar (NEXRAD) Algorithm Study [16] | NEXRAD | NOAA, FAA, DOD | Georgia Tech Research Institute is developing an algorithm, in conjunction with a ground clutter filter to help separate wind turbine interference from weather | Algorithm testing and NEXRAD peer review needed to determine the mitigation value vs. cost/risk factors | Near term | Yes | DOD |
| Least Squares Wind Turbine Suppression Algorithm [16] | ASR-11, DASR, CARSR | DOD, FAA | The Space Dynamic Laboratory is developing a new algorithm to mitigate observed wind turbine effects on radar systems using a process to remove wind turbine signatures to improve the radars' ability to perform its mission | Testing, characterization, and optimization of the algorithm is required. If successful, the FAA will need to test, evaluate, and integrate the algorithm into NAS software | Mid term | Yes | DOD |

| Mitigation | Applicable Radar Type | Tool or Radar Owner and/ or User | Current Status[22] | Remaining Steps for Mitigation Deployment | Target Deployment | Resource Gaps for Mitigation Solution Deployment | Agency Mitigation Sponsor(s) |
|---|---|---|---|---|---|---|---|
| Implementation of Mitigation for Offshore Wind Turbine Interference on High-Frequency Coastal Oceanographic Radar [26] | CODAR SeaSonde® Oceanographic HF radars | NOAA IOOS Regional Association member universities | This project concluded in Dec. 2021 by coding and documenting a real-time software program that mitigates offshore wind turbine interference by using signal processing to discard turbine-polluted data along with optimizations to the sweep rate and Doppler settings of the SeaSonde® HF-radar | Installing and field testing this new software tool in SeaSonde® HF radars that have offshore wind farms within their area of measurement coverage, once such large-scale offshore wind farms are built | TBD based on the buildout of offshore wind farms | No | BOEM |
| Software Tools for the Mitigation of Wind Turbine Interference in the U.S. IOOS Network [27] | CODAR SeaSonde® Oceanographic HF radars | NOAA IOOS Regional Association member universities | The objectives of this continuing project include documenting the best practices for high-frequency-radar setup that minimize interference, setting up robust WTRIM tests and testing standards | Testing the mitigation software and performing a field study of wind turbine interference impacts | TBD based on the buildout of offshore wind farms | Yes | NOAA |
| Oceanographic High-Frequency Radar Data Preservation in Wind Turbine Interference Mitigation [28] | CODAR SeaSonde® Oceanographic HF radars | NOAA IOOS Regional Association member universities | This project currently uses multiple high-frequency radars operating bi-statically to fill in gaps from wind turbine radar interference | Implementing a machine-learning model to identify and separate the wind turbine interference from the sea echo | TBD based on the buildout of offshore wind farms | No | National Offshore Wind Research and Development Consortium |

| Mitigation | Applicable Radar Type | Tool or Radar Owner and/ or User | Current Status[22] | Remaining Steps for Mitigation Deployment | Target Deployment | Resource Gaps for Mitigation Solution Deployment | Agency Mitigation Sponsor(s) |
|---|---|---|---|---|---|---|---|
| **Command and Control and Automation Upgrades** | | | | | | | |
| ASR-11 Build 14 Enhancement with Weather Edge Tagging and Increased RAG Count [23] | ASR-11, DASR | FAA, DOD | Development of test procedures are complete | Installation at Travis Air Force Base, operational testing, documentation updates, determination of WTRIM features | Near term | Yes | FAA, DOE |
| **Augmentation Radar** | | | | | | | |
| Infill Radars [19] | ASRs, ARSRs, CARSR | FAA, DOD | FAA is validating an infill radar integration approach that is expected to lead to a certification process. Field testing of this approach was completed in January 2022 | Final validation reporting, and certification process development | Near term | Yes | FAA |
| ASR/ARSR Multi-static Prototyping Effort [16] | ASRs, ARSRs | FAA, DOD | Modeling analysis, hardware development, and initial data collection are complete | Algorithm development, multi-sensor analysis, final array design, operational evaluation and FAA certification | Mid term | Yes | DOD, DOE, BOEM |
| **Radar Replacement** | | | | | | | |

| Mitigation | Applicable Radar Type | Tool or Radar Owner and/ or User | Current Status[22] | Remaining Steps for Mitigation Deployment | Target Deployment | Resource Gaps for Mitigation Solution Deployment | Agency Mitigation Sponsor(s) |
|---|---|---|---|---|---|---|---|
| Multi-Function Phased-Array Radar (MPAR) [30] | NEXRAD, WSR-88 | NOAA | MIT LL is assessing the MPAR for relevant aircraft, weather, and atmospheric science measurements in wind turbine environments. | Demonstration, analysis, and assessment | Mid term | Yes | DOE |
| ANSR [21] | ASRs | FAA, DOD | The FAA and DOD have determined the ASR-11 requirements will be the baseline for the ANSR project | The FAA and DOD will establish cost share and this program should be formally established in FY24 | Mid to long term | Yes | FAA |

# VI.  Mitigations Not Being Considered Because of Resource Constraints

This section lists mitigation options that are not currently being considered because of resource constraints but may be promising with additional resources and prioritization. The list is presented in Table 2 according to mitigation category.

Table 2 - Mitigations Not Being Considered Due to Resource Constraints

| Mitigation | Radar Type | Radar Owner or Operator | Project Description |
|---|---|---|---|
| **Wind Farm Siting and Wind Turbine Radar Interference Analysis Tools** | | | |
| None | | | |
| **Reduced Signal Wind Turbines** | | | |
| Wind Turbine Lightning Mitigation System Radar Cross Section Reduction [31] | Potentially applies to multiple radar system types | Varies by radar type | - A previous report, noted in Table 3, investigated proposed modifications to lightning mitigation cables to reduce the radar cross section when illuminated by ROTHR systems, which operate in the high-frequency band (3–30 megahertz). An expanded study that addresses specific frequencies used in ASR and ARSR systems versus the range of frequencies studied in the study for ROTHR (which varies frequency based on environmental conditions) could prove more cost-effective in developing a successful change to the lightning mitigation system installed in wind turbines<br><br>- Two examples from the studies include breaking up lightning mitigation system cables using spark gap connections and changing the orientation of the cable within the wind turbine blade or expanding the study to include both simulated and measured analyses of radar cross section mitigation techniques. In addition, there were several recommendations on further research that could prove valuable based on the scope and duration of wind farm deployments both on land and offshore expected over the next 10 years or more |
| **Radar Upgrades** | | | |
| Airport Surveillance Radar Wind Farm Mitigation [16] | Applies to ASR-11 and DASR systems | FAA, DOD | This proposed project is both a software and hardware upgrade to Airport Surveillance Radars (ASR-11) and Digital Airport Surveillance Radars (DASR). The objective is to increase the signal processing capability and modify the software that reduces wind turbine radar interference effects. The study portion would address parts obsolescence including redesign, development, and testing of various components |
| **Command and Control and Automation Upgrades** | | | |

| Mitigation | Radar Type | Radar Owner or Operator | Project Description |
|---|---|---|---|
| None | | | |
| **Augmentation Radar** | | | |
| Field Test of Multi-Static Radars [29] | Potentially applies to all ASR and ARSR system types | FAA, DOD | Previous field tests showed that only one of the two multi-static systems tested to date met DOD and FAA requirements.  Additional research, development, and testing focused on multi-static radars will answer two remaining issues of concern:<br>1. Current production of the successful multi-static radar is focused on filling a higher national security requirement<br>2. It will require hardware and software modifications to be made compatible with the current National Air Space configuration |
| **Replacement Radar** | | | |
| Three-Dimensional Pencil Beam Long-Range Radar System [8] | Potentially applies to all ASR and ARSR system types | Varies by radar type to be replaced | The TPS-77 radar is an actively electronically scanned phased-array radar that could be used in a way that avoids wind turbines being visible to the radar. This radar performed better than the existing program-of-record radars and from a technical performance standpoint, could have been the nearest-term mitigation option.  [8] |

# VII.  Dismissed Mitigations With Reasoning

This section provides a summary of mitigation options that have been dismissed as well as an explanation as to why they are not considered viable. Table 3 highlights these options according to mitigation category.

Table 3 - Dismissed Mitigations With Reasoning

| Mitigation | Radar Type | Radar Owner or Operator | Project Description | Reasons for Dismissal |
|---|---|---|---|---|
| **Wind Farm Siting and Operations** | | | | |
| NOAA IOOS - Siting as a Mitigation Option for High- | Applies to high-frequency coastal radar systems | NOAA | NOAA IOOS performed an internal study to determine if siting could be a viable option for mitigating wind-turbine-induced interference along the coastlines of the continental United States | The results of the study determined that siting is not effective in the coastal high- |

| Mitigation | Radar Type | Radar Owner or Operator | Project Description | Reasons for Dismissal |
|---|---|---|---|---|
| Frequency Radars [13] | | | | frequency arena primarily due to the complexity of sensor overlap. |
| **Wind Turbines with Reduced Radar Interference** | | | | |
| Incorporation of Radar-Absorbing Material into Wind Turbine Blades [17] | Applies to ASR, ARSR, NEXRAD, and ROTHR systems | Varies by radar type | DOE funded this research to investigate the feasibility of designing and manufacturing wind turbine blades with a reduced radar cross section that could be deployed within the line of sight of radar systems without any adverse impacts. The radar-cross-section-reduction structures were intended for direct integration into the wind turbine blade with minimal cost and performance impacts.<br><br>The research found that integrating radar-absorbing material into the wind turbine blade manufacturing process could achieve a reduction in the radar cross section for a wind turbine blade but that does not necessarily correspond to an equivalent reduction for the entire wind turbine. Significant work remains before altering wind turbines in this way can be considered a valid mitigation option. Additionally, the radar-absorbing material incorporated into the blade will need to be designed for the specific radar frequency or frequencies of interest. | The report noted that significant work remained before any reduced radar-cross-section wind turbine can be considered a valid mitigation option<br><br>No further DOE funding of this project is in progress due to the industry activities regarding stealth coatings for wind turbine blades[23] |
| Modification to Wind Turbine Blade Lightning Mitigation System [31] | Potentially applies to multiple radar system types – investigated for ROTHR | Varies by radar type | DOE funded this research to investigate proposed modifications to lightning mitigation system cables to reduce the radar cross section when illuminated by ROTHR systems that operate in the high-frequency band (3–30 megahertz). Simulated analyses of the modifications and further research recommendations were provided | The simulation showed promise for radar-cross-section reduction at specific frequencies but determined that this was not a feasible option for the ROTHR system that adjusts its frequency based on atmospheric conditions |

---

[23] https://www.qinetiq.com/en/what-we-do/services-and-products/stealth-wind-turbines

| Mitigation | Radar Type | Radar Owner or Operator | Project Description | Reasons for Dismissal |
|---|---|---|---|---|
| **Radar Upgrades** | | | | |
| Deployment of SDTS Code on ASR-11s [23] | ASR-11 and DASR | FAA, DOD | DOE funded FAA to apply the SDTS algorithm (which had been successfully applied to CARSRs) to a different radar type. FAA completed optimization and testing of code on a newly developed and validated ASR-11 simulator and verified that sufficient computing resources exist on the platform for the SDTS algorithm | The SDTS algorithm was detrimental to ASR-11 performance across various parameter optimizations.  The ASR-11 simulator developed under this project remains a useful asset to quickly test new mitigation algorithms |
| Radio Frequency Precision Nulling Device [32] | ASR-11 | FAA | This concept was designed to be attached to the radar to create a deep shadow to minimize energy reflected from the wind turbines to the radar | While this concept did provide some attenuation from the wind turbines, it was not sufficient to mitigate the false alarms. Also, it created a large shadow extending beyond the wind turbines which negatively impacted the performance of the radar in this airspace |
| **Radar Replacement** | | | | |
| Spectrum Efficient National Radar (SENSR) [20] | Potentially applies to all ASR and ARSR system types | FAA, DOD, DHS | The FAA, DOD, and DHS were mandated to examine the feasibility of making 50 megahertz of the spectrum available within 1,300-1,350 megahertz, with the aim of identifying potential surveillance solutions and evaluating the capability to sell off this band of the spectrum | The study found that it is not feasible to vacate the frequency range and the SENSR agencies submitted letters of nonconcurrence with the auction to the National Telecommunications and Information Administration |

# VIII.    References

[1]    R. Wiser, M. Bolinger, B. Hoen, D. Millstein, J. Rand, G. Barbose, N. Darghouth, W. Gorman, S. Jeong and B. Paulos, "Land-Based Wind Market Report: 2022 Edition," 2022. [Online]. Available: https://www.energy.gov/sites/default/files/2022-08/land_based_wind_market_report_2202.pdf. [Accessed 16 September 2023].

[2]    W. Musial, P. Spitsen, P. Duffy, P. Beiter, M. Marquis, R. Hammond and M. Shields, "Offshore Wind Market Report: 2022 Edition," 2022. [Online]. Available: https://www.energy.gov/sites/default/files/2022-09/offshore-wind-market-report-2022-v2.pdf. [Accessed 16 September 2023].

[3]    P. Gilman, "Activity Area Overview Presentation: Regulatory & Siting," 2 August 2021. [Online]. Available: https://www.energy.gov/sites/default/files/2021-10/fy21peerreview-regulatoryandsiting-gilman.pdf. [Accessed 19 January 2023].

[4]    Federal Aviation Administration, "Air Traffic Control / Surveillance Systems," Federal Aviation Administration, [Online]. Available: https://www.faa.gov/air_traffic/publications/atpubs/aim_html/chap4_section_5.html. [Accessed 19 August 2022].

[5]    Integrated Ocean Observing System, "HF Radar," National Oceanic and Atmospheric Administration, [Online]. Available: https://ioos.noaa.gov/project/hf-radar/#:~:text=About%20HF%20Radar,from%20one%20location%20to%20another.. [Accessed 19 August 2022].

[6]    Federation of American Scientists, "AN/TPS-71 ROTHR (Relocatable Over-the-Horizon Radar)," Federation of American Scientists, 29 June 1999. [Online]. Available: https://nuke.fas.org/guide/usa/airdef/an-tps-71.htm. [Accessed 19 January 2023].

[7]    National Oceanic and Atmospheric Adminstration Radar Operations Center, "NEXRAD Technical Information," FAA, 22 July 2022. [Online]. Available: https://www.roc.noaa.gov/WSR88D/Engineering/NEXRADTechInfo.aspx. [Accessed 19 August 2022].

[8]    B. Karlson, B. LeBlanc, D. Minster, D. Estill, B. Miller, F. Busse, C. Keck, J. Sullivan, D. Brigada, L. Parker, R. Younger and J. Biddle, "IFT&E Industry Report Wind Turbine-Radar Interference Test Summary," Sandia National Laboratories, Albuquerque, NM, 2014.

[9]    P. Gilman, L. Husser, B. Miller and L. Peterson, "Federal Interagency Wind Turbine Radar Interference Mitigation Strategy," US Department of Energy, Washington, DC, 2016.

