# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Sunrise Wind LLC,** | |
| *Plaintiff,* | |
| v. | No. 1:26-cv-00028-RCL |
| **Douglas J. Burgum, et al.,** | |
| *Defendants.* | |

## BRIEF OF AMICUS CURIAE
## NORTH AMERICA'S BUILDING TRADES UNIONS
## IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

Jonathan D. Newman (D.C. Bar No. 449141)
Jacob J. Demree (D.C. Bar No. 90012042)
Blake Phillips (D.C. Bar No. 90027926)*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9200
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

* Pro hac vice admission pending

January 14, 2026

# TABLE OF CONTENTS

Table of Authorities ..................................................................................iii

Statement of Interest.................................................................................. 1

Argument ................................................................................................... 3

    A Preliminary Injunction Will Promote the Public Interest by Saving
    Countless Work Hours, Wages, and Benefits for Well-Trained, Hard-
    Working Union Construction Workers................................................. 3

        A.    Offshore Wind Promotes Efficient Green Infrastructure
               Construction and Guarantees Solid, Middle-Class Union
               Construction Careers...................................................... 3

        B.    NABTU's Members Are Building Cutting-Edge Offshore
               Energy Facilities............................................................ 9

        C.    A Preliminary Injunction Will Protect NABTU's Members'
               Livelihoods. ................................................................. 13

Conclusion ............................................................................................... 15

Certificate of Compliance .............................................................................

Certificate of Service..................................................................................

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) .........................................5

*Gov't of Manitoba v. Zinke,*
    849 F.3d 1111 (D.C. Cir. 2017) ........................................................................13

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall,*
    628 F.2d 604 (D.C. Cir. 1980) ..........................................................................13

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.,*
    50 F.4th 164 (D.C. Cir. 2022) ............................................................................4

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.,*
    518 F. Supp. 3d 448 (D.D.C. 2021) ....................................................................4

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...............................................................................................13

**Statutes**

29 U.S.C. § 158(e) ................................................................................................4

29 U.S.C. § 158(f) ................................................................................................4

**Other Authorities**

Bureau of Ocean Energy Mgmt., Director's Order (Dec. 22, 2025),
    https://www.boem.gov/sites/default/files/documents/renewable-
    energy/state-activities/BOEM%20Sunrise%20Wind%20Suspension
    %20Letter.pdf ...........................................................................1-2, 8-9, 12-15

Jan De Nul Grp., *Connector* (Dec. 2020),
    https://www.jandenul.com/sites/default/files/2020-12/Connector%20%2
    8EN%29.pdf ....................................................................................................11-12

Minute Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-4 (D.D.C. Jan.
    12, 2026) ...............................................................................................................4

NABTU, *North America's Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor* (May 5, 2022), https://nabtu.org/press_releases/nowa-agreement-orsted/ ................................................................................................ 3-4

Order, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25-cv-830 (E.D. Va. Jan. 13, 2026) ................................................................................ 4

Order Granting NABTU's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 15, 2025) (Lamberth, J.) ................................................... 4

Ørsted, *North America's Building Trades Unions (NABTU) and Ørsted Sign Landmark MOU for U.S. Offshore Wind Workforce Transition* (Nov. 18, 2020), https://us.orsted.com/news-archive/2020/11/nabtu-and-orsted-sign-landmark-mou-for-us-offshore-wind-workforce-transition ...................... 3

Sunrise Wind, *Construction & Operations Plan: Sunrise Wind Farm Project* (Dec. 20, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SRW01_COP_2023.pdf......................... 10-11

## STATEMENT OF INTEREST

The December 22, 2025, Order issued by the Department of the Interior's Bureau of Ocean Energy Management "to suspend all ongoing activities related to the Sunrise Wind Project on the Outer Continental Shelf" has thrown union construction workers out of work.  Bureau of Ocean Energy Mgmt., Director's Order (Dec. 22, 2025) [hereinafter "Stop Work Order"].[1]  If the project is canceled, even more union construction workers will be out of work as a result of the Stop Work Order.

The workers performing work offshore are represented by affiliates of North America's Building Trades Unions ("NABTU") and are working under terms and conditions of employment established through a NABTU collective bargaining agreement.  They have undergone extensive training and have been performing the offshore work for over eighteen months.  But now as a result of the unlawful Stop Work Order, they are idled.

