**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SUNRISE WIND LLC,

    *Plaintiff*,

    v.

DOUGLAS J. BURGUM, *et al.*,

    *Defendants*.

Case No.: 1:26-cv-00028-RCL

Hearing: February 2, 2026
11:00 AM, Courtroom 15

**PLAINTIFF SUNRISE WIND LLC'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ........................................................................................................................2

I.     SUNRISE WIND IS LIKELY TO SUCCEED ON THE MERITS ...................................2

       A.     Defendants Concede That The Stop Work Order Is Arbitrary And
              Capricious And Otherwise Fail To Overcome Sunrise Wind's Positions ...............3

       B.     Defendants' Failure To Provide Any Process, Including The Relevant
              Information, Violates The APA And Due Process .................................................12

       C.     The Stop Work Order Was Issued Without Statutory Authority ...........................15

II.    SUNRISE WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE
       RELIEF ...........................................................................................................................16

III.   EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF .......................23

CONCLUSION ................................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
766 F. Supp. 3d 74 (D.D.C.), *enforced*, 768 F. Supp. 3d 1 (D.D.C. 2025) ............................25

*Boddie v. Connecticut*,
401 U.S. 371 (1971)...........................................................................................................13

*Bonds v. Heyman*,
950 F. Supp. 1202 (D.D.C. 1997)......................................................................................25

*Dickson v. Sec'y of Def.*,
68 F.3d 1396 (D.C. Cir. 1995)..............................................................................................3

*\*Empire Leaseholder, LLC v. Burgum*,
No. 1:26-cv-4 (D.D.C. Jan. 15, 2026)..................................1, 2, 13, 18, 19, 20, 22, 24

*Esparraguera v. Dep't of the Army*,
101 F.4th 28 (D.C. Cir. 2024)............................................................................................13

*Fares v. Smith*,
901 F.3d 315 (D.C. Cir. 2018) ...........................................................................................14

*FEC v. Cruz*,
596 U.S. 289 (2022)...........................................................................................................15

*Goldman v. Weinberger*,
475 U.S. 503 (1986)...........................................................................................................23

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir.
2020) ..................................................................................................................................19

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 257 (D.D.C. 2018) .....................................................................................3

*\*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................................18, 20, 25

*Life Techs. Corp. v. Promega Corp.*,
580 U.S. 140 (2017)...........................................................................................................16

*Mashpee Wampanoag Tribe v. Bernhardt*,
466 F. Supp. 3d 199 (D.D.C. 2020) ...................................................................................12

ii

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)................................................................................................12

*MomoCon, LLC v. Small Bus. Admin.*,
   No. CV 21-2386, 2022 WL 22940750 (D.D.C. Feb. 10, 2022) ...............................11

*National Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001) ...................................................................................7

*Olivares v. TSA*,
   819 F.3d 454 (D.C. Cir. 2016) .................................................................................23

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
   613 F.3d 220 (D.C. Cir. 2010) .................................................................................13

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) .................................................................................13

*Revolution Wind, LLC v. Burgum*,
   No. 1:25-cv-2999 (D.D.C. Jan. 12, 2026)
   ...............................................................1, 2, 4, 5, 6, 7, 8, 10, 16, 18, 19, 21, 22, 24

*Rubin v. Islamic Republic of Iran*,
   583 U.S. 202 (2018)..................................................................................................15

*Scotts Valley Band of Pomo Indians v. Burgum*,
   No. 1:25-CV-00958, 2025 WL 1639901 (D.D.C. June 10, 2025)............................20

*State of New York v. Burgum*,
   No. 1:26-cv-72-RCL (Jan. 28, 2026) .........................................................................3

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. 2021) ..............................................................................7

*Texas v. United States*,
   798 F.3d 1108 (D.C. Cir. 2015) ..................................................................................3

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) .............................................................................11, 12

*Va. Elec. & Power Co. v. U.S. Dep't of the Interior*,
   No. 2:25-cv-830 (E.D. Va. Jan. 16, 2026) ...........................1, 4, 8, 9, 10, 18, 22, 24

*Vineyard Wind 1 LLC v. U.S. Dep't of the Interior*,
   No. 1:26-cv-10156 (D. Mass. Jan. 27, 2026)......................................1, 4, 18, 19, 24

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)................................................................................................23, 24

iii

*Xiaomi Corp. v. Dep't of Def.*,
    No. CV 21-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ......................................................3

## STATUTES

5 U.S.C.
    § 558 ...........................................................................................................................................12
    § 558(c) .......................................................................................................................................12

43 U.S.C.
    § 1334 ..........................................................................................................................................15
    § 1334(a)(1)(B) .............................................................................................................10, 15, 16
    § 1334(a)(2)(B) ...........................................................................................................................16
    § 1337(p) ...........................................................................................................................12, 15, 16
    § 1337(p)(4) .................................................................................................................................15
    § 1341 ..........................................................................................................................................15
    § 1341(c) .........................................................................................................................15, 16, 23
    § 1341(d) ...............................................................................................................................15, 16
    § 1349(a) ......................................................................................................................................16
    § 1349(a)(1) .................................................................................................................................16

## REGULATIONS

30 C.F.R. § 485.417(b) ........................................................................................................................15

Four different judges have now all blocked nearly identical stop work orders issued to other offshore wind projects, including this Court's ruling in *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-2999 (D.D.C. Jan. 12, 2026) ("*Revolution*") (granting preliminary injunction and stay of BOEM Order).[1]  The Stop Work Order issued to Sunrise Wind suffers from the exact same flaws as the others, and Sunrise Wind suffers substantially similar irreparable harm to that facing the other projects.  As a result, this Court should find that Sunrise Wind has a likelihood of success on the merits, is suffering immediate and imminent irreparable harm, and that the balance of equities tips decidedly in the Project's favor.  Defendants still fail to offer this Court any valid reason not to grant Sunrise Wind's Motion for Preliminary Injunction and Stay Pending Review ("Motion").

Although Defendants now at least respond to more of Sunrise Wind's merits arguments than they did in *Revolution*, they still do not address—and therefore concede—that the Stop Work Order is overbroad and that it failed to consider reliance interests, in violation of the Administrative Procedure Act ("APA").  And Defendants' responses on the other merits arguments do not withstand scrutiny.  Defendants' actions and statements continue to belie the urgency they now claim and demonstrate that the Stop Work Order is arbitrary and capricious.  Indeed, the Government's recent public statements underscore the pretextual nature of the Order, doubling down on rationales for stopping wind projects—and now expressly stating that they are "taking them down"—that have nothing to do with national security.  Defendants' post hoc rationalization

---

[1] Minute Order, Prelim. Inj. Ruling Tr., *Empire Leaseholder, LLC v. Burgum*, No. 1:26-cv-4 (D.D.C. Jan. 15, 2026) ("*Empire*") (submitted at Dkts. 26-1, 26-2) (granting preliminary injunction and stay of BOEM Order); Order, Prelim. Inj. Hrg. Tr., *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 2:25-cv-830 (E.D. Va. Jan. 16, 2026) ("*Dominion*") (submitted at Dkts. 26-3, 26-4) (granting preliminary injunction and stay of BOEM Order); Electronic Order, Motion Hrg. Tr., *Vineyard Wind 1 LLC v. U.S. Dep't of the Interior*, No. 1:26-cv-10156 (D. Mass. Jan. 27, 2026) ("*Vineyard*") (granting stay of BOEM Order), attached as **Exhibits A and B**.

