# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


VINEYARD WIND 1, LLC,          )
                               )  Civil Action
            Plaintiff,         )  No. 26-10156-BEM
v.                             )
                               )
UNITED STATES DEPARTMENT       )
OF THE INTERIOR, et al.        )
                               )
                               )
            Defendants.        )


                 BEFORE THE HONORABLE BRIAN E. MURPHY
                    UNITED STATES DISTRICT JUDGE


                          MOTION HEARING


                        January 27, 2026



            John J. Moakley United States Courthouse
                       Courtroom No. 12
                      One Courthouse Way
                 Boston, Massachusetts  02210
```

```
                        Kelly Mortellite, RPR, RMR, CRR
                        Official Court Reporter
                        One Courthouse Way, Room 3200
                        Boston, Massachusetts  02210
                        mortellite@gmail.com
```

```
 1   APPEARANCES:

 2   Counsel on behalf of Plaintiff Vineyard Wind 1 LLC:

 3   Brooklyn Hildebrandt
     Sidley Austin LLP
 4   555 W. 5th Street
     Los Angeles, CA 90013
 5   213-896-6007
     bhildebrandt@sidley.com
 6
     Jack W. Pirozzolo
 7   Sidley Austin LLP
     60 State Street
 8   Boston, MA 02109
     617-223-0300
 9   jpirozzolo@sidley.com

10   Kathleen Moriarty Mueller
     Peter C. Whitfield
11   Matthew Brewer
     Sidley Austin LLP
12   5101 K Street NW
     Washington, DC 20005
13   202-736-8987
     kmueller@sidley.com
14
     Counsel on behalf of Defendant United States Department of the
15   Interior:

16   John Kenneth Adams
     DOJ-Enrd
17   950 Pennsylvania Ave NW
     Washington DC, DC 20530-0001
18   202-353-5905
     john.adams3@usdoj.gov
19
     Counsel for the Commonwealth of Massachusetts:
20
     Nathaniel Haviland-Markowitz
21   Turner Smith
     Massachusetts Attorney General's Office
22   One Ashburton Place, 20th Floor
     Boston, MA 02108
23   347-463-7595
     nathaniel.haviland-markowitz@mass.gov
24
     (continued.)
25
```

1    APPEARANCES: (continued.)

2    Counsel for Climate Jobs Massachusetts, Massachusetts AFL-CIO,
     Massachusetts Building Trades:

3
     Nicole Horberg Decter
4    Segal Roitman, LLP
     33 Harrison Avenue
5    Boston, MA 02111
     617-742-0208
6    ndecter@segalroitman.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          (The following proceedings were held in open court before
 3     the Honorable Brian E. Murphy, United States District Judge for
 4     the District of Massachusetts, at the John J. Moakley United
 5     States Courthouse, One Courthouse Way, Courtroom 12, Boston,
 6     Massachusetts, on January 27, 2026 at 2:04 p.m.)
 7     (Case called to order.)
 8               COURTROOM CLERK:  You may be seated.  If counsel can
 9     first identify yourselves, starting with plaintiff's counsel.
10               MR. PIROZZOLO:  Good afternoon, Your Honor.  Jack
11     Pirozzolo on behalf of Vineyard Wind.  And with me at counsel
12     table is Brooklyn Hildebrandt, Kathleen Mueller, Peter
13     Whitfield, and Matthew Brewer in the back.
14               THE COURT:  Good afternoon to everyone.
15               MR. PIROZZOLO:  Thank you, Your Honor.
16               MR. ADAMS:  Good afternoon, Your Honor.  I'm John
17     Adams on behalf of federal defendants.
18               THE COURT:  Good afternoon.
19               MS. HORBERG DECTER:  Nicole Horberg Decter on behalf
20     of the Massachusetts AFL-CIO, Massachusetts Building Trades
21     Council and Climate Jobs Massachusetts, the amici.
22               THE COURT:  Good afternoon.
23               MR. HAVILAND-MARKOWITZ:  Good afternoon, Your Honor.
24     Nathaniel Haviland-Markowitz with the Massachusetts Attorney
25     General's Office on behalf of the Commonwealth of
```

02:03 (line 10)
02:04 (line 20)

1    Massachusetts, and also with me is Turner Smith.

2         THE COURT:  Good afternoon.  I thank you for all for

3    being here.  I appreciate, I recognize that you may have been

4    asked to step in at the last minute, so I just want to

5    acknowledge I appreciate your being willing to do so.

6         I know as we talked about on the Zoom this was a case

7    that needed some rather quick resolution, and that's why we

8    ended up here quite quickly today.

9         I think I will give you the floor first.

02:04 10         MR. PIROZZOLO:  Thank you, Your Honor.  And just in

11    terms of some procedural blocking and tackling here, the

12    Attorney General's Office amici has asked for about five

13    minutes, and AFL-CIO and Building Trades Council has asked for

14    about one minute.

15         THE COURT:  I think we can accommodate that, yes.

16         MR. PIROZZOLO:  And I just want to make sure I'm

17    answering your questions, but I have probably about 20 minutes

18    or so of argument, but I anticipate that you'll have questions.

19         THE COURT:  Sure.  Take all the time that you need.

02:05 20         MR. PIROZZOLO:  Thank you, Your Honor.

21         THE COURT:  Well, let me start with a question.  A PI

22    versus a stay, what's the difference here?

23         MR. PIROZZOLO:  Well, functionally it's not likely to

24    be any different here.  So we would certainly want -- I think

25    we've actually asked for both.

```
 1              THE COURT:  You did.
 2              MR. PIROZZOLO:  So functionally it's going to be the
 3    same thing, but I don't know really if it really makes a
 4    difference procedurally as far as --
 5              THE COURT:  I know the factors are obviously the same.
 6    From the government's perspective, is there any difference
 7    between these two possible remedies?
 8              MR. ADAMS:  No, Your Honor.  We would agree with that.
 9    The factors are the same, and the government will have the same
10    defense.
11              THE COURT:  Okay.  Great.  Thank you.  Go ahead.
12              MR. PIROZZOLO:  Thank you, Your Honor.
13              So I want to start by saying Vineyard Wind really did
14    not want to be here.  It's not an accident that we were the
15    last of the projects to actually file a lawsuit.  And that's
16    because we tried, once the order came down, we tried very, very
17    hard to work with BOEM and BSEE.  And I know it's a bit of an
18    alphabet soup, but BOEM is the Bureau of Ocean Energy
19    Management, and BSEE is the Bureau of Safety and Environmental
20    Enforcement.  And they're both defendants in this case, and our
21    requested relief is going to go as to both.  I just want to, I
22    want to frame that up from the beginning, Your Honor.
23              We tried to work with them.  We tried to work within
24    the existing order to continue the construction of the project
25    to get whatever information that we could with regard to
```

1   potential mitigation of the purported national security issue

2   and there's just no engagement whatsoever.  That was nearly a

3   month before we were essentially forced -- it was about three

4   weeks before we were forced to actually sue here.

5       Now, the reality here, and I don't think this is

6   really disputed, is that without providing Vineyard Wind any

7   notice or opportunity to be heard, the government issued this

8   stop work order, and it suspended all ongoing activities

9   related to the project, except for activities related to safety

02:07 10   and ongoing power generation, which I'm going to address later

11   in my remarks.

12       So this stop work order was issued at a very crucial

13   time in the project.  The project was 95 percent completed.

14   Vineyard Wind has invested four and a half billion dollars so

15   far.  And completion of the vessel -- completion of the project

16   requires a specialized vessel.  You saw in the papers the

17   reference to the Sea Installer.  These are not vessels that you

18   can simply contract for.  It takes months and sometimes years

19   to actually get them under contract.

02:08 20       The Sea Installer is only available as contracted.  So

21   Vineyard Wind is only contracted with the Sea Installer through

22   March 31 of this year, and its commitments, financial

23   commitments require completion of the project by the end of

24   March of this year.

25       THE COURT:  That's 100 percent completion?  That

1  includes the replacing of all the blades?

2       MR. PIROZZOLO:  That's correct, Your Honor, that's

3  correct.  And we have barely enough time to finish as it is,

4  but, you know, if the order is entered, we expect that we'll be

5  able to, weather permitting, and I can explain how the weather

6  works here and I mentioned last week about the weather window,

7  but under the construction schedule there's a certain amount of

8  days that, just because of the historical weather patterns and

9  the requirement that the vessel can't engage in construction if

02:09 10  the seas are over a certain height, that there are going to be

11  lost days no matter what.  We can't tell exactly what day.  We

12  can project out in a few days in advance, as you heard on

13  Friday, but it's part of the plan that there will be days that

14  we cannot work.  But there are of course going to be days that

15  we can work, and that's the 60-day window that we have in order

16  to complete the project.  And there are 18 turbines essentially

17  that are at issue here because 44 have been completed.

