```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - - x
SUNRISE WIND, LLC,                         CV No. 1:26-cv-00028-RCL
                         Plaintiff,
v.

DOUGLAS J. BURGUM, et al.,
                         Defendants.
- - - - - - - - - - - - - - - - - - - - -
STATE OF NEW YORK, et al.,                 CV No. 1:26-cv-00072-RCL
                         Plaintiffs,

v.                                         Washington, D.C.
                                           Monday, February 2, 2026
DOUGLAS J. BURGUM, et al.,                 11:00 a.m.
                         Defendants.
- - - - - - - - - - - - - - - - - - - - x
```

_____

                 TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
              HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
                    UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the Plaintiffs:   Janice M. Schneider, Esq.
                      Stacey L. VanBelleghem, Esq.
                      Devin M. O'Connor
                      Roman Martinez, Esq.
                      LATHAM & WATKINS LLP
                      555 11th Street, NW
                      Suite 1000
                      Washington, DC 20004
                      (202) 637-2200

                      Laura Mirman-Heslin, Esq.
                      ATTORNEY GENERAL'S OFFICE/NY
                      28 Liberty Street
                      New York, NY 10005
                      (212) 416-6091

For the Defendants:   John K. Adams, Esq.
                      DOJ-Enrd Environment and
                      Natural Resources Division
                      950 Pennsylvania Avenue, NW
                      Washington, DC 20530
                      (202) 353-5905

Court Reporter:       Timothy R. Miller, RPR, CRR, NJ-CCR
                      Official Court Reporter

**P R O C E E D I N G S**

THE DEPUTY CLERK:  Good morning, Your Honor.

These are Civil Cases Year 2026-028, Sunrise Wind, LLC v. Douglas J. Burgum, et al.; and Civil Case Year 2026-072, State of New York, et al. v. Douglas J. Burgum, et al.

Counsel for each case, please come forward and introduce yourselves for the record, beginning with the plaintiffs.

MS. SCHNEIDER:  Good morning, Your Honor.  Janice Schneider, Latham & Watkins, for Plaintiff Sunrise Wind.

THE COURT:  Okay.

MS. MIRMAN-HESLIN:  Good morning, Your Honor.  Laura Mirman-Heslin for the State of New York, the New York State Energy Research and Development Authority.

THE COURT:  Okay.

MR. ADAMS:  Good morning, Your Honor.  John Adams on behalf of federal defendants.

THE COURT:  Okay.  All right.  Let me start with Sunrise counsel first, then.

MS. SCHNEIDER:  Thank you, Your Honor.  May it please the Court.  My name is Janice Schneider representing Plaintiff Sunrise Wind.  With me at counsel table are my colleagues Stacy VanBelleghem, Devin O'Connor, and Roman Martinez.

Your Honor, we have coordinated time with Plaintiff State of New York in the consolidated case.  With the Court's permission, they'll follow my presentation.

Your Honor, today, our hearing is about a different offshore wind project than we've appeared before you previously.  The project today is called Sunrise Wind.  As you recall, only three weeks ago, Your Honor held a hearing in the related case, Revolution Wind.  The Court there granted preliminary injunctive relief against a virtually identical stop work order as the one Sunrise Wind challenges here today and based on the exact same classified information provided to Your Honor for in-camera review.

Since our hearing in Revolution Wind, three other judges have followed your lead in Revolution granting preliminary relief to three other offshore wind projects with virtually identical orders based on the same exact information.  Each has found significant flaws and inconsistencies in the BOEM stop work orders and in the nature and process under which they were issued supporting likelihood of success on the merits.  Each has found that the irreparable harm to the offshore wind project and the balance of harms outweighs the defendants' purported national security interests.  And I want to pause here on -- just to focus on that point for just a moment.  While we have still not seen classified information relied upon by

BOEM or have been provided unclassified summaries of the information or had any substantive engagement from the Government on these issues in well over a month since we have last appeared before you, the four courts that have seen the classified information -- yourself included -- have uniformly rejected the Government's arguments and found that the balance of harms tips decidedly in favor of each of the projects.  There is nothing in this case that would support a different outcome here.  As with Revolution, Your Honor should find that Sunrise Wind is likely to succeed on the merits of our claims that the Government's illegal actions violate the Administrative Procedure Act, the Outer Continental Shelf Lands Act, and violate Sunrise Wind's due process rights under the U.S. Constitution, number one; number two, that Sunrise Wind is suffering immediate and imminent enterprise-threatening irreparable harm and that the balance of the equities and public interest favors granting relief to Sunrise Wind.

The only possible difference between Revolution and Sunrise that the Government has raised here is irreparable harm.  And so after providing a little bit of background about the project, I will focus on Sunrise's irreparable harm and why we need an injunction now which is essentially for two reasons:  One, we need to be able to construct the project and we're about to lose -- we -- at

risk of losing a critical specialized vessel called the Connector, which I'll spend a little bit more time about, which is necessary to complete an essential scope of work; and, second, the compounding and enterprise-threatening costs of delay due to the idled workforce.  And then if the Court has questions, I'm happy to address likelihood of success on the merits and balance of harms, although, like I said, those issues, you know, are very, very similar to what we've already discussed in the Revolution case.  I can also talk about why we believe the Government vastly overreads Winter -- the Supreme Court's decision in Winter v. NRDC.

So background.  BOEM approved this particular project in March of 2024 and issued the COP approval letter in June of 2024.  In reliance on those approvals, the project began construction and, in particular, started offshore construction shortly thereafter in July of 2024. So construction's been ongoing for about a year-and-a-half now.  The project is now 45 percent built and to date the project has spent or otherwise committed over $7 billion on the project, and if it is canceled it will cost Sunrise another 1 billion in breakaway costs for a total potential loss of over $8 billion, Your Honor.

A lot of offshore work has already been completed. Forty-four percent of the 84 foundations for the wind turbines have been installed as well as the offshore

converter station, directional drilling for the landfall in New York State waters, and other significant work. For clarity, no wind turbine generators or blades have been installed to date. Onshore, we're about 90 percent complete. The substation is substantially complete. The onshore converter station from high-voltage DC to AC is substantially complete. Onshore cable installation, about 18 miles of duct bank work, also substantially complete; now all undergoing testing and punch-list activities.

When completed, Sunrise Wind will provide much-needed and low-cost reliable power for over 600,000 homes and businesses in New York State which is desperately needed, and the state will address that issue in more detail. This project is very similar to Revolution Wind in a number of ways, including that it has, quote, coordinated extensively with the Federal Government for over 10 years and not only with the defendants here, but also many other agencies in developing the project. This --

THE COURT: I want to drill down a little more on that than I did with Revolution Wind. Did Sunrise employees have security clearances then granted by the government when they were working with the government in getting this approval?

MS. SCHNEIDER: No, Your Honor.

THE COURT: They did not? Okay.

MS. SCHNEIDER:  They did not.

THE COURT:  In Revolution Wind, they did, because they had --

MS. SCHNEIDER:  They did not, Your Honor.

THE COURT:  -- employees who had Top Secret clearances.  Okay.

MS. SCHNEIDER:  Right.  So this is a U.S.-based -- both of them are U.S.-based corporations and, you know, moving through the regular, normal permitting process.

THE COURT:  Okay.

MS. SCHNEIDER:  Part of that process does include a coordination function with the Department of Defense clearinghouse.  So there was a four-and-a-half year process where Sunrise Wind -- just like Revolution Wind -- provided information to the Department of -- what they call -- now call the Department of War to coordinate among the military agencies to ensure that there are no national security risks associated with the project.  The military does have the right under the statute to say:  We're not going to allow this project to go forward.

THE COURT:  Right.

MS. SCHNEIDER:  But after all of the information was provided -- and we provided all of the information they requested -- they requested that we provide certain types of mitigation for the project.  We agreed to all of that

mitigation which also includes the ability to curtail the project, if necessary, within minutes of getting a request from DOD or the Coast Guard and, you know, we executed a mitigation agreement just like Revolution Wind.  So we are contractually bound by that existing mitigation agreement, and it was also -- that mitigation agreement was also required by BOEM as part of its conditions of approval.  So we worked through the process not in a classified way.  We provided the information requested.  The military took the information, coordinated internally, came back to us, and said:  Here's the mitigation that we think is necessary to ensure that there are no national security interests implicated here.  We said okay, we signed the agreement, and we thought we were good to go.