[10]   U.S. Department of Energy, 15 June 2021. [Online]. Available: https://www.energy.gov/eere/wind/articles/doe-partners-interagency-agreements-avoid-potential-impacts-radar-systems-wind. [Accessed 17 September 2023].

[11]   Department of Defense, Department of Energy, Federal Aviation Administration, National Oceanic and Atmospheric Administration, Bureau of Ocean Energy Management, *Memorandum of Agreement Establishment of the Wind Turbine Radar Interference*

*Mitigation Working Group,* Washington, DC:
https://windexchange.energy.gov/projects/radar-interference-working-group, 2023.

[12]  D. J. Brigada and J. Ryvkina, "Radar-Optimized Wind Turbine Siting," IEEE Transactions on Sustainable Energy, Lexington, 2023.

[13]  National Oceanic and Atmospheric Administration Integration Ocean Observing Systems, *Version 1 of WTRIM Software for HFR: Deliverables from 2nd BOEM-funded WTRIM Study by CODAR Ocean Sensors, Ltd. for NOAA IOOS's HFR National Network,* Washington, DC, 2022.

[14]  A. Kirincich, D. Cahl, B. Emery, M. Kosro, H. Roarty, D. Trockel, L. Washburn and C. Whelan, "High Frequency Radar Wind Turbine Interference Community Working Group Report," June 2019. [Online]. Available: https://darchive.mblwhoilibrary.org/entities/publication/c01f9113-0d0b-518f-8bdd-3f46e5fcd1db. [Accessed 17 September 2023].

[15]  R. Colburn, C. Drummond, M. Miles, F. Brody, C. McGillen, A. Krieger and R. Jankowski, "Radar Interference Analysis for Renewable Energy Facilities on the Atlantic Outer Continental Shelf," Bureau of Ocean Energy Management, Washington, DC, 2020.

[16]  Department of Defense, *Briefing to the Senate Armed Services Commitee on Military Aviation and Installation Assurance Clearinghouse Matters (sec. 313 of SASC Committee Report 117-39),* Washington, DC, 2022.

[17]  J. J. McDonald, B. C. Brock, S. E. Allen, P. G. Clem, J. A. Paquette, W. E. Patitz, W. K. Miller, D. A. Calkins and H. Loui, "Radar-Cross-Section Reduction of Wind Turbines (Part 1)," Sandia National Laboratories, Albuquerque, NM, 2012.

[18]  B. Miller, "Travis Air Force Base Pilot Mitigation Project Summary Report for Public Release," 2021.

[19]  B. Karlson and B. E. Miller, "Wind Turbine Interference on Radar Systems; Travis Air Force Base Pilot Mitigation Project," in *AWEA Siting and Environmental Compliance Conference*, Washington, DC, 2020.

[20]  U.S. Department of Commerce, "Annual Report on the Status of Spectrum Repurposing and Other Initiatives," 2023. [Online]. Available: https://ntia.gov/sites/default/files/publications/annual_spectrum_repurposing_initiatives_report_final.pdf. [Accessed 18 August 2023].

[21]  Air Force Flight Standards Agency, *Airspace Non-Cooperative Radar (ANSR) Informational Briefing,* Oklahoma City, 2022.

[22]  B. Hoen and J. Rand, *US Offshore Wind Project Pipeline Database Briefing,* Berkley: Lawrence Berkley National Laboratory, 2022.

[23]  S. Mach, *FAA WTRIM Project Status May 2022,* Washington, DC: Federal Aviation Administration, 2022.

[24]  Forces Surveillance Support Center (FSSC), *Relocatable Over The Horizon Radar (ROTHR) Webinar Presented to the Wind Turbine Radar Inteference Mitigation Working Group,* Washington, DC, 2020.

[25]    B. Zelenke, *NOAA-IOOS WTRIM Projects Overview,* Washington, DC: National Oceanographic and Atmospheric Administration, 2022.

[26]    D. Trockel, I. Rodriguez-Alegre, D. Barrick and C. Whelan, "Impact Assessment and Mitigation of Offshore Wind Turbines on High Frequency Coastal Oceanographic Radar," August 2018. [Online]. Available: https://espis.boem.gov/final%20reports/BOEM_2018-053.pdf. [Accessed 17 September 2023].

[27]    NOAA Integrated Ocean Observing System, "OTT: Software Tools for the Mitigation of Wind Turbine Interference in the U.S. IOOS Network," [Online]. Available: https://ioos.noaa.gov/project/ott-hfr-wind-turbine-interference/. [Accessed 18 September 2023].

[28]    National Offshore Wind Research and Development Consortium, "Oceanographic HF Radar Data Preservation in Wind Turbine Interference Mitigation," [Online]. Available: https://nationaloffshorewind.org/projects/oceanographic-hf-radar-data-preservation-in-wind-turbine-interference-mitigation/. [Accessed 18 September 2023].

[29]    MIT Lincoln Laboratory, "Annual Report," 2021. [Online]. Available: https://www.ll.mit.edu/sites/default/files/page/doc/2022-10/MITLL_2021_Annual_Report.pdf. [Accessed 17 August 2023].

[30]    D. C. A. M. a. C. P. E. Kowalski, "Multifunction Phased Array Radar Advanced Technology Demonstrator (MPAR ATD) Nearfield Testing and Fielding," in *IEEE Radar Conference (RadarConf)*, Boston, MA, 2019.

[31]    D. A. Crocker, "Wind Turbine Lightning Mitigation System Radar Cross-Section Reduction," Sandia National Laboratories, Albuquerque, 2020.

[32]    Booz Allen Hamilton, "Radio-Frequency (RF) Precision Nulling Device," Justia Patents, 11 January 2013. [Online]. Available: https://patents.justia.com/patent/20130222171. [Accessed 17 January 2023].

[33]    D. Henley, "84th RADES optimizes nation's LRR systems for air surveillance, national defense," U.S. Air Force, 21 September 2021. [Online]. Available: https://www.af.mil/News/Article-Display/Article/2786101/84th-rades-optimizes-nations-lrr-systems-for-air-surveillance-national-defense/. [Accessed 19 January 2023].

# IX.    Glossary of Terms

**A**

| | |
|---|---|
| ANSR | Airspace Non-cooperative Surveillance Radar |
| ARSR | Air Route Surveillance Radar |
| ASR | Airport Surveillance Radar |

**B**

| | |
|---|---|
| BOEM | Bureau of Ocean Energy Management |

**C**

| | |
|---|---|
| CARSR | Common Air Route Surveillance Radar |
| CODAR | Coastal Ocean Dynamics Applications Radar |

**D**

| | |
|---|---|
| DASR | Digital Airport Surveillance Radar |
| DHS | U.S. Department of Homeland Security |
| DOD | U.S. Department of Defense |
| DOE | U.S. Department of Energy |

**F**

| | |
|---|---|
| FAA | Federal Aviation Administration |
| FSSC | Forces Surveillance Support Center |

**I**

| | |
|---|---|
| IFT&E | Interagency Field Test and Evaluation |
| IOOS | Integrated Ocean Observing System |

**M**

| | |
|---|---|
| MIT LL | Massachusetts Institute of Technology's Lincoln Laboratory |
| MPAR | Multi-Function Phased Array Radar |
| MOU | memorandum of understanding |

**N**

| | |
|---|---|
| NAS | National Airspace System |
| NEXRAD | Next Generation Weather Radar |

**R**

| | |
|---|---|
| RAG | Range-Azimuth Gate |
| ROTHR | Relocatable Over-The-Horizon Radar |

**S**

| | |
|---|---|
| SDTS | Stationary Doppler Target Suppressor |
| SENSR | Spectrum Efficient National Surveillance Radar |
| STARS | Standard Terminal Automation Replacement System |

**U**

| | |
|---|---|
| USWTDB | U.S. Wind Turbine Database |

**W**

| | |
|---|---|
| WTRIM | Wind Turbine Radar Interference Mitigation |
| Wx | weather |

# Appendix A. Wind Turbine Radar Interference Mitigation Working Group

The memorandum of understanding establishing the Wind Turbine Radar Interference Mitigation working group was put into effect in March 2015. Signatory members include those agencies listed in Table A-1 with their corresponding departments and websites, with the exception of the U.S. Department of Homeland Security agreeing to participate as an observer. While the Bureau of Ocean Energy Management did not originally sign the memorandum of understanding, they joined as a full member of the Wind Turbine Radar Interference Mitigation working group in 2018.

Table A-1 - Signatory Members of the Wind Turbine Radar Interference Working Group

| Agency | Department | Website |
|---|---|---|
| U.S. Department of Energy | Wind Energy Technologies Office | http://www.energy.gov/eere/wind/wind-energy-technologies-office |
| U.S. Department of Defense | Military Aviation and Installation Assurance Siting Clearinghouse | www.acq.osd.mil/dodsc/ |
| Federal Aviation Administration | Office of NextGen | Next Generation Air Transportation System (NextGen) \| Federal Aviation Administration (faa.gov) |
| National Oceanic and Atmospheric Administration | National Weather Service Radar Operations Center<br><br>Integrated Ocean Observing System | www.roc.noaa.gov/WSR88D/<br><br>https://ioos.noaa.gov/ |
| Bureau of Ocean Energy Management | Office of Renewable Energy Programs | http://www.boem.gov/renewable-energy |

# Appendix B. Wind Turbine Radar Interference Mitigation Memorandum of Understanding



**MEMORANDUM OF UNDERSTANDING**
**Establishment of the Wind Turbine Radar Interference Mitigation Working Group**

Between the Following U.S. Federal Government Agencies

**DEPARTMENT OF DEFENSE (DOD)**
**DEPARTMENT OF ENERGY (DOE)**
**DEPARTMENT OF HOMELAND SECURITY (DHS)**
**FEDERAL AVIATION ADMINISTRATION (FAA)**
**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (NOAA)**

I.  **PURPOSE.**

A.  This Memorandum of Understanding (MOU) establishes a general framework of cooperation and coordination between the forenamed agencies. Its purpose is to mitigate the technical and operational impact of wind turbine projects on critical radar missions. The goals of the Interagency effort include:

   a.  Develop near (5 years), Mid (10 Years), Long term (20 years) mitigation solution recommendations. These will be primarily technology driven but will also extend to policy and legislative proposals as necessary

   b.  Determine funding requirements to implement workable solutions and include a process for each MOU participant to fund execution of specific near, mid and far term mitigation as outlined in Section II

II.  **REQUIREMENTS**

A.  Whereas the DoD, DOE and the DHS have been tasked by internal management and in some cases, additionally by Congress, to identify wind turbine/radar interference mitigation solutions; their representatives will:

   a.  Take the lead in the organization of an Interagency team modeled after the former Interagency Field Test & Evaluation program

   b.  Coordinate the development of agency budgets and the commitment of funding required for studies, field tests or other agreed to expenditures based on the principle of cost-sharing commensurate with meeting agency equity needs

*155-1452*

Figure B-1 – The official memorandum of understanding for the Wind Turbine Radar Interference Mitigation working group

# EXHIBIT 2



www.sunrisewindny.com

October 29, 2021

Mr. James Bennett
Chief, Office of Renewable Energy Programs
Bureau of Ocean Energy Management Office
of Renewable Energy Programs
45600 Woodland Road,
VAM-OREP Sterling, Virginia 20166

**Subject:    Lease Area OCS-A 0487: Sunrise Wind Farm –Construction and Operations Plan Supplemental Filing – October 29, 2021**

Dear Mr. Bennett:

On behalf of Sunrise Wind LLC (Sunrise Wind), a 50/50 joint venture between Orsted North America Inc. (Orsted NA) and Eversource Investment LLC (Eversource), please find the enclosed Construction and Operations Plan (COP) supplemental filing for the Sunrise Wind Farm Project (Project). As outlined to the Bureau of Ocean Energy Management (BOEM) in previous communications, this filing is to address BOEM comments, provide outstanding appendices, and address reductions to the Project design envelope. The Project description changes focus on the following Project components:

- Selection of the 11 MW turbine
- Reduction of the maximum number of wind turbine generators from 122 to 102
- Reduction of the envelope of total capacity range from 880 MW to 1300 MW, to 924 MW to 1122 MW
- Reduction in the total IAC length to 180 miles (290 km)
- Reduction of the number of legs supporting the Offshore Converter Station from 8-legs to 4-legs
- Removal of Landfall HDD C

This electronic submission includes:

1. The COP (Sections 1 through 5), both a clean and redlined version;
2. Clean and redlined version of appendices that have been updated from the August 2021 NOI submittal. The attached table (Table 1) outlines specifically which appendices fall into this category;
3. Clean versions of appendices where a direct replacement was made or where the appendix is being submitted for the first time (see table). Specifically, the following appendices are being submitted for the first time;
    - Appendix G1 - Marine Site Investigation Report
    - Appendix G3 - Foundation Feasibility Assessment
    - Appendix G4 - Cable Burial Feasibility Assessment
    - Appendix M3 - Benthic Habitat Mapping
    - Appendix R - Marine Archaeology Resources Assessment
    - Appendix Z - Cultural Resources Avoidance, Minimization, and Mitigation Measures **CONFIDENTIAL** (flysheet only, anticipated submittal Q4 2021)
4. Digital data library. The digital library is complete and reflective of this revised submittal; and
5. Updated response to BOEM Comments (Round 1.2 Sufficiency Review), including

supporting documents and files, as applicable.

The appropriate COP appendices are marked as confidential. These appendices contain either sensitive cultural resource information, trade secrets, and/or privileged/confidential commercial/financial information that is exempt from disclosure under the Federal Freedom of Information Act, the New York Freedom of Information Law, the Massachusetts Public Records Law, and the Rhode Island Access to Public Records Act. There is no need for redacted text within the COP document.

Please do not hesitate to contact  Michael Evans, Sunrise Wind Permitting Manager, at MICEV@orsted.com or (614) 218-4286  if you have any questions or concerns.