If the project is canceled, not only will the livelihoods of the union construction workers performing the offshore work be adversely impacted, but many more union construction workers performing work onshore will be terminated.  The workers performing work onshore are doing so under a separate collective bargaining agreement to which a NABTU-affiliated building and construction trades council is party.  Those workers are performing the assembly and onshore construction necessary for the project, as well as the work necessary to upgrade the staging and

---

[1]    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Sunrise%20Wind%20Suspension%20Letter.pdf

operations port to support the project.

As a result of the unlawful Stop Work Order, the workers who had been employed offshore are idled, and those working onshore are threatened with the cancellation of the project. A preliminary injunction is necessary, and for the reasons stated herein, is wholly consistent with the public interest.

NABTU is a labor organization composed of fourteen national and international unions and 327 provincial, state, and local building and construction trades councils representing more than three million workers. Members of NABTU's affiliated unions have worked over one million hours on Plaintiff Sunrise Wind LLC's ("Sunrise Wind") project. When completed, the project is expected to generate approximately 924 megawatts of renewable energy — enough to power nearly 600,000 homes. The construction of the project has provided and, but for the Stop Work Order, would continue to provide solid, middle-class wages and benefits to many skilled union construction craftworkers. NABTU has a strong interest in this case because the Stop Work Order has imperiled the job security of its affiliates' members, who would continue to work on the Sunrise Wind project if not for the Stop Work Order.

Plaintiff consents to the filing of this brief, and the Defendants do not oppose NABTU's motion for leave to file the brief. NABTU and its counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than NABTU, its members, or its counsel has contributed money to

fund the preparation or submission of the brief.

## ARGUMENT

**A Preliminary Injunction Will Promote the Public Interest by Saving Countless Work Hours, Wages, and Benefits for Well-Trained, Hard-Working Union Construction Workers.**

### A.    *Offshore Wind Promotes Efficient Green Infrastructure Construction and Guarantees Solid, Middle-Class Union Construction Careers.*

In November 2020, NABTU and Ørsted announced a memorandum of understanding ("MOU") in anticipation of future offshore wind projects across the Eastern United States.[2]  Plaintiff Sunrise Wind is a subsidiary of Ørsted.  Decl. of Ryan Chaytors in Supp. of Pl.'s Mot. for Prelim. Inj. & Stay Pending Review ¶ 1, Dkt. No. 11-1 [hereinafter Chaytors Decl.].  Under the MOU, Ørsted agreed to negotiate a labor agreement with NABTU covering offshore construction work carried out by Ørsted and its subcontractors.  Ørsted also agreed to negotiate agreements with NABTU-affiliated local building and construction trades councils and appropriate NABTU-affiliated craft unions to cover related onshore construction work.

On April 22, 2022, NABTU and Ørsted signed a landmark agreement, known as the National Offshore Wind Agreement ("NOWA"), to govern labor relations for the offshore portion of the construction of several Ørsted projects that were slated to be built in the United States.  Chaytors Decl. ¶ 56; *see* NABTU, *North America's*

---

[2]    Ørsted, *North America's Building Trades Unions (NABTU) and Ørsted Sign Landmark MOU for U.S. Offshore Wind Workforce Transition* (Nov. 18, 2020), https://us.orsted.com/news-archive/2020/11/nabtu-and-orsted-sign-landmark-mou-for-us-offshore-wind-workforce-transition.

*Building Trades Unions and Ørsted Agree to Build an American Offshore Wind Energy Industry with American Labor* (May 5, 2022).[3]  The NOWA is a multi-union and multi-employer prehire collective bargaining agreement, often referred to as a project labor agreement ("PLA").  It sets terms and conditions of work performed in the ocean (offshore) for Ørsted's offshore wind projects on the East Coast, including the Sunrise Wind project.

Congress authorized the use of PLAs like the NOWA under Sections 8(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 158(e), (f).  A typical construction project involves work performed by multiple contractors, with multiple unions representing the employees working for those contractors.  A PLA brings labor-relations uniformity to a construction project by setting out terms and conditions of employment and work rules applicable across the project, irrespective of the contractor or union involved.  PLAs like the NOWA typically create forums for

---

[3]     https://nabtu.org/press_releases/nowa-agreement-orsted/.  This Court has "broad discretion to allow amicus briefs when they provide 'unique information or perspective.'"  *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 193 (D.C. Cir. 2022) (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 518 F. Supp. 3d 448, 453 n.2 (D.D.C. 2021)).  To the extent this brief refers to facts outside the record, those facts are merely intended to provide perspective on labor relations governing the Sunrise Wind project.  *See, e.g.*, Order Granting NABTU's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 15, 2025) (Lamberth, J.) (allowing NABTU to participate as amicus curiae in similar preliminary injunction-stage case challenging order to stop offshore wind construction); Minute Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-4 (D.D.C. Jan. 12, 2026) (same); Order, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25-cv-830 (E.D. Va. Jan. 13, 2026) (same).

communication and coordination, include no-strike, no-lockout provisions, and contain speedy dispute-resolution mechanisms. They also set standard pay and benefit rates and provide for hiring through union job referral systems. *See, e.g., Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 221-22, 230-32 (1993).