1

of their procedural failures cannot overcome their statutory and constitutional due process violations. Contrary to Defendants' arguments, they also lacked statutory authority for the Order.

Seeking to distinguish *Revolution*, Defendants mischaracterize Sunrise Wind's irreparable harm argument and ignore or downplay the enterprise-threatening delay and costs Sunrise Wind has demonstrated will result from the Stop Work Order. Like the four other offshore wind projects that obtained preliminary injunctions or stays, Sunrise Wind has demonstrated it will suffer irreparable harm from the Stop Work Order's halt of construction and delay that will likely lead to cancellation of the Project absent injunctive relief. The attendant risk of Project cancellation is exactly the kind of enterprise-level and reputational harm to Sunrise Wind that is irreparable.

As every court to consider the stop work orders has concluded, Defendants' claim of a public interest in national security does not overcome the Project's irreparable harm and likelihood of success on the merits. And Defendants fail to articulate any compelling public interest served by the Stop Work Order.

Every court to consider the issue has granted emergency relief against Defendants' actions. The Court should likewise stay the Stop Work Order and preliminarily enjoin its enforcement here.

## ARGUMENT

### I.      SUNRISE WIND IS LIKELY TO SUCCEED ON THE MERITS

Sunrise Wind is likely to succeed on the merits. The Bureau of Ocean Energy Management ("BOEM") lacked statutory authority to issue the Order. Even if BOEM had statutory authority (it does not), it was still required to wield that authority in a way that did not violate the APA or the Constitution. *See* Tr. 42:21-24, *Revolution*; Tr. 12:23-13:8, *Empire*. BOEM failed to do so.

2

### A.    Defendants Concede That The Stop Work Order Is Arbitrary And Capricious And Otherwise Fail To Overcome Sunrise Wind's Positions

As Defendants acknowledge, Sunrise Wind made three arguments that the Order is arbitrary and capricious in violation of the APA: "it [1] lacks a reasonable explanation, [2] violated the 'change-in-position doctrine,' and [3] is overbroad." Opp. at 15-16 (citing Mot. at 18-27).

Defendants did not respond to—and thus concede—Sunrise Wind's third argument that the Order is overbroad because it suspends all activities. *See Texas v. United States*, 798 F.3d 1108, 1114 (D.C. Cir. 2015) (courts should treat "unaddressed arguments as conceded"); *see* LCvR 7(b).[2] Moreover, Defendants' papers demonstrate that the Stop Work Order is overbroad. The Giacona Declaration does not even attempt to justify the Order's suspension of construction activities on national security grounds.[3]    Instead, it refers to a purported threat from "*operation[s]*," not construction. Decl. of Matthew Giacona ¶¶ 4, 10, Dkt. 31-1 (emphasis added). And notably—as best as Sunrise Wind can tell—the Marks Declaration does not say a suspension of any activities is necessary to protect national security. As explained in the Motion, the Order essentially (and impermissibly) says, "trust us, we had good national security reasons for what we did," *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018), without connecting facts to its conclusion that the Order's halt on all ongoing activities was justified, *see Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *5 (D.D.C. Mar. 12, 2021) (quoting *Dickson v. Sec'y*

---

[2] Although Defendants briefly mention overbreadth in their opposition to the State of New York's motion for preliminary injunction, Defs.' Opp. at 17, *State of New York v. Burgum*, No. 1:26-cv-72-RCL (Jan. 28, 2026), Dkt. 17, they fail to overcome the legal defect of the Order.

[3] Defendants assert (at 5, 26) that BOEM based its decision "in part" on the classified information it received from the Department of War ("DoW"), but the Stop Work Order does not use the term "in part." The Court should give no weight to this post hoc rationalization.

*of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).[4]

Nor did the Stop Work Order reconcile the purported concerns about operations and purported "uncertainty" about the possibility of future mitigation with an explanation of why construction could not continue now, as multiple courts have concluded. Tr. 43:16-17, *Revolution* (Order "does not explain why construction cannot continue"); Tr. 49:19-21, *Dominion* (arbitrary and capricious to suspend construction when "risks the government is concerned about appear to attend to the operation of the project, not its construction"); *see* Tr. 51:9-53:7, *Vineyard* ("[I]f the government's concern is the operation," halting construction "is irrational.").[5] But Sunrise Wind is not expected to be operational until October 2026. Logically, if Defendants' concern is about operations, construction can continue and a broad suspension of activities is arbitrary and capricious because it is overbroad. Defendants fail to grapple with this issue, other than to speculate that "any potential mitigation measures may be more effectively incorporated into the Project before construction is completed"—and even this despite having already conceded that BOEM lacks knowledge of what the mitigation might be. Giacona Decl. ¶ 10.

Defendants also fail to dispute Sunrise Wind's argument that they violated the change in position doctrine by ignoring Sunrise Wind's reliance interests. Defendants acknowledge (at 19)

---

[4] Further demonstrating the overbreadth of the Stop Work Order's halt of construction, Defendants applied the same approach to other projects at varying stages of construction. All five projects that BOEM halted in virtually identical orders are at different stages of construction. *Compare* Compl. ¶ 5 ("45% complete"), *with* Third Murphy Decl. ¶ 5, *Revolution*, Dkt. 50-1 ("87% complete"); Compl. ¶ 6, *Empire*, Dkt. 3 ("approximately 60% [] complete," with no wind turbines up); Compl. ¶¶ 44, 45, 47, *Dominion*, Dkt. 39 at 6 ("approximately 70% complete"); Compl. ¶ 1, *Vineyard*, Dkt. 1 ("95% complete and . . . partially operational"). If Defendants truly had "operation[s]"-related concerns, then it is arbitrary to subject all five projects to sweeping 90-day suspensions given their different stages of development.

[5] The arbitrary nature of BOEM's decision to halt construction on the basis of a supposed threat from operations was most blatant in the case of the *Vineyard*, where BOEM allowed 44 previously-commissioned turbines to continue operating, but prohibited completion of the remaining 18, prompting the judge call the decision "irrational." *See* Tr. 51:9-53:7, *Vineyard*.

4

that agencies must "recognize the change, reasonably explain it, and consider serious reliance interests," but they only make arguments as to the first of these points, despite Sunrise Wind raising deficiencies with all three. Mot. at 25-27. Defendants therefore concede that the Stop Work Order did not consider reliance interests here. *See* Mot. at 26-27.[6] It is undisputed that the Project has, just as this Court recognized for *Revolution*, "spent billions of dollars now" in reliance on BOEM's decision to approve the Project nearly two years ago. Tr. 13:9; *see also* Mot. at 27. The Stop Work Order failed to consider those interests.