18       And I want to add an additional fact that came up late

19  sort of after we filed our papers, which is that the government

02:10 20  had said that somehow Vineyard Wind isn't going to be

21  irreparably harmed because the lenders aren't going to be doing

22  anything.  As you may have seen in the supplemental declaration

23  that we filed, the lenders actually have informed the project

24  as of January 23 that they are now questioning the financial

25  viability of the project and have reserved the right to take

1    the position that the order is an event of default.

2            So this is not speculative.  This is real.  And in

3    terms of whatever standard you have for purposes of a likely

4    irreparable harm essentially, the potential collapse of the

5    project, you have that here on this record before the court.

6    The reality is the project is now at a grave risk of failing to

7    meet its construction schedule and in turn its financial

8    obligations under both the power purchase agreements and its

9    financing arrangements.

02:11 10         The government has made a lot about the fact that

11    there are 44 turbines that are permitted to continue to spin.

12    The record is that the current level of power production will

13    not cure the harm.  The current level of power production is

14    insufficient to meet the project's financial obligations and

15    its commitments, and the failure to provide a fully constructed

16    project at the end of March, which requires it to produce 800

17    megawatts of power, puts the project in a position where it

18    will be facing default under both the power purchase agreements

19    and under its financing arrangements.

02:11 20         The order is illegal.  It was issued in violation of

21    the APA, the OCSLA, the Outer Continental Shelf Lands Act, and

22    the Fifth Amendment.  We've shown immediate and irreparable

23    harm, and the balance of harms does not weigh in favor of the

24    government.  Instead, it weighs heavily in favor of an

25    injunction.

1          Now, it's important, as you saw in our reply brief,

2    that the court here is not facing these issues as the first

3    court to be facing these issues.  So far, three other projects

4    have gone to three separate judges, all of whom have concluded

5    the same thing; that an injunction should issue with regard to

6    the stop work orders.

7          There is no material difference between the stop work

8    orders that those judges determined were appropriately enjoined

9    and the stop work order that is at issue here.  And those

02:12 10  courts properly found and they really focused -- I'm going to

11   focus largely on the APA issues here that are raised, that the

12   projects there showed a likelihood of success in terms of a

13   violation of the APA, including arbitrary and capricious, and I

14   think one court suggested that there was evidence that this is

15   a pretext as well.

16         I don't think you need to decide the pretext issue

17   here on this record.  You certainly can if you want, but I

18   don't think it's necessary to get Vineyard Wind the relief that

19   we're seeking here.  It's sufficient to show that the order was

02:13 20  arbitrary and capricious; that the order was provided without

21   notice in violation of the procedural requirements that the

22   project is entitled to, and probably most importantly,

23   particularly given First Circuit case law here, there was no

24   consideration of the reliance interests of Vineyard Wind.

25         I think all of the reasons are sufficient for a

likelihood of success on the merits, but of all of them, I

think in terms of, if you look at the line of cases in the

First Circuit that we cited, you're going see that the absence

of considerable reliance interests really drives the question

of whether or not there's going to be a violation of APA, and I

don't think it's disputed here at all that there was any

consideration.  Certainly the order doesn't reflect it, and

administrative record doesn't reflect any consideration of the

reliance interests of Vineyard Wind.

02:14  So we've provided a case table in the reply which sort

of lays out the different cases, how they were decided.  There

were different rationales, but you can see the overall thrust

of how the courts have approached the issue in terms of the

balance of the various equities here.

Now, the government is I think forced into a position

of saying, well, you should just not follow those.  And the

government is forced to say, well, this is distinguishable,

right?  And it really comes down to basically two points that

they make as to why this is distinguishable, right?

02:14  The first has to do with the fact that they are

permitting the 44 wind turbines to continue to generate power.

That's one.  And then the second is they claim that there

really isn't a risk of catastrophic financial failure here.

I'll address the second one in a moment because I don't think

the record -- I think the record is overwhelming that Vineyard

1    Wind faces catastrophic, the collapse of the project if the

2    stop work order is in place, and I can explain why that is in a

3    minute.

4         But with regard to the question of the operation,

5    there are two things about that.  First, it doesn't affect the

6    APA analysis, but this is still arbitrary and capricious, I

7    think they're framing it more as a question of balance of harms

8    that there isn't as imminent a harm.  But let me tell you why

9    that's not true and why it's just an incorrect analysis based

02:15 10    on how the project works.

11         So first, as a threshold matter, the reality is the 44

12    turbines are simply insufficient to generate the amount of

13    power that's required under the power purchase agreements, it

14    requires 800.  The way financing works is Vineyard Wind is

15    committed to providing a completed project.  That's the

16    commitment.  They don't do that, so commercial operation and

17    failure to reach commercial operation date, if you look at the

18    purchase agreement, is an event of default under those, but

19    also with regards to the -- we submitted a declaration with

02:16 20    regard to the financing.  With regard to the financing, failure

21    to have a completed project at the end of March exposes the

22    project to a full default.

23         And so the question of the 44 turbines is just, it's

24    irrelevant to the financial and catastrophic harm that Vineyard

25    Wind is going to face if it can't complete the project on time.

1   And the project can't do that because the Sea Installer is --

2   we don't have a vessel to complete the project even after

3   March.

4           I will say that Vineyard Wind has tried to identify

5   whether there are other vessels that are available and has not

6   been able to locate another vessel that could take the place of

7   the Sea Installer.  And just so you know, the Sea Installer is

8   just sitting out there in the water waiting to work.  It's just

9   out there now, ready to work, and it can't do it.  And these

02:17 10   vessels are under tremendous demand worldwide.  There are other

11   projects worldwide.  And at a certain point, the Sea Installer,

12   it's just not going to be available to finish the project.

13           So with regard to the operations point as well, what's

14   sort of puzzling about the stop work order, and this goes to

15   the arbitrary and capricious nature of it, is as we understand

16   it based on the record that's been developed so far, whatever

17   the national security information is relates to issues related

18   to operation and not construction.  And the stop work order

19   here at least is stopping the construction phase of Vineyard

02:18 20   Wind, so there's no explanation as to the connection of those

21   two things.

22           And then with regard to operations, there's no

23   analysis whatsoever of why and how the current construction

24   plan, so the COP, and the mitigation agreement that Vineyard

25   Wind signed and amended in 2023, is insufficient to handle

1    whatever mitigation is needed for whatever this new additional
2    information is.

3        If you look at the mitigation agreement, you can see
4    that it provides, among other things, for curtailment.  So if
5    there's an issue, the blades can stop.  And my understanding is
6    that's just a matter of a couple of minutes once there's a
7    notification that there's an issue with regard to a potential
8    risk.

9        And the fundamental problem with the stop work order
02:18 10    that we have here is there's just no explanation of any -- and
11    I don't think there was any analysis of how the national
12    security information ties in any way to making the mitigation
13    agreement inadequate in any way or how it ties to the question
14    of construction.  They don't really analyze that in any way.
15    None of that stuff is classified.  They just simply didn't
16    analyze it.

17        The only thing I saw in the papers, Your Honor, was a
18    single paragraph from the acting director who said that he
19    looked at the COP and looked at the mitigation agreement.
02:19 20    Actually, incidentally, if you look at the declaration, it
21    doesn't say when he did; it just says he looked at it, with no
22    explanation as to how that should tie in any way to the
23    decision to stop this project.  And certainly there is no
24    analysis specific, really truly specific to this project with
25    regard to the connection of national security.  Nor is there

1    any further explanation, there's no explanation in the

2    administrative record at all.

3        So even if they could try to cure this with some

4    affidavit, they didn't do it.  They just said, I looked at it

5    and that's it.  There's no evidence that he had any expertise

6    whatsoever.  I don't think he has any expertise in national

7    security, radar, anything.  He didn't look -- there's no

8    expert, no record here at all of anybody saying or showing if

9    there's any particular rational basis for the decision to stop

02:20 10    the work here under these circumstances.

11        So as I mentioned at the top, and I don't want to

12    necessarily repeat myself, I think that really what

13    fundamentally is going to sort of -- I think is sort of

14    overwhelming here is the failure to consider the reliance

15    interests.

16        THE COURT:  Yes.

17        MR. PIROZZOLO:  There just isn't, and there is no

18    dispute and the government makes no showing that there was any

19    actual consideration of the reliance interests.

02:21 20        In terms of the irreparable harm issue, as I

21    mentioned, the way the construction works is that you have a

22    window and you have a certain amount of time in order to build

23    the project.  The Sea Installer is there until March 31, and

24    then it would take another year or so.

25        I want to address in terms of the -- sorry, I said

1    there were two.  One was operations.  And the second is this

2    idea that somehow the blade failure back in 2024 shows that

3    this really isn't going to be irreparable harm to the project

4    because there was a blade failure and the project survived.  It

5    wasn't entirely clear to me what the government's argument was

6    along those lines, but I infer from that they're suggesting,

7    well, Vineyard Wind is crying wolf here because they went

8    through a crisis before, and, you know, they can survive it

9    just as easily.  I think that's the thrust of the argument.