So now, this particular project, Sunrise, before the stop work order, was scheduled to deliver first power in October of this year.  So -- and then, you know, have its commercial operations date in 2027.  And so, again, just for clarity, the project is still solidly in its construction phase.  It will not be operational at the earliest, even without the stop work order, for eight or nine months.  So there is plenty of time for discussions -- whatever discussions the Government wants to have.  There's plenty of time for those discussions to occur in the normal course while construction continues.  And, you know, there's quite

a bit of work left to do: putting in the export cable; putting in the wind turbine generators; installing the monopiles; installing the inter-array cables; commissioning and integration, you know?  As we discussed previously, you know, this is a very tightly-sequenced schedule.  And if you miss certain work, it pushes everything back and you have the risk, as we do here, of losing vessels necessary to do the work.

Now, going back to the construction point, based on our experience working with military agencies around the world, we don't agree with the defendants that an operational project creates unaddressed or unmitigated or unmitigable national security concerns.  The Government here has conceded multiple times over that mere construction does not raise any national security concerns.  They said it in the Giacona declaration.  And, actually, if you run a red line between the Tyner declaration in Revolution and the Giacona declaration, you know, here, in this case, they are virtually identical but for some name changes.  So in Giacona at Paragraphs 10 and 12, they concede that construction is not a concern for them.  In the Revolution federal opposition which is Docket 60 in that case, they concede that construction is not an issue for them.  And in the Vineyard argument where Mr. Adams -- counsel here for the Government -- distinguished Vineyard from other projects

because other projects were not generating power.  So you know, while we think the defendants mischaracterize our irreparable harm argument, we think the Court should focus on two things: one, the loss of the vessel, the Connector; and, two, the compounding enterprise-threatening costs that will occur and result in, you know, financial, you know -- address -- affecting financial viability of the project unless an injunction is issued.

So the Connector, a little bit of information about that.  It has just arrived in Providence, Rhode Island, and it is here ready to pick up the export cable and to begin deploying it.  There is -- they're supposed to start this work this week.  They have to install over 80 miles of cable.  So it's a lot of cable.  It takes a lot of time to do the work properly.  And because of the technology at issue here, which is HVDC as opposed to AC in the Revolution case, they have to lay the cable -- two cables at the same time.  So it takes a long time to do this work.  It could take, as we've scheduled it, up to six months to do that work.  We only have the Connector by contract until July of this year.  So that's about six months.  That's why we need to get started now.  And if we can't finish the work, the Connector has -- just like in Revolution with the Scylla, the Connector has a contractual right to leave the site to work on another project.

And we've, you know -- we've looked to see if there are any other vessels available as a "just in case" and, you know, the Connector -- well, I should step back. The Connector is not available again until third quarter 2027.  That's way too late.  The alternative vessels are not available until the end of this year.  So also too late. And they can't just be switched out.  They have to be -- go through a review process, which is vessel-specific, by the Bureau of Safety and Environmental Enforcement, which is one of the defendants here, and that's about an eight-month process.  So eight months and eight months.  It just doesn't work.

Now, this is critically important work for the project.  It cannot -- I mean, the export cable is, like, the, you know -- it's the cord in the plug.  It -- we cannot deliver any power without the export cable connecting to the onshore grid.  And, you know, this is an issue that, when you read the Government's brief -- that they completely ignore; right?  They are trying to focus on some contractual agreement.  We'll talk about that in a second.  But in terms of irreparable harm, the focus from our perspective is losing the Connector before we can actually complete the work.  That alone is enough for this Court to find that Sunrise Wind is irreparably harmed in the absence of preliminary injunctive relief.  And other courts -- yourself

in Revolution, but also in Empire and in Vineyard -- those courts have also recognized that the loss of a critically needed specialized vessel to do certain work constitutes irreparable harm.  And so we think the same finding should be made here, Your Honor.

Now, separately, just to put costs into perspective, because this is the second reason why Sunrise is irreparably harmed, right now the project -- the shutdown caused by the stop work order is costing the project $2.5 million per day, which is a significant amount of money. This month, because there are -- was other work scheduled to start but which has been idled but which we still have to pay for, costs daily will increase by another $1.5 million, and in April if the stop work order is not enjoined, costs increase by another $1.3 million per day for a total of $4 million per day.  And if there's no injunction put in place by this summer -- mid-summer, which is when the Government, in its brief, suggests merits briefing could, you know, occur by then, it will have -- our costs will jump to almost $5 million per day and total approximately $600 million. That is enterprise threatening because the project cannot -- simply cannot sustain those costs.  We're not generating any revenue because, you know, we're not built to that effect. It's just, you know, a very, very significant and challenging situation for the project.  And, Your Honor,

there's no guarantee of recovery for these losses.  So you know, we believe that it's enterprise-threatening for those two issues and you can rule that Sunrise Wind has irreparable harm on those two issues alone.

Now, the defendants, in their brief, kind of, myopically focus on our OREC agreement.  And OREC, it's O-R-E-C, and it stands for Offshore Wind Renewable Energy Certificate Purchase and Sale Agreement and it's an agreement that we have with the state.  But they're completely wrong that that's the sole basis for irreparable harm.  And our main point about the OREC agreement is it's a contractual agreement.  The -- it contains provisions for event of a default and for termination, and the counterparty, as a matter of contract, could choose to elect to make those findings.  But the Court doesn't have to get into the OREC agreement.  The Court can find irreparable harm on the first two issues, the loss of the Connector and the enterprise-threatening costs to the project.  So that's, you know, just -- it's independent, Your Honor.

And as, you know, a number of other courts have found, citing the D.C. Circuit decision in League of Women Voters v. Newby, Damocles's sword does not have to actually fall before -- on the movant, excuse me, before the court will issue an injunction.  Sunrise Wind's sole function is to build the project.  And we can't, you know -- if we can't

use the Connector, it prevents timely completion of the project, cascading and compounding impacts and costs which significantly threaten project viability and, ultimately, if not enjoined, will force its cancellation.

The other point I want to make, Your Honor, just for additional context -- and this is new information since we filed our motion -- is that the defendants are now using the mere existence of the stop work order to object to a technical package of work for other scheduled installation activities for the inter-array cables.  Now, this work is supposed to occur in June of 2026.  They objected to the technical package.  There's no technical rationale for the objection.  The sole basis was the stop work order.  So again, just more context on how the order is being used in a way that is very detrimental to the project.

The defendants do try to distinguish Sunrise Wind based on its percent completion, you know?  They say:  Oh, you know, it's only 45 percent.  So you know, no harm, no foul.  We believe there's no merit to that argument whatsoever.  The complex stage construction process actually creates more risk to project viability, not less, given where it is in the construction program.  There are just more moving pieces, and if critical construction work, like the export cable, can't be completed on time, that has a significant domino effect which creates cascading delays for

all manner of packages of work.  So work -- just by way of example, work that is dependent on the export cable, you know, includes offshore jointing and termination at the converter station, the offshore converter station pull in, full cable test and handover, HVDC system energization and testing, and delivering ultimately power to the grid.  So there's a chain of events that has to happen and it all starts with the need to install the export cable.  So percent completion of the project does not dictate irreparable harm.  The project has an acute near-term risk of vessel availability and huge compounding costs that threaten project cancellation.  I just can't underscore it more, Your Honor.  The loss of the Connector, if we can't do the work, is a critical inflection point for the project.

On the merits -- on likelihood of success on the merits, we continue to have significant concerns about the true reason for the stop work orders.  The president's statements at Davos last month criticizing offshore wind and stating that the U.S. is taking down offshore wind projects simply underscores our concern that the order is pretextual.

But setting that aside, we have three other reasons the order violates the APA.  First, it is unreasonable; second -- well, and it lacks a reasonable explanation; second, it failed to consider Sunrise Wind's reliance interests and violates the change-in-position

doctrine; and, third, it's simply overbroad.  There is simply no reason to stop construction now on this project where the Government's purported national security concerns relate to operations.  And as the Vineyard court recently said, it is completely irrational to halt construction.  Any issues can, and should, be addressed in the normal process while construction continues.

Now, I will say, also, Your Honor, if you look at the Giacona declaration, the acting director, Mr. Giacona, is the person who made the decision.  If you look closely at his declaration, he has no military experience demonstrated in his declaration.  We believe his decision here should be given no deference whatsoever by the Court.