Yours sincerely,

Ryan Chaytors
Sunrise Wind LLC,
By its agent,
Orsted Wind Power North America LLC


Cc:    Jeffrey Browning, Project Coordinator, BOEM
       Michael Evans, Permitting Manger, Sunrise Wind
       Lia Howard, Environmental Manager, Sunrise Wind



**Table 1 – Summary of October 2021 COP NOI Version Updates and Anticipated Supplemental Filing Schedule**

| # | COP Section / Appendix | BOEM Submissions | Summary of Updates from August 2021 to October 2021 | Anticipated Supplemental Filing Schedule |
|---|---|---|---|---|
| | Front Matter | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updates to Project operating capacity, selection of D11 WTG, and removal of Landfall HDD C.<br>Updates to address outstanding BOEM comments on pre-NOI draft COP.<br>Integration of results from new and updated surveys and technical analyses as identified in the individual appendices below. | |
| 1 | Introduction | | | |
| 2 | Project Siting and Design Development | | | |
| 3 | Description of Proposed Activity | | | |
| 4 | Site Characterization and Assessment of Impacts | | | |
| 5 | References | | | |
| A | Agency Correspondence | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updates to meeting and outreach record. | |
| B | Fisheries Communication Plan | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Appendix replaced with new document. No redline provided. | |
| C | Coastal Zone Management Consistency Certifications | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Replaced Figure 1 to reflect PDE reduction. No redline provided. | |
| D | Certified Verification Agent (CVA) **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | |
| E1 | Emergency Response Plan / Oil Spill Response Plan **CONFIDENTIAL** | Aug 2021 - NOI | Resubmission of NOI version. | Prior to construction |
| E2 | Safety Management System **CONFIDENTIAL** | Aug 2021 - NOI | Resubmission of NOI version. | Prior to construction |
| F | Conceptual Project Engineering Design Drawings **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. No redline provided. | |
| G1 | Marine Site Investigation Report (MSIR) [Geophysical and Geotechnical] **CONFIDENTIAL** | Oct 2021 - Initial Submission | New appendix - includes results of complete G&G surveys. | |



www.sunrisewindny.com

| # | COP Section / Appendix | BOEM Submissions | Summary of Updates from August 2021 to October 2021 | Anticipated Supplemental Filing Schedule |
|---|---|---|---|---|
| G1 | MSIR Appendices A and B (10 files) **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updated based on results of complete G&G surveys. | |
| G2 | MEC and UXO Risk Assessment with Risk Mitigation Strategy **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Appendix replaced with new document. | |
| G3 | Foundation Feasibility Assessment **CONFIDENTIAL** | Oct 2021 - Initial Submission | New Appendix. Includes two reports. | |
| G4 | Cable Burial Feasibility Assessment **CONFIDENTIAL** | Oct 2021 - Initial Submission | New Appendix. | |
| H | Sediment Transport Modeling Report | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | |
| I1 | Underwater Acoustic Assessment **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | Anticipated supplemental filing 3-6 months prior to DEIS. Report will be updated based on additional modeling results and additional coordination with NOAA Fisheries. |
| I2 | Onshore Acoustic Assessment | Aug 2021 - NOI | Resubmission of NOI version. | |
| I3 | Offshore In-Air Acoustic Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | |
| J1 | Offshore EMF Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Revisions to modelling. | |
| J2 | Onshore EMF Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | |
| K | Air Quality Emissions Calculations and Methodology **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | Anticipated updated appendix at time of EPA air quality permit Application. |
| L | Onshore Ecological Assessment and Field Survey Report | Aug 2021 - NOI | Updated to incorporate results of additional surveys. Three versions | |



| # | COP Section / Appendix | BOEM Submissions | Summary of Updates from August 2021 to October 2021 | Anticipated Supplemental Filing Schedule |
|---|---|---|---|---|
| | | Oct 2021 - Rev1 | submitted: confidential, public, and redline. | |
| M1 | Benthic Resources Characterization Report - Federal Waters | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction and some habitat characterization terms. | |
| M2 | Benthic Resources Characterization Report - New York State Waters | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction and some habitat characterization terms. | |
| M3 | Benthic Habitat Mapping Report | Oct 2021 - Initial Submission | New Appendix. | |
| N | Essential Fish Habitat Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updates to reflect PDE reduction and incorporate information from benthic habitat mapping. | |
| O | Marine Mammal, Sea Turtle, and ESA-Listed Fish Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | |
| P | Avian and Bat Risk Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction. | |
| Q1 | Offshore Visual Impacts Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updates to reflect PDE reduction and further address BOEM comments. | |
| Q2 | Onshore Visual Resources Assessment | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updates to incorporate visual simulation of Onshore Converter Station. | |
| R | Marine Archaeological Resources Assessment (MARA)<br>**CONFIDENTIAL** | Oct 2021 - Initial Submission | New Appendix. | |
| S1 | Terrestrial Archaeological Resources Assessment<br>**CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | New attachment appended to reflect results of Phase 1A survey for Interconnection Cable corridor. No redline provided. | |



| # | COP Section / Appendix | BOEM Submissions | Summary of Updates from August 2021 to October 2021 | Anticipated Supplemental Filing Schedule |
|---|---|---|---|---|
| S2 | Terrestrial Archaeological Resources Phase 1B Assessment **CONFIDENTIAL** | Oct 2021 - Initial Submission | New Appendix to include results of complete Phase 1B surveys. | |
| T | Historic Resources Visual Effects Assessment (HRVEA) **CONFIDENTIAL** | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Updates to reflect PDE reduction and further address BOEM comments (consistent with edits made to VIA in Q1). | |
| U | Onshore Above-ground Historic Properties Report **CONFIDENTIAL** | Aug 2021 - NOI | Resubmission of NOI version. | |
| V | Commercial and Recreational Fisheries Data Report | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Minor updates to reflect PDE reduction . | |
| W | Economic Modeling Report **CONFIDENTIAL** | Aug 2021 - NOI | Resubmission of NOI version. | Anticipated filing in Q4 2021 |
| X | Navigation Safety Risk Assessment (NSRA) | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Analysis not updated to reflect PD parameter reduction, but disclaimer language added to clarify. Minor edits to further address BOEM comments. | |
| Y1 | Obstruction Evaluation and Airspace Analysis / Radar and Navigational Aid Screening Study | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Analysis not updated to reflect PD parameter reduction, but disclaimer language added to clarify. | |
| Y2 | Air Traffic Flow Analysis / ADLS Analysis | Aug 2021 - NOI<br>Oct 2021 - Rev1 | Analysis not updated to reflect PD parameter reduction, but disclaimer language added to clarify. | |
| Z | Cultural Resources Avoidance, Minimization, and Mitigation Measures | Oct 2021 - Flysheet only | No report at this time. | Anticipated filing in Q4 2021 |

# Sunrise Wind Farm Project

# Appendix Y1
# Obstruction Evaluation and Airspace Analysis

Prepared for:



August 23, 2021

Revision 1 – October 28, 2021

This page intentionally left blank



# Sunrise Wind Farm Project

Stantec Consulting Services Inc

*Obstruction Evaluation & Airspace Analysis*

September 30, 2020



Capitol Airspace Group

*capitolairspace.com*

*(703) 256 - 2485*

# Summary

Capitol Airspace conducted an obstruction evaluation and airspace analysis for the Sunrise Wind Farm Project (SRWF) located on the Outer Continental Shelf off the coast of Rhode Island & Massachusetts. The purpose for this analysis was to identify the potential for impacts on Visual Flight Rules (VFR) and Instrument Flight Rules (IFR) operations as a result of wind turbines that could have a minimum of 636-foot tall wind turbine generators (WTG) to a maximum of 968-foot tall WTGs.[1] This analysis assessed height constraints overlying an approximately 166-square-mile study area (black outline, *Figure 1*) to aid in identifying impacts to proposed wind turbine locations.

The Bureau of Ocean Energy Management (BOEM) is responsible for regulating renewable energy activities on the outer continental shelf in accordance with 30 CFR Part 585. As part of the application process for leases, grants, and easements, BOEM may require the inclusion of a Federal Aviation Administration (FAA) aeronautical study to determine the proposal's impact on airspace use and safety. If a project is determined to have an unacceptable impact on civil aviation or military activities, it could result in denial of the application.

14 CFR Part 77 applies to all structures within US territorial airspace. 14 CFR Part 77.9 requires that that all structures exceeding 200 feet above ground level (AGL) be submitted to the FAA so that an aeronautical study can be conducted. The FAA's objective in conducting aeronautical studies is to ensure that proposed structures do not affect the safety of air navigation or the efficient utilization of navigable airspace by aircraft. The result of an aeronautical study is the issuance of a determination of 'hazard' or 'no hazard' that can be used by the proponent to obtain necessary local construction permits. It should be noted that the FAA has no control over land use in the United States and cannot enforce the findings of its studies.

The lowest obstacle clearance surfaces overlying the SRWF range from 549 to 4,549 feet above mean sea level (AMSL) and are associated with instrument approach procedures, minimum vectoring altitude sectors, and minimum instrument flight rules (IFR) altitude sectors. With a design envelope range from 636 to 968 feet tall, proposed wind turbines in the northwestern and northeastern sections of the study area would exceed these surfaces and require an increase to minimum vectoring altitudes. If the increase to minimum vectoring altitudes is anticipated to affect as few as one radar vectoring operation per week, it may result in FAA objections to proposed wind development.

A warning area overlies the SRWF and could result in military objections to proposed wind development.

This study did not consider electromagnetic interference on FAA communication or surveillance radar systems.

*Capitol Airspace applies FAA defined rules and regulations applicable to obstacle evaluation, instrument procedures assessment and visual flight rules (VFR) operations to the best of its ability and with the intent to provide the most accurate representation of limiting airspace surfaces as possible. Capitol Airspace maintains datasets obtained from the FAA which are updated on a 28-day cycle. The results of this analysis are based on the most recent data available as of the date of this report. Limiting airspace surfaces depicted in this report are subject to change due to FAA rule changes and regular procedure amendments. Therefore, it is of the utmost importance to obtain FAA determinations of no hazard prior to making substantial financial investments in this project.*

[1] Since the time the analysis herein was conducted, Sunrise Wind has elected to reduce the number of turbines from 122 to 102 and has chosen a WTG model within the study parameters. This reduction is anticipated to result in the same or lower levels of impact than those presented in this report.

## Methodology

Capitol Airspace studied the proposed Project based upon location information provided by Stantec Consulting Services Inc. Using this information, Capitol Airspace generated graphical overlays to determine proximity to airports (*Figure 1*), published instrument procedures, enroute airways, FAA minimum vectoring altitude and minimum instrument flight rules (IFR) altitude charts, as well as military airspace and training routes.

Capitol Airspace evaluated all 14 CFR Part 77 imaginary surfaces, published instrument approach and departure procedures, visual flight rules operations, FAA minimum vectoring altitudes, minimum IFR altitudes, and enroute operations. All formulas, headings, altitudes, bearings and coordinates used during this study were derived from the following documents and data sources:

- 14 CFR Part 77 Safe, Efficient Use, and Preservation of the Navigable Airspace
- FAA Order 7400.2M Procedures for Handling Airspace Matters
- FAA Order 8260.3D United States Standard for Terminal Instrument Procedures
- FAA Order 8260.58B United States Standard for Performance Based Navigational (PBN) Instrument Procedure Design
- Technical Operations Evaluation Desk Guide for Obstruction Evaluation/Airport Airspace Analysis (1.5.1)
- United States Government Flight Information Publication, US Terminal Procedures
- National Airspace System Resource Aeronautical Data
- National Oceanic and Atmospheric Administration Maritime Boundaries Data



*Figure 1: Public-use (blue) and private-use (red) airports in proximity to the SRWF*

## Study Findings

**Territorial Airspace**

The FAA conducts aeronautical studies for structures proposed within any state, territory, or possession of the United States, within the District of Columbia, or within territorial waters[2] surrounding the United States.[3] Although an offshore wind project may be located outside of territorial waters, BOEM may require an aeronautical study as part of the application process.

The SRWF is not located within territorial waters (purple, *Figure 2*). Therefore, the FAA does not have a mandate to conduct aeronautical studies for wind turbines proposed within the defined study area. However, BOEM may require consultation with the FAA as part of the application process, as well as an aeronautical study to support these consultations.



*Figure 2: Territorial Airspace in proximity to the SRWF*

---

[2] The National Oceanic and Atmospheric Administration (NOAA) defines territorial waters as 12 nautical miles measured from the official U.S. baseline – a recognized low water line along the coast. NOAA publishes this boundary in a publicly available *Web Map Service*.

[3] As described in FAA Order 7400.2M 5-1-4(a) "Scope."

**14 CFR Part 77.17(a)(2) Obstruction Standard and 77.19/21/23 Imaginary Surfaces**

The FAA uses level and sloping imaginary surfaces to determine if a proposed structure is an obstruction to air navigation. Structures that are identified as obstructions are then subject to a full aeronautical study and increased scrutiny. However, exceeding a Part 77 imaginary surface does not automatically indicate that a structure would have an adverse effect on aviation operations. Proposed structures must have an impact on a significant volume of VFR or IFR operations in order to constitute a substantial adverse effect.

Military and public-use airport 14 CFR Part 77.17(a)(2) obstruction standard and 77.19/21/23 imaginary surfaces do not overlie the SRWF (*Figure 3*). However, at all proposed heights, wind turbines will exceed 77.17(a)(1) – a height of 499 feet AGL at the site of the object – and will be identified as obstructions regardless of location.



*Figure 3: 14 CFR Part 77.19 imaginary surfaces (solid blue) in proximity to the SRWF*

4

**Visual Flight Rules (VFR) Traffic Pattern Airspace**

VFR traffic pattern airspace is used by pilots operating during visual meteorological conditions (VMC). The airspace dimensions are based upon the category of aircraft which, in turn, is based upon the approach speed of the aircraft. 14 CFR Part 77.17(a)(2) and 77.19 (as applied to a *visual* runway) imaginary surfaces establish the obstacle clearance surface heights within VFR traffic pattern airspace.

VFR traffic pattern airspace does not overlie the SRWF (*Figure 4*). As a result, 636 to 968-foot tall wind turbines within the defined study area should not have an impact on VFR traffic pattern airspace.



*Figure 4: VFR traffic pattern airspace in proximity to the SRWF*

**Visual Flight Rules (VFR) Routes**

During periods of marginal VMC – low cloud ceilings and one statute mile visibility – pilots often operate below the floor of controlled airspace. Operating under these weather conditions requires pilots to remain within one statute mile of recognizable landmarks such as roads, rivers, and railroad tracks. The FAA protects for known and regularly used VFR routes by limiting structure heights within two statute miles of these routes to no greater than 14 CFR Part 77.17(a)(1) – a height of 499 feet AGL at the site of the object.

The SRWF is located in proximity to low-altitude enroute airways[4] that may be used as VFR routes (*Figure 5*). There is no dataset that identifies VFR routes or their utilization. However, a traffic flow analysis can be conducted to assess historical radar flight track data and identify regularly used low-level routes.[5] If the FAA determines that these VFR routes are flown regularly (as few as once per day), they could object to wind development in excess of 499 feet AGL and within two statute miles of these landmarks (hatched orange, *Figure 5*).



*Figure 5: Potential VFR routes in proximity to the SRWF*

---

[4] VFR traffic may use enroute airways at altitudes lower than the published minimum enroute altitude.

[5] Radar coverage must be adequate to detect low level VFR flights.

**Instrument Departures**

In order to ensure that aircraft departing during marginal weather conditions do not fly into terrain or obstacles, the FAA publishes instrument departure procedures that provide obstacle clearance to pilots as they transition between the terminal and enroute environments. These procedures contain specific routing and minimum climb gradients to ensure clearance from terrain and obstacles.

Proposed structures that exceed instrument departure procedure obstacle clearance surfaces would require an increase to instrument departure procedure minimum climb gradients. If the increase to minimum climb gradients is anticipated to affect as few as one flight per week, it may result in FAA objections to proposed wind development.