By signing the NOWA, NABTU and Ørsted sought to promote efficient completion of a high-quality offshore wind project. The NOWA streamlines hiring procedures to ensure a reliable supply of skilled U.S. labor on offshore wind projects. Under the NOWA, NABTU's affiliated national and international unions each designated local unions with expertise in the relevant trades. When contractors need employees, they contact the designated local union for a referral, and the union provides applicants for employment. The unions commit to recruiting enough employees to meet project demands.

Offshore wind construction workers need unique, specialized training, such as Helicopter Underwater Escape Training and Global Wind Organization Sea Survival Training. That training requires significant investments of resources and time. The NOWA governs the type of training that is required and how that training will be provided and funded.

The NOWA sets standard workweek and workday lengths for all covered employees, allowing contractors to plan work on the project well in advance. The agreement also sets out covered employees' wages and benefits, allowing contractors to predict their labor costs in advance. Employees covered by the NOWA earn family-

sustaining compensation, ranging from $55.00 to $133.41 per hour in total wages and benefits.

The NOWA also ensures that once work is underway, projects are completed smoothly and on time. It establishes a five-step grievance process that includes input from union and employer representatives. The grievance process includes fast turnarounds between steps, making sure that any dispute is settled quickly and without disrupting construction. The agreement also prohibits all work stoppages, including strikes and lockouts, meaning work continues while disputes are resolved. If such a work stoppage ever occurs, the NOWA provides for an expedited arbitration procedure to resume work within twenty-four hours. The agreement also provides for speedy resolution of craft jurisdictional disputes between unions.

The NOWA contains a "Standard of Excellence" provision to "reinforce the pride of every construction worker and the commitment to be the most skilled, most productive, and safest workforce available to construction employers and users in the United States." Under that provision, both labor and management make commitments to each other. The members represented by NABTU's affiliates agree to:

1.    Provide a full day's work for a full day's pay;

2.    Safely work toward the timely completion of the job;

3.    Arrive to the work location on time and work until the established quitting time;

4.    Adhere to established meal periods;

5.    Promote a drug- and alcohol-free work site;

6.    Work in accordance with all applicable safety rules and procedures;

7.    Allow union representatives to handle jobsite disputes and grievances without resort to slowdowns or unlawful job disruptions;

8.    Respect management directives that are safe, reasonable, and legitimate;

9.    Respect the rights of coworkers; and

10.    Respect the property rights of the owner, management, and contractors.

Management, in turn, agrees that the unions should expect the following from contractors working on the project:

1.    Management adherence to the NOWA;

2.    Communication and cooperation with trade foremen and stewards;

3.    Efficient, safe, and sanitary management of the jobsite;

4.    Efficient job scheduling to mitigate and minimize unproductive time;

5.    Efficient and adequate staffing by properly trained employees by trade;

6.    Availability of equipment and tools to ensure efficient job

progress;

7.    The provision of proper blueprints, specification, direction, and materials in a timely manner;

8.    The promotion of jobsite dispute resolution and leadership skills to mitigate such disputes; and

9.    The treatment of all employees in a respectful and dignified manner, acknowledging their contributions to a successful project.

Sunrise Wind contractors have further agreed to provide comprehensive safety, equipment, and other training to building trades workers, fueling the growth of a U.S. base of qualified offshore wind workers.  The NOWA prioritizes worker safety and reduces the risk of lost time due to injuries by requiring contractors to follow strict safety standards.  All applicants for employment offshore must be certified as fit for duty and must have passed a recent medical examination.

In addition to the offshore work in the ocean that union construction workers were performing prior to the Stop Work Order, workers represented by NABTU's affiliates were working onshore at New London State Pier in Connecticut where components are received, constructed and assembled to prepare for installation, and loaded onto barge and tug vessels to be transported for installation.  Chaytors Decl. ¶ 44.  In accordance with the MOU between NABTU and Ørsted, the onshore portion of the construction work is performed under a separate PLA — a PLA to which NABTU's affiliate, the Norwich-New London Building and Construction Trades

Council, is party. Work at the New London State Pier is now idle due to the Stop Work Order. *Id.* Thus, the unlawful Stop Work Order has thrown union construction workers out of work both on and offshore.