Defendants' contention (at 19) that there is no change in position at all because "BOEM has not taken any steps to invalidate or modify the lease or COP" is farcical. BOEM approved Sunrise Wind's *Construction* and Operations Plan ("COP"), allowing for construction, which is now well underway. The Stop Work Order now halts construction, and that is a complete change in position. Mot. at 13, 25-27. Defendants also changed position from its approvals that concluded that the Project did not interfere with national security without accounting for that change. *See* Tr. 42:14-17, *Revolution* ("failure to account for [BOEM's] previous assurances the project does not improperly interfere with national security clearly amounts to a change in position"). The January 2025 mitigation agreement between Sunrise Wind, the DoW, and the U.S. Air Force ("DOD Agreement") and the Project's COP Conditions of Approval were both designed to address national security considerations, including to mitigate the Project's potential effects on radar. Mot. at 8-9. As this Court held in *Revolution*, BOEM did not "explain how these [new] national security

---

[6] At most, Defendants dismissively state that BOEM "cannot place more importance on Orsted's financial interests than it does on national security." Giacona Decl. ¶ 12. But even this statement—which hardly justifies issuing the Order without notice—is based on the unfounded premise (*see infra* at 7-8) that Sunrise Wind is likely "to ignore [national security] risks and claim that it is too late to address the issues once the Project begins supplying power to customers." *Id.*

concerns differed from the same ones that the developers of [the Project] specifically committed to mitigating" previously.  Tr. 42:4-13.

Defendants say (at 17) that the Stop Work Order's rationale is "reasonable, albeit brief." But there are multiple reasons that the Stop Work Order is not adequately explained.  *First*, as was the case with Revolution Wind:

> The Bureau did not explain anywhere [in the Sunrise Stop Work Order] which features, specifications or activities related to the [Sunrise] Wind project implicated new national security concerns, nor did the Bureau explain how these national security concerns differed from the same ones that the developers of [Sunrise] Wind specifically committed to mitigating in their [2025] agreement with the Department of Defense or the ones which the project was extensively screened out for as part of its multi-year, multi-agency approval process under the Outer Continental Shelf Lands Act.

Tr. 42:4-13, *Revolution*.  *Second*, as this Court also concluded in *Revolution*, "[p]ointing to ongoing national security concerns based on purportedly new classified information does not constitute a sufficient explanation for the Bureau's decision to entirely stop work" on the project. *Id.* at 42:21-24.  BOEM did not explain in the Stop Work Order why the national security concerns the DoW identified required Sunrise Wind to stop work on Project construction.  Mot. at 24, 27-28.  Nor did the Order apply the purported concerns to the Project specifically or reference its current mitigation, instead vaguely citing national security concerns without further explanation. *Compare* Tr. 43:11-14, *Revolution*.

Defendants' argument (at 17) that the Stop Work Order's explanation is reasonable because of "the 'urgency' of the circumstances" is belied by Defendants' own actions.  The Marks and Giacona Declarations confirm Defendants' lack of urgency to address purported national security harms.  Although the DoW provided classified information to BOEM on November 13, 2025, Decl. of Dale Marks ¶ 7, Dkt. 31-3, Acting BOEM Director Matthew Giacona did not review this information until November 26, 2025, Giacona Decl. ¶ 6.  And then he waited at least another week to review the information with senior Departmental leadership. *Id.*  Thus, BOEM waited

6

nearly six weeks from receiving the information from the DoW before issuing the Stop Work Order on December 22, 2025, and never once did BOEM or any other agency raise the concerns with Sunrise Wind, despite weekly communications. *See* Decl. of Edward LeBlanc ¶¶ 35-38, Dkt. 11-2 ("First LeBlanc Decl."). There are also indications that this information was not new: Secretary Burgum discussed radar interference and drones publicly *last August*, when he attempted to belatedly justify the first stop-work order issued to Revolution Wind by referring to radar-related "concerns" that he attributed to the Secretary of War (along with Secretary Burgum's own litany of unrelated criticisms of offshore wind). *See id.* ¶ 22. On the same facts, this Court in *Revolution* agreed that Defendants showed no urgency. Tr. 44:21-24. The same finding should be made here.

Contrary to Defendants' assertion (at 17), neither the D.C. Circuit nor this Court has held that citing national security absolves the government of its duties under the APA. Defendants' reliance (at 18) on *National Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001), fails. The dicta they cite in that decision was expressly cabined to reviews under a statute empowering the Secretary of State to designate an entity as a "foreign terrorist organization." 251 F.3d at 196. Defendants' reliance (at 18) on *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81 (D.D.C. 2021), is similarly misplaced, because those plaintiffs "were soon provided with more specific information. . . and then given the opportunity to engage with the State Department on the accuracy of the information underlying the designation." *Id.* at 94. Nothing of the sort happened here and it is telling that to date, no relevant information has been provided to Sunrise Wind or its representatives.

The Stop Work Order's explanation is also inconsistent with Defendants' post hoc explanations. The Giacona Declaration suggests that BOEM believed it was necessary to halt the Project because of a "concern[] that allowing the Project to become operational without addressing

7

the national security risks may cause Orsted to ignore those risks and claim that it is too late to address the issues once the Project begins supplying power to customers." Giacona Decl. ¶ 12. This post hoc rationalization does not actually assert an imminent national security threat from project operations, rather is based on BOEM's own perception of its leverage over developers—a cynical view that fits with Defendants' policy bias against the industry as a whole, but is wholly inconsistent with Sunrise Wind's agreement to national security-based mitigation measures requested to date, not to mention demonstrated capabilities of installing radar equipment on an offshore wind project that is already operational. *See* First LeBlanc Decl. ¶¶ 10, 30-33.

Indeed, Sunrise Wind, like Revolution Wind, "has agreed at every stage of the approval process to work with the government to mitigate national security concerns." Tr. 43:18-20, *Revolution*. Sunrise Wind has engaged in near-weekly contact with agencies, including Defendants, as recently as January 27, 2026. First Chaytors Decl. ¶ 26; Rebuttal Decl. of Edward LeBlanc ¶ 4("LeBlanc Rebuttal Decl."); Rebuttal Decl. of Ryan Chaytors ¶ 8 ("Chaytors Rebuttal Decl."); Mot. at 12-13. In all these meetings, no one raised any of the alleged concerns Defendants now raise nor the potential need to mitigate or enhance certain national security capabilities before or after the Stop Work Order. First LeBlanc Decl. ¶¶ 35-38; LeBlanc Rebuttal Decl. ¶ 4; Chaytors Rebuttal Decl. ¶ 8. The Stop Work Order approach deviates from longstanding practice. First LeBlanc Decl. ¶ 11 ("In my decades of experience, I have never seen an instance in which the federal government perceived a threat involving critical energy infrastructure or national security concerns and failed to engage with the company about those concerns.").[7] And despite Sunrise

---

[7] On January 9, 2026, the former DOD Clearinghouse Director filed sworn testimony in *Dominion* that, in his opinion, the Government did not follow the process "designed to identify challenges and collaborate on solutions" in relation to the stop work orders. Decl. of Howard Belote ¶ 33, *Dominion*, Dkt. 39-4; *see also* Decl. of Howard Belote ¶ 33, *Vineyard*, Dkt. 10 (same).