02:22 10          That situation was completely different.  Among other

11    things, the period of time under the power purchase agreement

12    had already been extended, and there wasn't any kind of

13    imminent deadline for issuing of the power in the power

14    purchase agreements.  The financing arrangements were I think

15    nine months off.  But most importantly, and I think this is

16    truly fundamental in terms of the difference between this order

17    and what happened in 2024, is that when the blade fell, there

18    was an immediate response to figure out what happened, and then

19    Vineyard Wind was able to create a plan to come to the agencies

02:22 20    and say, here is the plan to complete construction.  If you can

21    show a plan and a timeline for completing construction, then

22    you're in a position to have the financing arrangements work

23    out.

24          Here, with respect to both the Sea Installer and the

25    financing arrangements, the stop work order here is for 90 days

1   minimum.  It's essentially an indefinite stop work order, and

2   it doesn't provide any guidance in terms of how there could be

3   any plan in order to mitigate.  They say there's going to be

4   mitigation, but there's absolutely no plan, and so the project

5   simply can't go to its lenders.  What lender is going to say,

6   okay, we're going to lend you money but I don't know when the

7   project is going to be completed, I don't know whether you're

8   going to ever be able to complete the project?

9        And the same with the Sea Installer.  It's not like

02:23 10  it's inexpensive to keep the Sea Installer around.  It costs

11  something in the order of $200,000 to $500,000 a day.  And

12  Vineyard Wind is an entity; and yes, it has money, but it

13  doesn't have infinite money.  And you can't be in a position to

14  simply say, okay, we're just going to keep you on in the hopes

15  that someday, somehow, several months later, okay, now Sea

16  Installer, you can do your work.  It puts the project

17  completely at risk because Vineyard Wind, as the entity -- and

18  really the focus here is on the entity, the LLC -- the entity

19  itself simply would not be in a position to have an indefinite

02:24 20  amount of money spent on a ship that is just sitting around.

21        I do have a picture of the Sea Installer if the court

22  is interested.

23        THE COURT:  I'd like to see that.  Let me ask you a

24  question that I've been struggling with a little bit, which is,

25  when I'm looking at irreparable harm, and I looked at the other

1    cases, the three other cases you talked about, is irreparable

2    harm the death knell of the smallest legal entity?

3         So let's say Vineyard Wind is owned -- I'm not saying

4    that this is the case, but Vineyard Wind is owned by Apple, but

5    it's separately incorporated so that the five-billion-dollar

6    loss that we'd be looking at, four-and-a-half-billion-dollar

7    loss that we'd be looking at here would wipe out the LLC but

8    potentially not the larger entity.

9         How do I deal with -- I mean, you could have

02:25 10   incorporated each individual turbine as an LLC and then say

11   that since one turbine is not online, it's the death knell of

12   Turbine 6 LLC, would that still be irreparable harm?  And how

13   am I supposed to think about those things?

14        MR. PIROZZOLO:  You do need to look at the juridical

15   entity, so the answer is yes.  So I think the answer to your

16   question is yes.  So the entity that you looked at in terms of

17   assets, liabilities, in terms of the ability to survive, and I

18   think the case law is quite clear on this, that you look at

19   that entity and you make the judgment as to whether or not

02:25 20   there's going to be a collapse of that entity.

21        Now, it just so happens there's all kinds of terrible

22   collateral other effects of the collapse of the project here,

23   but in terms of what you're supposed to focus on, the order

24   runs against Vineyard Wind LLC.

25        THE COURT:  Right.

1          MR. PIROZZOLO:  The construction, the COP is with

2    Vineyard Wind LLC.  And so the issue is what effect does it

3    have on Vineyard Wind LLC.  That's really the appropriate focus

4    of the court's inquiry.  May I approach?

5          THE COURT:  Of course, yeah.  Mr. Adams has seen this

6    before?

7          MR. PIROZZOLO:  Yes, I have provided him a copy.

8    Marked as Exhibit 1, Your Honor?

9          (Exhibit 1 admitted into evidence.)

02:26 10          THE COURT:  Sure.  Thank you.

11          MR. PIROZZOLO:  So just for the record, we're marking

12   a photograph of the Sea Installer that you can see.  Just to

13   describe what you're looking at, the Sea Installer is the

14   massive vessel with the crane, and you can see on the

15   right-hand side of the photo essentially the constructed tower

16   coming out of the water, sort of like a concrete post.  Do you

17   see that?

18          THE COURT:  Yes.

19          MR. PIROZZOLO:  Just for scale, to the left is a

02:27 20   service boat.  That gives you a sense of how large this vessel

21   truly is.  The turbines go hundreds of feet in the air.  This

22   is not a day sail that you can rent in Hyannis.  This is a

23   specialized vessel.  I believe that there are maybe fewer than

24   ten in the world that can do this work.

25          THE COURT:  Is that vessel floating on the water?

1          MR. PIROZZOLO:  I believe it's anchored, fastened to

2     the -- not fastened but it has footers that go to the floor of

3     the seabed.

4          THE COURT:  All right.  Thanks.

5          MR. PIROZZOLO:  It jacks up.

6          THE COURT:  It does, okay.  Thanks.

7          MR. PIROZZOLO:  And then the last, two more points

8     before I'll sit down, Your Honor, unless you have further

9     questions for me?

02:28 10          THE COURT:  No.  Go ahead.

11          MR. PIROZZOLO:  So I do want to focus, because the

12     government is so focused heavily on the *Winter* case, and we

13     think the *Winter* case actually helps us, it doesn't hurt us.

14     Because if you read the *Winter* case, it's clear that the

15     Supreme Court said you do conduct the same balancing test, the

16     test is the same, and national security doesn't overwhelm every

17     other consideration.

18          But I think the most germane part of *Winter* is if you

19     look at the actual development of the record that existed in

02:28 20     that case, you saw several Naval, I guess they were officers,

21     who submitted affidavits with regard to, it had to do with

22     essentially training exercises under water, multiple rounds, a

23     highly, highly developed factual record here, and even then it

24     was a close call.  But in this case, by contrast, we have

25     nothing.  We have an acting director who saw a report

1   designated secret, not even top secret, SCI, and made a

2   decision to just stop everything without any development.

3        There's no evidence that the Department of War

4   actually evaluated any of this, made the recommendation.

5   There's just no evidence of any of that.  I don't know whether

6   that happened or didn't happen, but we can only deal with the

7   record before us, and the court can only deal with the record

8   in evaluating the APA issue where the record gets presented,

9   and there's nothing of the sort here.

02:29  10        I mentioned at the beginning that this case is not

11   just against BOEM but also against BSEE.  I want to explain why

12   that matters.  So the way the construction works, and this

13   relates to the installation of the blades, is there's two

14   phases:  return to installation and return to service.

15        And in the construction, as part of the construction,

16   what happens is there's a blade, there are various

17   specifications for the blade, so testing, making sure the blade

18   meets the specifications basically.  And so what happens is the

19   project submits to BSEE the specifications, and then if BSEE

02:30  20   has any questions, they ask the questions.  And then once they

21   don't have any more questions, then the blades first can be

22   installed.  That's what they call RTI.  And then they can be

23   put into service.  That's RTS.  Okay?

24        On average over the last three months before this

25   order, the RTI process took two days.  The RTS process took

1    less than a day on average.  Since December 23, there's been

2    nothing.  There have been a series of what we call blade

3    packages that have been presented to BSEE and it's been silent.

4        It is of great concern in connection with whatever

5    order this court were to issue that it takes into account the

6    requirement that BSEE treat those blade packages in the

7    ordinary course.  There's a course of dealing so we know how

8    long and we know the types of things that are at issue with

9    BSEE.  We have some concern that even if the stop work order on

02:31 10   BOEM is enjoined that the government would countermand that by

11   having BSEE simply not provide the information back to the

12   project so the blades can be installed.

13       THE COURT:  What happened to the other three cases?

14   What happened in the other three cases?

15       MR. PIROZZOLO:  It wasn't an issue because those are

16   earlier in development.  Those are --

17       THE COURT:  They don't need it.

18       MR. PIROZZOLO:  They didn't need that.

19       THE COURT:  Okay.

02:32 20       MR. PIROZZOLO:  I think, unless the court has any

21   further questions for me, I think that's all I have.

22       THE COURT:  Great.  Thank you.  I'll give you a chance

23   again at the end.

24       Mr. Adams, do you want to speak now, or do you want to

25   give the amici a chance to speak and speak after that?

1          MR. ADAMS:  Your Honor, we'd appreciate it if the

2     amici go first so the government has a chance to respond to

3     whatever argument they make.