I will also share that the defendants continue to delay providing any substantive, meaningful information to us for the mitigation discussion they claim cures the due process violation.  They've had this classified information since November of 2025.  Not one mitigation proposal has been provided by them to us, underscoring the arbitrary nature of their actions which continue, in our view, to violate our due process rights.  Based on what little we can see in the highly redacted Department of War declaration, we do not see the Department of War asserting that a suspension of all activities is necessary to prevent a national security threat.  Sunrise has been in regular communication.

We continue to be in communication with various agencies. No one has raised a national security concern with us in the course of those other meetings.  So we think that the BOEM illegally issued the stop work order without any notice or compliance with the APA, due process, or the Outer Continental Shelf Lands Act, and we ask Your Honor to enjoin the stop work order for the same reasons it enjoined the Revolution stop work order.

Now, Your Honor, I want to ask you if you have any questions about our irreparable harm.

THE COURT:  Not right now.

MS. SCHNEIDER:  Does Your Honor have any questions about likelihood of success on the merits?

THE COURT:  (Indicates negatively.)

MS. SCHNEIDER:  Does Your Honor have any questions about due process?

THE COURT:  (Indicates negatively.)

MS. SCHNEIDER:  Let me talk a little bit, then, about balance of harms and the public interest, because that is also a little bit different from the Revolution case. There are some points that are the same, you know?  The defendants claim, you know, that national security overcomes, you know, any harms to the Sunrise project, but, Your Honor -- and I made this point in Revolution, as well -- defendants can only claim a national -- a public

interest if the national security justification is not arbitrary and is not a violation of due process and is not pretextual.  They have completely failed to do that here as they completely failed to do it there.  The public has an interest in the agency following the law and the project provides many, many benefits.

Additionally, defendants' actions, in our view, undermine the public's strong interest and reliability -- in reliability of federal agency processes.  Your Honor, any presumption of regularity is out the window here.  Failure to grant injunctive relief here -- preliminary injunctive relief here deprives the public of significant economic benefits from the project: the loss of 924 megawatts of clean power for 600,000 homes and businesses and associated environmental benefits, and also, harms public health.  So for example, Sunrise provides more than 3,500 direct and indirect jobs in construction, steel manufacturing, operations, and shipbuilding.  These are union jobs as well as non-union jobs, and they're providing over 800 million in wages and benefits for New York-based operations. Currently, these workers are idled.  And I would direct the Court to amicus North American Building Trades Union brief for more information on the jobs' impacts.

Sunrise also would pay over 100 million in royalties, rents, and operating fees which benefit the

public; an additional 800 million in economic benefits to New York under the OREC agreement; and an additional over 1 billion in other economic benefits.  We're talking billions of dollars of economic benefits for the State of New York. The project would produce clean energy, eliminating the equivalent emissions of taking over 500,000 cars off the roads, and NYSERDA has estimated that the project would have hundreds of millions of dollars in health impact benefits, including avoiding -- avoided hospitalizations and avoided premature deaths.  The project will also shore up grid reliability, which the state will talk a little bit more about, which is critically important.  Long Island is projected to be deficient without Sunrise coming online in 2027.  These are clear public benefits, Your Honor.  If the project is canceled, all of this will be lost.  In contrast, the Government is not harmed if the Court grants the preliminary injunctive relief requested in our motion. There's no public interest in perpetuating unlawful action and, more importantly, they have not articulated any national security concerns related to construction.

We agree with Judge Nichols in the Empire case that defendants all overread the Winter case.  The balance of harms there was significantly different.  The evidence before the court included many declarations by very senior naval officials that articulated to the court's satisfaction

the significant impacts to military readiness and operations in contrast to the plaintiff's interests were -- which were watching the whales and some study -- studying the whales. Here, the balance of harms is very different.  We have much, much greater significant harms, and in contrast the -- we believe, the Government's showing is incredibly insufficient.

THE COURT:  The showing by the Government here -- well, I don't think I can get into that, I guess, because you have not -- well, I don't think I can discuss that --

MS. SCHNEIDER:  Right.  Your Honor, we have not seen the classified information.

THE COURT:  You're not aware of any -- you haven't had any discussion with any Defense officials or --

MS. SCHNEIDER:  No, Your Honor.

THE COURT:  -- Department of War officials?

MR. SCHNEIDER:  No, Your Honor.

THE COURT:  So you don't know anything about what the concerns are of anyone in the Department of War and whether they even concur in this decision?

MS. SCHNEIDER:  That is correct, Your Honor.

THE COURT:  Okay.

MS. SCHNEIDER:  We have requested to have those discussions.  We have presented representatives -- experts with Top Secret SCI, you know -- national security

classification clearances.  We have not been provided an opportunity to have that discussion yet.

THE COURT:  You have such employees.  But they have not been allowed to have that information?

MS. SCHNEIDER:  They're not employees, Your Honor, just for clarity, but they are our representatives and they are hired by us --

THE COURT:  Okay.

MS. SCHNEIDER:  -- including a retired vice admiral.

THE COURT:  Okay.  Retired vice admiral.  Okay.

MS. SCHNEIDER:  Right.  So Your Honor --

THE COURT:  So he could be a consultant to you --

MS. SCHNEIDER:  Correct, Your Honor.

THE COURT:  -- to have access to the information.

MS. SCHNEIDER:  He is a consultant to us.

THE COURT:  Okay.

MS. SCHNEIDER:  And we also have experts in radar who are consultants to us who also have Top Secret SCI clearance.

THE COURT:  But ultimately, the Court can't order access to a private person for classified information.  Ultimately, the Court, of course, can look at it.

MS. SCHNEIDER:  Right.  Yes, Your Honor.

THE COURT:  All right.  I understand.

MS. SCHNEIDER:  Yeah.  So as we said, you know, we think the balance of harms here tips decidedly in favor of the project and, you know, as best we can tell from the Marks declaration from the Department of War -- the little that we can see -- we don't see a recommendation to suspend all activities, particularly construction activities.

So Your Honor, with that, I'll wrap it up and request, again, that the Court grant Sunrise Wind's motion for preliminary injunction and stay in its entirety.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you very much, Ms. Schneider.

I'll hear from the State of New York next.

MS. MIRMAN-HESLIN:  Good morning, Your Honor. Laura Mirman-Heslin for the State of New York.

THE COURT:  Speak in the mic a little better, would you?

MS. MIRMAN-HESLIN:  A little louder?  Yeah.

Good morning, Your Honor.  Laura Mirman-Heslin for the State of New York and the New York State Energy Research and Development Authority which I will collectively refer to as New York.

First, New York is likely to succeed on the merits of its claim that BOEM's suspension order is arbitrary and capricious for the reasons stated in the State's briefing

and by Sunrise Wind in its briefing and argument today. Rather than reiterate those points, New York would like to use this opportunity to discuss its distinct reliance interests which were not taken into account by BOEM in issuing the suspension order and are now jeopardized by that order.  As Sunrise Wind just explained, if the suspension order remains in place beyond February 6th, Sunrise Wind risks losing access to construction vessels which may not be available again until later this year or even 2027 and the resulting delays may make it economically infeasible for the project to continue.  The resulting delays -- oh, sorry.

New York is relying on the substantial benefits that the Sunrise Wind project is providing or will soon provide to the state.  These benefits fall into three categories: energy, economic, and environmental.  If the suspension order is not enjoined and the project is canceled, New York will be irreparably harmed by the loss of these benefits.

Regarding the energy benefits, the Sunrise Wind project is expected to begin delivering power to New York's electricity grid this year and be fully operational in 2027. The addition of 924 megawatts from the project to New York's grid cannot come soon enough.  Electricity demand is projected to grow in New York due to electrification of buildings and transportation.  The New York independent

system operator identified a need for additional electric generation on Long Island as early as summer 2026. The Sunrise Wind project will help maintain an adequate energy supply on Long Island by providing enough electricity to power 600,000 homes. The project will also diversify New York's energy system and thereby reduce the state's dependence on oil and natural gas in cold weather. Importantly, the project will enhance the reliability of the grid on Long Island which is facing a short-term reliability need beginning in summer 2027 due to the shutdown of two fossil fuel generators. The New York independent system operator found that once Sunrise Wind is delivering power, the reliability margins will improve. The suspension order jeopardizes these benefits and threatens irreparable harm to New York's energy interests by decreasing electric generating capacity, resource diversity, and reliability.