Instrument departure procedure obstacle clearance surfaces (e.g., *Figure 6*) are in excess of other, lower surfaces. At 636 to 968 feet tall, proposed wind turbines within the defined study area would not exceed these surfaces and should not have an impact on instrument departure procedures.



*Figure 6: Block Island State (BID) obstacle departure procedure assessment*

**Instrument Approaches**

Pilots operating during periods of reduced visibility and low cloud ceilings rely on terrestrial and satellite based navigational aids (NAVAIDS) in order to navigate from one point to another and to locate runways. The FAA publishes instrument approach procedures that provide course guidance to on-board avionics that aid the pilot in locating the runway. Capitol Airspace assessed a total of 17 published instrument approach procedures at five public-use airports in proximity to the SRWF: [6, 7]

**Block Island State (BID)**
RNAV (GPS) Approach to Runway 10
RNAV (GPS) Approach to Runway 28
VOR/DME Approach to Runway 10
VOR Approach to Runway 28

**Montauk (MTP)**
RNAV (GPS) Approach to Runway 06
RNAV (GPS) Approach to Runway 24
VOR Approach to Runway 06

**Westerly State (WST)**
RNAV (GPS) Approach to Runway 07

**Martha's Vineyard (MVY)**
ILS or Localizer Approach to Runway 24
RNAV (GPS) Approach to Runway 06
RNAV (GPS) Approach to Runway 15
RNAV (GPS) Approach to Runway 24
RNAV (GPS) Approach to Runway 33
VOR Approach to Runway 06

**Newport State (UUU)**
RNAV (GPS) Approach to Runway 16
Localizer Approach to Runway 22
VOR/DME Approach to Runway 16

Proposed wind turbines that exceed instrument approach procedure obstacle clearance surfaces would require an increase to their minimum altitudes. Increases to these altitudes, especially critical *decision altitudes (DA)* and *minimum descent altitudes (MDA)*, can directly impact the efficiency of instrument approach procedures. If the increase to instrument approach procedure minimum altitudes is anticipated to affect as few as one flight per week, it may result in FAA objections to proposed wind development.

---

[6] Capitol Airspace assessed instrument approach procedures within 30 nautical miles (NM) of the study area. Although approach surfaces – including Terminal Arrival Areas (TAA), feeder segments, and initial segments – from airports further than 30 NM may overlie the study area, the obstacle clearance surfaces present a lower risk to projects than the surfaces identified in this report. Therefore, height constraints associated with instrument approach surfaces for airports beyond 30 NM were not considered and are not included in the ***Composite Map***.

[7] Multiple minimum safe altitudes (MSA) overlie the study area. However, MSAs are for emergency use only and cannot be used as the basis for determinations of hazard in accordance with FAA Order 7400.2M Paragraph 6-3-9(e)(5). Therefore, height constraints associated with MSAs were not considered and are not included in the ***Composite Map***.

Block Island State (BID)

*RNAV (GPS) Approach to Runway 28*

The *OSSER* to *WAVON* initial approach segment minimum altitude is 2,000 feet AMSL. The primary area obstacle clearance surface (purple outline, *Figure 7*) is 1,000 feet AMSL and is one of the lowest height constraints overlying the northwestern section of the study area. However, at 636 to 968 feet tall, proposed wind turbines within the defined study area would not exceed this surface and should not require an increase to the minimum altitude (green area, *Figure 7*).



*Figure 7: Block Island State (BID) RNAV (GPS) Approach to Runway 28*

**Enroute Airways**

Enroute airways provide pilots a means of navigation when flying from airport to airport and are defined by radials between VHF omni-directional ranges (VORs). The FAA publishes minimum altitudes for airways to ensure clearance from obstacles and terrain. The FAA requires that each airway have a minimum obstacle clearance of 1,000 feet in non-mountainous areas and normally 2,000 feet in mountainous areas.

Proposed structures that exceed enroute airway obstacle clearance surfaces would require an increase to their minimum obstruction clearance altitudes (MOCA) and/or minimum enroute altitudes (MEA).

### V46

*CLAMY* to *LIBBE*

The MOCA is 2,000 feet AMSL. The primary area obstacle clearance surface (inner purple outline, *Figure 8*) is 1,000 AMSL and would be lower than the height constraints depicted in the Composite Map (*Figure 13*) in the northern section of the study area. However, 636 to 968-foot tall wind turbines would not exceed this surface and should not require an increase to the V46 MOCA. Additionally, due to the project's location beyond 22 nautical miles from the NAVAIDs defining V46, this surface should not be used as the sole basis for FAA objections to proposed offshore wind development.[8]

The MEA is 3,000 feet AMSL. The primary area obstacle clearance surface (inner purple outline, *Figure 8*) is 2,000 feet AMSL and is in excess of other, lower surfaces. Additionally, 636 to 968-foot tall wind turbines would not exceed this surface and should not require an increase to the V46 MEA.

---

[8] In accordance with FAA Order 7400.2M Paragraph 6-3-9(d)(2), proposed structures beyond 22 nautical miles from an airway's supporting NAVAIDs that impact only the MOCA are not considered to have a substantial adverse effect. Therefore, height constraints associated with the V46 MOCA were not included in the **Composite Map**.



*Figure 8: Low altitude enroute chart L-33 with V46 obstacle evaluation area (purple outline)*

**Minimum Vectoring/IFR Altitudes**

The FAA publishes minimum vectoring altitude (MVA) and minimum instrument flight rules (IFR) altitude (MIA) charts that define sectors with the lowest altitudes at which air traffic controllers can issue radar vectors to aircraft based on obstacle clearance. The FAA requires that sectors have a minimum obstacle clearance of 1,000 feet in non-mountainous areas and normally 2,000 feet in mountainous areas.

Proposed structures that exceed MVA/MIA sector obstacle clearance surfaces would require an increase to the altitudes usable by air traffic control for vectoring aircraft.

Boston Consolidated (A90) Terminal Radar Approach Control (TRACON) MVA sectors, Providence (PVD) TRACON MVA sectors, and Boston (ZBW) Air Route Traffic Control Center (ARTCC) MIA sectors overlie the SRWF. The obstacle clearance surfaces range from 549 to 4,849 feet AMSL and are the lowest height constraints overlying most of the study area (*Table 1*). At 636 to 968 feet tall, wind turbines in the northwestern and northeastern sections of the study area (red areas, *Figure 9* & *Figure 10*) would exceed multiple Boston Consolidated (A90) TRACON and Providence (PVD) TRACON MVA sectors' obstacle clearance surfaces and would require an increase to the associated MVAs. This mitigation is subject to FAA approval.

*Table 1: MVA/MIA sector analysis results*

| Facility | Chart | Sector | MVA/MIA (AMSL Feet) | OCS (AMSL Feet) | Limiting @ 636' | Limiting @ 968' |
|---|---|---|---|---|---|---|
| **ACT TRACON** | *A90_MVA_FUS3_2020* | *II* | 1500 | 549 | Yes | Yes |
| | | *U* | 2000 | 1049 | No | No |
| | | *T* | 5500 | 4549 | No | No |
| | *A90_MVA_FUS5_2019* | *FF* | 1500 | 549 | Yes | Yes |
| | | *HH* | 2300 | 1349 | No | No |
| | | *EE* | 5500 | 1549 | No | No |
| **PVD TRACON** | *PVD_MVA_FUS3_2019* *PVD_MVA_FUS5_2019* | *C* | 1500 | 549 | Yes | Yes |
| | | *N* | 2000 | 1049 | No | No |
| | | *G* | 2300 | 1349 | No | No |
| | | *H* | 5800 | 4849 | No | No |
| **ZBW ARTCC** | *ZBW_TAV_2020* | *bBOS04* | 2300 | 1349 | No | No |
| | | *bBOS06* | 5800 | 4849 | No | No |



*Figure 9: Boston Consolidated (A90) TRACON FUSION 3 MVA sectors (blue) with Sector II obstacle evaluation area (hatched purple)*



*Figure 10: Providence (PVD) TRACON FUSION 5 MVA sectors (blue) with Sector C obstacle evaluation area (hatched purple)*

**Terminal and Enroute Navigational Aids**

The FAA has established protection areas in order to identify proposed structures that may have a physical and/or electromagnetic effect on navigational aids (NAVAIDs). The protection area dimensions vary based on the proposed structure type as well as the NAVAID type. Proposed structures within these areas may interfere with NAVAID services and will require further review by FAA Technical Operations. If further review determines that proposed structures would have a significant physical and/or electromagnetic effect on NAVAIDs, it may result in FAA objections to proposed wind development.

NAVAID protection areas do not overlie the SRWF (*Figure 11*). As a result, it is unlikely that proposed wind turbines would have a physical or electromagnetic effect on terminal or enroute NAVAIDs.



*Figure 11: Sandy Point (SEY) VOR/DME protection area and the SRWF*

**Military Airspace and Training Routes**

Although the FAA does not consider impact on military airspace or training routes, they will notify the military of proposed structures within these segments of airspace. Impact on these segments of airspace can result in military objections to the proposed development. If the planned development area is on federal land, impact on military airspace or training routes may result in the denial of permits by the Bureau of Land Management.

Warning areas (W) overlying the SRWF (*Figure 12*):

    **US Navy, Fleet Area Control and Surveillance Facility, Virginia Capes (FACSFAC VACAPES)**
    *Route/Airspace*     *Minimum Altitude*
    W-105A           Surface

Due to the low altitude associated with this airspace, wind development could have an impact on its operations. If the US Navy uses this airspace regularly, they may object to proposed wind development within its boundaries. Under the provisions of the 2018 National Defense Authorization Act (NDAA), the Military Aviation and Installation Assurance Siting Clearinghouse (Clearinghouse) may issue a Notice of Presumed Risk to National Security (NPR) letter to initiate mitigation discussions. These discussions are facilitated through the Clearinghouse and with the affected bases or organizations with operational interests. Per the legislative directive, NPR letters are provided to the Governor of the State(s). The Clearinghouse typically attempts to notify developers shortly before the issuance of an NPR letter.



*Figure 12: Military airspace overlying the SRWF*

## Conclusion

At a minimum of 636 feet to a maximum of 968 feet tall, proposed wind turbines will exceed 14 CFR Part 77.17(a)(1) – a height of 499 feet AGL at the site of the object – and will be identified as obstructions regardless of location. However, exceeding this standard does not automatically indicate that a structure would have an adverse effect on aviation operations. Proposed structures must have an impact on a significant volume of VFR or IFR operations in order to constitute a substantial adverse effect.

The lowest obstacle clearance surfaces overlying the SRWF range from 549 to 4,549 feet AMSL (*Figure 13*) and are associated with instrument approach procedures, MVA sectors, and MIA sectors. At 636 to 968 feet tall, proposed wind turbines in the northwestern and northeastern sections of the study area (red areas, *Figure 9*, *Figure 10*, & *Figure 14*) would require an increase to Boston Consolidated (A90) TRACON and Providence (PVD) TRACON MVAs. These mitigations would be subject to FAA approval.

Warning Area W-105A overlies the SRWF (*Figure 12*). Impact on this airspace could result in military objections to proposed wind development

If you have any questions regarding the findings of this study, please contact *Dan Underwood* or *Candace Childress* at (703) 256-2485.







**SUNRISE OFFSHORE WIND PROJECT**

**RADAR AND NAVIGATIONAL AID SCREENING STUDY**

**NOVEMBER 12, 2020**

This report contains proprietary information of Westslope Consulting, LLC.  Please obtain requests for use or release of this report in writing from:

Westslope Consulting, LLC
3960 West Tecumseh Road
Suite 100
Norman, Oklahoma 73072
(405) 310-6058

© 2020 Westslope Consulting, LLC

**WESTSLOPE**
**CONSULTING**

**INTRODUCTION**

The Sunrise Offshore Wind Project consists of approximately 106,393 acres of ocean (study area) off the coasts of Rhode Island and Massachusetts.[1] This report provides the results of a radar and navigational aid screening study conducted by Westslope Consulting, LLC (Westslope) for the study area using blade-tip heights of 636 feet above ground level (AGL) and 968 feet AGL, which represent the minimum and maximum turbine size under consideration.

This study includes the following:

- An initial analysis using the Department of Defense (DoD) Preliminary Screening Tool (PST);
- Research into other radar sites and Very High Frequency (VHF) Omnidirectional Range (VOR) navigational aid sites near the study area;
- An Air Route Surveillance Radar (ARSR) and Airport Surveillance Radar (ASR) line-of-sight (LOS) analysis;
- An Early Warning Radar (EWR) screening analysis;
- A Terminal Doppler Weather Radar (TDWR) screening analysis;
- A VOR screening analysis;
- A Next Generation Radar (NEXRAD) weather radar screening analysis; and
- A coastal High Frequency (HF) radar LOS analysis.

**ANALYSIS**

**DoD Preliminary Screening Tool**

Westslope conducted an initial analysis for Long Range Radar (LRR) and NEXRAD using the DoD PST on the Federal Aviation Administration (FAA) Obstruction Evaluation/Airport Airspace Analysis website.[2] This analysis provides a cursory indication of whether wind turbines may be within line-of-sight of one or more radar sites, and likely to affect radar performance.

The PST LRR analysis accounts for ARSR sites and a few select ASR sites used for air defense by the DoD at the North American Aerospace Defense Command and for homeland security by the Customs and Border Protection Air and Marine Operations Center.[3] Further, the PST NEXRAD analysis accounts for DoD, FAA, and National Oceanic and Atmospheric Administration (NOAA) Weather Surveillance Radar model-88 Doppler (WSR-88D) sites.[4] The PST does not account for all DoD, Department of Homeland Security (DHS), or FAA ground-based radar sites, including Relocatable Over-the-Horizon Radar sites, tethered aerostat radar sites, or FAA TDWR sites.

---

[1] LE_487_A_Site_Area_05_20200528_SRWF_poly.shp.
[2] See http://oeaaa.faa.gov.
[3] For LRR, the PST uses a buffered line-of-sight analysis at a blade-tip height of 750 feet AGL.
[4] For NEXRAD, the PST uses a blade-tip height of 160 meters AGL (525 feet AGL).



The PST is helpful for identifying potential impacts to LRR and NEXRAD; however, the results are preliminary, as suggested by the title of the PST, and do not provide an official decision as to whether impacts are acceptable to operations.

Please note that the PST NEXRAD analysis does not account for blade-tip heights greater than 525 feet AGL and does not reflect the wind farm impact zone scheme updated in 2018 by the NOAA WSR-88D Radar Operations Center (ROC).  The updated scheme expands the red area, or "No Build Zone," from three to four kilometers (km) and to areas where wind turbines penetrate the third elevation angle scanned by a WSR-88D.

Based on the study area, Westslope created a single point and a four-point polygon for PST analysis purposes.