To date, more than one thousand employees have worked over one million hours on the Sunrise Wind project and associated construction to earn over $97 million in wages and benefits, including workers engaged in onshore construction work and workers fabricating specialized vessels and equipment for the project. Chaytors Decl. ¶ 56. If the Stop Work Order remains in place after February 6, 2026, the project's viability will be threatened, and depending upon the length of the delay, the project may be canceled, which would result in the termination of the union construction workers building the project. *Id.* ¶¶ 35-37, 60.

**B.    *NABTU's Members Are Building Cutting-Edge Offshore Energy Facilities.***

Sunrise Wind's offshore lease consists of portions of leases awarded in July 2013 and January 2015. Chaytors Decl. ¶ 11. After several years of surveys and permitting processes, including coordination with the Department of Defense, onshore construction began in July 2023. *Id.* ¶ 15. Offshore construction began in July 2024. *Id.* ¶ 16. Employees working on the project will install eighty-four wind turbines, numerous inter-array cables, an offshore converter station, export cables, onshore transmission and interconnection cables, and an onshore converter station. *Id.* ¶ 7. The turbines, which are located seventeen or more miles off the coasts of Massachusetts, New York, and Rhode Island, will generate approximately 924 megawatts of renewable energy, enough to power nearly 600,000 homes. *Id.* ¶¶ 7, 51.

9

The Sunrise Wind project is extremely complex, with multiple phases and components of construction, and coordination between over one hundred vessels, many of which are in limited supply and in high demand. Chaytors Decl. ¶ 31. Offshore, Sunrise Wind began by conducting three-dimensional boulder surveys, site preparation activities, and scour protection installation. *Id.* ¶¶ 16-17. Employees started installing monopile foundations in June 2025. *Id.* ¶ 19. The monopiles are steel tubes weighing up to 3,755 metric tons with diameters of up to thirty-nine feet. Sunrise Wind, *Construction & Operations Plan: Sunrise Wind Farm Project* 3-51 to 3-52 (Dec. 20, 2023) [hereinafter Sunrise Wind, *COP*].[4] The monopiles are driven up to 164 feet below the seafloor. *Id.* at 3-52. So far, employees have installed forty-four of the eighty-four monopiles required, as well as forty-three sets of advanced foundation components. Chaytors Decl. ¶ 19. Employees were scheduled to start installing the wind turbines on top of the monopiles in late February. *Id.* ¶ 20. Sunrise Wind has contracted with over a dozen vessels for monopile installation this year. *Id.* ¶ 38.

The wind turbines will be connected to each other and to the offshore converter station by inter-array cables. Chaytors Decl. ¶ 21. The cables consist of bundled copper or aluminum conductor cores surrounded by layers of insulation and protective armoring and sheathing, as well as a fiber optic cable. Sunrise Wind, *COP*, *supra*, at 3-63. The inter-array cables will have diameters of up to eight inches and

---

[4]    https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SRW01_COP_2023.pdf

will run up to 180 miles.  *Id.* at 3-64.  Employees will install the inter-array cables four to six feet below the seafloor.  *Id.*  Employees expected to start installing the inter-array cables in mid-2026.  Chaytors Decl. ¶ 21.

Employees have already installed sixteen miles of export cables, as well as the project's offshore converter station.  Chaytors Decl. ¶ 17.  Installation of the mid- and far-shore offshore export cables, which will transport energy from the offshore converter station to onshore operations, was set to start the week of February 1.  *Id.* ¶ 22.  The export cables consist of a copper or aluminum conductor core surrounded by layers of installation and protective armoring and sheathing, bundled with a fiber optic cable.  Sunrise Wind, *COP*, *supra*, at 3-25.  The export cables' diameter is at most 7.8 inches (15.6 inches when bundled together), and the cables will be buried between four and six feet beneath the seafloor.  *Id.* at 3-27.  Over approximately four to six months, employees will use a vessel called the *Connector* to install the remaining export cable sections.  Chaytors Decl. ¶¶ 33-35.  The *Connector* (pictured below) is anticipated to depart Europe mid-January 2026.  *Id.* ¶ 33.