Wind and the *Dominion* court raising Defendants' inconsistent behavior, Defendants fail to even address it in their brief or declarations. *See* Mot. at 12-13; Tr. 49:5-11, *Dominion* (finding instructive "the evidence Dominion presented regarding the government's failure to raise its concerns through normal channels"). That is telling.

The Marks Declaration (¶ 8) erroneously suggests that the well-established DOD Clearinghouse process is inadequate because it "focuses on project disruption to military operations and readiness . . . rather than evaluating potential threats to . . . the homeland." The Project's DOD Agreement (scarcely a year old) explains, as "originally filed," the Project would "conflict with North American Aerospace Defense Command's (NORAD) operation of the Falmouth-Otis Air Force Base (AFB), Massachusetts Airport Surveillance Radar 8 (ASR-8)." First LeBlanc Decl. ¶ 31. As a result, the DOD Agreement's purpose was "de-conflicting these activities," and the DoW concluded that the Agreement "will allow the mutual goals of the Parties to be met, *including the protection of the radar, which promotes national security*, and protection of the National Airspace System, while supporting military readiness." *Id.* (emphasis added). Indeed, one of NORAD's stated missions is to provide "Aerospace warning to North America," i.e., "processing, assessing, and disseminating intelligence and information related to man-made objects in the aerospace domain and the *detection, validation, and warning of attack against North America whether by aircraft, missiles or space vehicles*."[8] Given that detecting and warning of attacks on the United States is one of NORAD's primary "operations," Defendants cannot credibly claim that the DOD Clearinghouse did not consider "potential threats to critical infrastructure or

---

[8] Agreement Between the Government of the United States and the Government of Canada on the North American Aerospace Defense Command, art. I §§ 1, 2(a) (Apr. 2006), https://www.norad.mil/Portals/29/Documents/History/NORAD%20Agreements/2006%20NORAD%20Agreement.pdf?ver=52SH6UU_1njFmjaq4fQUTg%3d%3d.

the homeland" when reviewing the Project.[9]

Not only was BOEM's decision not reasonably explained, it was not reasonable.  Although Defendants are correct (at 19) that Sunrise Wind has not seen the materials submitted to the Court *ex parte in camera*, the Government has conceded that it submitted the same materials in all of the other cases enjoining or staying BOEM's orders.  *See* Tr. 34:24-35:9, *Dominion*.

Neither this Court in *Revolution* nor the *Dominion* court identified "any evidence" in the classified material "of a new finding of particularized harm such that the government could order an immediate suspension."  Tr. 44:24-45:1, *Revolution*; *see* Tr. 48:12-49:4, *Dominion* ("[T]he national security concerns the government stated . . . are not particularized to concerns about the Coastal Virginia Offshore Wind commercial project.").  The *Dominion* court further commented regarding the same information submitted to this Court that "there appear to be some inconsistencies between statements contained in the unredacted declaration of Deputy Under Secretary Marks and the classified information that the Court reviewed *ex parte in camera*," which "further lend[s] support to the Court's conclusion" that the order is likely arbitrary and capricious.  Tr. 49:7-18 (also noting the project's "mitigation strategies have proven successful in the past").

There is also strong and growing evidence that Defendants' stated reason for the Stop Work Order was pretextual, as this Court recognized in *Revolution*.  Tr. 44:7-14 ("[Defendants'] failure to explain or apply [its] reasoning suggests that the stated national security reason may have been pretextual.  My concern is heightened by Interior Secretary Burgum's press appearances . . . in which he criticized offshore wind projects for a variety of reasons unrelated to national security.").

---

[9] There is also good reason to doubt the magnitude of any national security threat.  Defendants have not claimed to have suspended lease operations under Section 1334(a)(1)(B).  Defendants' failure to invoke Section 1334(a)(1)(B) amounts to a concession that Sunrise Wind's activities pose no threat to human or marine life, property, mineral deposits, or the environment.  So even if national security is implicated, the magnitude of any threat appears to be overstated.

Defendants do not even try to rebut Sunrise Wind's pretext arguments but contend, instead, that these arguments are "best addressed through a challenge to any alleged inadequacies in the administrative record." Opp. at 19. This Court does not need to wait for the administrative record: "judicial review under the APA may go beyond the administrative record 'when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.'" *MomoCon, LLC v. Small Bus. Admin.*, No. CV 21-2386, 2022 WL 22940750, at *2 (D.D.C. Feb. 10, 2022) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)).

Defendants and the President continue to make public statements indicating that the true reasons for the Stop Work Order were different than the reasons given in the Order itself. As examples, the President, in a January 9, 2026 White House meeting with oil executives, turned toward Secretary Burgum and stated: "I'm not much of a windmill person. I can proudly say, Doug, that we have not approved one windmill since I've been in office and we're going to keep it that way. My goal is to not let any windmill be built. They're losers."[10] Then in a January 21, 2026 speech at the World Economic Forum's Annual Meeting in Davos, the President similarly stated: "Instead of building ineffective money losing windmills, *we're taking them down* and not approving any."[11] This Court should not turn a blind eye to the mounting evidence of pretextual behavior. *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 514.

---

[10] Dinah Voyles Pulver, *Trump assails 'windmills' and wind energy as junk: 'They're losers'*, USA Today (Jan. 11, 2026), https://www.usatoday.com/story/news/nation/2026/01/09/trump-assails-windmills-and-wind-energy-as-junk-theyre-losers/88108694007/; *see also 'We Will Not Approve Any Windmills In This Country': Trump Goes Off On Wind Energy*, https://www.youtube.com/watch?v=LpdPuJoBmts.

[11] *Davos 2026: Special Address by Donald J Trump, President of the United States of America*, World Economic Forum (Jan. 21, 2026), https://www.weforum.org/stories/2026/01/davos-2026-special-address-donald-trump-president-united-states-america/ (emphasis added).

**B.      Defendants' Failure To Provide Any Process, Including The Relevant Information, Violates The APA And Due Process**

Defendants' belated attempt (at 20) to invoke the public interest exception to 5 U.S.C. § 558's pre-deprivation process requirements is insufficient.  As an initial matter, BOEM's post hoc invocation of the public interest exception comes too late—the record lacks any contemporaneous explanation for evading procedural requirements.  *See Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199, 222 (D.D.C. 2020) ("courts must evaluate the agency's contemporaneous explanation of its decision and cannot accept 'post hoc' rationalizations").  BOEM has not shown that the purported national security issue here "required" action without pre-deprivation process, and BOEM did not act with urgency.  *See supra* at 6-7; Mot. at 31-32.  Defendants' brief mention (at 20) of "post-Suspension Order meetings with BOEM" does nothing to salvage their argument.  Section 558(c) requires the agency to provide notice and an opportunity to be heard "*before* the institution of agency proceedings."  5 U.S.C. § 558(c) (emphasis added).