4          THE COURT:  Sure.

5          MR. HAVILAND-MARKOWITZ:  Can you hear me all right?

6          THE COURT:  Okay.

7          MR. HAVILAND-MARKOWITZ:  Good afternoon, Your Honor.

8     The Commonwealth of Massachusetts would like to emphasize two

9     points in support of Vineyard Wind's motion.

02:32 10          First, BOEM's order has caused Massachusetts to incur

11     significant harm, and if it is not enjoined, additional

12     significant harm will accrue, and that relates directly to the

13     public interest inquiry related to Vineyard Wind's motion.

14          Second, BOEM's order did not consider at all the

15     serious reliance interests that the Commonwealth of

16     Massachusetts has engendered, and for that reason, Vineyard

17     Wind is likely to succeed on the merits.

18          So I want to start first with one of the categories of

19     harm that faces Massachusetts.  BOEM's order hampers

02:33 20     Massachusetts' ability to provide reliable, affordable energy

21     to its hospitals, schools, residents and businesses.  The

22     winter period like the one that we're in right now is the

23     period that is the most intensive for the grid.  It requires

24     the highest level of demand, and energy supply sources are

25     usually most constrained.  That means energy prices are also at

1    their highest.

2         THE COURT:  Can I consider the damage to Massachusetts

3    when deciding if Vineyard Wind has demonstrated irreparable

4    harm?

5         MR. HAVILAND-MARKOWITZ:  Yes.  I believe the case

6    *Department of Homeland Security v. Regents of University of*

7    *California,* 591 U.S. 1, indicates that third party harms can be

8    considered and reliance interests can also be considered in the

9    APA analysis.

02:34 10         THE COURT:  Thank you.

11         MR. HAVILAND-MARKOWITZ:  So going back to this period

12    we're in, this winter with this crazy storm, it's when energy

13    prices are high, the grid is constrained, and often wind energy

14    resources have their highest capacity factor in winter, meaning

15    they can generate the most electricity during this period.

16         Currently there are a portion of the blades online,

17    but there's a portion that are not.  And the remaining blades,

18    if they were to come online, would be able to power

19    approximately 150,000 homes in the Commonwealth of

02:34 20    Massachusetts.  That's a significant and critical amount of

21    energy.

22         I also want to note that there's no new comparable

23    energy generation that could come online to take the place of

24    Vineyard Wind.  So that is all to say that BOEM's order

25    jeopardizes Massachusetts' sovereign obligation to provide

1    reliable, affordable energy to its residents and ratepayers.

2        Next I want to talk about the economic damage that's

3    brought by BOEM's order.  Massachusetts has been working in

4    partnership with Vineyard Wind for nearly a decade to develop

5    this project.  And one of the features of that partnership are

6    the power purchase agreements, long-term contracts that are

7    signed by Massachusetts electricity distribution companies and

8    Vineyard Wind.  Those contracts provide for a stable price for

9    both energy and renewable energy credits.  However, those

02:35 10   prices are not available right now because BOEM's order

11   prohibits Vineyard Wind from meeting its commercial operation

12   date and the power purchase agreement price becoming active.

13       That means that the electricity that is currently

14   being generated by Vineyard Wind is being sold and purchased on

15   the wholesale open market, and those prices are much, much

16   higher than the stable price that would have been guaranteed by

17   the power purchase agreement.  We've estimated that that's

18   going to cost ratepayers in Massachusetts $11 million for

19   energy costs between January and March of this year and 13

02:36 20   million to purchase renewal energy credits over that same

21   period.

22       I also want to note that Massachusetts has invested or

23   committed over $418 million into the development of the

24   offshore wind industry, and that also includes thousands of

25   jobs and millions of labor income that are associated with the

1    Vineyard Wind project that are threatened by BOEM's order.

2           As further explained in our brief, the order also

3    causes harm to other state interests, including our ability to

4    meet clean energy and climate statutory obligations as well as

5    to protect our residents from climate harms and public health

6    harms.

7           The last point I want to touch on are the reliance

8    interests.  The public -- the harms that I've just been

9    describing also serve as the basis for our reliance interests.

02:36 10   First Circuit and U.S. Supreme Court case law clearly establish

11   that where a federal agency did not consider serious reliance

12   interests, they acted arbitrarily and capriciously.

13          BOEM's order does not make any reference to

14   Massachusetts' dependence on Vineyard Wind for energy supply,

15   its ability to decrease ratepayer bills or its ability to

16   prevent the harms associated with climate change and the public

17   health impacts of other emitting energy resources.

18          In closing, we ask the court to please grant the

19   preliminary injunction and other remedies requested by Vineyard

02:37 20   Wind.  Thank you.

21          THE COURT:  Thank you.

22          MS. HORBERG DECTER:  Good afternoon, Your Honor.  Can

23   you hear me?

24          THE COURT:  I can.  Good afternoon.

25          MS. HORBERG DECTER:  Wonderful.  I'm here on behalf of

     1    500,000 workers represented by the Massachusetts AFL-CIO's

     2    affiliates and particularly 75,000 construction workers

     3    represented by the Massachusetts Building Trades Council.  I'm

     4    also here on behalf of Climate Jobs Massachusetts, a

     5    Massachusetts coalition of unions and community groups focused

     6    on building an American workforce to support the offshore wind

     7    industry and renewable energy generally.

     8            Our position is very simple, and it goes both to

     9    irreparable harm that will be suffered if the order is not

02:38 10    enjoined and the public interest in this case.  Vineyard Wind

    11    is the first industrial-scale wind project in the United

    12    States.  The Southeastern Massachusetts Building Trades Council

    13    reached a historic deal with Vineyard Wind, guaranteeing good

    14    jobs for Massachusetts construction workers beginning in 2021

    15    and continuing through the end of the project.  That promise

    16    will not be met if this stop work order is not enjoined.

    17            Vineyard Wind has generated thousands of unionized

    18    construction jobs, and over 200 unionized workers whose skilled

    19    construction work has been a boon to the project are still

02:39 20    needed to complete this job.  Thousands of hours are estimated

    21    as needed to complete those 18 windmills and make this wind

    22    farm fully functional.

    23            These workers' ability to continue their work remains

    24    in limbo.  Many of these workers have committed years of their

    25    lives not just to the work but to the training and

1   certifications required to perform this work.  They've planned

2   on careers in offshore wind, and their livelihoods are frankly

3   in jeopardy.

4         The failure to immediately employ these workers has

5   consequences for the success of this project, as these workers

6   will be forced to move on.  These are not workers who can wait

7   for a month and see if the work returns.  These are workers who

8   live paycheck to paycheck.  They have families.  They have

9   mortgages.  They have lives.  They have already waited over six

02:39 10   weeks.  It's too long.  They cannot wait another day, 90 days

11   or 180 days for a return to work.

12         And it's important to note that there isn't new work

13   that can be offered in offshore wind in Massachusetts.

14   Vineyard Wind is the only offshore wind project in construction

15   for the foreseeable future.  The only work that they can do to

16   continue their livelihoods, continue what they began is on this

17   project.  If this project does not continue immediately, they

18   will, frankly, even if it's restarted, there's no guaranty

19   these workers will be able to come back to work, they will need

02:40 20   to find work elsewhere.  Their services will be retained

21   elsewhere.  That would mean that Vineyard Wind, through its

22   contractors, would need to train and certify a whole new wave

23   of workers.  That would only further delay and complicate this

24   project.

25         This project requires significant attention to detail,

1    but more than that, it requires the exceptional skill of these

2    trades workers who have already spent years on the job and know

3    this work well.  They've made it efficient.  They can get it

4    done in the next three months.

5         Finally, I just want to highlight plaintiff counsel's

6    statement about the installation vessel and the urgency of

7    bringing construction back online.  In my experience working on

8    wind projects in New England on behalf of the unionized trades,

9    I can tell you that the average wait time for a new vessel is

02:41 10   approximately two years and that they are in very high demand

11   around the world.  And so even a year may be a generous

12   estimate of when this could come back online.  Thank you very

13   much.

14        THE COURT:  Thank you.  Mr. Adams, I'm going to turn

15   to you in one second.  I'm going to ask Mr. Pirozzolo one quick

16   question if that's all right.

17        Whether or not the government considered reliance

18   interests, it's something that you've made strongly in your

19   papers, you made strongly here, how do I know?

02:42 20        MR. PIROZZOLO:  Well, that's part of the problem, is

21   that you don't know.  So in a case like this, you have to look

22   at the administrative record.  There is no meaningful

23   administrative record.  And so the inquiry is have they

24   documented consideration of the reliance interests.  If they

25   didn't, there's nothing for you to -- there's no reliance

1    interests that can support the order.  So does that answer your

2    question?

3            THE COURT:  It does.  I'm going to give Mr. Adams a

4    chance to answer it, too.  How am I supposed to judge on a very

5    limited record before me whether or not the government

6    considered reliance interests at all?