Sunrise Wind is also providing New York with significant economic benefits. The project is projected to pay hundreds of millions of dollars in taxes to New York state and local governments over its lifetime. NYSERDA's agreement with Sunrise Wind calls for 875 million in total economic benefits to accrue to New York by the end of the third year of the project's operations. Benefits include investments in electrical infrastructure, establishment of operational and logistical facilities, the purchase of

goods, services, and materials from New York businesses, workforce development initiatives, and expenditures toward fish and wildlife monitoring.  The Sunrise Wind project is also supporting 3,500 jobs in construction, steel manufacturing, shipbuilding, and operations, many of which are high-paying union jobs.  The suspension order threatens irreparable harm to New York by depriving it of the significant economic benefits of its contract with Sunrise Wind, decreasing tax revenue and eliminating jobs.

The Sunrise Wind project will also provide environmental benefits.  The offshore wind energy produced by the project will reduce greenhouse gas emissions in New York, helping to slow the advance of climate change which is already imposing significant impacts on the state.  The project will reduce the need for electric generation from fossil fuel combustion and thereby reduce emissions of toxic and hazardous air pollutants.  This, in turn, will improve air quality for New Yorkers.

The suspension order threatens irreparable harm not only to New York's environmental interests, but also to its sovereign interests by impeding its ability to implement the state's climate act which sets a target of developing nine gigawatts of offshore wind energy by 2035.  The project is the result of over a decade-and-a-half of work by New York's public and private sectors to develop the offshore

wind industry.  If the project fails because of the suspension order, the state will need to devote significant time, resources, and expense to address the loss of this offshore wind energy.  The negotiation, contracting, permitting, and construction of a project of this scale takes years to complete, and NYSERDA and other state agencies would need to invest substantial time and money to analyze the impact of the project's cancellation and to determine whether the wind energy from the project could be replaced.  Moreover, the cancellation of the project would reflect a highly uncertain federal regulatory environment and chill the investment in, and development of, offshore wind in New York, making any timely replacement of the project even more unlikely.

In conclusion, BOEM did not take New York's substantial reliance interests into account when issuing the suspension order and the state will suffer irreparable harm if that order is not enjoined.

Thank you.

THE COURT:  Thank you.

Okay.  Mr. Adams?

MR. ADAMS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ADAMS:  John Adams on behalf of federal defendants, and may it please the Court.

I'm aware that this Court resolved a case involving similar issues -- Revolution Wind -- just a few weeks ago.  So I'd like to emphasize at the outset that this case involves different facts, recent developments, and more bold claims by a wind project challenging the national security interests underlying the suspension order.  With that in mind, I'd like to begin with the balance of harms which, just like in Winter v. NRDC, gave the court sufficient grounds to deny the motion for injunctive relief, before turning to the other two factors, irreparable harm and likelihood of success on the merits, none of which Sunrise Wind can succeed on.

Turning to the balance of harms, I'd like to first start with the legal standards that this Court must first recognize, beginning with the fact that national security is paramount for the Federal Government.  As the Supreme Court stated in Haig v. Agee, it is obvious and unarguable that no governmental interest is more compelling than the security of the nation.  The justices' opinions, for example, in Hamdi v. Rumsfeld explained, quote, "national security is the primary responsibility and purpose of the Federal Government," end quote.  And contrary to Ms. Schneider's assertion that the Federal Government would not be harmed if it is enjoined from protecting national security, national security is the highest order for the Federal Government, as

the D.C. Circuit recognized in the Busic decision cited in our papers.  This case, as Your Honor knows based on your review of the classified information, like Winter itself, involves complex, subtle, and professional decisions from members of the military and the Department of War.  This Court must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest because, as the Supreme Court emphasized in Winter itself, judges do not begin their day with briefings that may describe new and serious threats to our nation and its people, including the briefing that happened on November 2025 just a few months ago.  Simply put, courts do not second-guess expert agency judgments on potential risks to national security.  Here, as explained in the suspension order, BOEM suspended the project to address the national security risk that would be amplified once the project becomes fully operational just next year.  Sunrise Wind, unlike other wind projects, improperly downplays these national security risks, going so far as to, quote, "doubt the magnitude of any national security threat," end quote, and that's found in the reply brief at Footnote 9.  Sunrise is wrong.

First, it is undisputed that Sunrise Wind poses a national security risk to our nation as even Sunrise recognizes in its opening brief at Page 8 where it explains

that it entered into a mitigation agreement for, quote, "to address the national security risks," end quote.  Those national security risks are explained in Section 4 of the construction and operation plan that's appended to the Giacona declaration, Exhibit-A.  The dispute here is whether mitigation measures currently in place in the mitigation agreement are sufficient to address the new national security information identified in November 2025 that is before Your Honor.  And I'd just like to explain the mitigation agreement for just a moment to explain why it's the case that the government is taking a look at the mitigation agreement as it relates to the information.  The mitigation agreement generally contains three provisions to mitigate the known -- the then known national security risks at the time when it was entered in January 2025.  One is an $80,000 payment from a multi-billion-dollar company explained in Section 3 of the mitigation agreement to study and perhaps --

THE COURT:  Where is that mitigation agreement?

MR. ADAMS:  The mitigation agreement is Exhibit-B to the Giacona declaration.

THE COURT:  It's what?

MR. ADAMS:  Exhibit-B to the Giacona declaration --

THE COURT:  All right.

MR. ADAMS:  -- at Docket 30- -- I think it's 31-1.

THE COURT:  Okay.

MR. ADAMS:  So Section 3 explains that one-time voluntary contribution of $80,000.

THE COURT:  Right.

MR. ADAMS:  The -- Sections 4 -- excuse me, Sections 5 and 6 explain some notification requirements that Sunrise Wind has to give -- notify the government in the event of certain instances.  And then, finally, there are curtailment procedures explained at Section 4 of the mitigation agreement.  Right now, the parties are going through a meet-and-confer process -- and it's only been a little over 30 days -- to assess the new national security information before Your Honor from November 2025 and to hold that information up to the existing mitigation agreement to determine whether the mitigation agreement actually mitigates those new risks.

Process is the second point I'd like to raise, why I think Sunrise Wind errs in making light of the national security risks.  Sunrise Wind argues many times in its papers, and even this morning before Your Honor, that it needs the classified documents, and it suggests in its papers that without access to the classified documents, that there's somehow insufficient risk or even pretext to the Department of War's information.  For example, at opening

brief Page 21, Sunrise Wind argues that the Government's failure to provide access to the classified documents, quote, "underscores the lack of immediacy or existence of a true threat level," end quote.  That's nonsense, Your Honor. As you know, there are significant national security risks identified in the November 2025 information.

Moreover, while Sunrise Wind repeatedly raises its inability to access the classified documents, including from Ms. Schneider this morning, what it fails to articulate is that it has ever accessed classified information or documents before as it relates to this project: not in 2013 when it executed a lease with the government, not in the 2020s leading up to the 2024 construction and operation plan, and not in 2025 when it entered into a mitigation agreement.  From my preliminary conversations with the Department of War, as I understand it, the War Department has never shared classified documents or information with Sunrise Wind.  If that is correct -- and, again, that's my preliminary understanding and Sunrise Wind does not argue otherwise -- if that is correct, it is a material omission for Sunrise Wind not to inform this Court that it has never accessed classified documents before while leading up to the 2025 mitigation agreement while, at the same time, arguing that its inability to access the classified documents now somehow suggests that there's a less threat level based on

the national security information from November 2025.

And, Your Honor, I'd highlight that it's understandable why our government is reluctant to share classified documents with Sunrise Wind which is owned by Orsted which Sunrise Wind boasts about in its papers is a foreign company with close and cooperative relationships with foreign militaries and foreign national security agencies. Sunrise Wind says that in its reply brief at Page 23, Footnote 3, and in Mr. LeBlanc's declaration at Paragraphs 8 through 10. So it is understandable why our government is taking its time as it assesses the classified documents and the information as it relates to the mitigation agreement.