The PST analysis results for LRR show that the single point falls within a yellow area.  A yellow area indicates that impacts are likely to air defense and homeland security radar.  Further, the PST analysis results for the polygon show that the study area falls within yellow and green areas.  A green area indicates no anticipated impacts to air defense and homeland security radar.  Please note that blue and grey areas also represent green areas in the PST LRR analysis results.  See Figure 1, where the black rotor represents the single point, the black line represents the polygon, and the red line represents the study area.

Westslope identified the closest six radar sites in the PST LRR results as the Boston Airport Surveillance Radar model-9 (ASR-9), Falmouth Airport Surveillance Radar model-8 (ASR-8), Nantucket ASR-9, North Truro Air Route Surveillance Radar model-4 (ARSR-4), Providence ASR-9, and the Riverhead ARSR-4.  In addition to the DoD and DHS using these radar sites for air defense and homeland security, the FAA uses these radar sites for air traffic control at multiple facilities, including the Boston Terminal Radar Approach Control (TRACON), Nantucket Air Traffic Control Tower, Boston Air Route Traffic Control Center (ARTCC), Providence TRACON, and the New York ARTCC.

For NEXRAD, the PST analysis results for the single point and the polygon show that the study area falls within a green area.  A green area, or "No Impact Zone," indicates that impacts are not likely to WSR-88D operations.  Please note that blue and grey areas also represent green areas in the PST NEXRAD analysis results.  See Figure 2.  Westslope identified the two radar sites in the PST NEXRAD analysis as the Boston WSR-88D and the Brookhaven WSR-88D.





**Figure 1 Long Range Radar Results for the Single Point (left) and for the Polygon (right)**



**Figure 2 NEXRAD Results for the Single Point (left) and for the Polygon (right)**

**Other ARSR and ASR Sites**

Research conducted by Westslope identified no additional ARSR or ASR sites near the study area.

**Co-Located Secondary Surveillance Radar**

Research conducted by Westslope identified the following secondary surveillance radar systems co-located with the ARSR and ASR systems:

- An Air Traffic Control Beacon Interrogator model-5 is co-located with the Falmouth ASR-8;
- An Air Traffic Control Beacon Interrogator model-6 is co-located with the North Truro ARSR-4 and the Riverhead ARSR-4; and
- A Mode S is co-located with the Boston ASR-9, Nantucket ASR-9, and the Providence ASR-9.

In general, secondary surveillance radar systems are less susceptible to interference from wind turbines than primary surveillance radar systems, such as the ARSR and ASR systems.

**EWR Sites**

Research conducted by Westslope identified one EWR site near the study area: the Cape Cod Air Force Station (AFS) EWR.

The DoD uses the Cape Cod AFS EWR for ballistic missile defense and space surveillance.

**TDWR Sites**

Research conducted by Westslope identified one TDWR site near the study area: the Boston TDWR.

The FAA uses this TDWR site for air traffic control at the Boston TRACON.

**VOR Sites**

Research conducted by Westslope identified the following two navigational aids near the study area:

- Martha's Vineyard VOR and co-located Distance Measuring Equipment (VOR/DME); and
- Sandy Point VOR/DME.

Correspondence with the FAA indicates that the Martha's Vineyard VOR/DME is a conventional VOR and the Sandy Point VOR/DME is a Doppler VOR. In general, conventional VORs are more susceptible than Doppler VORs to interference from wind turbines.

**HF Radar Sites**

Research conducted by Westslope identified the following six HF radar sites near the study area:

- Amagansett HF radar;
- Block Island HF radar;
- Martha's Vineyard HF radar;
- Moriches HF radar;
- Nantucket HF radar; and
- Nauset HF radar.

The Amagansett HF radar, Block Island HF radar, Martha's Vineyard HF radar, Moriches HF radar, and Nantucket HF radar are operated by Rutgers University. The Nauset HF radar is operated by the University of Massachusetts Dartmouth.

Various federal agencies in partnership with NOAA's Integrated Ocean Observing System (IOOS) use the ocean surface current and wave data provided by these HF radar sites in support of multiple missions.

**WESTSLOPE CONSULTING**

**ARSR and ASR LOS Analysis**

Westslope conducted an ARSR and ASR LOS analysis using the United States Geological Survey (USGS) 10-meter National Elevation Dataset (NED).  This analysis shows whether wind turbines at blade-tip heights of 636 feet AGL or 968 feet AGL will be within line-of-sight of one or more ARSR or ASR sites.

Westslope conducted the LOS analysis for the following six ARSR and ASR sites:

- Boston ASR-9;
- Falmouth ASR-8;
- Nantucket ASR-9;
- North Truro ARSR-4;
- Providence ASR-9; and
- Riverhead ARSR-4.

The study area is beyond the instrumented range of the Boston ASR-9.  As such, no additional analysis was considered necessary for this radar site.

Falmouth ASR-8

The LOS analysis results show that wind turbines in a small section along the northern edge of the study area will be within line-of-sight of and may interfere with the Falmouth ASR-8 at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in sections along the northern and eastern edges of the study area and in the central section of the study area will be within line-of-sight of and may interfere with this radar site.  See Figure 3.  The radar effects may include unwanted radar returns (clutter) resulting in a partial loss of primary target detection and a number of false primary targets over and in the immediate vicinity of wind turbines within line-of-sight in the study area.  Other possible radar effects may include a partial loss of weather detection and false weather indications over and in the immediate vicinity of wind turbines within line-of-sight in the study area.

Nantucket ASR-9

The LOS analysis results show that wind turbines in the eastern one-fourth of the study area will be within line-of-sight of and may interfere with the Nantucket ASR-9 at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in the eastern two-thirds of the study area will be within line-of-sight of and may interfere with this radar site.  See Figure 4.  The radar effects may include clutter resulting in a partial loss of primary target detection and a number of false primary targets over and in the immediate vicinity of wind turbines within line-of-sight in the study area.  Other possible radar effects may include a partial loss of weather detection and false weather indications over and in the immediate vicinity of wind turbines within line-of-sight in the study area.

7



<u>North Truro ARSR-4</u>

The LOS analysis results show that wind turbines in the study area will not be within line-of-sight of and will not interfere with the North Truro ARSR-4 at blade-tip heights of 636 feet AGL or 968 feet AGL.  As a result, Westslope does not expect any radar effects at or below these blade-tip heights.

<u>Providence ASR-9</u>

The LOS analysis results show that wind turbines in the majority of the study area will be within line-of-sight of and may interfere with the Providence ASR-9 at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in the entire study area will be within line-of-sight of and may interfere with this radar site.  See Figure 5.  The radar effects may include clutter resulting in a partial loss of primary target detection and a number of false primary targets over and in the immediate vicinity of wind turbines within line-of-sight in the study area.  Other possible radar effects may include a partial loss of weather detection and false weather indications over and in the immediate vicinity of wind turbines within line-of-sight in the study area.

<u>Riverhead ARSR-4</u>

The LOS analysis results show that wind turbines in the study area will not be within line-of-sight of and will not interfere with the Riverhead ARSR-4 at blade-tip heights of 636 feet AGL or 968 feet AGL.  As a result, Westslope does not expect any radar effects at or below these blade-tip heights.



**Figure 3 LOS Analysis Results for the Falmouth ASR-8 using 10-meter NED**





**Figure 4 LOS Analysis Results for the Nantucket ASR-9 using 10-meter NED**



**Figure 5 LOS Analysis Results for the Providence ASR-9 using 10-meter NED**



**EWR Screening Analysis**

Westslope conducted an EWR screening analysis using USGS 10-meter NED.  This analysis shows whether wind turbines at blade-tip heights of 636 feet AGL or 968 feet AGL will be within line-of-sight of one or more EWR sites.

Westslope conducted the EWR screening analysis for the Cape Cod AFS EWR.

Cape Cod AFS EWR

The EWR screening analysis results show that wind turbines in the study area will not be within line-of-sight of and will not interfere with the Cape Cod AFS EWR at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines along the northern and eastern edges of the study area and in the northwestern one-fourth of the study area will be within line-of-sight of this radar site.  See Figure 6.

Research conducted by Westslope suggests that wind turbines in the study area within line-of-sight of the Cape Cod AFS EWR could have a significant impact on this early warning radar. [1]  As such, Westslope recommends early consultation with the DoD Siting Clearinghouse.





**Figure 6 LOS Analysis Results for the Cape Cod AFS EWR using 10-meter NED**

**TDWR Screening Analysis**

Westslope conducted a TDWR screening analysis using USGS 10-meter NED.  This analysis shows whether wind turbines at blade-tip heights of 636 feet AGL or 968 feet AGL will be within line-of-sight of one or more TDWR sites and determines the number of elevation angles potentially affected.

Westslope conducted the TDWR screening analysis for the Boston TDWR.

The study area is beyond the instrumented range of the Boston TDWR.  As such, no additional analysis was considered necessary for this radar site.

**VOR Screening Analysis**

Westslope conducted a VOR screening analysis using USGS 10-meter NED.  This analysis shows whether wind turbines in the study area (1) are less than or equal to 8 nautical miles (NM) from a VOR site; (2) will subtend elevation angles greater than 0.60 degrees from the base elevation of a conventional VOR at blade-tip heights of 636 feet AGL or 968 feet AGL, or 0.75 degrees for a Doppler VOR; and (3) will fall within line-of-sight of a VOR site.  This screening analysis provides a cursory indication of whether wind turbines in the study area may affect VOR performance and is similar to the FAA's analysis approach for VOR sites.  The same criteria will also protect for DMEs.

Westslope conducted a VOR screening analysis for the following two navigational aid sites:

- Martha's Vineyard VOR/DME; and
- Sandy Point VOR/DME.

The study area is greater than 8 NM from the Martha's Vineyard VOR/DME and the Sandy Point VOR/DME.  As such, no additional analysis was considered necessary for these navigational aid sites.

**NEXRAD Weather Radar Screening Analysis**

The PST NEXRAD analysis does not account for blade-tip heights greater than 525 feet AGL and does not reflect the wind farm impact zone scheme updated in 2018 by the NOAA WSR-88D ROC.  The updated scheme expands the red area, or "No Build Zone," from three to four kilometers and to areas where wind turbines penetrate the third elevation angle scanned by a WSR-88D.

Westslope conducted a NEXRAD weather radar screening analysis using USGS 10-meter NED.  This analysis shows whether wind turbines at blade-tip heights of 636 feet AGL or 968 feet AGL will be within line-of-sight of one or more WSR-88D sites and incorporates the updated wind farm impact zone scheme.

Westslope conducted the NEXRAD weather radar screening analysis for the following two radar sites:

- Boston WSR-88D; and
- Brookhaven WSR-88D.

<u>Boston WSR-88D</u>

Westslope's NEXRAD weather radar screening analysis shows that wind turbines in the study area will not be within line-of-sight of and will not interfere with the Boston WSR-88D at blade-tip heights of 636 feet AGL or 968 feet AGL.  The results also show that wind turbines in the study area at blade-tip heights of 636 feet AGL and 968 feet AGL will fall within a NOAA green area for this radar site.  A green area, or "No Impact Zone," indicates that impacts are not likely to WSR-88D operations.  See Figures 7 and 8.

<u>Brookhaven WSR-88D</u>

Westslope's NEXRAD weather radar screening analysis shows that wind turbines in the study area will not be within line-of-sight of and will not interfere with the Brookhaven WSR-88D at blade-tip heights of 636 feet AGL or 968 feet AGL.  The results also show that wind turbines in the study area at blade-tip heights of 636 feet AGL and 968 feet AGL will fall within a NOAA green area for this radar site.  See Figures 9 and 10.



**Figure 7 WSR-88D ROC Zone Results at 636 feet AGL for the Boston WSR-88D using 10-meter NED**





**Figure 8 WSR-88D ROC Zone Results at 968 feet AGL for the Boston WSR-88D using 10-meter NED**



**Figure 9 WSR-88D ROC Zone Results at 636 feet AGL for the Brookhaven WSR-88D using 10-meter NED**



**Figure 10 WSR-88D ROC Zone Results at 968 feet AGL for the Brookhaven WSR-88D using 10-meter NED**

**HF Radar LOS Analysis**

Westslope conducted an HF radar LOS analysis using USGS 10-meter NED. This analysis shows whether wind turbines at blade-tip heights of 636 feet AGL or 968 feet AGL will be within line-of-sight of one or more HF radar sites.

Westslope conducted the LOS analysis for the following six HF radar sites:

- Amagansett HF radar;
- Block Island HF radar;
- Martha's Vineyard HF radar;
- Moriches HF radar;
- Nantucket HF radar; and
- Nauset HF radar.

Amagansett HF Radar

The LOS analysis results show that wind turbines in the study area will not be within line-of-sight of the Amagansett HF radar at a blade-tip height of 636 feet AGL. At a blade-tip height of 968 feet AGL, wind turbines in the western one-third of the study area will be within line-of-sight of this radar site. See Figure 11. The radar effects may include clutter in the vicinity of wind turbines in the study area within line-of-sight and possibly in the vicinity of wind turbines in the study area beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface. As a result, impacts to Amagansett HF radar operations are possible.

Block Island HF Radar

The LOS analysis results show that wind turbines in the entire study area will be within line-of-sight of the Block Island HF radar at blade-tip heights of 636 feet AGL and 968 feet AGL. See Figure 12. The radar effects will include clutter in the vicinity of wind turbines in the study area. As a result, impacts to Block Island HF radar operations are possible.

Martha's Vineyard HF Radar

The LOS analysis results show that wind turbines in the northeastern three-fourths of the study area will be within line-of-sight of the Martha's Vineyard HF radar at a blade-tip height of 636 feet AGL. At a blade-tip height of 968 feet AGL, wind turbines in the entire study area will be within line-of-sight of this radar site. See Figure 13. The radar effects may include clutter in the vicinity of wind turbines in the study area within line-of-sight and possibly in the vicinity of wind turbines in the study area beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface. As a result, impacts to Martha's Vineyard HF radar operations are possible.



Moriches HF Radar

The LOS analysis results show that wind turbines in the study area will not be within line-of-sight of the Moriches HF radar at blade-tip heights of 636 feet AGL or 968 feet AGL.  See Figure 14.  Although wind turbines in the study area will not be within line-of-sight of this radar site, radar effects are still possible beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface.

Nantucket HF Radar

The LOS analysis results show that wind turbines in the study area will not be within line-of-sight of the Nantucket HF radar at blade-tip heights of 636 feet AGL or 968 feet AGL.  See Figure 15.  Although wind turbines in the study area will not be within line-of-sight of this radar site, radar effects are still possible beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface.

Nauset HF Radar

The LOS analysis results show that wind turbines in the study area will not be within line-of-sight of the Nauset HF radar at blade-tip heights of 636 feet AGL or 968 feet AGL.  See Figure 16.  Although wind turbines in the study area will not be within line-of-sight of this radar site, radar effects are still possible beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface.