Photograph of the *Connector*, *in* Jan De Nul Grp., *Connector* (Dec. 2020).[5]

After the offshore export cable is installed, additional construction, energization, and testing is required before power can be delivered to the electric grid. Chaytors Decl. ¶ 22. Now, however, all offshore work has halted, except for limited activities necessary to prevent impacts to health, safety, and the environment. *Id.* ¶ 24. Meanwhile, much work still has to be done by members of NABTU's affiliated unions. Employees still must install approximately half of the monopiles, all the inter-array cables, the remaining portions of export cable, and all the wind turbines. *Id.* ¶ 19. Sunrise Wind anticipated performing most of this work this year. *Id.* Over 90% of the wind turbine components have been manufactured, *id.* ¶ 20, and first power was forecast for October 2026, *id.* ¶ 23. The Stop Work Order threatens the viability of the Sunrise Wind project, *id.* ¶¶ 37-39, and, in turn, threatens the livelihoods of skilled building trades workers.

The Stop Work Order has also threatened the jobs of workers onshore. As set forth above, prior to their being idled as a consequence of the Stop Work Order, union construction workers were performing work at the New London State Pier under a project labor agreement with a NABTU-affiliated building and construction trades council. Chaytors Decl. ¶ 44. The Stop Work Order therefore has harmed and will continue to harm onshore and offshore employees, all while a massive semi-completed construction project stands still off the coasts of Massachusetts, New York, and Rhode

---

[5]    https://www.jandenul.com/sites/default/files/2020-12/Connector%20%28EN%29.pdf

Island.

### C.    *A Preliminary Injunction Will Protect NABTU's Members' Livelihoods.*

Sunrise Wind is entitled to a preliminary injunction because it is likely to succeed on the merits of its claims; it is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in its favor; and an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When evaluating whether a preliminary injunction is in the public interest, courts weigh the social and economic costs of maintaining the status quo. *See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 616 (D.C. Cir. 1980); *see also Gov't of Manitoba v. Zinke*, 849 F.3d 1111, 1121-22 (D.C. Cir. 2017) (weighing the costs of delaying construction of a water treatment plant in determining the public interest of modifying an injunction).[6]

The Stop Work Order jeopardizes not only the just transition to clean energy, but also the livelihoods of construction workers represented by NABTU's affiliates. The offshore portion of the project has already started to provide steady employment and solid, middle-class wages and benefits to building trades workers. The average hourly wage on the project is $57.21, and the average fringe benefit contribution is $48.75 per hour (found by averaging the second-highest and second-lowest rates).

---

[6]    For the reasons explained in Sunrise Wind's motion and brief, NABTU agrees that a preliminary injunction is appropriate here due to the likelihood of success on the merits, the irreparable harm that will be suffered, and the balance of equities. This brief addresses only the public interest prong.

Sunrise Wind contractors, unions, and joint labor-management apprenticeship programs provide training opportunities for the next generation of building trades workers, securing a pipeline of expert offshore wind employees for the future and providing those workers with the credentials and experience they need to support their families.

At the time of the Stop Work Order, workers represented by NABTU's affiliates anticipated many more work hours on the project to install monopiles, trench inter-array and export cables, and install the turbine towers, nacelles, and blades. The workers who have invested the time to obtain the specialized skills necessary to work offshore have been forced to seek work elsewhere. Even if the Stop Work Order is eventually declared unlawful, without an injunction, those workers trained to work on the Sunrise Wind project will need to find work elsewhere to support their families. As a result, without a preliminary injunction, other workers will have to be trained, which will delay the project even further.

The apparent temporary nature of the Stop Work Order does not lessen these harms. Though the order suspends activities only "for the next 90 days," the federal government retains the authority to "further extend the 90-day suspension period." Stop Work Order, *supra.* More importantly, as Sunrise Wind explains in its brief, even a ninety-day delay will likely result in the cancellation of the project. Employees working under the NOWA cannot put their bills on hold for three (or more) months, waiting for a permanent injunction. They will have to find new employment, and new workers will have to be trained to perform the specialized offshore construction work.

This Court should promptly protect the wages, benefits, training, and livelihoods of the U.S. unionized offshore construction workforce by enjoining the Stop Work Order.

## CONCLUSION

This Court should grant Sunrise Wind's motion for a preliminary injunction.

Respectfully submitted,

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
Jacob J. Demree (D.C. Bar No. 90012042)
Blake Phillips (D.C. Bar No. 90027926)*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

* Pro hac vice admission pending

January 14, 2026

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7(o), I certify that this brief conforms to the

requirements of Local Rule 5.4, complies with the requirements set forth in Federal

Rule of Appellate Procedure 29(a)(4), and does not exceed twenty-five pages.

<u>/s/ Jonathan D. Newman</u>
Jonathan D. Newman (D.C. Bar No. 449141)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

January 14, 2026

## CERTIFICATE OF SERVICE

I certify that on January 14, 2026, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

January 14, 2026