As to due process, Defendants' nonsensical argument (at 20-21) that Sunrise Wind has not been deprived of a property interest because "[a]ny property interest for Sunrise Wind arises under Section 1337(p), Interior's regulations, and the resulting lease" is contrary to binding precedent.  In addition to Sunrise Wind's property interest in its lease, "the interest of an individual in continued receipt of" statutorily created "benefits is a statutorily created 'property' interest protected by the Fifth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see* Mot. at 30.  The fact that a statute may authorize an agency to affect individual property interests does not resolve the separate constitutional issue of what process was due before deprivation of the interests.  *See Mathews*, 424 U.S. at 333.  Here, even assuming Section 1337(p) gives BOEM the broad-reaching authority it claims (it does not, *see infra* at 15-16), that does not mean BOEM can act without constitutionally required due process.  As the *Empire* court held, "the record appears to

12

show[] that BOEM did not give Empire Wind any form of process or an opportunity to be heard before issuing the Suspension Order," so "Empire Wind has established that it is likely to succeed on the merits." Tr. 13:13-15.  The same is true here.

Defendants suggest (at 21) that "[p]ost-deprivation procedural protections may be sufficient" because national security is at issue.  But BOEM has not—in the Stop Work Order or otherwise—demonstrated an "extraordinary situation[] where some valid governmental interest is at stake that justifies postponing the hearing until after the event."  *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971); *see Esparraguera v. Dep't of the Army*, 101 F.4th 28, 40 (D.C. Cir. 2024) (requiring "exigent circumstances").  Any claims of urgency are undercut by BOEM's delay.  *See supra* at 6-7; Mot. at 31-32; Rebuttal Decl. of Bryan Stockton. ¶¶ 2-12 ("Stockton Rebuttal Decl.").

Further, Defendants have not even identified post-deprivation procedures offered, let alone any that would be constitutionally sufficient.  Due process requires that Sunrise Wind have a fair opportunity "to tailor its submission to the [government's] concerns [and] rebut the factual premises underlying the [agency] action," regardless of whether classified information is key to the government's decision. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014); *see People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 613 F.3d 220, 227-29 (D.C. Cir. 2010); Mot. at 31.  Neither Defendants nor the DoW have provided any classified information to Sunrise Wind's representatives (including a retired vice admiral) who are all U.S. citizens with one of the highest U.S. security clearances—"Top Secret/Sensitive Compartmented Information" —and Defendants also have not provided unclassified summaries of the information underlying

13

the decision, despite having the information from the DOW since November 2025.[12]  *See* Decl. of Bryan Stockton ¶¶ 17-18, Dkt. 11-3; Stockton Rebuttal Decl. ¶¶ 4-8, 13.

Interior has now told Sunrise Wind it is "meeting with DoW again . . . to discuss mitigation measures on these projects" and asked "if Orsted is able to share" "all the information in its possession on mitigation measures that could be used to counter the national security issues that are set forth in publicly available documents, such as the suspension letters and court pleadings, relating to Sunrise and Revolution."  Stockton Rebuttal Decl. ¶ 8.  But BOEM still has not explained the basis for its decision and has given no additional information in court pleadings or otherwise about the national security issues that motivated the Stop Work Order, other than that it is classified.  *See* Giacona Decl. ¶¶ 4-5.  Instead, it hides behind the DoW, and while it purports to be a go-between, no relevant information has been provided to the Project.  *See* Stockton Rebuttal Decl., ¶ 8 and Ex. 3 at 2.  As Sunrise Wind has explained to this Court (and to Defendants), Ørsted works cooperatively with military and national security agencies to identify specific measures to meet the precise needs of those agencies and needs the appropriate information to tailor its recommendations.  *See* First LeBlanc Decl. ¶ 9; Stockton Rebuttal Decl. ¶¶ 11-12.[13]  Due process demands that the Project have information on the basis for BOEM's decision.  *See Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018).

---

[12] Defendants complain that developing unclassified summaries will take months (at 10), but it has now been two months since the DoW provided the information to BOEM that initiated the Order.

[13] Other worldwide military and national security governmental agencies have executed Non-Disclosure Agreements and/or Information Handling Agreements to which certain Ørsted personnel are subject.  Because information is restricted from disclosure by other governments and militaries, Ørsted is not authorized to provide "all of the information in its possession," as Interior recommended.  Stockton Rebuttal Decl. ¶ 12.

14

### C.    The Stop Work Order Was Issued Without Statutory Authority

Defendants concede that they do not rely on either 43 U.S.C. §§ 1334(a)(1)(B) or 1341. Their attempt to find other authority for the Stop Work Order is misplaced and would render these provisions superfluous. *See* Opp. at 12-14. According to Defendants, Sections 1334 and 1341 are irrelevant because 30 C.F.R. § "485.417(b) *alone* provides BOEM with authority to suspend a lease when, as here, BOEM concludes there are risks to national security." Opp. at 12 (emphasis added). But it is axiomatic that a regulation cannot give an agency authority that Congress has not. *FEC v. Cruz*, 596 U.S. 289, 301 (2022) ("An agency . . . 'literally has no power to act'— including under its regulations—unless and until Congress authorizes it to do so by statute.").

Defendants cannot rely on 43 U.S.C. § 1337(p)(4) or (5) for the unlimited authority they invoke here.[14] Section 1337(p)(4) governs "leases, easements or rights-of-way for energy and related purposes." As relevant here, it imposes "requirements" to ensure that in executing the subsection the Secretary "provides for" certain interests, including national security. 43 U.S.C. § 1337(p). Interior satisfied that requirement when it approved the COP. *See* Mot. at 25. Section 1337(p)(5) authorizes the Secretary of the Interior to provide for the "duration, issuance, transfer, renewal, suspension, and cancellation of a lease." But these provisions do not provide unbounded authority—rather they must be read in conjunction with other statutory provisions—namely, 43 U.S.C. § 1341(c) and (d)—that more specifically provide authority with respect to suspending lease operations on national security grounds. Mot. at 5-6, 34-35. Defendants' reading of Section 1337(p) would render Sections 1341(c) and (d) and Section 1334(a)(1)(B) superfluous, and this Court should interpret OCSLA to give meaning to every provision. *See Rubin v. Islamic Republic*

---

[14] The Order does not even cite those statutory provisions. Defendants' reliance on them now is a post hoc rationalization. Instead, the Order borrows text from Section 1334(a)(1), referring to "serious, immediate, and irreparable" harm. But BOEM did not make the statutorily-required "particularized harm" finding, Mot. at 36; *see supra* at 10, and Defendants do not argue otherwise.

*of Iran*, 583 U.S. 202, 213 (2018); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 141 (2017).

Defendants' suggestion (at 13) that it would be "incongruous" for OCSLA to permit cancellation, but not suspension, under Section 1334(a)(2) in circumstances other than those contemplated elsewhere in OCSLA makes no sense. Section 1334(a)(2)(B) permits cancellation only if a suspension has been operative for at least five years, and national security suspension, in turn, is authorized when (1) the conditions set forth in Sections 1341(c) and (d) are satisfied or (2) any applicable condition in Section 1334(a)(1)(B) is satisfied. 43 U.S.C. § 1334(a)(2)(B).