7            MR. ADAMS:  Your Honor, what you have before you is

8    the suspension order that allows Vineyard Wind to continue

9    operating at 75 percent capacity, and that is some indication

02:43 10   that reliance interests were considered.  The suspension order

11   in this case, unlike the other cases, has more case specific

12   facts, specifically as it relates to operations.

13           Counsel is correct that there's no final

14   administrative record.  We're at a preliminary stage right now.

15   But that's one indication that BOEM did consider reliance

16   interests here.

17           THE COURT:  All right.  Thank you.  The floor is

18   yours.

19           MR. ADAMS:  Thank you, Your Honor.

02:43 20           THE COURT:  Well, let me start with the two questions

21   that I'm struggling most with on your side.  So I suspect you

22   are going to do this anyway, but obviously I have three other

23   district court judges who have looked at similar cases.  I've

24   reviewed what they did, looked at the briefing.  I understand

25   there are some distinctions, but I'm interested in hearing

1    where you see those distinctions are.

2         And then the second thing that I've struggled with is,

3    if the national security interest is with operation, and that I

4    don't think is contested on your part, how am I not supposed to

5    conclude that allowing the continued operation or prohibiting

6    construction isn't arbitrary?

7         MR. ADAMS:  I'll start with the first question.

8         THE COURT:  Sure.

9         MR. ADAMS:  The distinction is irreparable harm.  I'll

02:44 10   spend most of my argument on irreparable harm.  But in short,

11   the other wind projects weren't able to reach even past zero

12   power.  They were not operating.  Here, Vineyard Wind is 95

13   percent constructed and operating at 75 percent power.  And

14   with operations of that 75 percent power, Vineyard Wind is

15   collecting revenue unlike the other wind projects.

16        THE COURT:  Right.

17        MR. ADAMS:  That is the easiest distinction for Your

18   Honor, and that goes to irreparable harm.

19             With respect to operations and construction, the

02:44 20   answer about whether it's arbitrary and capricious lies within

21   the classified information that Your Honor has for ex-parte,

22   in-camera review, and this court can make its own determination

23   based on those classified materials about whether the order was

24   arbitrary or capricious.  We can talk about the face of the

25   order when I get to the merits arguments.

1           THE COURT:  Sure.

2           MR. ADAMS:  If I could, Your Honor, I would like to

3      start with the balance of the harms because as Vineyard Wind's

4      counsel just stated, they rely on *Winter v. NRDC* and so do we.

5      We think that *Winter v. NRDC* supports the government here

6      because that case, like here, the analysis turned on the

7      balance of the harms, given the significant national security

8      risks at issue.

9           And let me begin by stating that as this court is

02:45 10   balancing the interests, the significant national security

11     risks that the government has put forward to Your Honor for

12     ex-parte, in-camera review versus all the other interests from

13     Vineyard Wind and third parties before the court, this court

14     must first start with the premise as stated in *Winter* that

15     national security is paramount.

16          I'm just going to quote some Supreme Court

17     jurisprudence about this.  As the Supreme Court stated in *Haig*

18     *v. Agee*, it is obvious and unarguable that no governmental

19     interest is more compelling than the security of the nation.

02:46 20   The justices' opinions, for example in *Hamdi v. Rumsfeld*,

21     explain that national security is the primary responsibility

22     and purpose of the federal government.  Courts thus recognize

23     that protecting the national security is a government interest

24     of the highest order.

25          This case, like *Winter*, involves complex, subtle and

1    professional decisions by the Department of War.  This court

2    must give great deference to the professional judgment of

3    military authorities, as it's seen in the classified

4    information because, as a Supreme Court has emphasized, judges

5    do not begin their day with briefings that may describe

6    security risks to the nation and its people, unlike individuals

7    within the executive branch, including the declarant, the

8    Honorable Dale Marks.  Simply put, courts do not second-guess

9    expert agency judgments on potential risks to national

02:47 10   security.

11        Here, as explained in the suspension order issued by

12   BOEM, there was new national security information that was

13   brought to light that caused it to suspend activities while

14   BOEM analyzed that information as it related to extant

15   mitigation measures that were already in the project.

16        Your Honor, I want to emphasize one thing.  It is

17   undisputed that the Vineyard Wind project does pose a national

18   security risk.  The dispute is whether the mitigation measures

19   currently in place are enough to be able to mitigate those

02:47 20   national security risks.  But as the suspension order

21   emphasized in November 2025, the Department of War came forward

22   after a different assessment based on new information about a

23   rapid evolution of adversarial technology that presents new

24   risks to the homeland and its people.

25        Mr. Giacona further explains in his declaration that

1   suspension is necessary now because further mitigation

2   measures, if they exist, would be necessary to put in place

3   before the project reaches full operational status.  The

4   mitigation measures could also be more effectively put into the

5   project while it's under construction rather than trying to

6   unwind the knot.

7          This court has the classified information, including

8   the classified declaration of the Honorable Dale Marks it

9   should consider.  And as this court is reviewing that

02:48   10   information and balancing that information that details the

11   significant national security risks against the other interests

12   from Vineyard Wind and third parties before this court, I would

13   make a few observations for this court to consider.

14          First, the fact that BOEM is allowing Vineyard Wind to

15   continue at current level operations is significant.  Vineyard

16   Wind is 95 percent complete and is operating at about 75

17   percent capacity, and BOEM is allowing Vineyard Wind to

18   continue its operations for the time being.

19          Second, Vineyard Wind's alleged harm is all economic.

02:49   20          And third, Vineyard Wind has not satisfied its burden

21   to show that its economic harm is irreparable, and I'll explain

22   why.  Before I do so, I just want to pause for one moment and

23   emphasize, just as in *Winter*, this court could resolve the

24   motion and deny it based on the balance of harms.

25          *Winter* makes clear that even if plaintiff has suffered

1    irreparable harm, the balance of harms could still outweigh

2    that irreparable harm, and *Winter* itself didn't even reach the

3    merits of the plaintiff's claims in that case.  So this court

4    can deny the motion based on the significant national security

5    risk under this court's review.

6        Turning to irreparable harm, let me provide an answer

7    to Your Honor's questions to the Commonwealth.  I disagree that

8    this court can look at third-party harm as it relates to

9    irreparable harm.  I'm not familiar, I don't have the case that

02:49 10    counsel provided to the court.  I would suspect that the

11    third-party considerations relate to the public interest, which

12    the government doesn't contend that it's appropriately before

13    the court.

14        But let me just read to you what *Winter* says about the

15    standard here.  "A plaintiff seeking a preliminary injunction

16    must establish that he is likely to suffer irreparable harm in

17    the absence of preliminary relief."  It doesn't say "third

18    party's irreparable harm."  So the government disagrees with

19    the Commonwealth on that point.

02:50 20        THE COURT:  What about the point that I asked Vineyard

21    Wind about, if it is going to be devastating for the legal

22    structure, right, if Vineyard Wind was 44 turbines with 18 more

23    getting built under one LLC, it was an LLC per turbine, one

24    turbine.  What do I do with the fact that there might be

25    smaller legal entities owned by larger legal entities when

1    assessing whether or not it's irreparable harm?

2          MR. ADAMS:  Your Honor, I'll just go to the standard

3    for irreparable harm here, and this is something that I'm going

4    to emphasize in the irreparable harm argument that Vineyard

5    Wind makes.  Financial losses do not constitute irreparable

6    harm unless the potential economic loss is so great as to

7    threaten the existence of the movant's business.

8          So to answer your question, Your Honor, it's all about

9    existential threat.  So if there was this web of

02:51  10    interconnecting LLCs and the plaintiff in that particular

11    circumstance wasn't able to show that there was existential

12    threat to the business as a whole, then the plaintiff hasn't

13    satisfied its heavy burden to show that there was irreparable

14    harm.  I'm not familiar with Vineyard Wind's corporate

15    structure.  I don't think that's in the record right here.

16          THE COURT:  It's not.

17          MR. ADAMS:  But going to the actual standard, Vineyard

18    Wind makes five arguments in support of its contention that

19    it's suffering irreparable harm.  Only one of those arguments

02:51  20    relates to satisfying the standard of existential threat, and

21    that argument relates to lenders.

22          Vineyard Wind contends, and this is at its opening

23    brief at page 24, that it faces existential threat because its,

24    quote, "lenders will have the ability," end quote, to declare

25    an event of default, accelerate repayment of a loan and

1    foreclose on the project.

2         In support of that statement, Vineyard Wind puts

3    forward just three paragraphs from its declarations.  That's

4    paragraph four from Mr. Moeller's declaration, paragraph seven

5    from Mr. Hortiguela's declaration and paragraph 11 from his

6    same declaration.

7         Your Honor, paragraphs four and seven are conclusory

8    allegations with no factual support.  They simply assert that

9    Vineyard Wind will suffer irreparable harm because it faces

02:52 10    existential threat.  There's no factual basis to support those

11    conclusory allegations.  Paragraph 11 candidly does add a

12    little bit more substance, but it's still not sufficient to be

13    able to satisfy the standard that the plaintiff is likely to

14    suffer irreparable harm.