Ironically, too, Your Honor, while Sunrise Wind complains about the process -- the meet-and-confer process that's, I think, about 36 days old, ironically, Sunrise Wind refuses to share information about mitigation measures that its implemented in other wind projects around the world because of nondisclosure agreements with, quote, "other worldwide military and national security governmental agencies," end quote. That's at the reply brief at Footnote 13 and in Mr. Stockton's supplemental declaration at Paragraph 12. Thus, Sunrise Wind cannot credibly claim about its inability to access classified documents now and suggest that the Government's hiding something or that the

threat level is decreased because it's unable to access those documents while, at the same time, withholding information from the government, despite the Department of Interior's good-faith efforts to engage in a meet-and-confer process to address the mitigation measures as it relates to the national security information.

The third reason Sunrise Wind improperly belittles the national security risks is its heavy reliance on pretext. It heavily relies on pretext in its papers and we heard arguments about pretext this morning. Sunrise Wind, for example, quotes government officials saying that wind power is unreliable, unaffordable, inefficient, and harmful for natural resources. I want to make one distinction right now which is that Sunrise Wind is quoting officials from the Department of Interior and elsewhere but does not challenge the Department of War or the Department of War's information as pretextual. What I understand the pretextual arguments to be is that the Department of War took that bona fide information and is using it as a pretext for some other policy goal related to wind energy. But, as Your Honor noted in Revolution Wind, citing Department of Homeland Security v. Regents of California, 591 U.S. 1 at 20, it is a foundational principle of administrative law that the judicial review of agency action is limited to the grounds that the agency invoked when it took the action. Your

Honor, none of those pretextual statements -- the alleged pretextual statements are in the administrative record that governs this motion.

But in any event, Your Honor, the Supreme Court has also recognized in Department of Commerce v. New York, 588 U.S. 752 at 781, that a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by other administrations' priorities.  That is because all these things can be true.  Wind farms can be inefficient. Wind farms can increase consumer prices.  Wind farms can cause damage to our natural resources.  And wind farms can pose national security risks.  There's nothing inconsistent about any of those statements.

Moreover, Your Honor, Sunrise Wind selectively quotes statements from our senior government officials as it relates to offshore wind.  Let me read you a quote that Secretary Burgum made on December 22nd, 2025, the date when the suspension order at issue was released.  He said at the time, quote, "The prime duty of the United States Government is to protect the American people.  The suspension order addresses emerging national security risks, including the rapid evolution of the relevant adversary technologies and the vulnerabilities created by large-scale offshore wind projects with proximity near our East Coast population

centers.  The Trump administration will always prioritize the security of the American people," end quote.  And that is consistent with the Federal Government's highest order to protect the American people and our homeland.  Your Honor, all this is to say --

THE COURT:  That part is, but he kept going --

MR. ADAMS:  He did, Your Honor, but, again, these aren't inconsistent statements.  All these things can be true.  And, Your Honor, all this is to say, is that Sunrise Wind is wrong to downplay the national security risks at issue here as this Court considers the balance of the harms.  It is undisputed that Sunrise Wind poses a national security risk.  Sunrise Wind has never had -- as I understand it, has never had access to the classified documents --

THE COURT:  I don't quite understand the risk.  They're not operating.  So what is the risk of their working now when they're not operating?

MR. ADAMS:  Your Honor, Ms. Schneider, I think, misrepresented the Federal Government's position as it relates to construction and operations.  We haven't conceded anything.  And I would point the Court to Paragraph 10 of Mr. Giacona's declaration where he says, quote, "based on the classified material with Secret designation, mitigation measures will need to be in place before the project becomes operational," end quote, and that's the rationale, among

other things, about issuing a suspension order right now.

Returning to the balance of the harms, Your Honor, for those reasons, Sunrise Wind downplays the national security risk that this Court must weigh when balancing the harms.  And, in addition, this Court has the classified information, including the classified declaration by the Honorable Dale Marks, for its review.  The Government understands that this Court has taken a look at that information and has preliminarily come to a judgment in Revolution Wind and, therefore, to bolster the record, the Government wants to offer the Honorable Dale Marks, the declarant for the classified information, for closed witness testimony to answer any of Your Honor's questions or to explain anything in the classified information that this Court may have questions about or may misunderstand, given the national security speak within the classified materials, as Your Honor knows.

This Court must balance that information, including the offer to present the Honorable Dale Marks for closed witness testimony, against the alleged harm that Sunrise Wind and New York asserts.  In its balancing, this Court should consider a few things.  First, this Court can resolve the merits as early as this summer as the Government believes -- and I think the plaintiffs would be on board with -- obviating the need for Sunrise Wind to obtain the

sweeping preliminary injunctive relief that it's seeking.

And there are important differences, Your Honor, between this case and Revolution Winds.  This case, the construction is less than half complete, whereas in Revolution Wind it was 87 percent complete.  First power in Revolution Wind was just last month, January 2026, whereas first power for Sunrise Wind is October 2026.  Those are material differences that would justify this Court denying the motion here, even while it granted the motion in Revolution Wind.

The second thing this Court should consider in its balancing of the harms is that Sunrise Wind primarily relies on economic harms.  It has an argument about reputational harm that I'll address that is conclusory and this Court shouldn't consider, but nevertheless it's primarily about economic harms.

And then third, Your Honor, Sunrise Wind's or New York's economic harms are not irreparable.

I'd just like to pause, Your Honor, right here before going to irreparable harm and remind the Court that in Winter v. NRDC, the court resolved the motion and denied preliminary injunctive relief based on the balance of the harms, and this Court will have a renewed opportunity to learn more about the classified information contained for Your Honor's ex parte, in-camera review with the closed

witness testimony of the Honorable Dale Marks.

Plaintiffs are not requesting a preliminary injunction before -- or the latest date they say is February 6th.  This Court doesn't need to resolve this motion now.  This Court can take the Government up on its offer and learn more about the significant national security risks posed by the offshore wind project at issue here.  And moreover, just like in Winter v. NRDC, Your Honor, the court even stated even if the plaintiffs have shown irreparable harm, that does not satisfy or that does not overcome the balance of the harms as it relates to the national security risks at issue in that case, and the Government contends the same is true here and the Supreme Court didn't even reach the merits of the case in Winter v. NRDC.

But nevertheless, Your Honor, the plaintiffs have failed to show irreparable harm in this case.  As this Court knows, a plaintiff seeking a preliminary injunction must establish that he is likely to suffer irreparable harm in the absence of injunctive relief.  The Supreme Court, in other precedent, made clear that the mere possibility of irreparable harm is insufficient.  Moreover, as the D.C. Circuit explained in League of Women Voters v. Newby, the harm must be so imminent that there is a clear and present need for equitable relief to prevent irreparable harm.

Plaintiffs make a few sets of irreparable harm

arguments.  I may begin with Sunrise Wind before turning to New York.

For Sunrise Wind, there are three sets of irreparable harm that it contends warrants the extraordinary injunctive relief that it seeks.  One is reputational harm; two is construction delays, as we heard Ms. Schneider earlier; and then, three, is an existential threat based on economic harm.

Beginning with reputational harm, it's almost an argument in passing, but Sunrise argues that putting a contract in jeopardy inflicts loss of, quote, "goodwill." That's found at opening -- Sunrise Wind's opening brief at Page 41.  In support of that statement, Sunrise cites the declaration of Mr. Chaytors at Paragraph 46.  The problem with Sunrise for this particular argument is that Mr. Chaytors doesn't even say that Sunrise Wind will suffer irreparable harm based on reputational harm or goodwill. Sunrise Wind, when the Government pointed this out in its opposition brief, seems to have abandoned that argument in its reply with just one sentence about why it satisfies reputational harm.  Your Honor, I'd submit that Sunrise Wind has not satisfied its extraordinary burden to show reputational harm.

Moving on to the other two forms of irreparable harm that Sunrise Wind contends.  There are two categories,

according to Sunrise Wind, of the suspension order that is causing imminent irreparable harm that threatens the viability of the project. And I'm going to break it out as they break it out in their headers in their opening brief. One, Sunrise Wind faces substantial irreparable harm from construction delays due to the order. Beginning with construction delays, it's noticeable, Your Honor, that Sunrise Wind doesn't actually argue that it faces an existential threat based on the construction delays as it does in the very next section of its opening brief for irreparable harm. The syllogism that Sunrise Wind puts forward is based on three contingencies relating to ultimately potential financial viability of the project. It says if Sunrise Wind does not resume construction now, there is, quote, "a high risk," end quote, it will not complete installation of the mid- and far-shore portion of its offshore export cables before the Connector departs in July. That's the first contingency.