**Figure 11 LOS Analysis Results for the Amagansett HF Radar using 10-meter NED**



**Figure 12 LOS Analysis Results for the Block Island HF Radar using 10-meter NED**



**Figure 13 LOS Analysis Results for the Martha's Vineyard HF Radar using 10-meter NED**



**Figure 14 LOS Analysis Results for the Moriches HF Radar using 10-meter NED**



**Figure 15 LOS Analysis Results for the Nantucket HF Radar using 10-meter NED**





**Figure 16 LOS Analysis Results for the Nauset HF Radar using 10-meter NED**

**CONCLUSIONS**

The DoD PST analysis results for the study area indicate the following:

- Impacts to air defense and homeland security radar are likely; and
- Impacts to WSR-88D weather radar are not likely.

Westslope identified the closest six radar sites in the PST analysis results for Long Range Radar as the Boston ASR-9, Falmouth ASR-8, Nantucket ASR-9, North Truro ARSR-4, Providence ASR-9, and the Riverhead ARSR-4.  Further, Westslope identified the two radar sites in the PST analysis results for NEXRAD as the Boston WSR-88D and the Brookhaven WSR-88D.

Research conducted by Westslope identified no additional ARSR and ASR sites near the study area.

Westslope conducted an ARSR and ASR LOS analysis for the following six radar sites:

- Boston ASR-9;
- Falmouth ASR-8;
- Nantucket ASR-9;
- North Truro ARSR-4;
- Providence ASR-9; and
- Riverhead ARSR-4.

The study area is beyond the instrumented range of the Boston ASR-9.  As such, no additional analysis was considered necessary for this radar site.

The ARSR and ASR LOS analyses conducted by Westslope show the following:

- For the Falmouth ASR-8, wind turbines in a small section along the northern edge of the study area will be within line-of-sight of and may interfere with this radar site at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in sections along the northern and eastern edges of the study area and in the central section of the study area will be within line-of-sight of and may interfere with this radar site.
- For the Nantucket ASR-9, wind turbines in the eastern one-fourth of the study area will be within line-of-sight of and may interfere with this radar site at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in the eastern two-thirds of the study area will be within line-of-sight of and may interfere with this radar site.
- For the Providence ASR-9, wind turbines in the majority of the study area will be within line-of-sight of and may interfere with this radar site at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in the entire study area will be within line-of-sight of and may interfere with this radar site.

28

- For the North Truro ARSR-4 and Riverhead ARSR-4, wind turbines in the study area will not be within line-of-sight of and will not interfere with these radar sites at blade-tip heights of 636 feet AGL or 968 feet AGL.

For the Falmouth ASR-8, Nantucket ASR-9, and the Providence ASR-9, without mitigation, the radar effects due to clutter may include a partial loss of primary target detection and a number of false primary targets over and in the immediate vicinity of wind turbines within line-of-sight in the study area. Other possible radar effects may include a partial loss of weather detection and false weather indications over and in the immediate vicinity of wind turbines within line-of-sight in the study area. Please note that radar effects do not always translate into operational impacts.  Because wind turbines will be within line-of-sight of these radar sites, Westslope expects that the DoD and FAA will have concerns with wind turbines within line-of-sight in the study area at blade-tip heights of 636 feet AGL and 968 feet AGL based on electromagnetic interference to air navigation facilities.  The FAA's aeronautical study process and the DoD Siting Clearinghouse process will provide an official decision as to whether impacts are acceptable to operations.  Although possible, Westslope does not expect that the DHS will have concerns with wind turbines within line-of-sight in the study area at blade-tip heights of 636 feet AGL or 968 feet AGL based on impacts to these radar sites.

Westslope does not expect that wind turbines in the study area will affect the secondary surveillance radar co-located with the Falmouth ASR-8, Nantucket ASR-9, or the Providence ASR-9.

Westslope's EWR screening analysis for the Cape Cod AFS EWR shows that wind turbines in the study area will not be within line-of-sight of and will not interfere with this early warning radar at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines along the northern and eastern edges of the study area and in the northwestern one-fourth of the study area will be within line-of-sight of this radar site of and could have a significant impact on this early warning radar.

For the Cape Cod AFS EWR, Westslope recommends early consultation with the DoD Siting Clearinghouse.  Because wind turbines will be within line-of-sight of this radar site, it is possible that the DoD will have concerns with wind turbines within line-of-sight in the study area based on electromagnetic interference to a ballistic missile defense and space surveillance facility.

Westslope's TDWR screening analysis shows that the study area is beyond the instrumented range of the Boston TDWR.  As such, no additional analysis was considered necessary for this radar site.

Westslope's VOR screening analysis for the Martha's Vineyard VOR/DME and the Sandy Point VOR/DME shows that the study area is greater than 8 NM from these navigational aid sites.  Although possible, Westslope does not expect that the FAA will have concerns with wind turbines in the study area at blade-tip heights of 636 feet AGL or 968 feet AGL based on impacts to these navigational aid sites.

WESTSLOPE
CONSULTING

Westslope's NEXRAD weather radar screening analysis for the Boston WSR-88D and the Brookhaven WSR-88D shows that wind turbines in the study area will not be within line-of-sight of and will not interfere with these radar sites at blade-tip heights of 636 feet AGL or 968 feet AGL.  The results also show that wind turbines in the study area at blade-tip heights of 636 feet AGL and 968 feet AGL will fall within a NOAA green No Impact Zone for these radar sites.

Westslope conducted an HF radar LOS analysis for the following six radar sites:

- Amagansett HF radar;
- Block Island HF radar;
- Martha's Vineyard HF radar;
- Moriches HF radar;
- Nantucket HF radar; and
- Nauset HF radar.

The HF radar LOS analyses conducted by Westslope show the following:

- For the Amagansett HF radar, wind turbines in the study area will not be within line-of-sight of this radar site at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in the western one-third of the study area will be within line-of-sight of this radar site.
- For the Block Island HF radar, wind turbines in the entire study area will be within line-of-sight of this radar site at blade-tip heights of 636 feet AGL and 968 feet AGL.
- For the Martha's Vineyard HF radar, wind turbines in the northeastern three-fourths of the study area will be within line-of-sight of this radar site at a blade-tip height of 636 feet AGL.  At a blade-tip height of 968 feet AGL, wind turbines in the entire study area will be within line-of-sight of this radar site.
- For the Moriches HF radar, Nantucket HF radar, and the Nauset HF radar, wind turbines in the study area will not be within line-of-sight of these radar sites at blade-tip heights of 636 feet AGL or 968 feet AGL.  Although wind turbines in the study area will not be within line-of-sight of these radar sites, radar effects are still possible beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface.

For the Amagansett HF radar, Block Island HF radar, and the Martha's Vineyard HF radar, without mitigation, the radar effects may include clutter in the vicinity of wind turbines in the study area within line-of-sight and possibly in the vicinity of wind turbines in the study area beyond line-of-sight due to the propagation of HF electromagnetic waves over the ocean surface.  Because wind turbines will be within line-of-sight of these radar sites, Westslope expects that multiple federal agencies in partnership with NOAA's IOOS may have concerns with wind turbines in the study area within line-of-sight at blade-tip heights of 636 feet AGL and 968 feet AGL based on potential interference to these HF radar sites.



Westslope recommends that the study area be submitted to the DoD Siting Clearinghouse for an informal review and to the National Telecommunications Information Administration (NTIA) for a detailed review.  The NTIA is essentially a clearinghouse for other federal agencies, including the National Oceanic and Atmospheric Administration.  Additionally, Westslope recommends consultation with NOAA's IOOS Program Office.

If you have any questions regarding this analysis, please contact Geoff Blackman at (405) 816-2604 or via email at gnblackman@westslopeconsulting.com.

**REFERENCES**

[1] DoD, Missile Defense Agency, "*Wind Turbine Analysis for Cape Cod Air Force Station Early Warning Radar and Beale Air Force Base Upgraded Early Warning Radar,*" Spring 2007.

31

# EXHIBIT 3

# AGREEMENT BETWEEN
# THE DEPARTMENT OF DEFENSE,
# THE DEPARTMENT OF THE AIR FORCE,
# AND
# SUNRISE WIND LLC,
# ADDRESSING THE SUNRISE WIND OFFSHORE WIND PROJECT
# NEAR RHODE ISLAND SOUND

This is an agreement between the Department of Defense (DoD), acting through the Military Aviation and Installation Assurance Siting Clearinghouse, the Department of the Air Force (DAF), acting through the Deputy Assistant Secretary of the Air Force for Installations (SAF/IEI) (collectively, the "DoD Parties"), and Sunrise Wind LLC (Project Owner). Together, these three (3) entities are referred to as "Parties" and individually as a "Party." Any reference to "DoD Parties" means all Parties (other than Sunrise Wind LLC) and does not indicate that one Party acts for or on behalf of the other.

This agreement is entered into pursuant to Section 183a of Title 10, United States Code (U.S.C.) and part 211 of Title 32, Code of Federal Regulations (CFR).

The Parties acknowledge that the Secretary of the Interior is responsible for administration of energy development, including identification of locations for leasing and development, on the outer continental shelf (OCS) as designated by the Outer Continental Shelf Lands Act (43 U.S.C. Section 1331 et. seq.). The Secretary of the Interior, through the Bureau of Ocean Energy Management (BOEM), has issued Project Owner a lease, OCS-A 0487, for the construction and operation of the Sunrise Wind Project (Project).

Attachments A, *Sunrise Wind Project Structures in Lease Area OCS-A 0487*; B, *Sunrise Wind Project Area Map and Wind Turbine Locations*; and C, *Curtailment Communications Protocol*, are attached to this agreement and made a part hereof.

For good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1 of 17

**AGREEMENT BETWEEN THE DEPARTMENT OF DEFENSE, THE DEPARTMENT OF THE AIR FORCE, AND
SUNRISE WIND LLC, ADDRESSING THE DEVELOPMENT OF THE SUNRISE WIND OFFSHORE WIND PROJECT
NEAR RHODE ISLAND SOUND**

## SECTION 1.  PURPOSE.

**A.  Objective.**  The objective of this agreement is to mitigate any potential adverse impacts on military operations and readiness and to minimize risks to national security while allowing the Sunrise Wind Offshore Wind Project (the Project,) within the BOEM lease area OCS-A 0487 to proceed with development.

**B.  De-confliction.**  As the Project was originally filed, its spinning turbine blades would conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth-Otis Air Force Base (AFB), Massachusetts Airport Surveillance Radar 8 (ASR-8).  The Parties have focused on de-conflicting these activities and agree that the terms below will allow the mutual goals of the Parties to be met, including the protection of the radar, which promotes national security, and protection of the National Airspace System, while supporting military readiness.  Additional mitigation, implemented as part of BOEM's approval of the Construction and Operations Plan, will also be sought by the DoD to de-conflict the Project with national defense interests.  Those measures, which are outside the scope of this agreement. address the following concerns: 1. Coordination between the Project Owner and DoD at-sea operators during construction and operation of the Project; 2. DoD efforts to evaluate and mitigate risk from distributed optical fiber sensing and acoustic monitoring equipment deployed as part of the Project; and 3. Evaluation and mitigation of risk related to foreign investment.

## SECTION 2.  DEFINITIONS.

**A.  Access.**  Either to enter a physical space or to remotely read, copy, edit, divert, release, alter the state of, or otherwise affect information technology systems (e.g., network, data, security, software, hardware).

**B. Actual Curtailment Hours**.  [RESERVED]

**C. ASN.**  Federal Aviation Administration Aeronautical Study Number.

**D.** Banked Hours.  [RESERVED]

**E. BOEM.**  Bureau of Ocean Energy Management, a technical bureau of the Department of the Interior.

**F. CFIUS.**  Committee on Foreign Investment in the United States.

**G. CFR.**  Code of Federal Regulations.

**H.  Curtailment**.  The cessation of wind turbine operations when the wind turbine blades are not spinning and are either fully feathered with brakes applied (0 RPM) or fully feathered (typically less than 1 RPM), with the chosen method depending on both the reason for Curtailment and wind speeds at the time of the Curtailment request.  Specifically, according to information from the manufacturer, the wind turbines can be held at 0 RPM through full feathering of blades and application of brakes in wind speeds up to and including 18 meters per second (m/s) (approximately 40 miles per hour).  In

2 of 17

wind speeds above 18 m/s, the wind turbine blades will be fully feathered without the application of brakes.

**I.  DAF.**  The Department of the Air Force, a military department of the United States.

**J.  Day.**  A calendar day, unless indicated otherwise.

**K.  DoD.**  The Department of Defense, an executive department of the United States.

**L.  FAA.**  Federal Aviation Administration, an agency of the United States Department of Transportation.

**M. Fiscal Year**.  [RESERVED]

**N.  Hour.**  [RESERVED]

**O.  Lease.**  The commercial lease issued by BOEM to the Project Owner for the construction and operation of the Sunrise Wind Project, OCS-A 0487.

**P. National Security or Defense Purpose.**  An emergency circumstance where the President of the United States, the Secretary of Defense, or a combatant commander under 10 U.S.C. Section 164 directs a change to the mission of NORAD in support of emergency circumstances.  An emergency circumstance does not include routine changes to the mission of NORAD.  A NORAD air defense event is an emergency circumstance under this definition.

**Q.  Project.**  The Sunrise Wind Project, which will consist of no more than one (1) offshore converter station and 84 wind turbines identified in Attachment A by turbine ID or by substitute turbine ID submitted in accordance with Sections 3.E.2. and 3.E.3 of this agreement.

**R.  Project Area.**  The location where the Project Owner plans to construct and operate its turbines within BOEM lease area OCS-A 0487, as shown in Attachment B.

**S.  Project Owner.**  Sunrise Wind LLC, and its successors and assigns.

**T.  Radar Adverse-impact Management (RAM).**  The technical process designed to minimize the adverse impact of obstruction interference on a radar system.  Involves a visit to the radar site by technicians to adjust applicable radar parameters.

**U.  Siting Clearinghouse.**  The Military Aviation and Installation Assurance Siting Clearinghouse established pursuant to 10 U.S.C. Section 183a.

**V.  U.S.C.**  United States Code.

SECTION 3.  MITIGATION WITH VOLUNTARY CONTRIBUTION.

**A.  In General.**  This agreement is structured to ensure Project Owner may construct and operate the Project without adversely impacting DoD military operations and readiness.  Project Owner agrees to limit the total number of Project wind turbines to 84 with a maximum height of 787 feet above sea level (ASL).  Project Owner agrees to build no more than one offshore converter station with a maximum height of 305 feet ASL.  Project Owner agrees to restrict the construction of the Project wind turbines and offshore converter station to the specific geographic coordinates listed in Attachment A and Project Area, as shown in Attachment B.  Project Owner shall notify NORAD via email (n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil) and DAF via email (SAF.IEI.Encroachment@us.af.mil) when the Project is within 30-60 days of completion (for RAM scheduling purposes) and again when the Project is complete and operational such that the RAM can be accomplished.  Parties agree wind turbine and offshore converter station locations adjusted within 500 feet of the geographic coordinates provided in Attachment A shall not require additional review by the DoD Parties or an amendment to this agreement, as provided by Section 10.A of this agreement.  Project Owner shall notify NORAD and DAF via email addresses above immediately after any new ASNs or structures associated with the Project are filed with the FAA or BOEM that are not listed in Attachment A.