Defendants end by touting that "BOEM had the authority to issue the Suspension Order, and no court has held that it does not." Opp. at 15.[15] No court has held that BOEM *had* statutory authority for the stop work orders, and Defendants in fact admit that this Court stated in *Revolution* that OCSLA *does not* provide the expansive Section 1337(p) authority BOEM claims here: "[S]uspensions are limited to emergency situations and demonstrated findings of particularized harm that cannot be averted short of a total stop to project activity." Tr. 44:18-20; *see* Opp. at 14.

## II.    SUNRISE WIND FACES IRREPARABLE HARM ABSENT IMMEDIATE RELIEF

In an attempt to avoid the same outcome as in the four other cases, Defendants mischaracterize Sunrise Wind's irreparable harm arguments, trying to narrow their basis solely to the Project's Offshore Renewable Energy Certificate Purchase Agreement (the "OREC Agreement"). *See* Opp. at 2 ("Sunrise Wind's enterprise-level harm argument is based *entirely* on

---

[15] Defendants' Tucker Act argument (at 15) misreads the Motion. Sunrise Wind is not seeking damages or specific performance of a contractual obligation based on violations of lease provisions; rather Sunrise Wind explains how the lease makes clear that BOEM is contradicting its own interpretation of the statute and is arbitrary and capricious. Mot. at 6, 24-25, 35-36. Moreover, OCSLA authorizes suits to "compel compliance . . . for any violation . . . of the terms of any permit or lease issued by the Secretary under [OCSLA]." 43 U.S.C. § 1349(a)(1); *see* Dkt. 1-3 at 2-3 (Notice of Intent to Sue under 43 U.S.C. § 1349(a)).

the *possibility* that the countersigning party to the OREC Agreement could act to terminate that agreement." (first emphasis added)); *id.* at 23, 24-26. To be sure, Sunrise Wind has acknowledged that "[r]evenues under the OREC Agreement are critical to the Project's viability," First Chaytors Decl. ¶ 45, meaning that its termination is an existential threat. But, contrary to Defendants' mischaracterization, the Motion and the Chaytors Declaration focus on "two categories" of irreparable harm that are independent of whether the OREC Agreement is terminated: (1) that the halt of construction will lead to the loss of specialized vessels needed for construction, and as a result, will threaten Project cancellation; and (2) that the Stop Work Order increases costs and delay that will threaten Project cancellation. Decl. of Ryan Chaytors ¶¶ 30-48, Dkt. 11-1 ("First Chaytors Decl."); Mot. at 36-41. Defendants fail to refute this showing of irreparable harm.

*First*, Defendants erroneously assert (at 23) that "the alleged enterprise-level harm related to construction delays is speculative and hedged in permissive language." But Sunrise Wind has demonstrated concrete, imminent enterprise-level harm to the Project due to the Stop Work Order's delay to the scope of work of the critical export-cable-laying vessel—the Connector, which was scheduled to begin its four-to-six months of work on the Project this upcoming week.[16] Mot. at 38; First Chaytors Decl. ¶¶ 33-37. If it is not enjoined, the Stop Work Order will prevent Sunrise Wind from using the Connector for the work it is contracted to perform. *See* First Chaytors Decl. ¶¶ 33, 37. Even if Sunrise Wind could use the Connector during its next availability window (no sooner than Q3 2027) or if Sunrise Wind were able to contract with an alternative vessel (no sooner than late 2026), as Defendants speculate (without support) (at 23), Sunrise Wind would

---

[16] The Connector is currently scheduled to arrive at the Port of Providence, Rhode Island on February 1, 2026, where it was scheduled on February 2, 2026 to dock and load the export cable in preparation for and to subsequently conduct the export cable installation. Chaytors Rebuttal Decl. ¶ 7. But that will be delayed unless the Stop Work Order is enjoined. Indeed, Sunrise Wind will, as a technical matter, be unable even to load cable onto the vessel. First Chaytors Decl. ¶ 33.

17

face a minimum delay of nearly a year during which it would continue to incur enormous costs. *See id.* ¶¶ 35-37, 40-42. This would certainly delay first power beyond October 2026. And these costs and delay, which are independent of the status of the OREC Agreement, are clearly enterprise-threatening harm. *See* Tr. 9:22-25, *Empire* ("Damocles's sword does not have to actually fall on the movant before the court will issue an injunction." (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016))); *accord* Tr. 54:10-17, *Vineyard*. Every court to review this question in the context of the stop work orders has found that the loss of specialized vessels and resulting delays and costs are enterprise threatening.[17]

Defendants also ignore the additional significant hurdle Sunrise Wind would face even if it missed the Connector's last vessel availability date and were able to contract with an alternative vessel in place of the Connector: the technical certification process under BSEE's own regulations to account for a different vessel, which process can take upwards of eight months. *See* First Chaytors Decl. ¶ 36. And even this is a "Catch-22" if the Stop Work Order is not enjoined. This challenge is far from speculative, because the Stop Work Order is *already* directly hindering the Project's certification process for other work related to the inter-array cables, the installation of which is a separate scope of work from the export cable installation to be performed by the Connector. Just last week, Defendant BSEE sent Sunrise Wind a Notification of Objection to the Project's inter-array cable, design, manufacturing and installation technical information, objecting to that package solely based on the Stop Work Order. Chaytors Rebuttal Decl. ¶¶ 5-6 & Ex. 1

---

[17] *See* Tr. 10:10-14, *Empire* ("[L]osing access to specialized vessels that cannot be replaced in time to meet binding deadlines, will not just cause substantial financial loss, but it will threaten Empire Wind's entire existence."); Tr. 51:2-12, *Dominion* (citing "costs associated with the ongoing construction delays" in finding irreparable harm); Tr. 45:9-22, *Revolution* (noting risk that the "entire enterprise could collapse," pointing to daily costs from delays, benchmark deadlines, and limited availability of "specialized ship necessary to complete the project"); Tr. 54:5-9, *Vineyard* (irreparable harm from "los[ing] access to a specialized ship necessary to complete the project").

18

(Jan. 20, 2026 BSEE objection letter).[18]  Defendants argue (at 23 n.4) that Sunrise Wind has not shown irreparable harm based on delays to inter-array cable installation because "this case can be decided on the merits by mid-summer."  But BSEE's Notice of Objection directly refutes that contention and demonstrates the Order is already preventing Sunrise Wind from completing the required technical certification process for the inter-array cable installation.  *Id.* ¶ 6 & Ex. 1.

*Second*, Defendants wrongly assert (at 23 n.4 & 24) that a mid-summer timeline for briefing and a ruling on the merits of this case would avoid the Stop Work Order's costs from reaching enterprise-threatening level.  But they do not actually dispute the costs detailed in the First Chaytors Declaration, which are sworn evidence—just like the declarations provided in every one of the four other cases in which stop work orders have been enjoined or stayed.  *See Karem v. Trump*, 404 F. Supp. 3d 203, 215 n.3 (D.D.C. 2019) (explaining evidentiary standard at preliminary injunction stage), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020); Decl. of Paul Murphy, *Revolution,* Dkt. 50-1; Decl. of Theodore Muhlfelder, *Empire*, Dkt. 8-2; Decl. of Grant T. Hollett, *Dominion*, Dkt. 39-2; Decl. of Javier Hortiguela, *Vineyard*, Dkt. 8; *contra* Opp. at 25.