15         The Supreme Court has expressly rejected in *Winter*

16    that the mere possibility of suffering irreparable harm

17    satisfies the standard.  It must be likely that the event will

18    pass for the plaintiff to satisfy the burden.  And to do so

19    Mr. Hortiguela says at paragraph 11 that if the project is not

02:53 20    timely completed by March 31, 2026, the contractual maturity

21    date due under the credit agreement and with no vessel secured

22    to complete the project in the foreseeable future, then its

23    lenders will have the ability to declare an event of default,

24    accelerate repayment of the construction loan and foreclose on

25    the project.  Such an event would threaten Vineyard Wind's

1    ability to survive.

2            As the federal defendants pointed out in their

3    opposition brief, just because someone, a third party has the

4    ability to do something doesn't make it likely that it's going

5    to happen.  We also pointed to the fact that in July 2024

6    Vineyard Wind wasn't operating for, as I understand, about six

7    months.  And at that point the lenders made no contention that

8    they would default or foreclose on the loan.

9            Counsel for Vineyard Wind just made a factual

02:53 10    distinction saying that July 2024 was a year and a half away;

11    we're closer to the completion date, therefore this factual

12    scenario is much different.  Your Honor, I would submit that's

13    a factual distinction without a difference.

14            The whole thesis of the irreparable harm argument from

15    Vineyard Wind is that there are cascading effects that if

16    there's one blip at one moment in time to be able to complete

17    the construction, then those cascading effects will thwart the

18    whole project to be able to reach its maturity date to be able

19    to provide full power.  Under that thesis the argument would

02:54 20    run that back in July 2024 when there was a six-month

21    suspension, that would have way more effect on the ability to

22    meet the March 2026 date to come to full power than what we're

23    at right now, which is, I think the 34th day of a suspension

24    order.  So the fact that the lenders apparently didn't take any

25    action while Vineyard Wind was suspended for about six months

1    in 2024 militates against finding that it's credible now.

2          In the reply brief, Vineyard Wind adds one more

3    paragraph to support its argument that it has satisfied the

4    irreparable harm standard for existential harm to its business.

5    That is paragraph four of Mr. Moeller's supplemental

6    declaration.  Mr. Moeller informs the court that the lenders

7    submitted a letter to Vineyard Wind after the federal

8    government made its observation that the plaintiffs haven't

9    carried their burden to satisfy irreparable harm for the

02:55 10    standard and that the letter came Friday last week on the day

11    when the hearing was originally supposed to come.  Tellingly,

12    Your Honor, Vineyard Wind has not provided this court with that

13    letter which basically its irreparable harm hinges on; nor has

14    Vineyard Wind provided this court with the credit agreement.

15          But in any event, if we take Mr. Moeller's

16    supplemental declaration at face value, the letter as I

17    understand it raised questions about the financial viability of

18    the Vineyard Wind project in light of the suspension order,

19    which, Your Honor, lenders raise questions every single hour of

02:56 20    every single day about the financial viability of the things

21    they invest in.  That's what lenders do.  That does not make it

22    more likely that the lenders would suddenly declare a default

23    and foreclose on this project that's been ten years in the

24    making.

25          Second, the lenders make a reservation of rights to be

1    able to declare a default or foreclose on a project.  But

2    again, that doesn't move the needle from the mere possibility

3    of the injury happening to making it more likely that the

4    injury would happen.  Parties reserve rights every hour of

5    every day to be able to do something.  That doesn't mean that

6    they're likely to happen.

7         Your Honor, outside of that one argument in support of

8    existential threat, Vineyard Wind makes four additional

9    arguments to support its contention that it has irreparable

02:56 10   harm.  None of those arguments importantly relate to the

11   existential threat that Vineyard Wind claims.

12        I'll start with the power purchase agreement that we

13   heard just now.  Importantly, Vineyard Wind does not argue that

14   it faces an existential threat if it's not able to come to full

15   power by March 2026.  Instead, Vineyard Wind claims, quote, "It

16   could be exposed to the potential declaration of default," end

17   quote, if it doesn't generate enough power to satisfy the PPAs.

18   That's at the opening brief at page 23.

19        Again, Vineyard Wind relies on the declaration of

02:57 20   Mr. Hortiguela at paragraph 12, but as the federal defendants

21   pointed out in their papers, the fact that something could

22   happen does not mean it's likely to happen.  Again, this goes

23   back to what *Winter* expressly rejected as relates to

24   irreparable harm, that the mere possibility of something to

25   happen is insufficient to satisfy the standard and obtain the

1    extraordinary relief of an injunction.

2         Moreover, Your Honor, I would submit, aside from

3    Vineyard Wind failing to carry its burden, that it's unlikely

4    to happen.  We just heard a passionate argument from the

5    Commonwealth about how important this project is.  It's been

6    ten years in the making.  It supports hospitals and schools and

7    all these other projects.  Given the fact that the Commonwealth

8    so vigorously supports this project, it is unlikely that if

9    Vineyard Wind happens to miss full power at March 2026 that the

02:58 10    utilities would suddenly pull the rug out from Vineyard Wind

11    with whatever consequences might come of that.

12         The fact that Vineyard Wind is currently operating at

13    70 percent and is constructed at 95 percent makes that event

14    unlikely.  Moreover, Vineyard Wind submitted a declaration from

15    Ms. Mahoney who is the Commissioner on the Massachusetts

16    Department of Energy Resources.  Same argument, Your Honor.

17    The fact that you have these important state officials and the

18    Commonwealth of Massachusetts vigorously supporting this

19    project makes it highly unlikely that just because Vineyard

02:58 20    Wind is unable to reach full power in March 2026 that the

21    utilities would suddenly declare default rather than take a

22    more measured or sensible approach such as renegotiate the PPAs

23    or allow a little bit of a grace period to happen while the

24    suspension order plays out.

25         Your Honor, Vineyard Wind makes three more arguments

1   in support of its irreparable harm arguments.  The next two
2   I'll talk about I think collapse within the argument of the PPA
3   that I just described because it's all about being able to
4   reach full power by March 2026.

5        I'll be begin with the replacement blades.  Vineyard
6   Wind maintains it needs to be able to set up these replacement
7   blades right now, again to reach full power by March 2026.  But
8   for the reasons I just stated, that doesn't mean that it's
9   suffering irreparable harm if it's not able to replace the
02:59 10 replacement blades at this point in time.  It's also unclear
11  why, aside from being able to satisfy the PPA in reaching full
12  power in March 2026, that the inability to replace a part of a
13  construction project would suddenly cause a company irreparable
14  harm.

15       Construction companies all the time have to replace
16  projects because of defaulting projects or whatever.  That
17  doesn't mean the construction company is suffering irreparable
18  harm.  I think again, it just relates to being able to satisfy
19  a construction timeline that is tightly sequenced as Vineyard
03:00 20 Wind contends.

21       Nevertheless, the more important principle, Your
22  Honor, for the replacement blades is that the expert agency
23  here, BSEE, has already considered the issue, and this court
24  must defer to the technical and scientific expertise of an
25  expert agency.

1           Here is what Mr. Stevens had to say in his

2    declaration.  Mr. Stevens is part of BSEE, and the government

3    submitted his declaration in support of our opposition brief.

4    He says, "BSEE technical personnel determined that there should

5    be no structural issues associated with the tower and

6    nacelle-only configuration if they were installed correctly.

7    Further, BSEE technical personnel noted that the towers were

8    routinely left in this configuration by the project over the

9    last year and five months with no reported adverse impacts to

03:00 10   safety."  It's unclear why now is different than the year and a

11   half, about the year and a half that Vineyard Wind had left

12   these blades or the wind turbines in the same condition.

13          And then, Your Honor, I would just emphasize, as we

14   state in our papers, an agency is entitled to deference with

15   regard to factual questions involving scientific matters in its

16   own area of expertise.

17          The fourth argument that Vineyard Wind makes in

18   support of its claim of irreparable harm is the construction

19   delays.  Again, Your Honor, I think that just goes to the PPAs

03:01 20   that I addressed.

21          Finally, Vineyard Wind contends it's suffering

22   significant financial losses.  Vineyard Wind does not argue

23   that those financial losses that it catalogs, the 2.3 million

24   dollars a day, will inflict existential threat to the harm.

25   It's just arguing that it's losing a large amount, which Your

1    Honor, I would submit with a multi-billion-dollar valued

2    company that those amounts are single-digit percentages and

3    don't satisfy the irreparable harm standard for economic harms,

4    which, again, is that the business is facing an existential

5    threat in the absence of injunctive relief.

6           Turning to the merits, Your Honor, unless the court

7    has any questions on authority, I'm going to turn right to

8    arbitrary and capriciousness, which is what we heard from

9    counsel today.