Your Honor, the quote about high risk, I think, stems from the timeline that the Connector is on station at this point. Right now, the suspension order is set to expire on March 22nd, 2026. Sunrise Wind says that the Connector can finish its project within four to six months and it has to depart no later than July 25th, 2026. And that's found in the opening brief at Page 38. If that's

right, if the suspension order ends as it's supposed to on March 22nd and the Department of Interior doesn't extend it, the Connector can start after the suspension order expires and still satisfy its obligation to be able to complete the project of the export cables before it has to depart four months later.  That's why Sunrise Wind says there's a high risk, but it doesn't say it's likely that it won't complete the project.

The next contingency as it relates to construction delays says that -- Sunrise Wind says that if this happens, that if the Connector cannot finish the -- finishing the export cables, the project's commercial operations date next year could be delayed.  Sunrise Wind doesn't explain to the Court when it's supposed to go commercially operational. It's sometime in 2027, but it says that it could be delayed. And then the final contingency is such a delay in turn could delay revenue generation and compromise the project's financial viability.  Your Honor, for construction delays, that's contingency upon contingency upon contingency, and that falls squarely within the Supreme Court's Winter v. NRDC decision that prohibits the fact that there -- the mere possibility of something happening satisfies the likelihood of irreparable harm.

The next argument that Sunrise Wind makes relates to existential threat, and this is the standard that Sunrise

Wind needs to satisfy to show irreparable harm.  Under existential threat, there are two subarguments that Sunrise raises: one relates to economic harms and one relates to the risk of default.

Beginning with economic harms, as this Court knows, pure economic harms does not, in and of itself, constitute irreparable harm.  The economic harm must be so great as to threaten the very existence of the plaintiff's business here.  In its opening brief, Sunrise Wind argues that the suspension order is costing the project in estimated losses of at least $1.25 million per day.  And if I heard Ms. Schneider correctly earlier, that number may be around 2, 2-and-a-half million now.  And then the opening brief goes on to speculate that a 90-day delay could cost Sunrise Wind over $100 million in lost revenue during the first year after the full operations.  I think that's in 2028.  The Government pointed out in its opposition brief that those things are insufficient to show an existential harm to Sunrise Wind.  So Sunrise Wind comes back in its reply brief and adds $600 million more to its claimed economic harms.  It gets there by presuming that the suspension order will just last, in effect, throughout the whole time that this case is litigated, but there's no basis to conclude that.  And based on that assumption, which Sunrise Wind has not established any evidence or argument to

show that it is likely that the Department of Interior's going to issue the suspension order past its March 22nd date, it contends that the $600 million more that it claims it will suffer will cause -- it says the magnitude of those costs is enterprising [sic] threatening.  At the very least, the obstacles created by the suspension order make it more difficult for Sunrise Wind to accomplish its primary mission of construction of the project.  And that's at the reply brief, Page 20.  Your Honor, I'd submit that Sunrise Wind has not satisfied its heavy burden to show that the claimed economic harms satisfy the standard to show existential harm to the overall business.

And then, finally, Sunrise Wind argues that the risk of default will show the existential harm.  And this is what it really emphasizes in its opening brief and it seems to have walked away a little bit in its reply brief and its argument this morning.  Sunrise argues that the risk of default under the OREC agreement will cause it existential harm.  It says, in Mr. Chaytors's declaration at Paragraph 45, that if the counterparty takes the position that Sunrise Wind is out of compliance with its requirements because of the suspension order, those non-compliances could turn into events of default with an immediate unilateral right to the counterparty to terminate the agreement, end quote.

There are a few problems with this argument, Your

Honor.  The first is that Sunrise Wind doesn't even provide the OREC agreement for this Court to review what it even means to have an event of default.  So there's a burden problem there.  But more simply, Your Honor, the counterparty to the OREC agreement is also a party in this consolidated proceeding.  That's the development authority in Ms. -- that Ms. Sonnenfeldt represents here.  It's unlikely that the development authority in the State of New York that sued the Federal Government to prevent this happening would, all of a sudden, turn around and terminate the OREC agreement just because there's a suspension order in place.  And in any event, Your Honor, you can simply ask the development authority right now whether it will terminate the OREC agreement if the suspension order remains in place.  Anything short of an answer that says that it's likely to terminate the agreement if the suspension order remains in place means that Sunrise Wind has not satisfied its burden -- its heavy burden -- to show irreparable harm.

Moving on to New York's claims, irreparable harm.  New York argues that the order threatens it in three ways -- threatens it with irreparable harm in three ways.  First, the viability of the project threatens economic harms, its economic interests, and its environmental issues -- interests.  The problem with New York's arguments is that, one, third-party irreparable harm is not recognized in the

law; and, second, none of its arguments are imminent.

First, as this -- as the D- -- this court recognized in Alcresta v. Azar, 318 F. Supp. 3d 321, injuries to a third party are insufficient basis to find irreparable harm.  Thus, any alleged irreparable harm to the project provides no basis for New York to claim irreparable harm here.

Second, New York's climate and economic goals are years away.  For example, it contends that it's aiming for a zero-emission electric system by 2035.  Injunctive relief cannot be granted against something feared as liable to occur so far in the future.  And more broadly, Your Honor, the Federal Government has not targeted a state policy or any state statutes here.  Instead, the suspension order addresses a private party.

Finally, New York's alleged environmental harms are not imminent.  And this is just one project and it will not solve New York's claim to address harms related to climate change.

Moving on to the merits, Your Honor, New York and Sunrise Wind put forward three arguments that they contend make it that they are likely to succeed on the merits of their claim.  One relates to authority, one relates to arbitrary and capriciousness, and the -- finally, relates to due process.

Beginning with authority, I'd like to first highlight the fact that New York does not challenge the Federal Government's authority to issue the suspension order, conceding that the Federal Government has the ability and the authority to issue the suspension order, and that's right.  30 C.F.R. 585.417(b) gives the agency clear authority to issue the suspension order.  That regulation states, quote, "BOEM may order a suspension when the suspension is necessary for reasons of national security or defense."  The regulation itself cites for the authority of its ability to issue a suspension order Section 1337 of OCSLA.  43 U.S.C. Section 1337(p)(4) goes on to state, quote, "the Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for the protection of national security interests of the United States," end quote.

That resolves the authority question, Your Honor, but Sunrise Wind goes on to contend that national security interests, as construed in Section 1337 and Section 585.417(b), are hampered or confined by another provision within OCSLA, and that's Section 1341(c).  Section 1341(c) is a lease term that Sunrise Wind and other wind projects must insert into their lease that allows the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or a national emergency declared by the Congress or

the President of the United States, to suspend operations under the lease.  Sunrise Wind takes that provision and says this provision constrains Section 1337(p)(4) because there's no way that national security interests could be more broad in a different provision within the statute.  The problem with -- for Sunrise Wind's argument is that Congress knew how to write "emergency" or "a declaration of war" within the statute and declined to do so within Section 1337(p)(4), and the Department of Interior declined to do so within its own regulatory authority, and that makes sense, Your Honor. The plain meaning of national security interests and common sense dictate that national security does not start or stop with a declaration of war or a declaration of emergency. This Court has to look no further than 9/11 when our country experienced a significant national security risk, yet there was no declaration of war or declaration of emergency at the time.  It defies the plain meaning of the statute and common sense to suggest that national security interests only relate to those that are happening during a declared state of war or declared state of emergency.

On "arbitrary and capriciousness," Your Honor, beginning with the standard, as the Supreme Court said just last term in Seven County, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.  As

this Court knows, review under the Administrative Procedure Act's "arbitrary and capriciousness" standard is highly deferential.  The Court must uphold a decision of less-than-ideal clarity if the agency's path may be, quote, "reasonably discerned," end quote.  And that's the Bowman Transportation decision cited in our papers, 419 U.S. 281 at 286.