**B.  Impact Analysis during Test Energy Phase.**  [RESERVED]

**C.  Voluntary Contribution.**  Subject to the terms and conditions of this agreement, Project Owner shall pay to DoD, within 10 days of the operational date of the Project, the amount of $80,000.  It is expected that the time gap between the commissioning (including spinning) of the first and last wind turbine is less than two years.  For projects where the expected time gap between commissioning of the first and last wind turbine is three (3) years or greater, the Project Owner shall contribute funds in the amount of $80,000 to NORAD toward the execution of the RAM when 50 percent of the turbines are commissioned, and an additional $80,000 to NORAD toward execution of additional RAM when the last turbines are commissioned.   This allows NORAD to manage radar adverse impacts over an extended period of construction.  DoD will use these funds to offset the cost of measures undertaken by DoD to mitigate adverse impacts of this Project or other energy projects within the meaning of 10 U.S.C. Section 183a on military operations and readiness or to conduct studies of potential measures to mitigate such impacts.  DoD will accept such payment as a voluntary contribution of funds pursuant to 10 U.S.C. Section 183a.  Such voluntary contributions may be in addition to voluntary contributions made by other Project Owners, and such other contributions may be in amounts different from that made by Project Owner.  DoD will accept the voluntary contribution on behalf of the DoD Parties and will transfer the funds to appropriate accounts.  All voluntary contributions shall be paid electronically through Pay.gov.

   1.  Project Owner shall use one of the following two methods of making payment:

     a.  ACH Debit (preferred).  ACH debit authorizes Pay.gov to request a payment immediately upon processing.  Many institutions use ACH debit blocks as a precaution to prevent accidental withdrawals from unauthorized sources.  In order to ensure the transaction is not blocked, Project Owner will use DoD's specified ID number as an exception for the debits authorized on the Pay.gov site.  The ID for this specific collection is 00008522Z4

b. ACH Credit.  ACH Credit is a promise to arrange a payment from the promisor's bank account to the agency being paid.

2.  To complete a voluntary contribution transaction:

a. Visit the Pay.gov website: https://www.pay.gov/public/form/start/579188704.

b. Fill out the form provided on the site.

c. Once submitted, print a copy of the confirmation for your records.

3.  Data to include on submittal:

a. Collection Number: 2025SunshineWindOrsted

b. Description: $80,000.00

c. For further assistance, visit Pay.gov Web Help section: https://www.pay.gov/WebHelp/HTML/about.html

DoD Office for Voluntary Contribution Settlement:
WHS Financial Management Directorate
4800 Mark Center Drive
Alexandria, VA 22350
Office: 703-545-0048 / 0028
Email: whs.mc-alex.fmd.mbx.system-division@mail.mil

The DoD Parties agree to provide any information reasonably required by Project Owner to process the payment such that external auditors may verify the payment.  Project Owners shall notify the Clearinghouse when the contribution has been transmitted.

**D.  Amendment of Applications**.  [RESERVED]

**E.  Withdrawal of Objections**.

1.  [RESERVED]

2.  All Parties agree that, if Project Owner requests to extend the effective period of FAA's Determination of No Hazard to Air Navigation in accordance with 14 CFR Section 77.35, then the DoD Parties agree to deliver to the FAA "No Objections with Provisions" to such an extension as requested, provided that the affected ASNs are listed on Attachment A (as amended, if applicable, in accordance with Section 10.A), do not exceed the maximum heights specified in Section 3.A, and are located within the siting parameters of the Project Area specified in Attachment B of this agreement or any amendments to this agreement, that the total number of structures for the Project still does not exceed 84 wind turbines and one offshore converter station, and a statement is incorporated into FAA's OE/AAA system referencing this

agreement.

    3.  If the Project Owner submits any substitute structures to BOEM within 36 months of the execution of this agreement, the DoD Parties agree to deliver to BOEM written concurrence provided that the affected structures are listed on Attachment A, do not exceed the maximum height specified in Section 3.A, that the substitute structures are located within the siting parameters of the Project Area specified in Attachment B of this agreement or any amendments to this agreement, and that the total number of structures does not exceed 84 wind turbines and one offshore converter station.

    4.  The DoD Parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project (except as provided in Sections 6.B and 10.H of this agreement), provided that Project Owner is in material compliance with the terms of this agreement and that, as of the effective date of this agreement, Project Owner has disclosed to the DoD Parties in writing all material facts necessary for the DoD Parties to be able to fully assess the Project's potential adverse impacts on military operations and readiness and risks to national security.

    **F.  Other Regulatory Actions.**  This agreement shall not prevent or limit the DoD Parties from communicating in any form with any regulatory body or agency with jurisdiction or possible jurisdiction over matters affecting NORAD and the Falmouth-Otis AFB, Massachusetts ASR-8 beyond the Project.

## SECTION 4.  CURTAILMENT.

    **A.  Curtailment for Test Purposes.**  [RESERVED]

    **B.  Curtailment for Training Purposes**.  [RESERVED]

    **C.  Curtailment for a National Security or Defense Purpose.**  Upon request by NORAD, Project Owner agrees to immediately curtail wind turbine operations for a National Security or Defense Purpose utilizing the communication protocol set out in Attachment C.  Such Curtailment may not be requested except for a National Security or Defense Purpose.  Curtailment for a National Security or Defense Purpose will be temporary in nature and extend only so long as is absolutely necessary to meet the discrete, temporary, and stated National Security or Defense Purpose.  This agreement in no way precludes Project Owner from seeking any available legal remedies for any Curtailment associated with a national security emergency other than challenging the Curtailment itself.  Any request for Curtailment under this subsection will be communicated by either DoD Party or applicable NORAD Air Defense Sector (ADS) to Project Owner and will include the releasable portions of the President's, the Secretary's, or the combatant commander's mission order.

    **D.  Curtailment for Establishing Baselines**.  [RESERVED]

    **E.  Wear and Tear.**  It is a fundamental premise of this agreement that the limited Curtailment expected to be required from this agreement will not cause excess wear and tear on the Project.

Project Owner agrees that it is responsible for any damage or wear and tear to the turbines as a result of Curtailment (as defined in Section 2.H) pursuant to this agreement.

**F.  Disclosure of Curtailment Request.**  Project Owner acknowledges that there may be national security considerations associated with any request by NORAD for Curtailment in accordance with the terms of this agreement and any Curtailment resulting therefrom.  Project Owner therefore agrees not to disclose any such request or any Curtailment resulting therefrom, except for disclosure as specified in Section 10.O, without the prior consent of the DAF, and the DAF agrees that consent to disclose to a business entity with which a non-disclosure agreement is in place will not be unreasonably withheld.


## SECTION 5.  PROTECTION OF DEFENSE CAPABILITIES

It is a priority for the DAF to protect national defense capabilities and military operations, including military installations, research, development, test and evaluation activities, and military readiness activities from compromise and exploitation that may occur due to an activity under foreign control operating in the vicinity of those national defense capabilities and military operations.  Nothing in this agreement shall relieve Project Owner or its successors or assigns from complying with 31 CFR Part 800 and 802 (Mergers, Acquisitions, and Takeovers by Foreign Persons) nor prevent or limit the parties from communicating in any form with the Committee on Foreign Investment (CFIUS).


## SECTION 6.  ASSIGNMENT.

**A.  Right to Assign.**  This agreement shall be binding upon the Project Owner and its successors and assigns.  If Project Owner and its successors or assigns (assignors) elect to sell, convey, mortgage, assign, or otherwise transfer all or any part of its interests and obligations in the assets comprising the Project (assignment) to any third party (assignee), assignor shall cause such assignee to expressly acknowledge the existence of this agreement.  The assignor shall provide a copy of this agreement to the assignee.  The assignee shall provide new point of contact (POC) information (as in Section (8)) to the DoD Parties.

**B.  Notice of Assignment to CFIUS.**  If the prospective assignee is a foreign national or foreign-owned or -controlled business entity, assignor and the proposed assignee shall jointly provide notice of the proposed transaction to CFIUS to the extent required by applicable regulations (31 CFR Parts 800 and 802) and provide a copy of the notice to the DoD Parties.  Nothing in this agreement shall prohibit or limit DoD from objecting to the transaction before CFIUS, nor limit communications with CFIUS during national security reviews and investigations, and should mitigation result, during mitigation, tracking, and post-consummation monitoring and enforcement, pursuant to applicable statutes and regulations.

**C.  Effect of Assignment.**  Upon an assignment, assignor shall be relieved of any obligations or liabilities under this agreement to the extent that the assignee has assumed in writing such obligations or liabilities and provided that Project Owner has provided a copy of the assignment, including the assumption of obligations and liabilities, to the DoD Parties.

7 of 17

## SECTION 7.  EFFECTIVE DATE AND EXPIRATION.

**A.  Effective Date.**  This agreement becomes effective on the date when all Parties have signed.

**B.  Expiration.**  This agreement shall expire and have no further force and effect upon the occurrence of the earlier of the following:

   1.  Termination of the BOEM lease agreement.

   2.  The Project is decommissioned.

   3.  Falmouth-Otis Air Force Base AFB, Massachusetts ASR-8 permanently ceases operations.  However, if the current radar is replaced with a radar system that has similar needs for mitigation, then this agreement shall not expire.

   4.  Termination of the agreement by written mutual agreement of the Parties.

**C.  Actions Prior to Expiration.**  Any activities engaged in by the Parties (including the expenditure of part or all of any voluntary contribution) that occurred prior to expiration of this agreement shall remain valid and continue in effect, notwithstanding the expiration of the agreement.

## SECTION 8.  POINTS OF CONTACT AND NOTIFICATION.

**A.  Points of Contact (POCs).**  The following persons shall be the primary POCs for the Parties for the purposes of this agreement.  Any notice, request, or other communication to be provided pursuant to this agreement shall be delivered to the POCs.  Any Party may change its POC by providing written notification of the change to the other Parties at least 30 days in advance of the change taking effect.

   **1.  DoD.**

      a.  Executive Director, Military Aviation and Installation Assurance Siting Clearinghouse, 3400 Defense Pentagon, Room 5C646, Washington, DC 20301-3400, osd.dod-siting-clearinghouse@mail.mil

      b.  Headquarters NORAD Radar Analysis Branch, 250 Vandenberg Street, Ste B016, Peterson AFB, CO, 80914, n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil

   **2.  DAF.**  Director, Air Force Mission Sustainment, Office of the Assistant Secretary of the Air Force for Installations, Environment, and Energy, 1665 Air Force Pentagon, Room 4B941, Washington, DC 20330-1665, SAF.IEI.Encroachment@us.af.mil

   **3.  Project Owner.**  Sunrise Wind LLC, 437 Madison Avenue, Suite 1903, New York, NY 10022. Attention: Asset Manager; with a copy to Orsted North America Inc., 399 Boylston

8 of 17

Street, 12th Floor, Boston, MA 02116, Attention: Legal

**B. Notification.**  Any written notice required by or provided for in this agreement shall be sent by registered or certified mail, postage prepaid, sent by a nationally recognized overnight delivery service that provides a receipt for delivery, or hand delivered.  A notice shall be deemed to be received when delivered to the recipient's address.

## SECTION 9.  BREACH AND DISPUTE RESOLUTION.

If a Party believes that another Party has breached this agreement, it shall provide written notice of the breach within 60 days of discovery of the breach to all other Parties and provide the breaching Party a reasonable opportunity (but in all cases at least 60 days from delivery of such notice) to cure the breach.  Failure to provide notice within such 60-day period only waives the rights with respect to the periods from after the expiration of such 60-day period and until the date when the notice was given.  If there is a dispute between the involved Parties as to whether a breach occurred, the involved Parties agree to attempt to resolve the dispute beginning with Project Owner and representatives of the DoD Parties.  Disputes may be elevated, on the part of the DoD Parties, to the DAF headquarters and then to the Executive Director of the Siting Clearinghouse.  If the breach is not cured or resolved after this initial dispute resolution process, any Party may seek to enforce this agreement.  Each Party specifically reserves any and all rights or causes of action it may have either at law or in equity to require compliance with any provision of this agreement.  Each Party reserves the right to enforce or refrain from enforcing against another Party the terms of this agreement as it sees fit and failure to enforce does not act to excuse future breaches.

## SECTION 10.  GENERAL PROVISIONS.

**A. Amendments.**  Any Party to this agreement may request that it be amended, whereupon the Parties agree to consult to consider such amendments.  Any amendment to this agreement shall become effective when signed by all of the Parties unless its terms provide for a different effective date.  Wind turbine and offshore converter station locations adjusted within 500 feet of the geographic coordinates provided in Attachment A shall not require additional review by the DoD Parties or an amendment to this agreement.  However, wind turbine locations adjusted greater than 500 feet of the geographic coordinates provided in Attachment A shall require DoD Parties review, and if approved, will be included in an amendment to this agreement.  Amendments only providing substitute structures within the Project boundary, with no change to height or total number of Project structures, need only be signed by the DoD Parties' and Project Owner's designated Project officers if filed with BOEM within 36 months of the effective date of this agreement.  Project Owner shall notify NORAD via email (n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil) and DAF via email (SAF.IEI.Encroachment@us.af.mil) immediately after any new ASNs or structures associated with the Project are filed with the FAA or BOEM that are not listed in Attachment A.  For the avoidance of doubt, no notice shall be required for wind turbine and offshore converter station locations adjusted within 500 feet of the geographic coordinates provided in Attachment A.

**B. Integration.** This agreement contains the entire agreement and understanding between the Parties with respect to all of the subject matter contained herein, thereby merging and superseding all prior agreements and representations by the Parties with respect to such subject matter.

**C. Governing Law.** This agreement shall be governed by and construed in accordance with the laws of the United States and the State of New York, as may be applicable.

**D. Interpretation.** In the event an ambiguity or question of intent or interpretation arises, this agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any of the provisions of this agreement. Any reference to any Federal, state, interstate, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, as they may have been amended from time to time, unless the context requires otherwise.

**E. Headings and Titles.** The headings or section titles contained in this agreement are inserted solely for convenience and do not constitute a part of this agreement between the Parties, nor should they be used to aid in any manner in the construction of this agreement.

**F. Severability.** If any term, provision, or condition of this agreement is held to be invalid, void, or unenforceable by a governmental authority and such holding is not or cannot be appealed further, then such invalid, void, or unenforceable term, provision, or condition shall be deemed severed from this agreement and all remaining terms, provisions, and conditions of this agreement shall continue in full force and effect. The Parties shall endeavor in good faith to replace such invalid, void, or unenforceable term, provision, or condition with valid and enforceable terms, provisions, or conditions that achieve the purpose intended by the Parties to the greatest extent permitted by law.