As Sunrise Wind explained, it is the magnitude and cumulative nature of the Stop Work Order's costs that threaten the Project's financial viability and are likely to force its cancellation. Mot. at 38; First Chaytors Decl. ¶¶ 31-37; *see* Tr. 8:16-17, *Empire* (recognizing irreparable harm from "cascading effects of additional delays").  Based on conservative estimates, Sunrise Wind has been and is estimated to be incurring at least an additional $1.25 million in costs per day on installation and manufacturing contracts without any certainty that construction work will be allowed to resume.  First Chaytors Decl. ¶ 40.  If the Stop Work Order is not enjoined, in February

---

[18] The inter-array cables will connect the wind turbine generators to the offshore converter station. Chaytors Rebuttal Decl. ¶ 6.

19

these daily costs are expected to increase by another $1.5 million, and in April, by another $1.3 million to total approximately $4 million per day. *Id.* If the Stop Work Order remains in effect through "mid-summer 2026" (the time by which Defendants say this case could be litigated on the merits, Opp. at 24), Sunrise Wind will have incurred over $600 million in additional costs due to the Order (using conservative estimates).[19] *See* Chaytors Rebuttal Decl. ¶¶ 9-10. The magnitude of those costs is enterprise threatening—at the very least, "the obstacles created by the Suspension Order 'unquestionably make it more difficult for [Sunrise] Wind to accomplish its primary mission' of constructing the Project," which constitutes irreparable harm. Tr. 10:5-9, *Empire* (quoting *League of Women Voters*, 838 F.3d at 9).

Defendants' characterization (at 21, 23) of the massive financial harms posed by the Stop Work Order as "[p]urely economic losses," "speculative and hedged in permissive language" ignores the enterprise-threatening nature of these harms to the Project, which are clearly sufficient and non-speculative. And Defendants' reliance (at 22) on *Scotts Valley Band of Pomo Indians v. Burgum*, No. 1:25-CV-00958, 2025 WL 1639901 (D.D.C. June 10, 2025), is misplaced because that case addressed financial losses from the fact that a tribal plaintiff entered into contracts before the government's decision to make tribal land eligible for gaming. In contrast, Sunrise Wind's irreparable harm is not based on financial losses from contracts entered into before BOEM issued the lease in 2013 and 2015, *see* First Chaytors Decl. ¶ 11, but is instead based on the threat of Project cancellation and attendant existential risk to Sunrise Wind, *see* Mot. at 36-41. Sunrise Wind's explanation of how the Stop Work Order threatens viability of its very enterprise is far more than alleging "conclusory monetary losses." *See Scotts Valley*, 2025 WL 1639901 at *4.

---

[19] Even excluding the additional cost increase expected in February, *see* First Chaytors Decl. ¶ 40, the cost of a 90-day halt of activities at the initial daily cost of $1.25 million, *see id.*, would exceed $100 million dollars.

And Defendants do not suggest the Stop Work Order will end after 90 days (*i.e.*, March 22, 2026).  To the contrary, their arguments against irreparable harm assume the Order will remain in place through merits briefing, which they say could be decided "by mid-summer 2026."  *See* Opp. at 23 n.4 & 24.[20]  Beginning in April, the daily costs due to the Order will again increase by up to approximately $1.3 million if the Order continues to prevent monopile foundation installation.  First Chaytors Decl. ¶ 40.  And installation of the remaining wind turbine generators (scheduled to begin in late February 2026), monopile foundations (scheduled to begin after May 1, 2026 due to time-of-year protected-species restrictions), and inter-array cable installation (scheduled to begin in June 2026) would all be significantly delayed by the Stop Work Order remaining in place until mid-summer 2026, contrary to Defendants' claims (at 23 n.4).  *See id.* ¶¶ 19, 21, 38-39; Chaytors Rebuttal Decl. ¶ 6.  Such delays will cause Sunrise Wind to incur increasing daily costs under its existing vessel contracts—and, depending on the length of delay, would lead to the loss of specialized vessels with replacements uncertain and likely to cost even more.  First Chaytors Decl. ¶¶ 38, 40-41.  And, of course, delay of construction will delay the Project operations, generating power and receiving revenues.  *Id.* ¶ 42.[21]

---

[20] It is noteworthy that, whereas in *Revolution*, Defendants argued that the project failed to show irreparable harm because the order was "slated to expire well before" the relevant power purchase agreement deadline, Opp. at 14, *Revolution*, Dkt. 60, they now make no contention that BOEM intends to resolve the Stop Work Order in the near term.  This is consistent with BOEM stonewalling Sunrise Wind on information about the purported threat to be mitigated, as well as the express references to lease cancellation in the Order and the Giacona Declaration (at ¶ 12).  Particularly in light of the Administration's recent statements that it is "taking . . . down" wind turbines, and that it will not allow them to be built unless "forced to," *see supra* note 10, it is clear that judicial relief is Sunrise Wind's only realistic path forward at present.

[21] As with the first category of irreparable harm, and contrary to Defendants' mischaracterizations, enterprise-threatening costs and delays will result from the Stop Work Order regardless of whether the OREC Agreement is terminated.  If it is terminated, Sunrise Wind will forfeit approximately $90 million in credit support, aggravating the other costs incurred.  First Chaytors Decl. ¶ 46.  Even if it is not terminated, Sunrise Wind will be harmed by delay of its revenues.  *Id.* ¶ 47.

While Defendants argue (at 21) that monetary losses are not irreparable, nowhere do Defendants outline a path for recovery of those losses. And as the *Dominion* court recognized, that project, like this one, "ha[d] already taken millions of dollars of losses, and even if it could recoup some of that money from the government pursuant to regulation, the costs associated with the ongoing construction delays would be difficult to calculate." Tr. 51:3-7.

Again, contrary to Defendants' mischaracterization (at 2) that "Sunrise Wind's enterprise-level harm argument is based entirely on the *possibility*" of OREC Agreement termination, Sunrise Wind has established irreparable harm for reasons independent of such termination. *See supra* at 16-21. And although the OREC Agreement does not have termination provisions tied to specific deadlines like the Revolution Wind power purchase agreement, that does not mean the Stop Work Order here carries no risk of default and termination by the counterparty under the contract.[22] *See* First Chaytors Decl. ¶ 45. Defendants' reputational harm arguments (at 25-26) fail for the same reasons. *See* Tr. 51:9-12, *Dominion* (crediting "damage to Dominion's goodwill and reputation associated with delay and completion of a project Virginians are already paying for").

Defendants (at 24-25) also attempt to distinguish *Revolution* because that project was further along in construction and scheduled to achieve first power sooner. But the complex, staged construction process here is even more at risk where so much work remains. And Sunrise Wind's upcoming scheduled work on the "[o]ffshore export cable installation . . . is a critical phase of offshore construction," that, if derailed, could cause "cascading delays because there are later construction phases that cannot begin until the export cable is installed." First Chaytors Decl. ¶ 22. Sunrise Wind has clearly shown it will face irreparable harm absent the relief requested.