03:02 10           Under the arbitrary and capriciousness standard, a

11    court asks not whether it agrees with the agency decision but

12    rather only whether the agency was reasonable and reasonably

13    explained.  That's well established in the administrative law,

14    and that comes right from the *Seven County* decision that the

15    Supreme Court issued last year.  Review under the APA's

16    arbitrary and capriciousness standard is highly deferential,

17    and especially so when it involves marked areas of technical or

18    scientific matters within the agency's area of expertise.

19           Your Honor, this court may not substitute its own

03:02 20    judgment for that of the agency and must uphold a decision,

21    even one that has less than ideal clarity in the record, if the

22    reasoning can be reasonably discerned from that record.  And

23    this goes to Your Honor's point earlier about how do I know

24    that BSSE or BOEM hasn't considered reliance interests.

25           Well, in the face of the order, given the

1    circumstances of classified information, it is reasonable and

2    reasonably explained.  BOEM explained there's new information,

3    the nature of the risk that the agency is taking action to

4    mitigate, to investigate the mitigation measures as it relates

5    to the new information from November 2025.  It gave project

6    specific information as it related to allowing Vineyard Wind to

7    continue operations at 75 percent capacity, and it also cited

8    its legal authority to be able to issue the suspension order,

9    which is 30 CFR Section 585.417(b).  The order on its face is

03:03 10   reasonable and reasonably explained.

11           There is no APA deficiency just because an

12   administrative record is brief.  There's no such thing as

13   unlawful conciseness.  In fact, I think the court and parties

14   appreciate when things are brief.  The court just has to take a

15   look at the suspension order and determine whether it is

16   reasonable and reasonably explained.  And moreover, Your Honor,

17   given the circumstances involving the classified information,

18   BOEM was hampered in its ability to explain even further, BOEM

19   sensibly didn't expose our national security vulnerabilities or

03:04 20   risks for the world to see.

21           In addition, Your Honor, this court may consider the

22   ex-parte review of the full administrative record including the

23   classified declaration of the Honorable Dale Marks to make its

24   arbitrary and capriciousness assessment.  If Your Honor doesn't

25   have any questions about due process, I will --

1          THE COURT:  No.

2          MR. ADAMS:  Your Honor, I'm just going to end on one

3     thing that we saw in Vineyard Wind's papers, which is

4     allegations of pretext.  As this court knows, and even Vineyard

5     Wind cited the correct standard, it is a foundational principle

6     of administrative law that judicial review of agency action is

7     limited to the grounds that the agency invoked when it took the

8     action.  That's *Department of Homeland Security v. Regents*.

9          And notwithstanding that foundational principle,

03:05 10     Vineyard Wind introduces extra record evidence about

11     policymakers' decisions or judgments on offshore wind projects.

12     Those decisions or those statements are not properly considered

13     for this court's review of the administrative record.

14          Nevertheless, Your Honor, in *Department of Commerce v.*

15     *New York*, the Supreme Court was clear that a court may not set

16     aside an agency's policymaking decision solely because it might

17     have been influenced by political considerations or prompted by

18     the administration's priorities.  The citation for that is 558

19     U.S. 752-781 from the decision in 2019.

03:05 20          All that is to say, Your Honor, is both things can be

21     true.  Our senior government officials may think that offshore

22     wind energy is inefficient and is not a good policy for this

23     nation to be invested in.  And the offshore wind projects,

24     specifically Vineyard Wind, create national security risks.

25     While Vineyard Wind selectively draws quotes from senior

1    government officials, it omits important information that

2    directly supports our senior government officials' thinking as

3    it relates to national security risks posed by offshore wind

4    projects.

5         Here is what Secretary Burgum had to say last month

6    that was omitted from Vineyard Wind's papers.  "The prime duty

7    of the United States government is to protect the American

8    people.  Today's actions addressing emerging national security

9    risks," referring to the December 22nd orders, "including the

03:06 10   rapid evolution of relevant adversary technologies and the

11   vulnerabilities created by large-scale offshore wind projects

12   with proximity near our East Coast population centers.  The

13   Trump administration will always, always prioritize the

14   security of the American people."

15        Your Honor, you have the classified information for

16   ex-parte, in-camera review, and the government submits that

17   that information, including all the arguments we made and the

18   fact that Vineyard Wind has not satisfied its heavy burden to

19   show irreparable harm warrants denial of the motion.

03:07 20        THE COURT:  Thank you, Mr. Adams.  I will take a

21   ten-minute recess and come back and rule from the bench.

22        COURTROOM CLERK:  All rise.

23        (Recess, 3:07 p.m. - 3:23 p.m.)

24        THE COURT:  Give me just a minute, please.

25        First I want to thank all of you for both a very

1    helpful oral argument and very thorough briefing in a very

2    short time period.  It makes my job a lot easier when you all

3    do an extraordinary job at yours.  So I want to start with

4    thanking you all for that.

5        I came into today knowing that an opinion from the

6    bench would be what would be best, given the urgency of the

7    parties' issues here, but I don't often do this, so I'm going

8    to attempt to articulate my opinion as clearly as possible.  At

9    the end of it I'll give you an opportunity to ask any follow-up

03:23 10    questions you might have.

11        So in this case, plaintiffs moved for a preliminary

12    injunction.  They're asking for a preliminary injunction.  I'm

13    granting the motion insofar as it is an order to stay the stop

14    work section under section 705 of the APA.  I am granting the

15    stay rather than an injunction because I believe that it is

16    sufficient and because it is a less drastic remedy.

17        I will explain my reasoning, but in advance, I will

18    say that I have reviewed the arguments and the evidence

19    submitted by both parties, including the declarations attached

03:24 20    to the parties' filings, as well as the classified information

21    the government provided to explain the reason for the stop work

22    order.

23        The Bureau of Ocean and Energy Management, BOEM,

24    issued a stop work order on December 22, 2025, directing

25    Vineyard Wind to, quote, "suspend all activities related to the

1   Vineyard Wind 1 project for the next 90 days for reasons of

2   national security."

3        The order excepted activities, quote, "necessary for

4   the current level of power generation," which Vineyard Wind

5   states is approximately 572 megawatts out of approximately 800

6   megawatts it would be able to produce if fully completed, about

7   70 percent, and those, quote, "necessary to respond to

8   emergency situations and/or to prevent impacts to health,

9   safety, and the environment."

03:25 10        While only producing 70 percent of its goal power, the

11  project is substantially nearly 95 percent complete.  The

12  remaining work is the installation of a relatively small number

13  of turbines, I believe it was 18, and the replacement of some

14  blades that had manufacturing defects.

15       It is undisputed that during the permitting process

16  Vineyard Wind worked extensively with a variety of federal

17  agencies, including the Department of Defense, NORAD, and other

18  branches of the military to ensure that the project would not

19  interfere with any military concerns and to address and

03:25 20  mitigate those concerns.  In issuing this order, BOEM relied on

21  a classified security assessment provided to the Bureau by the

22  Department of War or Defense in November of 2025.

23       The court is limited in its ability to describe the

24  classified information that was shared on an ex-parte,

25  in-camera basis.  However I have reviewed these documents

1    carefully, and their contents have informed my analysis of the

2    relevant factors.

3         And to clarify here, my decision here does not rely in

4    any way on any statements made by officials outside the

5    purported intention of the order itself, meaning there was some

6    discussion about what other people in the executive branch may

7    have said.  I have not considered those statements in any way.

8         A plaintiff seeking a preliminary injunction must

9    establish that he is likely to succeed on the merits, that he

03:26  10   is likely to suffer irreparable harm in the absence of

11   preliminary relief, and that the balance of equities tips in

12   his favor, and that an injunction is in the public interest.

13   The same factors govern when a court should grant a stay of

14   agency action under 705 of the APA.

15        Likelihood of success on the merits is the most

16   important factor.  On the first factor, the likelihood of

17   success on the merits, the court finds that the plaintiff has

18   demonstrated it is likely to succeed in showing that the order

19   was arbitrary and capricious under section 706(2) of the APA.

03:27  20   The arbitrary and capricious standard requires that an agency

21   action be reasonable and reasonably explained, as both parties

22   stated in their argument.

23        As the Supreme Court explained in *Ohio v. EPA*, 603

24   U.S. 279, 2024, a court may not substitute its own judgment for

25   that of the agency but must ensure, quote, "that the agency has

1    offered a satisfactory explanation for its action, including a

2    rational connection between the facts found and the choices

3    made."  Furthermore, when an agency's "new policy rests upon

4    factual findings that contradict those which underlie its prior

5    policy or when its prior policy has engendered serious reliance

6    interests," close quote, the failure to consider such factors

7    is arbitrary and capricious.  That's citing *FCC v. Fox*

8    *Television Stations, Inc.*, 556 U.S. 502, 2009.