Here, on the face of the suspension order, BOEM explained that there was new information from November 2025 that changed its assessment.  It explained the nature of the risk, the fact that -- new classified information concerning the rapid evolution of adversary technologies, and the fact that it is heightened by the project's sensitive location to the East Coast.  BOEM cited the legal authority that it has to issue the suspension order, 30 C.F.R. 485 -- or 585.417(b) which I explained gives the agency the authority to issue the suspension order.  And the suspension order also explained that mitigation measures that -- currently in place from the mitigation agreement are not sufficient to address the new national security information.

There is no APA deficiency in this reasonable, albeit concise, explanation.  Of course the agency was constrained with its ability to explain more information, given the role of the classified materials at issue here and before this Court.  Moreover, Your Honor, you may consider

your ex parte review of the full administrative record to confirm that the agency has not run afoul of the requirement to give reasons for its decision.  And as Your Honor knows, the classified information cannot be shared outside of the ex parte review for those who do not have the requisite access or need to know.

On a change-in-position doctrine, Your Honor, New York and Sunrise both contend that the agency did not consider reliance interests and so forth and that we conceded the argument.  There has been no concession about reliance interests.  There's been no change to the construction and operation plan or lease.  The suspension order is an interim order to allow the agency to review the mitigation measures based on new classified information as it relates to the national security risks at issue, and that process is playing out right now.

The last merits argument, Your Honor, the -- are process arguments.  There are two process arguments that the plaintiffs make.  One is under the APA and one is under the Fifth Amendment of the Constitution.

Under the APA, 5 U.S.C. Section 558(c) allows an agency to suspend a license without a proceeding when it is in the public interest.  As the Government explained in its papers, it is plainly within the public interest of the United States Government to ensure the national security

defense of our nation and our people.

Moving on to constitutional due process, property interests protected by the Fifth Amendment are created and their dimensions are defined by existing rules and understandings that stem from an independent source.  That independent source here is the lease from 2013.  Section 1 of the lease expressly contemplates the authority that BOEM exercised to issue the suspension order.  The private interest here must thus be considered alongside the fact that Sunrise Wind has always known since 2013 that it is subject to a suspension order based on national security.  Given this knowledge and considering that due process is flexible and calls for such procedural protections as a particular situation demands, post-deprivation processes may be sufficient where there is some valid government interest at stake.  That government interest is the national security risks posed by the project.  This Court should not pre-judge the post-deprivation meet-and-confer process that is ongoing right now, particularly given the Department of Interior's recent good-faith efforts to obtain mitigation information from Sunrise Wind as it assesses the mitigation agreement and future mitigation measures that Sunrise Wind may be able to take as it relates to the national security risks.

With that, Your Honor, unless this Court has any questions for the Government, the Government contends that

the Court should deny the motion and, at a minimum, it should not rule on the motion until it has the opportunity to have a closed witness hearing with the Honorable Dale Marks.

THE COURT:  What would be the availability of Marks if I were to accept your offer?

MR. ADAMS:  Your Honor, I don't know.  I told the Honorable Marks this morning -- I told his counsel that Sunrise Wind is asking for relief no later than February 6th.  So we have a -- I think, a whole -- I think that's Friday.  So I think we have a whole week to arrange this hearing, but I understand Sunrise and plaintiff's position about irreparable harm and their date of February 6th and I conveyed that to the Honorable Marks.

THE COURT:  Well, they're talking about a million-and-a-half a day, though, or up above that now.

MR. ADAMS:  I'm sorry?

THE COURT:  They're talking about -- a million-and-a-half a day or up above that now is what they're talking about.

MR. ADAMS:  I understand, Your Honor, but that -- again, that amount doesn't go to existential threat which is the standard for irreparable harm.

THE COURT:  All right.

MS. SCHNEIDER:  A couple of quick points for Your

Honor to take into consideration.

First, Winter. Winter very clearly states that military interests do not always trump other considerations, and we have not held that they do. That's a Supreme Court quote at 55 U.S. 26.

I also want to take issue with counsel's statement that the meet-and-confer process is ongoing. We have certainly made ourselves available for such a meet-and-confer process, but we have been provided no information to actually -- in a meaningful way, to actually participate in any sort of process. And so this argument that the post-deprivation meet-and-confer process is something the Court should be comfortable with is really not based in fact at all, you know? As we discussed, Your Honor, we have requested the opportunity to understand what capabilities the government is trying to secure. We have not demanded that we have access to the classified information, as counsel wrongly states. We have suggested that they provide us with unclassified summaries of the information. We have also requested that we just have a basic understanding of what it is that they are trying to achieve so that we can participate in a meaningful dialogue. To date, we have been completely stonewalled on every single one of our requests. The government is not providing any meaningful post-deprivation process here, and the suggestion

that they are is simply not correct.

The other point I will make, Your Honor, goes to this question of whether the government is actually going to extend the stop work order or not.  Counsel suggests that perhaps they won't.  There is no basis on the record to make that statement.  And, in fact, we think, given the lack of any sort of meaningful dialogue about the meaning -- the meet-and-confer process, it is more than likely that the government will continue to extend the meet-and- -- the stop work order unless a preliminary injunction is issued by this Court ASAP, you know?  Basically, they're saying, Your Honor:  Trust us.  We'll do the right thing here.  They have done -- they have, to date, not done the right thing here, and we would submit that the Court not give credence to the assertions made in a post hoc way by counsel.

With respect to the merits, you know, as we've stated in our briefs, we don't think that BOEM has the requisite authority here.  That is, you know, a tricky legal question that we don't think the Court needs to get into, but we do feel that the Court has to give merit to every provision in the Outer Continental Shelf Lands Act.  That includes 1341(c) which is the more specific authorization.  We don't think that 1337(p) provides free-floating, duplicative, overriding authority for BOEM to do whatever it feels like doing.

And then, finally, Your Honor, with respect to the "arbitrary-and-capricious" claims, the Court, as we said earlier, doesn't need to get into the authority question because it's quite clear that the issuance of the stop work order was arbitrary and capricious.  And let me just run through that in particular, Your Honor.  First, it's not reasonable because it suspends all activities.  It's overbroad.  This is an argument that they themselves do not address in their opposition and, therefore, in our view, concede that point.  It's too -- the order is too conclusory.  It's one page long.  It's very generalized.  It fails to acknowledge our 2025 mitigation agreement.  It doesn't point to any design or technical specification of Sunrise Wind that raises any national security concerns.  And it really doesn't explain the factual basis for the need for such a sweeping order.

We also feel that given the very slow movement on the part of the government, that their asserted need for a sweeping order with -- because of immediate and irreparable harm on their part is just not accurate.  They've had the information for three months now, Your Honor, and we've, you know, not been able to engage them in any sort of meaningful dialogue.  As we discussed in the Revolution case, we have extensive experience.  We, you know -- mitigation -- to the extent there is a national security issue, mitigation is not

a one-size-fits-all.  We are open to having a dialogue with the government.  To date, the government has refused to provide any sort of meaningful dialogue with us.

With that, Your Honor, we ask that you enter a motion -- that you grant our motion for preliminary injunctive relief.

Thank you.

THE COURT:  I'd like to ask the State if they want to take up the defendant on his question of whether you want to make some further statement or response to his offer.

MS. MIRMAN-HESLIN:  Yes.  Yes, Your Honor.

First, regarding that question, Article 13 of the OREC purchase and sale agreement governs events of default and Article 14 governs termination of the agreement. Sunrise Wind is correct that the OREC agreement allows NYSERDA to terminate if an event of default, as defined by the agreement, occurs.  Whether an event of default giving rise to the right to terminate has occurred is a highly fact-dependent question that NYSERDA would need to review on the specific facts at issue before making a determination.

Next, Your Honor, agency defendants did not dispute that New York's grid reliability will be harmed if the Sunrise Wind project is canceled.  As I mentioned in my earlier comments, Long Island is facing grid reliability issues as soon as 2027.

Next, while economic injuries are generally reparable with monetary damages in the ordinary course of litigation, here monetary damages are not available to repair the state's loss of substantial investments and tax revenue claimed particularly in the Administrative Procedure Act nature of this suit.

Third, nor do the agency defendants' characterization of the state's reliance interests as non-regulated third parties excuse agency defendants from having to identify and weigh such interests.  For example, when it ruled that the Federal Government's recision of Deferred Action for Childhood Arrivals program was arbitrary and capricious, the Supreme Court held that the Federal Government violated the change-in-position doctrine through its failure to consider not only the reliance interests of program recipients, but also of third parties, including state and local governments.  That's Department of Homeland Security v. Regents of the University of California, 591 U.S. 1 at 31, 32.