**G. Waivers; Remedies Cumulative.** There is no implied waiver of rights under this agreement. No failure or delay on the part of a Party in exercising any of its rights under this agreement or in insisting upon strict performance of provisions of this agreement, no partial exercise by either Party of any of its rights under this agreement, and no course of dealing between the Parties shall constitute a waiver of the rights of any Party under this agreement, other than the requirement to raise a matter of breach within 30 days of discovery. Any waiver shall be effective only by a written instrument signed by the Party granting such waiver, and such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent failure to comply with this agreement. The remedies provided in this agreement are cumulative and not exclusive of any remedies provided by law.

**H. Anti-Deficiency.** For the DoD Parties, this agreement is subject to the availability of appropriated funds and sufficient resources. No provision in this agreement shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. Section 1341.

**I. Disclosure.** The Parties may freely disclose this agreement with any person or entity. DoD will post the agreement on the Siting Clearinghouse website. Project Owner may mark any part of any document it believes to be proprietary or competition sensitive that it wants DoD or the DAF to

exempt from disclosure.  The DoD Parties will only disclose any such marked information in accordance with the provisions of 5 U.S.C. Section 552 (the Freedom of Information Act).

**J.   No Third-Party Beneficiaries.**  Nothing in this agreement, express or implied, is intended to give to, or shall be construed to confer upon, any person not a Party any remedy or claim under or by reason of this agreement.  This agreement shall be for the sole and exclusive benefit of the Parties and their respective successors and assigns.

**K.  Full and Complete Satisfaction.**  The completion of the obligations of each of the Parties under this agreement constitute the full and complete satisfaction of those obligations.

**L.   Other Federal Agencies.**  This agreement does not bind any Federal agency, other than the DoD Parties, nor waive required compliance with any law or regulation.

**M. Completion of Construction.**  Within 60 days of the completion of construction of the Project, Project Owner shall deliver to DoD final coordinates for each turbine erected.

**N.  Grid Operator Protocols.**  Project Owner shall disclose this Curtailment requirement to the grid operator and shall comply with the mitigation agreement's curtailment provisions, including requesting waivers from the grid operator if grid protocols would interfere with this mitigation agreement.  If Curtailment for a National Security or Defense Purpose is requested by NORAD, the Project Owner shall notify the following of the request: the New York Independent System Operator, Inc. (NYISO); the Long Island Power Authority (LIPA); and New York State Energy Research and Development Authority (NYSERDA).

*[**Continued on the following page**]*

**O.  Signature/Counterparts.**  The Parties represent and warrant that the signatories below have authority to sign on behalf of and bind each respective Party, and that no other signature is required to bind that Party.  This agreement may be executed in several counterparts, each of which shall be deemed an original, all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have executed and delivered this agreement.

**FOR THE DEPARTMENT OF DEFENSE**

THOMPSON.RO BERT.E.104404 6578
Digitally signed by THOMPSON.ROBERT.E.10 44046578
Date: 2025.01.17 09:24:52 -05'00'

1/17/25

_____          _____
Robert E. Thompson                                            Date
Acting Assistant Secretary of Defense for
Energy, Installations, and Environment

**FOR SUNRISE WIND LLC**

RYACH
Digitally signed by: RYACH
DN: CN = RYACH email = RYACH@orsted.com OU = DE-PROD.DK, BRUGERE, Commercial
Date: 2025.01.16 14:13:27 -05'00'

1/16/25

_____          _____
Authorized Person                                            Date

Digitally signed by ROSOD
Date: 2025.01.16 14:45:07 -05'00'

1/16/25

_____          _____
Authorized Person                                            Date

**ATTACHMENT A**
Sunrise Wind Structures in Lease Area OCS-A 0487

Coordinate Reference System NAD83 (2011)

| ASN | Turbine ID | US Coast Guard Turbine ID | Str. Type | Maximum Height (ASL) | Latitude | Longitude |
|---|---|---|---|---|---|---|
| | C03 | AR16 | Wind Turbine | 787' | 41.0465 | -70.9467 |
| | C04 | AS01 | Wind Turbine | 787' | 41.0237 | -71.2762 |
| | C05 | AS02 | Wind Turbine | 787' | 41.0240 | -71.2545 |
| | C06 | AS03 | Wind Turbine | 787' | 41.0246 | -71.2320 |
| | C07 | AS04 | Wind Turbine | 787' | 41.0248 | -71.2101 |
| | C08 | AS05 | Wind Turbine | 787' | 41.0245 | -71.1885 |
| | C09 | AS06 | Wind Turbine | 787' | 41.0249 | -71.1663 |
| | C10 | AS07 | Wind Turbine | 787' | 41.0262 | -71.1443 |
| | C11 | AS08 | Wind Turbine | 787' | 41.0267 | -71.1224 |
| | C12 | AS09 | Wind Turbine | 787' | 41.0260 | -71.1002 |
| | C13 | AS10 | Wind Turbine | 787' | 41.0275 | -71.0782 |
| | C14 | AS11 | Wind Turbine | 787' | 41.0278 | -71.0552 |
| | C15 | AS12 | Wind Turbine | 787' | 41.0283 | -71.0342 |
| | C16 | AS13 | Wind Turbine | 787' | 41.0287 | -71.0122 |
| | C17 | AS14 | Wind Turbine | 787' | 41.0290 | -70.9902 |
| | C18 | AS15 | Wind Turbine | 787' | 41.0294 | -70.9682 |
| | C19 | AS16 | Wind Turbine | 787' | 41.0302 | -70.9463 |
| | C20 | AS17 | Wind Turbine | 787' | 41.0302 | -70.9241 |
| | C21 | AS18 | Wind Turbine | 787' | 41.0300 | -70.9026 |
| | C22 | AS19 | Wind Turbine | 787' | 41.0309 | -70.8803 |
| | C23 | AS20 | Wind Turbine | 787' | 41.0313 | -70.8573 |
| | C25 | AT01 | Wind Turbine | 787' | 41.0071 | -71.2757 |
| | C26 | AT02 | Wind Turbine | 787' | 41.0075 | -71.2539 |
| | C27 | AT04 | Wind Turbine | 787' | 41.0084 | -71.2098 |
| | C28 | AT05 | Wind Turbine | 787' | 41.0088 | -71.1878 |
| | C29 | AT06 | Wind Turbine | 787' | 41.0092 | -71.1658 |
| | C30 | AT07 | Wind Turbine | 787' | 41.0096 | -71.1438 |
| | C31 | AT08 | Wind Turbine | 787' | 41.0100 | -71.1218 |
| | C32 | AT09 | Wind Turbine | 787' | 41.0108 | -71.1001 |
| | C33 | AT10 | Wind Turbine | 787' | 41.0108 | -71.0777 |
| | C34 | AT11 | Wind Turbine | 787' | 41.0102 | -71.0557 |
| | C35 | AT12 | Wind Turbine | 787' | 41.0116 | -71.0337 |
| | C36 | AT13 | Wind Turbine | 787' | 41.0120 | -71.0117 |
| | C37 | AT14 | Wind Turbine | 787' | 41.0122 | -70.9896 |
| | C38 | AT15 | Wind Turbine | 787' | 41.0127 | -70.9677 |

13 of 17

| ASN | Turbine ID | US Coast Guard Turbine ID | Str. Type | Maximum Height (ASL) | Latitude | Longitude |
|---|---|---|---|---|---|---|
| | C39 | AT16 | Wind Turbine | 787' | 41.0131 | -70.9457 |
| | C40 | AT17 | Wind Turbine | 787' | 41.0136 | -70.9238 |
| | C41 | AT18 | Wind Turbine | 787' | 41.0138 | -70.9016 |
| | C42 | AT19 | Wind Turbine | 787' | 41.0142 | -70.8796 |
| | C43 | AT20 | Wind Turbine | 787' | 41.0146 | -70.8587 |
| | C45 | AU01 | Wind Turbine | 787' | 40.9903 | -71.2752 |
| | C46 | AU02 | Wind Turbine | 787' | 40.9908 | -71.2531 |
| | C47 | AU04 | Wind Turbine | 787' | 40.9917 | -71.2092 |
| | C48 | AU05 | Wind Turbine | 787' | 40.9921 | -71.1872 |
| | C49 | AU06 | Wind Turbine | 787' | 40.9925 | -71.1652 |
| | C50 | AU07 | Wind Turbine | 787' | 40.9929 | -71.1432 |
| | C51 | AU09 | Wind Turbine | 787' | 40.9937 | -71.0992 |
| | C52 | AU10 | Wind Turbine | 787' | 40.9941 | -71.0771 |
| | C53 | AU11 | Wind Turbine | 787' | 40.9948 | -71.0543 |
| | C54 | AU12 | Wind Turbine | 787' | 40.9951 | -71.0331 |
| | C55 | AU13 | Wind Turbine | 787' | 40.9953 | -71.0112 |
| | C56 | AU14 | Wind Turbine | 787' | 40.9957 | -70.9892 |
| | C57 | AU15 | Wind Turbine | 787' | 40.9956 | -70.9667 |
| | C58 | AU16 | Wind Turbine | 787' | 40.9964 | -70.9452 |
| | C59 | AU17 | Wind Turbine | 787' | 40.9968 | -70.9232 |
| | C60 | AU18 | Wind Turbine | 787' | 40.9972 | -70.9012 |
| | C61 | AU19 | Wind Turbine | 787' | 40.9980 | -70.8792 |
| | C63 | AU21 | Wind Turbine | 787' | 40.9982 | -70.8360 |
| | C64 | AV01 | Wind Turbine | 787' | 40.9738 | -71.2747 |
| | C65 | AV02 | Wind Turbine | 787' | 40.9742 | -71.2527 |
| | C66 | AV03 | Wind Turbine | 787' | 40.9746 | -71.2307 |
| | C67 | AV04 | Wind Turbine | 787' | 40.9750 | -71.2087 |
| | C68 | AV05 | Wind Turbine | 787' | 40.9754 | -71.1867 |
| | C69 | AV06 | Wind Turbine | 787' | 40.9758 | -71.1647 |
| | C70 | AV07 | Wind Turbine | 787' | 40.9763 | -71.1427 |
| | C71 | AV08 | Wind Turbine | 787' | 40.9767 | -71.1207 |
| | C72 | AV09 | Wind Turbine | 787' | 40.9771 | -71.0987 |
| | C73 | AV10 | Wind Turbine | 787' | 40.9775 | -71.0767 |
| | C74 | AV11 | Wind Turbine | 787' | 40.9779 | -71.0548 |
| | C75 | AV12 | Wind Turbine | 787' | 40.9781 | -71.0327 |
| | C76 | AV13 | Wind Turbine | 787' | 40.9786 | -71.0107 |
| | C80 | AV17 | Wind Turbine | 787' | 40.9801 | -70.9227 |
| | C83 | AW01 | Wind Turbine | 787' | 40.9571 | -71.2741 |
| | C84 | AW02 | Wind Turbine | 787' | 40.9575 | -71.2521 |
| | C85 | AW03 | Wind Turbine | 787' | 40.9579 | -71.2301 |

| ASN | Turbine ID | US Coast Guard Turbine ID | Str. Type | Maximum Height (ASL) | Latitude | Longitude |
|---|---|---|---|---|---|---|
| | C86 | AW05 | Wind Turbine | 787' | 40.9588 | -71.1861 |
| | C87 | AW06 | Wind Turbine | 787' | 40.9588 | -71.1641 |
| | C88 | AW07 | Wind Turbine | 787' | 40.9596 | -71.1421 |
| | C89 | AW08 | Wind Turbine | 787' | 40.9594 | -71.1201 |
| | C90 | AW09 | Wind Turbine | 787' | 40.9604 | -71.0982 |
| | C91 | AW10 | Wind Turbine | 787' | 40.9608 | -71.0762 |
| | C92 | AW11 | Wind Turbine | 787' | 40.9612 | -71.0542 |
| | C93 | AW12 | Wind Turbine | 787' | 40.9608 | -71.0322 |
| | D25 | AU03 | Wind Turbine | 787' | 40.9912 | -71.2326 |
| | Z01 | AU08 | Offshore Converter Station | 305' | 40.9934 | -71.1214 |

15 of 17

**ATTACHMENT B**
Sunrise Wind Offshore Project Area Map
and Wind Turbine Locations



16 of 17

**ATTACHMENT C**
Curtailment Communications Protocol

**Section 1.  Notices**.  The following persons shall be the primary points of contact ("POCs") for the Parties for purposes of administering this agreement.  Any Party may change its POC by providing written notification of the change to the other Parties at least 30 days in advance of the change taking effect.

**A. DoD.**

1.  Executive Director, Military Aviation and Installation Assurance Siting Clearinghouse, 3400 Defense Pentagon, Room 5C646, Washington, DC 20301-3400, osd.dod-siting-clearinghouse@mail.mil

2.  NORAD Radar Analysis Branch, 250 Vandenberg Street, Ste B016, Peterson AFB, CO, 80914, n-nc.peterson.nj3.mbx.norad-j36r-omb@mail.mil

**B. DAF.**  Director, Air Force Mission Sustainment, Office of the Assistant Secretary of the Air Force for Installations, Environment, and Energy, 1665 Air Force Pentagon, Room 4B941, Washington, DC  20330-1665, SAF.IEI.Encroachment@us.af.mil

**C. Project Owner.**  Sunrise Wind LLC, c/o Asset Manager, Sunrise Wind LLC., 437 Madison Avenue, Suite 1903, New York, NY 10022. Attention: us_legal_notices@orsted.com

**Section 2.  Criteria for Curtailment**.  The Parties agree that the following protocol will be used for communication between Project Owner and NORAD in the event curtailment of wind turbine operations will occur under circumstances delineated in Section 4 of the main agreement.

**Section 3.  Communications Protocol for a National Security or Defense Purpose.**
Under circumstances described in Section 4.C of the main agreement, the applicable NORAD Air Defense Sector (ADS) will call the Project operations center at 401-223-2380 and request immediate curtailment.  Advance notification is unlikely due to the unpredictable and dynamic nature of NORAD air defense events.  If the wind speeds are up to and including 18 meters per second (m/s) (approximately 40 miles per hour) at the time of curtailment request, the wind turbine blades will be fully feathered with brakes applied (0 RPM).  If the wind speeds are above 18 m/s at the time of curtailment request, the wind turbine blades will be fully feathered without the application of brakes. At any time during curtailment, if the wind speeds drop to 18 m/s or below, brakes will be applied to create a 0 RPM condition. If wind speeds subsequently exceed 18 m/s, brakes may be released on the fully feathered blades.  The goal during NORAD curtailment is to create a 0 RPM condition to the maximum extent practical for the maximum amount of time.  The applicable NORAD ADS will call the Project operations center as soon as possible after the air defense event is terminated and curtailment is no longer required.  If the Project operations center has not been notified by NORAD after 1 hour of fully feathered with brakes applied (0 RPM) Curtailment, the operations center is authorized to transition to fully feathered (less than 1 RPM) Curtailment until contacted by NORAD to confirm Curtailment is no longer required.

17 of 17