---

[22] Regardless, irreparable harm was demonstrated in *Empire* and *Dominion* without reference to revenue contracts. *See generally Empire*, Dkts. 3, 8, 31-1; *Dominion*, Dkts. 1, 13, 39, 71.

22

## III.    EQUITABLE FACTORS STRONGLY FAVOR IMMEDIATE RELIEF

Defendants' core argument is that their national security rationale "outweighs Sunrise Wind's alleged economic harms," because *Winter* requires courts to "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'"  Opp. at 26-27 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). Multiple courts have rejected that argument, and the facts of this case are no different.

As an initial matter, neither BOEM nor any of the Defendants are "military authorities" and the Court therefore should not defer to Defendants on matters of national security or "the relative importance of a particular military interest."  *Winter*, 555 U.S. at 24; *see Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (deferring to the "professional judgment of military authorities concerning the relative importance of a particular military interest"); *Olivares v. TSA*, 819 F.3d 454 (D.C. Cir. 2016) ("defer[ing] to the informed judgment of agency officials whose obligation it is to assess risks to national security.").  Defendants do not claim there has been a "recommendation" from the DoW as required by 43 U.S.C. § 1341(c), nor does the redacted Marks Declaration appear to refer to one.  Indeed, the Giacona Declaration concedes that Defendants themselves do not understand the asserted national security issue well enough to know whether it can be mitigated.  Giacona Decl. ¶ 10.  Yet, Mr. Giacona says that *he* was the one who "determined that the Project's activities did not adequately provide for the protection of national security interests." *Id.* ¶ 7.  Defendants cannot simultaneously confess ignorance and demand deference.[23]

---

[23] As explained, Ørsted has extensive experience worldwide working with military and national security governmental agencies to identify measures to meet the specific needs identified by those agencies, including installing and deploying measures at operational offshore wind facilities and those under construction.  First LeBlanc Decl. ¶ 1, 3; Stockton Rebuttal Decl. ¶ 11.  Had a genuine concern arisen about the feasibility of mitigating a newly-identified risk, it would have made sense for BOEM to confer with Sunrise Wind before it issued the Stop Work Order, not withhold the information for what is now close to two months since BOEM learned of it.

23

And the *Empire* court rejected Defendants' similar argument on both the law and facts. The court concluded that "the government overreads *Winter*," which "itself made clear that 'military interests do not always trump other considerations.'" Tr. 14:16-21 (quoting *Winter*, 555 U.S. at 26). The court also contrasted the facts of *Winter*, concluding that "Empire Wind's interest is much stronger . . . while the government's interest is weaker and less concrete." *Id.* at 15:5-8. Likewise, the *Dominion* court held that while "[o]rdinarily, a national security risk would weigh heavily in favor of the government," "here, the evidence the Court has reviewed does not demonstrate that the onset of the national security risk is so imminent that the government needs to stop work on the Dominion project entirely." Tr. 51:15-23. Similarly, in *Revolution* this Court recognized that "[BOEM's] failure to explain or apply [its] reasoning suggests that the stated national security reason may have been pretextual," Tr. 44:8-10, and the Court was "not persuaded that any such emergency exists in this case," *id.* at 44:23-24. And the *Vineyard* court noted that any legitimate national security concern could feasibly be addressed through the "normal channels," rather than halting construction of a major project. Tr. 56:8-14.

Sunrise Wind also has a far stronger interest than the *Winter* plaintiffs—it is likely to suffer enterprise-threatening economic harms, losses of over $8 billion, and reputational damage. *See supra* at 16-22; First Chaytors Decl. ¶ 40. There is also extensive evidence that the Project will support the public interest in jobs, provide economic benefits, and promote energy reliability and security in New York. Mot. at 42-45; *see* Pls.' Mot. for Prelim. Inj. at 30-32, *State of New York*, No. 1:26-cv-72-RCL (Jan. 16, 2026), Dkt. 9; Order, *Revolution*, Dkt. 64 (granting Rhode Island and Connecticut's motion). As Amicus North America's Building Trade Unions explains, the Stop Work Order threatens union construction workers' livelihoods. *See generally* Amicus Br. in Support of Prelim. Inj., Dkt. 17-1. After Sunrise Wind filed its Motion, members of Congress

24

wrote to Secretary Burgum and the Secretary of War about the affected projects, including the Sunrise Wind Project, explaining that stopping the projects jeopardizes their many benefits, including "affordable and reliable electricity," "thousands of good-paying jobs for American workers," "achieving American energy dominance[,] and strengthening our national security by reducing reliance on energy produced by our adversaries."[24]

As four courts have now found, Defendants' interest is too weak to tip the balance in their favor. *See Bonds v. Heyman*, 950 F. Supp. 1202, 1216 (D.D.C. 1997). The Stop Work Order and the post hoc rationalizations in the Giacona and Marks Declarations do not demonstrate a compelling public interest; instead, they provide further evidence that the Stop Work Order is arbitrary and capricious. *See supra* at 7-10. And the D.C. Circuit clearly holds that the public's interest is in agencies following the law, *League of Women Voters*, 838 F.3d at 12, which Defendants have not done here.

Sunrise Wind's "credible and unrebutted evidence of harm, and the absence of any such evidence on the other side, tilts both the balance of equities and the public interest in [its] favor." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 84 (D.D.C.), *enforced*, 768 F. Supp. 3d 1 (D.D.C. 2025).

**CONCLUSION**

For the foregoing reasons, this Court should grant Sunrise Wind's motion for a stay of the Stop Work Order and a preliminary injunction that bars Defendants from enforcing it.

---

[24] Letter from Members of Congress to Secretaries Burgum and Hegseth (Jan. 22, 2026), attached as **Exhibit C**. Defendants appear to have denied these Members of Congress, as well as the ranking member of the House Armed Services Committee's Seapower subcommittee, access to the classified material. *See id.*; *Pentagon Brushes Off Request to Understand How Wind Turbines Threaten National Security*, Military.Com (Jan. 18, 2026), https://www.military.com/daily-news/2026/01/18/pentagon-brushes-off-request-understand-how-wind-turbines-threaten-national-security.html.

Dated:  January 29, 2026                          Respectfully submitted,


                                    By */s/  Janice M. Schneider*
                                        Janice M. Schneider (D.C. Bar No. 472037)
                                        Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                        Roman Martinez (D.C. Bar No. 1001100)
                                        Devin. M. O'Connor (D.C. Bar No. 1015632)
                                        Rachael L. Westmoreland (D.C. Bar No. 90034032)
                                        LATHAM & WATKINS LLP
                                        555 11th Street NW, Suite 1000
                                        Washington, D.C. 20004
                                        Tel:  (202) 637-2200
                                        Fax:  (202) 637-2201
                                        Email: janice.schneider@lw.com
                                                stacey.vanbelleghem@lw.com
                                                roman.martinez@lw.com
                                                devin.o'connor@lw.com
                                                rachael.westmoreland@lw.com

                                        *Counsel for Plaintiff Sunrise Wind LLC*

26