9            Of note here, mitigation has been a part of the

03:28  10    project from the outset, and the failure to consider any

11    possible mitigation when such efforts have been successful in

12    the past is likely arbitrary and capricious.  The court finds

13    that the record, including the classified information provided

14    to the court, fails to adequately explain or justify the

15    decision to halt construction.

16            To even begin construction, Vineyard Wind engaged in a

17    multiyear, multiagency approval process under the Outer

18    Continental Shelf Lands Act, which included identifying

19    national security concerns and agreeing to various mitigation

03:29  20    efforts.  The agency has failed to explain how the purportedly

21    new classified information undermines BOEM's prior conclusions

22    or renders the mitigation measures inadequate.

23            While the government states that it has concerns that

24    Vineyard Winds will not be able to mitigate the national

25    security concerns or will ignore those concerns if Vineyard

1    Wind is allowed to continue construction, such speculative

2    concerns are belied by the undisputed evidence that Vineyard

3    Wind has complied with all of the litigation measures

4    requested.

5          Further, the record before the court indicates that

6    Vineyard Wind continues to try and work with the government to

7    address the government's concern.  In addition, as Judge Walker

8    of the Eastern District of Virginia noted in *Virginia Electric*

9    *& Power Company v. U.S. Department of the Interior*, at docket

03:30  10    2:25-CV-830, on January 16, 2026, quote, "the risks the

11    government is concerned about appear to attend to the operation

12    of the project, not its construction," close quote.  However,

13    the order at issue here, like the one in *Virginia Electric*,

14    bars construction of the remaining turbines but permits the

15    continued operation of the 44 already-constructed turbines.

16    This can hardly be characterized as a, quote, "rational

17    connection" between the facts found and the choice made."  The

18    government has made no attempt to explain this disconnect,

19    despite its being raised hardly two weeks ago in a directly

03:31  20    comparable case.

21          To be clear, if the government's concern is the

22    operation of these facilities allowing the ongoing operation of

23    the 44 turbines while prohibiting the repair of the existing

24    turbines and the completion of the 18 additional turbines is

25    irrational, the government has not attempted to explain why

1    national security interests would be triggered by a completion

2    of the remaining small number of turbines but not implicated by

3    the operation of the existing turbines.

4         Because the government has failed to provide a

5    reasoned explanation both for its change of position and for

6    why a complete stop in construction is required, the court

7    finds that the December 22 stop work order is likely arbitrary

8    and capricious under the Administrative Procedure Act.  Having

9    concluded that the stop work order was likely arbitrary and

03:32 10  capricious, the court will not engage at this time with

11   plaintiff's other arguments concerning whether the government's

12   order was unlawful on other grounds.

13        On the second factor, the court finds that Vineyard

14   Wind has demonstrated it faces irreparable harm should the

15   order continue to apply.  And to be clear here, under the

16   irreparable harm factor, I am only considering the irreparable

17   harm to Vineyard Wind in the analysis, not irreparable harm to

18   any third parties, including the State of Massachusetts, as the

19   Supreme Court instructed me to in *Winter*.

03:33 20        While economic loss alone does not generally

21   constitute irreparable harm, it can where, quote, "the

22   potential economic loss is so great as to threaten the

23   existence of the movant's business."  That is cited in *NACM,*

24   *New England v. The National Association of Credit Management*, a

25   First Circuit case at 927 F.3d 1 from 2019.

1          Here, Vineyard Wind has demonstrated that it has

2     already suffered losses of approximately $2 million a day,

3     which would total approximately $180 million in losses over the

4     90-day stop work order contemplated by the order.

5          Further, Vineyard Wind has demonstrated that if the

6     stop work order is not stayed, it will lose access to a

7     specialized ship necessary to complete the project and would

8     not be able to contract another specialized ship within the

9     foreseeable future.

03:34 10          Finally, Vineyard Wind has demonstrated that stopping

11    construction now risks defaulting on approximately $2 billion

12    in loans.  While the government has described the risk as

13    merely speculative, as the D.C. circuit put it in 2016, quote,

14    "Damocles's sword does not actually have to fall before the

15    court will issue an injunction," and that is citing *The League*

16    *of Women Voters v. Newby,* 838 F.3d 1, a D.C. Circuit decision

17    from 2016.

18          Regardless, Vineyard Wind has provided evidence that

19    its lenders have questioned Vineyard Wind's financial viability

03:34 20    in light of the stop order such that the court can and does

21    conclude that the risk of default is more than hypothetical.

22          In sum, the evidence shows that the potential economic

23    loss here cannot be remedied after the fact by award of damages

24    because there is sufficient risk to the very existence of

25    Vineyard Wind's business.

1          The final two factors, weighing the balance of

2     equities and determining whether a preliminary injunction would

3     be in the public interest, merge here because the government is

4     the party opposing the preliminary injunction.  Quote, "To

5     begin with, the plaintiffs' likelihood of success on the merits

6     lightens defendants' stated interests."  That is citing *Devitri*

7     *v. Cronen*, 289 F. Supp. 3d 287, a District of Massachusetts

8     case from 2018.  And the government's reliance on the

9     invocation of national security does not end the inquiry as the

03:36 10     government seems to suggest.  The Supreme Court made clear in

11     *Winter* that, quote, "military interests do not always trump

12     other considerations."

13          The court gives deference to the government's

14     determination of national security concerns.  However, as

15     stated earlier, even taking the government's assertions at face

16     value does not explain or justify its actions with respect to

17     this construction project.  It is worth noting that the

18     classified assessment was completed in November of 2025, and

19     yet the government did not issue a stop work order until

03:36 20     December 22, 2025, undermining any claim that this new

21     assessment presented an emergency in need of immediate

22     addressing.

23          Thus, the court finds based on the government's own

24     contentions that the issuance of relief will not substantially

25     impede the government's interests.  Accordingly, the

1    government's interest in the relief not issuing cannot outweigh

2    Vineyard Wind's, where Vineyard Wind is likely to suffer

3    irreparable harm absent preliminary relief.

4         Moreover, Vineyard Wind and the amici have provided

5    evidence that the public stands to benefit in other ways from

6    this project's completion, including as a result of economic

7    investment, jobs and the availability of new energy.

8         Moreover, to the extent that the government requires

9    further mitigation of any operations-related security concerns,

03:37 10    Vineyard Wind has adequately demonstrated that the government

11    can address its national security concerns through the normal

12    channels without an order that shuts down nearly the entire

13    project.  And I am quoting the *Virginia Electric & Power*

14    transcript there as well.

15         Ultimately, the balance of equities and the public

16    interest favors preserving what the status quo was before the

17    stop work order issued.  It is worth noting that I am not the

18    first to rule on a motion like this in a case involving a stop

19    work order on a wind energy project based on the same set of

03:38 20    classified materials.  Courts in three other cases, the

21    District of Columbia in the *Matter of Empire Leaseholder v.*

22    *Douglas Burgum*, and the matters of *Rhode Island v. Department*

23    *of Interior*, and *Revolution Wind v. Burgum,* and the Eastern

24    District of Virginia in the matter of *Virginia Electric v.*

25    *U.S. Department of the Interior*, have all granted the same or

1    substantially the same preliminary relief sought and granted in

2    the instant case.

3        Accordingly, all four factors weigh in Vineyard Wind's

4    favor.  The government's December 22, 2025 stop work order as

5    to the Vineyard Wind project is hereby stayed until further

6    order of the court.

7        The BSEE order that you had sought I am declining to

8    issue at this time.  I have not had evidence presented to me

9    that BSEE delays are likely in the situation where the stop

03:39 10  work order is stayed.  Should that arise, you are welcome to

11   return to the court, and we will address you in very short

12   order.  I hesitate to issue an injunction against BSEE without

13   some showing that BSEE would change its behavior in the absence

14   of the stop work order.

15       Finally, I order the parties to file a joint status

16   report by Friday of this week with a proposed schedule for the

17   remainder of the case.  I recognize this has great expediency

18   to all the parties and will accommodate you on a very rapid

19   schedule.  I would instruct you to meet with each other and

03:40 20  come up with a schedule that works if you can.  If you cannot

21   agree, submit duelling schedules and I'll decide.

22       Is there anything I could clarify from the

23   government's perspective?

24       MR. ADAMS:  No, Your Honor.

25       THE COURT:  Is there anything I could clarify from the

1    plaintiff's perspective?

2            MR. PIROZZOLO:  No, Your Honor.  Thank you.

3            THE COURT:  All right.  I thank you all for your work.

4    I appreciate the great diligence you clearly put into this.

5            (Adjourned, 3:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Professional

4   Reporter, Registered Merit Reporter and Certified Realtime

5   Reporter, in and for the United States District Court for the

6   District of Massachusetts, do hereby certify that the foregoing

7   transcript is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter to the best of my skill and ability.

10                   Dated this 28th day of January, 2026.

11

12                   /s/ Kelly Mortellite

13                   _____

14                   Kelly Mortellite, RPR, RMR, CRR

15                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```