And, finally, the impact of the reduction of hazardous air pollutants that would occur from the power that the state would receive -- the clean power that the state would receive from the Sunrise Wind project would occur immediately, particularly in cold weather, such as we have now, where the state is very reliant on fossil fuel

combustion.

And that's all I have to add, Your Honor.

THE COURT:  All right.  Thank you.

MS. MIRMAN-HESLIN:  Thank you.

THE COURT:  I'm going to take a few minutes and I'll come back in a few minutes and have a discussion with you.

THE DEPUTY CLERK:  All rise.

(Brief recess taken.)

THE DEPUTY CLERK:  Your Honor, we're now back on the record.

THE COURT:  Having reviewed the Marks in-camera submission, I don't find it would be worth the delay in having him explain anything further, which is what your offer was.  So I won't delay the proceedings further to have him appear in camera ex parte and before the Court, having re-read his affidavit just now and the in-camera submission.

So before the Court are the motions for a preliminary injunction and stay pending review from both Sunrise, LLC and the New York State plaintiffs.  Both motions contemplate the same December 22nd, 2025 stop work order issued to Sunrise Wind, LLC.  In deciding these motions, I'm relying on the same reasoning I offered when I recently enjoined a near identical stop work order in Case No. 25-cv-2999, Revolution Wind v. Burgum, as well as the

reasoning offered by Judge Nichols on this court, Judge Walker in the Eastern District of Virginia, and Judge Murphy in the District of Massachusetts, all of whom issued stays of similar stop work orders directed to other major wind projects over the last few weeks.  My reasoning in this case is as follows:

The Bureau of Ocean and Energy Management, BOEM, issued a stop work order to Sunrise Wind, LLC, on December 22nd, 2025, to suspend all ongoing activities related to the Sunrise Wind project on the outer continental shelf for the next 90 days for reasons of national security. During this time, BOEM claimed that it would coordinate with Sunrise Wind to determine whether the national security threats posed by the project could be mitigated and reserved the right to extend the suspension at the end of the 90-day period.  In arguing that the project posed a national security threat, BOEM relied on a new -- relied on new classified information provided to the Bureau by the Department of War in November 2025.  BOEM made it publicly known that this report included information relating to the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects.  As in other wind project cases, the classified information was shared with the Court for ex parte, in-camera review but was not provided to the

plaintiffs and their lawyers.  I have reviewed the classified information and have heard oral arguments from all parties and am now considering the pending motions.

Issuance of a stay under the Administrative Procedure Act is governed by the same four-factor test that governs preliminary injunctions: one, whether the party seeking the stay is likely to succeed on the merits; two, the likelihood that the moving party will be irreparably harmed absent a stay; three, the prospect that others will be harmed if the Court grants the stay; and, four, the public interest in granting the stay, citing Hill Dermaceuticals, Inc. v. FDA, 524 F. Supp. 2d 5 and 8, D.D.C. 2007.  Here, all four factors weigh in favor of granting the motions.

First, plaintiffs are likely to succeed on the merits.  As the basis for the stop work order, the Bureau cited national security concerns based on classified information uncovered as part of a new assessment completed by the Department of War in November 2025.  These were the same concerns cited in a number of near identical stop work orders issued on the same day to multiple wind projects up and down the East Coast.  The Bureau did not explain anywhere in the December 22nd stop work order which features, specifications, or activities related to the Sunrise Wind project implicated new national security

concerns.  Nor did the Bureau explain how these national security concerns differed from the same ones that the developers of Sunrise Wind specifically committed to mitigating in their 2025 DOD agreement, or the ones which the project was extensively screened for as part of its multi-year, multi-agency approval process under the Outer Continental Shelf Lands Act.  The Bureau's failure to account for its previous assurances that the project does not improperly interfere with national security clearly amounts to a change in position by the government.

As the Supreme Court has stated, an agency position [sic] is arbitrary or capricious where it is not reasonable or reasonably explained.  FCC v. Prometheus Radio Project, 592 U.S. 414 at 423, 2021.  Pointing to ongoing national security concerns based on purportedly new classified information does not constitute a sufficient explanation for the Bureau's decision to entirely stop work on the Sunrise Wind project.  Although the Department of Interior did subsequently issue a press release with additional justification for all of the stop work orders, that action did not solve the issue.  Under DHS v. Regents of the University of California, I am limited to considering the specific grounds that the Bureau invoked at the time it acted.  591 U.S. 1 at 20, 2022.  That's because it is a foundational principle of administrative law that judicial

review of agency action is limited to the grounds that the agency invoked when it took the action.  Again, citing DHS v. Regents.

At the time the Bureau issued the stop work order, it merely cited national security concerns without further explanation and without applying newly-discovered national security concerns to the Sunrise Wind project specifically. The Bureau also admits it is not sure that its new concerns can be mitigated at all, does not explain why construction could not continue while it investigates that question further.  Sunrise Wind has agreed at every stage of the approval process to work with the government to mitigate national security concerns.  I see no reason why the project will not continue to do so even while time-sensitive construction continues.

Because the Bureau has failed to provide sufficient reasoning for its change in position, and because the Bureau has failed to explain why it could not take action short of a complete stop to construction, the December 22nd stop work order likely amounts to arbitrary and capricious action under the Administrative Procedure Act.  Because I find that BOEM's order was likely arbitrary and capricious, I decline to reach plaintiffs' other merits arguments.

Second, I am persuaded that plaintiffs will be

irreparably harmed absent a stay. As it stands, the Sunrise Wind project is 45 percent, I think, complete. Many hundreds of workers have stopped work. At every step, Sunrise Wind has relied on approval from Interior and BOEM decisions; meaning, there are strong reliance interests at stake. Sunrise Wind represents the delays resulting from the stop work order are costing the project more than $1.25 million per day, but more importantly if Sunrise Wind cannot meet certain deadlines the entire enterprise could collapse, costing Sunrise Wind $7 billion in development funds and another $1 billion in breakaway costs. Of note, a specialized vessel necessary to complete installation of the project's offshore export cable will no longer be available after July of this year, which means that if the stop work order is not stayed soon, cascading delays could cause the project to miss its projected first power in October 2026 and for full commercial operations in 2027. Depending on the length of delay, this would threaten the project's financial viability and could force its cancellation, posing an existential threat to Sunrise Wind. As the D.C. Circuit ruled in League of Women Voters v. the U.N. -- of the U.S. v. Newby, "Damocles's sword does not have to actually fall on the movant before the court will issue an injunction." 838 F.3d 1 at 9, D.C. Circuit 2016. Every court to review this question has now found that the loss of specialized

vehicles -- vessels and resulting delays amounts to irreparable harm.  I agree.

The final two factors -- weighing the balance of equities and determining whether a preliminary injunction would be in the public interest -- merge here because the government is the party opposing the preliminary injunction. The government argues that their national security concerns outweigh Sunrise Wind's economic harms because Winter requires courts to give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest, citing their opposition at 26 and 27 quoting Winter v. National Resource Defense Council at 555 U.S. 7 at 24, a 2008 case.  However, all of the courts that have considered this question in the context of the stop work orders have rejected the government's argument, finding that the economic harm facing major wind projects outweighs the harm to the government's stated national security interests after in-camera, ex parte review.  The government has now acknowledged that its national security concerns are the same across all the wind projects it's attempted to pause.  Balancing the same harms here, I find that Sunrise Wind faces greater harms by a total pause of construction than the government faces from continued mitigation efforts while the construction continues.  The balance of the equities, therefore, favors

Sunrise Wind.

For these reasons, both Sunrise Wind, LLC, and the New York State plaintiffs' motions are granted.  The stays and -- of -- and injunctions run only to the December 22nd, 2022 [sic] stop work order.  I'll issue plaintiffs' proposed orders and say for the reasons stated on the record in open court.

With that, then, the court will be in recess.

Thank you, Counsel, for your arguments.

THE DEPUTY CLERK:  All rise.

(Proceedings concluded at 1:10 p.m.)

* * * * * * * * * * * *

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability, dated this 3rd day of February 2026.**

**/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**
**United States Courthouse**
**Room 6722**
**333 Constitution Avenue, NW**
**Washington, DC 20001**